# EXHIBIT D

# EXHIBIT D

LEXSEE

ROGER J. BALLA, Appellee, v. GAMBRO, INC., et al., Appellants

No. 70942

Supreme Court of Illinois

145 Ill. 2d 492; 584 N.E.2d 104; 1991 Ill. LEXIS 125; 164 Ill. Dec. 892; 16 A.L.R.5th 1000; 7 I.E.R. Cas. (BNA) 1

December 19, 1991, Filed

PRIOR HISTORY: [***1] Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Dean L. Sodaro, Judge, presiding.

DISPOSITION: *Appellate court reversed; circuit court affirmed.*

COUNSEL: Pedersen & Houpt, P.C., of Chicago (Arthur B. Sternberg, of counsel), for appellants.

Alan O. Amos & Associates, P.C., of Chicago (Alan O. Amos and Marilyn Martin, of counsel), for appellee.

Robert P. Cummins, Jerry Kokolis and Donald K.S. Petersen, of Bickel & Brewer, of Chicago, for *amicus curiae* American Corporate Counsel Association.

Maurice E. Bone and Dennis A. Rendleman, of Springfield, for *amicus curiae* Illinois State Bar Association.

JUDGES: Justice Clark delivered the opinion of the court. Justice Freeman, dissenting.

OPINION BY: CLARK

OPINION

[*494] [**105] JUSTICE CLARK delivered the opinion of the court:

The issue in this case is whether in-house counsel should be allowed the remedy of an action for retaliatory discharge.

Appellee, Roger Balla, formerly in-house counsel for Gambro, Inc. (Gambro), filed a retaliatory discharge action against Gambro, its affiliate Gambro Dialysatoren, KG (Gambro Germany), its parent company Gambro Lundia, AB (Gambro Sweden), [***2] and the president of Gambro in the circuit court of Cook County (Gambro, Gambro Germany and Gambro Sweden collectively referred to as appellants). Appellee alleged that he was fired in contravention of Illinois public policy and sought damages for the discharge. The trial court dismissed the action on appellants' motion for summary judgment. The appellate court reversed. (203 Ill. App. 3d 57, 148 Ill. Dec. 446, 560 N.E.2d 1043.) We granted appellant's petition for leave to appeal (134 Ill. 2d R. 315) and allowed *amicus curiae* briefs from the American Corporate Counsel Association and Illinois State Bar Association.

Gambro is a distributor of kidney dialysis equipment manufactured by Gambro Germany. Among the products distributed by Gambro are dialyzers which filter excess fluid and toxic substances from the blood of patients with no or impaired kidney function. The manufacture [*495] and sale of dialyzers is regulated by the United States Food and Drug Administration (FDA); the Federal Food, Drug, and Cosmetic Act (Federal Act) (21 U.S.C. § 331 *et seq.* (1988)); FDA regulations (21 C.F.R. §§ 820.150 through 820.198 (1987)); and the Illinois [***3] Food, Drug and Cosmetic Act (Ill. Rev. Stat. 1985, ch. 56 1/2, par. 501 *et seq.*).

Appellee, Roger J. Balla, is and was at all times throughout this controversy an attorney licensed to practice law in the State of Illinois. On March 17, 1980, appellee executed an employment agreement with Gambro which contained the terms of appellee's

Page 1

145 Ill. 2d 492, \*495; 584 N.E.2d 104, \*\*105;
1991 Ill. LEXIS 125, \*\*\*3; 164 Ill. Dec. 892

employment. Generally, the employment agreement provided that appellee would "be responsible for all legal matters within the company and for personnel within the company's sales office." Appellee held the title of director of administration at Gambro. As director of administration, appellee's specific responsibilities included, *inter alia*: advising, counseling and representing management on legal matters; establishing and administering personnel policies; coordinating and overseeing corporate activities to assure compliance with applicable laws and regulations, and preventing or minimizing legal or administrative proceedings; and coordinating the activities [\*\*106] of the manager of regulatory affairs. Regarding this last responsibility, under Gambro's corporate hierarchy, appellee supervised the manager of regulatory affairs, [\*\*\*4] and the manager reported directly to appellee.

In August 1983, the manager of regulatory affairs for Gambro left the company and appellee assumed the manager's specific duties. Although appellee's original employment agreement was not modified to reflect his new position, his annual compensation was increased and Gambro's corporate organizational chart referred to appellee's positions as "Dir. of Admin./Personnel; General Counsel; Mgr. of Regulatory Affairs." The job description [\*496] for the position described the manager as an individual "responsible for ensuring awareness of and compliance with federal, state and local laws and regulations affecting the company's operations and products." Requirements for the position were a bachelor of science degree and three to five years in the medical device field plus two years experience in the area of government regulations. The individual in the position prior to appellee was not an attorney.

In July 1985 Gambro Germany informed Gambro in a letter that certain dialyzers it had manufactured, the clearances of which varied from the package insert, were about to be shipped to Gambro. Referring to these dialyzers, Gambro Germany advised [\*\*\*5] Gambro:

> "For acute patients risk is that the acute uremic situation will not be improved in spite of the treatment, giving continuous high levels of potassium, phosphate and urea/creatine. The chronic patient may note the effect as a slow progression of the uremic situation and depending on the interval between medical check-ups the medical risk may not be overlooked."

Appellee told the president of Gambro to reject the shipment because the dialyzers did not comply with FDA regulations. The president notified Gambro Germany of its decision to reject the shipment on July 12, 1985.

However, one week later the president informed Gambro Germany that Gambro would accept the dialyzers and "sell [them] to a unit that is not currently our customer but who buys only on price." Appellee contends that he was not informed by the president of the decision to accept the dialyzers but became aware of it through other Gambro employees. Appellee maintains that he spoke with the president in August regarding the company's decision to accept the dialyzers and told the president that he would do whatever necessary to stop the sale of the dialyzers.

[\*497] On September 4, 1985, appellee [\*\*\*6] was discharged from Gambro's employment by its president. The following day, appellee reported the shipment of the dialyzers to the FDA. The FDA seized the shipment and determined the product to be "adulterated within the meaning of section 501(h) of the [Federal Act]."

On March 19, 1986, appellee filed a four-count complaint in tort for retaliatory discharge seeking $ 22 million in damages. Counts III and IV for emotional distress were dismissed from the action, as was the president in an order entered by the trial court on November 5, 1986.

On July 28, 1987, Gambro filed a motion for summary judgment. Gambro argued that appellee, as an attorney, was precluded from filing a retaliatory discharge action in light of the appellate court opinion in *Herbster v. North American Co. for Life & Health Insurance* (1986), 150 Ill. App. 3d 21, 103 Ill. Dec. 322, 501 N.E.2d 343. Gambro Germany and Gambro Sweden joined in Gambro's motion. Appellee argued that while the *Herbster* opinion declined to extend the tort of retaliatory discharge to the plaintiff/attorney before the court, the opinion did not foreclose the possibility of extending the tort in the future. Appellee argued that the plaintiff [\*\*\*7] in *Herbster* was in-house counsel for a corporation whose duties were restricted to legal matters (*Herbster*, 150 Ill. App. 3d at 26); whereas he served as the director of administration and personnel and manager of regulatory affairs as well as general counsel for

Page 2

Gambro. Appellee argued that a question of fact existed as to whether he was discharged [**107] for the performance of a purely legal function.

On November 30, 1988, the trial court granted appellants' motion for summary judgment. In its opinion, the trial court specifically stated that "the very ground [appellee is] claiming as the basis for retaliatory discharge all [sic] involves the decisions which he made applying [*498] law to fact to determine whether these things complied with the federal regulations, and that is clearly legal work." Thus, the trial court concluded that the duties appellee was performing which led to his discharge were "conduct clearly within the attorney-client relationship" and that Gambro had the "absolute right" to discharge its attorney. On appeal, the court below held that an attorney is not barred as a matter of law from bringing an action [***8] for retaliatory discharge. (203 Ill. App. 3d 57, 148 Ill. Dec. 446, 560 N.E.2d 1043.) Rather, determination of whether an attorney has standing to bring the action was based on the following three-part test:

> "(1) whether [the attorney's] discharge resulted from information he learned as a 'layman' in a nonlegal position; (2) whether [the attorney] learned the information as a result of the attorney/client relationship, if so, whether the information was privileged, and if it was privileged, whether the privilege was waived; and (3) whether there were any countervailing public policies favoring disclosure of privileged information learned from the attorney/client relationship." (203 Ill. App. 3d at 63.)

The court remanded for a determination of these questions of fact.

We agree with the trial court that appellee does not have a cause of action against Gambro for retaliatory discharge under the facts of the case at bar. Generally, this court adheres to the proposition that "'an employer may discharge an employee-at-will for any reason or for no reason [at all].'" (Fellhauer v. City of Geneva (1991), 142 Ill. 2d 495, 505, 154 Ill. Dec. 649, 568 N.E.2d 870, quoting [***9] Barr v. Kelso-Burnett Co. (1985), 106 Ill. 2d 520, 525, 88 Ill. Dec. 628, 478 N.E.2d 1354.) However, in Kelsay v. Motorola, Inc. (1978), 74 Ill. 2d 172, 23 Ill. Dec. 559, 384 N.E.2d 353, this court first recognized the limited and narrow tort of retaliatory discharge. In Kelsay, an at-will employee was fired for filing a worker's compensation claim against her employer. After examining the history and purpose behind the [*499] Workers' Compensation Act to determine the public policy behind its enactment, this court held that the employee should have a cause of action for retaliatory discharge. This court stressed that if employers could fire employees for filing workers' compensation claims, the public policy behind the enactment of the Workers' Compensation Act would be frustrated.

Subsequently, in Palmateer v. International Harvester Co. (1981), 85 Ill. 2d 124, 52 Ill. Dec. 13, 421 N.E.2d 876, this court again examined the tort of retaliatory discharge. In Palmateer, an employee was discharged for informing the police of suspected criminal activities of a co-employee, and because he agreed to provide assistance in any investigation and trial of the matter. Based on the public [***10] policy favoring the investigation and prosecution of crime, this court held that the employee had a cause of action for retaliatory discharge. Further, we stated:

> "All that is required [to bring a cause of action for retaliatory discharge] is that the employer discharge the employee in retaliation for the employee's activities, and that the discharge be in contravention of a clearly mandated public policy." Palmateer, 85 Ill. 2d at 134.

In this case it appears that Gambro discharged appellee, an employee of Gambro, in retaliation for his activities, and this discharge was in contravention of a clearly mandated public policy. Appellee allegedly told the president of Gambro that he would do whatever was necessary to stop the sale of the "misbranded and/or adulterated" dialyzers. In appellee's eyes, the use of these dialyzers could cause death or serious bodily harm to patients. As we have stated before, "[t]here is no public policy [**108] more important or more fundamental than the one favoring the effective protection of the lives and property of citizens." (See Palmateer, 85 Ill. 2d at 132; Wheeler v. Caterpillar Tractor Co. (1985), 108 Ill.

2d 502, 511, 92 Ill. Dec. 561, 485 N.E.2d 372; [***11] Ill. Const. 1970, Preamble.) However, in this [*500] case, appellee was not just an employee of Gambro, but also general counsel for Gambro.

As noted earlier, in *Herbster v. North American Co. for Life & Health Insurance* (1986), 150 Ill. App. 3d 21, 103 Ill. Dec. 322, 501 N.E.2d 343, our appellate court held that the plaintiff, an employee and chief legal counsel for the defendant company, did not have a claim for retaliatory discharge against the company due to the presence of the attorney-client relationship. (See *Herbster*, 150 Ill. App. 3d 30, 103 Ill. Dec. 477, 501 N.E.2d 794.) Under the facts of that case, the defendant company allegedly requested the plaintiff to destroy or remove discovery information which had been requested in lawsuits pending against the company. The plaintiff refused arguing that such conduct would constitute fraud and violate several provisions of the Illinois Code of Professional Responsibility. Subsequently, the defendant company discharged the plaintiff.

The appellate court refused to extend the tort of retaliatory discharge to the plaintiff in *Herbster* primarily because of the special relationship between an attorney and client. The court stated: [***12]

> "The mutual trust, exchanges of confidence, reliance on judgment, and personal nature of the attorney-client relationship demonstrate the unique position attorneys occupy in our society." (*Herbster*, 150 Ill. App. 3d at 29.)

The appellate court recited a list of factors which make the attorney-client relationship special such as: the attorney-client privilege regarding confidential communications, the fiduciary duty an attorney owes to a client, the right of the client to terminate the relationship with or without cause, and the fact that a client has exclusive control over the subject matter of the litigation and a client may dismiss or settle a cause of action regardless of the attorney's advice. (See *Herbster*, 150 Ill. App. 3d at 27-29.) Thus, in *Herbster*, since the plaintiff's duties pertained strictly to legal matters, the appellate court determined [*501] that the plaintiff did not have a claim for retaliatory discharge.

We agree with the conclusion reached in *Herbster* that, generally, in-house counsel do not have a claim under the tort of retaliatory discharge. However, we base our decision as much [***13] on the nature and purpose of the tort of retaliatory discharge, as on the effect on the attorney-client relationship that extending the tort would have. In addition, at this time, we caution that our holding is confined by the fact that appellee is and was at all times throughout this controversy an attorney licensed to practice law in the State of Illinois. Appellee is and was subject to the Illinois Code of Professional Responsibility (see the Rules of Professional Conduct which replaced the Code of Professional Responsibility, effective August 1, 1990), adopted by this court. The tort of retaliatory discharge is a limited and narrow exception to the general rule of at-will employment. (See *Fellhauer*, 142 Ill. 2d at 505.) The tort seeks to achieve "'a proper balance * * * among the employer's interest in operating a business efficiently and profitably, the employee's interest in earning a livelihood, and society's interest in seeing its public policies carried out.'" (*Fellhauer*, 142 Ill. 2d at 507, quoting *Palmateer*, 85 Ill. 2d at 129.) Further, as stated in *Palmateer*, "[t]he foundation [***14] *of the tort of retaliatory discharge lies in the protection of public policy * * *.*" (Emphasis added.) *Palmateer*, 85 Ill. 2d at 133.

In this case, the public policy to be protected, that of protecting the lives and property of citizens, is adequately safeguarded without extending the tort of retaliatory discharge to in-house counsel. [**109] Appellee was required under the Rules of Professional Conduct to report Gambro's intention to sell the "misbranded and/or adulterated" dialyzers. Rule 1.6(b) of the Rules of Professional Conduct reads:

> [*502] "A lawyer *shall* reveal information about a client to the extent it appears necessary to prevent the client from committing an act that would result in death or serious bodily injury." (Emphasis added.) (134 Ill. 2d R. 1.6(b).)

Appellee alleges, and the FDA's seizure of the dialyzers indicates, that the use of the dialyzers would cause death or serious bodily injury. Thus, under the above-cited rule, appellee was under the mandate of this court to report the sale of these dialyzers.

In his brief to this court, appellee argues that not extending the tort of retaliatory discharge to [***15] in-house counsel would present attorneys with a

145 Ill. 2d 492, *502; 584 N.E.2d 104, **109;
1991 Ill. LEXIS 125, ***15; 164 Ill. Dec. 892

"Hobson's choice." According to appellee, in-house counsel would face two alternatives: either comply with the client/employer's wishes and risk both the loss of a professional license and exposure to criminal sanctions, or decline to comply with client/employer's wishes and risk the loss of a full-time job and the attendant benefits. We disagree. Unlike the employees in *Kelsay* which this court recognized would be left with the difficult decision of choosing between whether to file a workers' compensation claim and risk being fired, or retaining their jobs and losing their right to a remedy (see *Kelsay*, 74 Ill. 2d at 182), in-house counsel plainly are not confronted with such a dilemma. In-house counsel do not have a choice of whether to follow their ethical obligations as attorneys licensed to practice law, or follow the illegal and unethical demands of their clients. In-house counsel must abide by the Rules of Professional Conduct. Appellee had no choice but to report to the FDA Gambro's intention to sell or distribute these dialyzers, and consequently protect the aforementioned public policy.

[***16] In addition, we believe that extending the tort of retaliatory discharge to in-house counsel would have an undesirable effect on the attorney-client relationship that exists between these employers and their in-house counsel. [*503] Generally, a client may discharge his attorney at any time, with or without cause. (*Rhoades v. Norfolk & Western Ry. Co.* (1979), 78 Ill. 2d 217, 228, 35 Ill. Dec. 680, 399 N.E.2d 969.) This rule applies equally to in-house counsel as it does to outside counsel. Further, this rule "recognizes that the relationship between an attorney and client is based on trust and that the client must have confidence in his attorney in order to ensure that the relationship will function properly." (*Rhoades*, 78 Ill. 2d at 228; *Miller v. Solomon* (1964), 49 Ill. App. 2d 156, 167, 199 N.E.2d 660; *Fracasse v. Brent* (1972), 6 Cal. 3d 784, 790, 494 P.2d 9, 13, 100 Cal. Rptr. 385, 389.) As stated in *Herbster*, "the attorney is placed in the unique position of maintaining a close relationship with a client where the attorney receives secrets, disclosures, and information [***17] that otherwise would not be divulged to intimate friends." (*Herbster*, 150 Ill. App. 3d at 27.) We believe that if in-house counsel are granted the right to sue their employers for retaliatory discharge, employers might be less willing to be forthright and candid with their in-house counsel. Employers might be hesitant to turn to their in-house counsel for advice regarding potentially questionable corporate conduct knowing that their in-house counsel could use this information in a retaliatory discharge suit.

We recognize that under the Illinois Rules of Professional Conduct, attorneys shall reveal client confidences or secrets in certain situations (see 134 Ill. 2d Rules 1.6(a), (b), (c)), and thus one might expect employers/clients to be naturally hesitant to rely on in-house counsel for advice regarding this potentially questionable conduct. However, the danger exists that if in-house counsel are granted a right to sue their employers in tort for retaliatory discharge, employers might further limit their communication with their in-house counsel. As stated in *Upjohn Co. v. United States* (1981), 449 U.S. 383, 389, [*504] [**110] 66 L. Ed. 2d 584, 591, 101 S. Ct. 677, 682, [***18] regarding the attorney-client privilege:

> "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that *such advice or advocacy depends upon the lawyer being fully informed by the client.*" (Emphasis added.)

If extending the tort of retaliatory discharge might have a chilling effect on the communications between the employer/client and the in-house counsel, we believe that it is more wise to refrain from doing so.

Our decision not to extend the tort of retaliatory discharge to in-house counsel also is based on other ethical considerations. Under the Rules of Professional Conduct, appellee was required to withdraw from representing Gambro if continued representation would result in the violation of the Rules of Professional Conduct by which appellee was bound, or if Gambro discharged the appellee. (See 134 Ill. 2d Rules 1.16(a)(2), (a)(4).) In this case, Gambro did discharge appellee, and according to appellee's claims herein, his continued representation [***19] of Gambro would have resulted in a violation of the Rules of Professional Conduct. Appellee argues that such a choice of withdrawal is "simplistic and uncompassionate, and is completely at odds with contemporary realities facing in-house attorneys." These contemporary realities

145 Ill. 2d 492, *504; 584 N.E.2d 104, **110;
1991 Ill. LEXIS 125, ***19; 164 Ill. Dec. 892

apparently are the economic ramifications of losing his position as in-house counsel. However difficult economically and perhaps emotionally it is for in-house counsel to discontinue representing an employer/client, we refuse to allow in-house counsel to sue their employer/client for damages because they obeyed their ethical obligations. In this case, appellee, in addition to being an employee at Gambro, is first and foremost an attorney bound by [*505] the Rules of Professional Conduct. These Rules of Professional Conduct hope to articulate in a concrete fashion certain values and goals such as defending the integrity of the judicial system, promoting the administration of justice and protecting the integrity of the legal profession. (See Ill. Const. 1970, Preamble.) An attorney's obligation to follow these Rules of Professional Conduct should not be the foundation for a claim of retaliatory discharge.

[***20] We also believe that it would be inappropriate for the employer/client to bear the economic costs and burdens of their in-house counsel's adhering to their ethical obligations under the Rules of Professional Conduct. Presumably, in situations where an in-house counsel obeys his or her ethical obligations and reveals certain information regarding the employer/client, the attorney-client relationship will be irreversibly strained and the client will more than likely discharge its in-house counsel. In this scenario, if we were to grant the in-house counsel the right to sue the client for retaliatory discharge, we would be shifting the burden and costs of obeying the Rules of Professional Conduct from the attorney to the employer/client. The employer/client would be forced to pay damages to its former in-house counsel to essentially mitigate the financial harm the attorney suffered for having to abide by Rules of Professional Conduct. This, we believe, is impermissible for all attorneys know or should know that at certain times in their professional career, they will have to forgo economic gains in order to protect the integrity of the legal profession.

Our review of cases from other [***21] jurisdictions dealing with this issue does not persuade us to hold otherwise. In *Willy v. Coastal Corp.* (S.D. Tex. 1986), 647 F. Supp. 116, the district court declined to extend the tort of retaliatory discharge to the wrongful termination of in-house counsel. In that case, the plaintiff, in-house counsel [*506] for the defendant company, alleged that he was fired because he required the defendant to comply with environmental laws. The court held that the ethical canons and disciplinary rules set forth the standards for attorneys to follow and that they require an attorney presented with ethical conflicts to withdraw from representation. [**111] ( *Willy*, 647 F. Supp. at 118.) Further, once the client elects to terminate the relationship, "the attorney is required *mandatorily* to withdraw from any further representation of that client." (Emphasis in original.) *Willy*, 647 F. Supp. at 118.

Also, in *Nordling v. Northern States Power Co.* (Minn. App. 1991), 465 N.W.2d 81, the appellate court of Minnesota, relying exclusively on our appellate court's [***22] decision in *Herbster*, held that the plaintiff's status as in-house counsel precluded not only a breach-of-contract claim against the defendant company, but also the plaintiff's retaliatory discharge claim. ( *Nordling*, 465 N.W.2d at 86 n.1.) In *Nordling*, the court stated:

> "The client's unfettered right to discharge an attorney is deemed necessary because of the confidential nature of the relationship between attorney and client and the evil that would be engendered by friction or distrust." ( *Nordling*, 465 N.W.2d at 85.)

Since the relationship between the plaintiff and the defendant company required an atmosphere of continued mutual trust, the breakdown of that trust allowed the defendant to discharge the plaintiff without liability.

In contrast to the two cases discussed above which specifically held that in-house counsel do not have a right to sue for retaliatory discharge, two other cases have allowed in-house counsel to sue their employer for wrongful termination. However, both cases are distinguishable from our holding. In *Parker v. M & T Chemicals, Inc.* (1989), 236 N.J. Super. 451, 566 A.2d 215, [***23] the superior court of New Jersey construed that State's "Whistleblowers [*507] Act" as compelling "a retaliating employer to pay damages to an employee-attorney who is wrongfully discharged or mistreated * * * for any reason which is violative of law, fraudulent, criminal, or incompatible with a clear mandate of New Jersey's public policy concerning public health, safety or welfare." ( *Parker*, 236 N.J. Super. at 460, 566 A.2d at 220.) The court also noted in distinguishing the aforementioned *Herbster* and *Willy* opinions that they did not involve "whistle-blower"

Page 6

statutes, only the right of in-house counsel to maintain a cause of action for retaliatory discharge at common law. *Parker*, 236 N.J. Super. at 460, 566 A.2d at 220.

In *Mourad v. Automobile Club Insurance Association* (1991), 186 Mich. App. 715, 465 N.W.2d 395, the plaintiff, as in-house counsel for the defendant company, sued the defendant for, *inter alia*, breach of employment contract and retaliatory demotion. The appellate court of Michigan determined that the plaintiff had [***24] a cause of action for breach of a just-cause contract, but not for retaliatory demotion. The court distinguished the aforementioned *Herbster*, *Willy* and *Parker* cases as involving the issue of whether the "state will recognize a public policy exception to the typical employment-at-will contract." (*Mourad*, 186 Mich. App. at 723, 465 N.W.2d at 399.) In this case, however, the Michigan court stated that the defendant company's policy manual and pamphlets had created a contract to terminate for just cause. (*Mourad*, 186 Mich. App. at 720, 465 N.W.2d at 398.) Thus, plaintiff's claim for retaliatory demotion was an alternative theory of recovery from a breach of a just cause contract, and could not be sustained as an independent claim for recovery. (*Mourad*, 186 Mich. App. at 726, 465 N.W.2d at 400.) The Michigan court made no statements regarding the propriety of in-house counsel's bringing claims for retaliatory discharge.

[*508] In light of our decision that in-house counsel generally are not entitled to bring a cause of action for retaliatory [***25] discharge against their employer/client, we must consider appellee's argument that he learned of the dialyzers' defect and Gambro's noncompliance with FDA regulations in his role as manager of regulatory affairs at Gambro, and not as corporate counsel. Appellee argues that, if he did learn of Gambro's alleged violation of FDA regulations as manager of regulatory affairs, and acted pursuant to his duties as manager of regulatory affairs, he is merely an "employee" at Gambro and therefore should be entitled to bring a cause of action for retaliatory discharge. The appellate court in this matter [**112] agreed with appellee and held that a question of fact exists as to whether "[appellee's] discharge resulted from information he learned as a 'layman' in a nonlegal position." 203 Ill. App. 3d at 63.

We disagree. A motion for summary judgment should be granted when the pleadings, depositions, and affidavits reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (See Ill. Rev. Stat. 1989, ch. 110, par. 2 -- 1005(c).) In this case, there is no issue of fact as to whether [***26] appellee learned of Gambro's violations of FDA regulations as a "layman," as opposed to general counsel for Gambro. After examining the pleadings, exhibits and appellee's deposition testimony, we find that appellee was acting as Gambro's general counsel throughout this ordeal. As noted earlier, at the time of this controversy, appellee not only was acting as general counsel for Gambro, but also was its manager of regulatory affairs. Under the corporate hierarchy at Gambro, the corporate counsel supervised the manager of regulatory affairs. Thus, appellee "supervised" himself in his role as manager of regulatory affairs. More importantly, based on the official job descriptions supplied [*509] by Gambro, it is clear that the general counsel and the manager of regulatory affairs performed essentially the same roles with regards to FDA compliance. The job description for the director of administration, which defined the position of general counsel, required appellee to "*coordinate[] and oversee[] corporate activities to assure compliance with applicable laws* and regulations and prevent[] or minimize[] [the] possibility of legal or administrative proceedings." Along the [***27] same vein, the job description for manager of regulatory affairs required appellee to "*establish programs and procedures to ensure compliance with applicable FDA laws and regulations*." Thus, both roles had equivalent duties for assuring compliance with FDA regulations.

Appellee's deposition testimony discredits his claim that he learned of the dialyzers in his role as manager of regulatory affairs. First, appellee conceded that the question of whether a medical device could be legally sold under an FDA regulation is essentially a legal question. Second, appellee admitted that he did not consciously change "frames of mind" when acting as general counsel or manager of regulatory affairs. Third, in response to a question of whether he had a legal opinion as to whether the dialyzers were "misbranded and/or adulterated," appellee stated that "as a private person and *as an attorney*, I was of the opinion that the dialyzers were misbranded and/or adulterated." Fourth, appellee stated that he was acting as corporate counsel when he advised the president of Gambro of the criminal penalties for the interstate shipment of "misbranded and/or adulterated" products. Lastly, appellee [***28]

145 Ill. 2d 492, *509; 584 N.E.2d 104, **112;
1991 Ill. LEXIS 125, ***28; 164 Ill. Dec. 892

admitted that he was always an attorney licensed by the State of Illinois whenever he performed his duties as manager of regulatory affairs.

Appellee relies on the fact that previous managers of regulatory affairs at Gambro were not attorneys, and [*510] the position only required a bachelor of science degree and three to five years experience in the medical device field as evidence that this position is a nonlegal position. We disagree. Although previous managers evidently were not attorneys, the two roles appellee performed for Gambro were so intertwined and inextricably bound, we fail to see how appellee was not performing his general counsel functions in this matter. As support for our conclusion, we quote from the ABA Formal Opinion No. 328, which addressed the dual role situation appellee confronted:

> "If the second occupation is so law-related that the work of the lawyer in such occupation will involve, inseparably, the practice of law, the lawyer is considered to be engaged in the practice of law while conducting that occupation." (ABA Formal Opinion No. 328, at 65 (June 1972).)

In this case, as the trial court explained, appellee investigated certain facts, applied [***29] the law to those investigated facts and reached certain conclusions as to whether [**113] these dialyzers complied with the FDA regulations. In that sense, appellee inescapably engaged in the practice of law. Consequently, although appellee may have been the manager of regulatory affairs for Gambro, his discharge resulted from information he learned as general counsel, and from conduct he performed as general counsel.

For the foregoing reasons, the decision of the appellate court is reversed, and the decision of the trial court is affirmed.

*Appellate court reversed; circuit court affirmed.*

DISSENT BY: FREEMAN

DISSENT

JUSTICE FREEMAN, dissenting:

I respectfully dissent from the decision of my colleagues. In concluding that the plaintiff attorney, serving [*511] as corporate in-house counsel, should not be allowed a claim for retaliatory discharge, the majority first reasons that the public policy implicated in this case, *i.e.*, protecting the lives and property of Illinois citizens, is adequately safeguarded by the lawyer's ethical obligation to reveal information about a client as necessary to prevent acts that would result in death or serious bodily harm (134 Ill. 2d R. 1.6(b)). [***30] I find this reasoning fatally flawed.

The majority so reasons because, as a matter of law, an attorney cannot even contemplate ignoring his ethical obligations in favor of continuing in his employment. I agree with this conclusion "as a matter of law." However, to say that the categorical nature of ethical obligations is sufficient to ensure that the ethical obligations will be satisfied simply ignores reality. Specifically, it ignores that, as unfortunate for society as it may be, attorneys are no less human than nonattorneys and, thus, no less given to the temptation to either ignore or rationalize away their ethical obligations when complying therewith may render them unable to feed and support their families.

I would like to believe, as my colleagues apparently conclude, that attorneys will always "do the right thing" because the law says that they must. However, my knowledge of human nature, which is not much greater than the average layman's, and, sadly, the recent scandals involving the bench and bar of Illinois are more than sufficient to dispel such a belief. Just as the ethical obligations of the lawyers and judges involved in those scandals were inadequate to ensure [***31] that they would not break the law, I am afraid that the lawyer's ethical obligation to "blow the whistle" is likewise an inadequate safeguard for the public policy of protecting lives and property of Illinois citizens.

As reluctant as I am to concede it, the fact is that this court must take whatever steps it can, within the [*512] bounds of the law, to give lawyers incentives to abide by their ethical obligations, beyond the satisfaction inherent in their doing so. We cannot continue to delude ourselves and the people of the State of Illinois that attorneys' ethical duties, alone, are always sufficient to guarantee that lawyers will "do the right thing." In the context of this case, where doing "the right thing" will often result in termination by an employer bent on doing the "wrong thing," I believe that the incentive needed is recognition of a cause of action for retaliatory discharge,

145 Ill. 2d 492, *512; 584 N.E.2d 104, **113;
1991 Ill. LEXIS 125, ***31; 164 Ill. Dec. 892

in the appropriate case.

The majority also bases its holding upon the reasoning that allowing in-house counsel a cause of action for retaliatory discharge will have a chilling effect on the attorney-client relationship and the free flow of information necessary to that relationship. This reasoning [***32] completely ignores what is very often one of the basic purposes of the attorney-client relationship, especially in the corporate client -- in-house counsel setting. More importantly, it gives preeminence to the public policy favoring an unfettered right to discharge an attorney, although "[t]here is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens." *Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 132, 52 Ill. Dec. 13, 421 N.E.2d 876 (citing, *inter alia*, Ill. Const. 1970, Preamble).

One of the basic purposes of the attorney-client relationship, especially in the corporate [**114] client -- in-house counsel setting, is for the attorney to advise the client as to, exactly, what conduct the law requires so that the client can then comply with that advice. Given that purpose, allowing in-house counsel a cause of action for retaliatory discharge would chill the attorney-client relationship and discourage a corporate client from communicating freely with the attorney only where, as here, the employer decides to go forward with particular conduct, regardless of [*513] [***33] advice that it is contrary to law. I believe that, just as in-house counsel might reasonably so assume, this court is entitled to assume that corporate clients will rarely so decide. As such, to allow a corporate employer to discharge its in-house counsel under such circumstances, without fear of any sanction, is truly to give the assistance and protection of the courts to scoundrels.

Moreover, to recognize and sanction the corporate employer's freedom (as opposed to its "right") to discharge its in-house counsel under such circumstances, by denying the in-house counsel a cause of action for retaliatory discharge, is to exalt the at-will attorney-client contractual relationship above all other considerations, including the most important and fundamental public policy of protecting the lives and property of citizens. Such a result manifestly ignores one of the fundamental rules of contract law, *viz.*, that individuals are presumed to have contracted with knowledge of the existing law and such laws enter into and form part of their contract as fully as if they were expressly referred to and incorporated into its terms. (*Schlosser v. Jursich* (1980), 87 Ill. App. 3d 824, 43 Ill. Dec. 257, 410 N.E.2d 257.) [***34] Admittedly, this is not, strictly speaking, a contract construction case. However, where, as here, the court's holding in essence involves the construction of a contract and the impact of competing public policies thereon, the foregoing rule should not be ignored.

In holding as it does, the majority also reasons that an attorney's obligation to follow the Rules of Professional Conduct should not be the basis for a claim of retaliatory discharge.

Preliminarily, I would note that were an employee's desire to obey and follow the law an insufficient basis for a retaliatory discharge claim, *Palmateer* would have been decided differently. In this regard, I do not believe any useful purpose is served by distinguishing attorneys [*514] from ordinary citizens. It is incontrovertible that the law binds all men, kings and paupers alike. (See *City of Chicago v. Weiss* (1972), 51 Ill. 2d 113, 122, 281 N.E.2d 310, quoting *Cox v. Louisiana* (1965), 379 U.S. 559, 574, 13 L. Ed. 2d 487, 498, 85 S. Ct. 476, 486 ("[t]here is * * * a plain duty and responsibility on the part of all citizens to obey all valid laws and [***35] regulations").) An attorney should not be punished simply because he has ethical obligations imposed upon him over and above the general obligation to obey the law which all men have. Nor should a corporate employer be protected simply because the employee it has discharged for "blowing the whistle" happens to be an attorney.

I find the majority's reasoning that an attorney's ethical obligations should not be the basis of a retaliatory discharge claim faulty for another reason. In so concluding, the majority ignores the employer's decision to persist in the questionable conduct which its in-house counsel advised was illegal. It is that conduct, not the attorney's ethical obligations, which is the predicate of the retaliatory discharge claim. That conduct is the true predicate of the claim because it is what required the attorney to act in compliance with his ethical obligations and thereby resulted in his discharge by the employer. As such, granting the attorney a claim for retaliatory discharge simply allows recovery against the party bent on breaking the law, rather than rewarding an attorney for complying with his ethical obligations.

Additionally, I cannot share the majority's [***36]

Page 9

145 Ill. 2d 492, *514; 584 N.E.2d 104, **114;
1991 Ill. LEXIS 125, ***36; 164 Ill. Dec. 892

solicitude for employers who discharge in-house counsel, who comply with their ethical obligations, by agreeing that they should not bear the economic burden which that compliance imposes upon the attorney. Unlike the majority, I do not believe that it is the attorney's compliance with his ethical obligations which imposes economic burdens [**115] upon him. Rather, those burdens are imposed upon him by the [*515] employer's persistence in conduct the attorney has advised is illegal and by the employer's wrongful termination of the attorney once he advises the employer that he must comply with those obligations.

Similarly, I do not believe that this case implicates any knowledge on an attorney's part that, in order to protect the integrity of the legal profession, he will have to forgo *prospective* economic gain. Plaintiff here did not merely forgo the prospect of economic gain in order to comply with his ethical obligations. Rather, he was wrongfully deprived of continued employment and its attendant benefits, economic and otherwise, simply because he sought to competently represent his client within the bounds of the law. 134 Ill. 2d Preamble 472, Rules of [***37] Professional Conduct.

In this same regard, it should be borne in mind that this case involves an attorney discharged from his employment, not one who has voluntarily resigned due to his ethical obligations. I believe the majority's reasoning, in general, and with respect to the question of who should bear the economic burdens of the attorney's loss of job, specifically, would be valid grounds for denying a cause of action to an attorney who voluntarily resigns, rather than is discharged. By focusing upon the immediate economic consequences of the discharge, the majority overlooks the very real possibility that in-house counsel who is discharged, rather than allowed to resign in accordance with his ethical obligations once the employer's persistence in illegal conduct is evident to him, will be stigmatized within the legal profession. That stigma and its apparent consequences, economic and otherwise, in addition to the immediate economic consequences of a discharge, also militate strongly in favor of allowing the attorney a claim for retaliatory discharge.

[*516] Finally, with respect to the foreign case law cited and discussed by the majority, suffice it to say that I do not [***38] find it as clearly one-sided as does the majority.

Of particular relevance is *Parker v. M. & T. Chemicals, Inc.* (1989), 236 N.J. Super. 451, 566 A.2d 215. The majority distinguishes *Parker* as involving the New Jersey "whistle-blower" statute, rather than a common law action for retaliatory discharge, like this case and *Herbster v. North American Co. for Life & Health Insurance* (1986), 150 Ill. App. 3d 21, 103 Ill. Dec. 322, 501 N.E.2d 343. In so doing, the majority ignores that the New Jersey Superior Court viewed the statute as a recognition by the New Jersey legislature of a preexisting common law tort cause of action for retaliatory discharge. (*Parker*, 236 N.J. Super. at 456, 566 A.2d at 218.) It also ignores that the *Parker* court specifically distinguished *Herbster* as not involving the *constitutionality* of a "whistle-blower" statute, rather than as merely involving a common law retaliatory discharge claim. 236 N.J. Super. at 459, 566 A.2d at 220.

Inasmuch as the "whistle-blower" statute being construed in *Parker* recognized a preexisting [***39] common law tort cause of action for retaliatory discharge, the fact that *Herbster* and this case involve such actions is an insufficient ground upon which to distinguish *Parker*. As such, the reasoning of the *Parker* court in allowing an attorney a claim for retaliatory discharge, albeit on a statutory basis, should not be so blithely dismissed by the majority.

Ultimately, the court's decision in the instant case does nothing to encourage respect for the law by corporate employers nor to encourage respect by attorneys for their ethical obligations. (*Cf. Parker*, 236 N.J. Super. at 460, 463, 566 A.2d at 220, 222 (the court recognized that its holding should discourage employers from inducing employee-attorneys to participate in or condone illegal schemes, encourage an attorney's resolve to resist [*517] such inducements because they would henceforth enjoy some specific statutory protections, and reinforce integrity and ethical professional practice).) Therefore, I must respectfully dissent.