LEXSEE

In the Matter of John C. Grant, Complainant, v. Dominion East Ohio Gas, Respondent.

Case No.: 2004-SOX-00063

U.S. Department of Labor
Office of Administrative Law Judges

2005 DOLSOX LEXIS 79

March 10, 2005

[*1]

RECOMMENDED DECISION AND ORDER n1

n1 Citations to the record of this proceeding will be abbreviated as follows: "Tr." refers to the Hearing Transcript; "CX" refers to Complainant's Exhibits; "ALJX" refers to Administrative Law Judge's Exhibits; and "RX" refers to Respondent's Exhibits.

By LINDA S. CHAPMAN, Administrative Law Judge

OPINION:

This proceeding arises from a complaint filed by Mr. John C. Grant (hereinafter "Complainant" or "Mr. Grant") against Dominion East Ohio Gas (hereinafter "Respondent" or "DEO"), alleging violations of the employee protection provisions in Section 806 of the Sarbanes-Oxley Act of 2002, codified in 18 U.S.C. § 1514A (hereinafter "the Act"). Enacted on July 30, 2002, the Act provides the right to bring a "civil action to protect against retaliation in fraud cases" under section 806. The Act affords protection from employment discrimination to employees of companies with a class of securities registered under section 12 of the Security Exchange Act of 1934 (15 U.S.C. 78l) and companies required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o [*2] (d)). Specifically, the law protects so-called "whistleblower" employees from retaliatory or discriminatory actions by the employer, because the employee provided information to their employer or a federal agency or Congress relating to alleged violations of 18 U.S.C. §§ 1341, 1343, 1344 or 1348, or any provision of Federal law relating to fraud against shareholders. All actions brought under Section 806 of the Sarbanes-Oxley Act are governed by 29 C.F.R. §1980 (2004).

Complainant filed a Sarbanes-Oxley whistleblower complaint with the Occupational Safety & Health Administration (hereinafter "OSHA"), U.S. Department of Labor, accusing the Respondent of suspending him for questioning his supervisors about what he describes as "accounting irregularities." In response, Respondent maintains that it suspended the Complainant for violating company policy governing employee conduct. After conducting an investigation, OSHA's regional director issued a letter dated May 17, 2004 advising the parties that Mr. Grant's complaint lacked merit. Subsequently, Mr. Grant filed his objections with the Office of Administrative Law Judges, U.S. Department of Labor. [*3] A formal hearing was held before me in Canton, Ohio, on November 9-10 and December 14, 2004, at which times the parties were given full opportunity to offer testimony and documentary evidence, and to make oral argument. At the hearing, Complainant's Exhibits 1-18 n2, and 21, Respondent's Exhibits 1-27, and ALJ Exhibit 1 were admitted into evidence. The parties submitted post-hearing briefs pursuant to an Order Establishing Briefing Schedule dated January 15, 2004. I have reviewed and considered these briefs in making my determination in this matter. n3

2005 DOLSOX LEXIS 79, *3
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

n2 At the hearing, the parties agreed that Claimant's Exhibits would be admitted into the record so long as those portions containing the Complainant's narratives describing the evidence are redacted. Thus, I have considered CX 1-18 and CX 21 in their redacted state only in making my determination in this matter. (Tr., at 41-42).

n3 Complainant timely filed his Post-Hearing Brief of Complainant, John C. Grant. Within days, Complainant also submitted an amended version of his post-hearing brief before the deadline. After reviewing Complainant's amended brief, it is clear that my consideration of the second brief does not place Respondent at any disadvantage regarding its ability to effectively argue its case. Thus, I have considered Complainant's amended brief in making my determination in this matter.

[*4]

## STATEMENT OF THE CASE

Dominion Resources, Inc. (hereinafter "Dominion") is an energy utilities provider incorporated in the state of Virginia with its executive offices located in Richmond, Virginia. Dominion, through its many subsidiaries (including the Respondent Dominion East Ohio Gas), is one of the nation's largest energy producers and suppliers of electricity and natural gas. Serving customers throughout the Midwest, Mid-Atlantic, and Northeast regions, Dominion serves roughly 3.8 million electric and gas distribution customers, maintains a $ 44.2 billion asset base, and operates with more than 15,000 employees.

In 2000, Dominion Resources, Inc. merged with Consolidated Natural Gas (hereinafter "CNG"), transforming Dominion into one of the nation's largest electric and gas utilities. As part of the new deal, Dominion acquired Cleveland-based East Ohio Gas Company and renamed it Dominion East Ohio Gas in September of 2000. Dominion East Ohio Gas--the Respondent here--has a number of offices around the region, including in Cleveland, Akron, Youngstown, Ashtabula, and North Canton, Ohio. As Dominion's wholly owned subsidiary, Dominion East Ohio Gas operates as a gas distributor, [*5] providing distribution, transmission, and storage services throughout Ohio and the surrounding region.

The record here contains very little information regarding the corporate structure of Dominion Resources, Inc. and Respondent, Dominion East Ohio Gas. Neither party submitted a current Form 10-K, Form 8-K, Form 10-Q, or any other document that might explain the corporate structure of Dominion and its subsidiaries. The reconstruction of the corporate structure contained in this Decision and Order, therefore, is the direct result of piecing together the various witnesses' testimony during the course of these proceedings, along with a handful of web pages submitted from Dominion's official website.

Generally speaking, Dominion East Ohio Gas is comprised of two major groups of employees: (1) the Union labor employees responsible for executing the company's daily activities; and (2) those in management/supervisory roles responsible for overseeing the labor employees' operations. Those individuals holding supervisory positions then answer directly to the corporate officers of the parent company--Dominion Resources, Inc.--assigned to a particular department. (See RX 18-1).

The Complainant, [*6] John Grant, began working for East Ohio Gas almost 35 years ago in various capacities; over the years he has worked in everything from meter reading to gas supply engineering to gas control. (Tr., at 239-42). Since 1988, Mr. Grant has worked as an engineer technician (or what he describes as a "utility coordinator") within the engineering department in the company's North Canton office. (Tr., at 241-42). Mr. Grant testified at the hearing. He explained that as an engineer technician, he is responsible for protecting Dominion's infrastructure in the event a corporation or individual wishes to develop or improve land upon which Dominion facilities n4 reside. In other words, Mr. Grant examines the potential effects a building or land development plan might have on Dominion's proprietary interests.

n4 Mr. Grant refers to Dominion's infrastructure (e.g., transmission pipelines, storage facilities, etc.) throughout the transcript as "facilities." (Tr., at 250).

2005 DOLSOX LEXIS 79, *6
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

Once a developer submits a plan to Dominion East Ohio Gas, Mr. Grant assesses the company's interests regarding that land and then develops a plan by which the land developer and Dominion can co-exist. Should a conflict arise, [*7] Mr. Grant's plans usually include an option of relocating Dominion's facility at the developer's expense. Thus, Mr. Grant is often responsible for administering and overseeing the bidding process among the contractors involved in relocating Dominion's facilities. Successful administration of any relocation plan, including the bidding process, also requires detailed knowledge of state and federal regulations n5 and the specific engineering plan to be executed. (Tr., at 250-51).

n5 Mr. Grant also testified that he works regularly with the company's attorneys whenever an issue arises concerning the state and federal codes or regulations because any request to relocate a Dominion facility must be approved by the local and state authorities. (Tr., at 263).

According to Mr. Grant, the administration of a development or relocation project to which he is assigned as engineer technician also involves monitoring the engineering costs that accrue over the span of the project. (Tr., at 252). In other words, although he is not an accountant or a part of the company's accounting department, Mr. Grant "monitor[s] the accounting all the way" for a particular project. (Tr., at 252). Mr. Grant [*8] explained that "monitoring the accounting" involves creating the initial estimates of engineering costs likely to be incurred, compiling the final bills, and delivering invoices to various parties. By the time a project is complete, Mr. Grant compares the estimated engineering costs to the actual engineering costs of a project to make sure each cost "hits"--that is, whether each cost is charged to the appropriate project account and whether each cost is accurate. (Tr., at 253-55; 401).

Mr. Grant testified that since 2000, Dominion East Ohio Gas has created an accounting department--headed by the supervisor of general accounting, Gary Abbate--responsible for closing projects from an accounting standpoint and compiling billing summaries. (Tr., at 254). Thus, according to Mr. Grant, he is no longer responsible for compiling final billing; however, he does still review the accounting for his projects on a regular basis to .see if everything is okay." (Tr., at 254; 402). Ultimately, the project manager assigned to the job (usually a supervisor/manager) along with the accounting department is responsible for the final billing. (Tr., at 402-3). However, if Mr. Grant comes across a "weird" [*9] cost on a billing summary, or if a project cost does not make it on a billing summary when it should have, he notifies the accounting department or his "bosses" so they can fix any discrepancy on the account. (Tr., at 255; 265-66). And at times, the accounting department will approach Mr. Grant asking if all of the engineering costs have hit. He then in turn "tell[s] them to close the project as the costs appear to be correct" or "some times [he] tell[s] them . . . the costs don't appear to be correct" and should be fixed. (Tr., at 264).

In addition to his occasional interaction with the accounting department, Mr. Grant often works with Greg Theirl, who is the area Director/Manager of Gas Supply Operations and was at one time Mr. Grant's direct supervisor. n6 (Tr., at 256; 557-58). Mr. Grant's current direct supervisor is Jerry Williams, who is the supervisor/manager of engineering in North Canton, and with whom Mr. Grant interacts regularly. According to Mr. Grant's testimony, before November of 2003--the date of Mr. Grant's suspension--he had both a regular social and business relationship with his supervisors and a number of corporate officers from Dominion and premerger East Ohio [*10] Gas. (Tr., at 257-58). Specifically, Mr. Grant testified that anytime Senior Vice President Tom Hymon, Vice President Bruce Klink, and other officers were at the North Canton office, they would stop by and speak with him. His relationship with these corporate officers, according to Mr. Grant, was one in which "they didn't treat me any different than other people, and I didn't treat them any different than any other people." (Tr., at 259).

n6 As Director/Manager, Mr. Theirl is responsible for overseeing the company's transmission and storage operations in Ohio, Pennsylvania, and West Virginia. (Tr., at 557-58). According to Mr. Theirl, he supervises roughly 80 employees. However, because Mr. Grant's department acts only as a "support function" for Mr. Theirl's department, he is not Mr. Grant's direct supervisor.

Mr. Grant also testified that he met Vice President of Customer Planning Ken Barker the first time Mr. Barker visited the North Canton office after the merger for a brief introduction of the "new boss." Mr. Grant specifically remembers Mr. Theirl introducing him to Mr. Barker, and the three of them "kidding around" with each other about Mr.

2005 DOLSOX LEXIS 79, *10
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

Grant's future with the company. [*11] Mr. Grant testified that he had a "close and personal" relationship with Mr. Klink, Mr. Hyman, and Mr. Barker, and that he felt comfortable using what has been described throughout these proceedings as "shop talk" around Mr. Hyman and Mr. Klink. n7 (Tr., at 277-78).

> n7 Mr. Barker testified that he did not know Mr. Grant in November of 2003. (Tr., at 54). When pressed on cross-examination, Mr. Barker did admit that he may have met Mr. Grant and 30-40 other employees in the North Canton office shortly after the merger. (Tr., at 82). As Vice President of Customer Planning, Mr. Barker oversees the liability, planning, engineering, marketing of the electrical and gas construction for Dominion; he manages 500 employees. (Tr., at )

The parties and witnesses have used the term "shop talk" to describe the type of language typically used around the company offices, including the North Canton office. Generally, the witnesses described "shop talk" as the everyday language used among employees that might include the occasional four-letter word or sexual innuendo. According to Vice President Ken Barker, who has been with Dominion for almost 27 years, "shop talk" is a term referring to the [*12] conversation employees have in their work environment, and often includes slang, sexual innuendo, or vulgarity in the workplace. And, while vulgarity is not tolerated at Dominion, Mr. Barker admitted that "shop talk" is inevitable. It only crosses the line into the realm of unacceptable, according to Mr. Barker, when it is used to harass, intimidate, or make others feel uncomfortable in the workplace. n8 (Tr., at 49-51; 95). He further testified that Dominion expects its employees to engage in professional behavior and use language that does not harass, intimidate, threaten, or offend others. (Tr., at 50). Virtually every witness who testified about "shop talk" supplied similar definitions to describe it, and acknowledged that "shop talk" is used throughout the North Canton office.

> n8 According to Mr. Barker, members of management are trained by the Human Resources Department to determine whether an employee's language is harassing, intimidating, or offending in nature. (Tr., at 95-97).

The general culture of the North Canton office was also described during the hearing by a number of witnesses. Margaret Bell, a Dominion East Ohio Gas employee in the engineering department who [*13] interacts regularly with Mr. Grant, testified that the North Canton office is an "easy going" workplace where the employees "laugh and tell jokes," and where "some dirty language is used from time to time." (Tr., at 142-43). Lorraine Gray, who is part of the building maintenance department at the North Canton office and who represents the local Gas Workers Union G555, described the office culture as a "relaxed" or "typical blue collar working class atmosphere," where everyone gets along. (Tr., at 156). Ms. Gray went as far as to suggest that "off-color" words (which she expressly and explicitly described) are used in the North Canton office "everyday." (Tr., at 157). And Leonard Smith, an engineering technician in North Canton, described the North Canton office as "average," and a place where some "off-color" language is used at times by supervisors and union employees alike. (Tr., at 198-99).

In an attempt to further describe the "relaxed" culture of the North Canton office the Complainant submitted a large number of electronic mail messages circulated among the Dominion East Ohio Gas employees, including those in supervisory or managerial positions. The content of those messages [*14] can be best described as containing "shop talk" language, or language that is inappropriate or vulgar. For example, Complainant submitted a few e-mails containing sexually suggestive and sexually vulgar text that had been exchanged and forwarded between a number of employees during a period from March 1999 through October 2003, which were clearly intended to be amusing and of a joking nature. (See CX 1, at 27-33; CX 1, at 35; CX 1, at 26-27; CX 1, at 38-40). Others, as recent as January 2004, contained sexually suggestive and vulgar images of various human anatomies. (See CX 6; CX 10; CX 1, at 26-27). The source and recipients of these e-mails varied, and included both union employees and supervisors/managers from the North Canton, Cleveland, Youngstown, Ashtabula, and Akron offices. As Complainant so adamantly points out, no one was ever disciplined for sending or receiving any of these particular e-mails.

Dominion employee conduct, including the conduct of employees of its wholly-owned subsidiary Dominion East Ohio Gas, is governed by a very comprehensive policy manual. The company's current policy, which has been described by Dominion East Ohio Gas employees as more strict than [*15] the policies prior to the CNG merger, went

into effect on January 1, 2001. (RX 16-5; Tr., at 48, 487-89). Mr. Barker explained in detail the provisions of the policy related specifically to employee behavior and electronic communications at the workplace. As Vice President, Mr. Barker feels that it is his obligation to "uphold the policies . . . at Dominion for all employees and contractors," (Tr., at 53), and he takes those policies "very seriously." (Tr., at 52). The Dominion policies, which are readily available to all employees, including Mr. Grant, via the company's intranet, are compiled and administered by the company's Human Resources Department (hereinafter "HR" or "Human Resources"). (Tr., at 371). Dominion's Human Resources department has also circulated the company's policies by internal office memoranda.

The company policy manual provides both general and specific guidelines by which employees are expected to abide. Generally, Dominion employees are expected to "conduct themselves in a professional manner," and any "employee[] who [does] not meet these expectations, may be subject to disciplinary action up to and including termination." (RX 3, 8; Tr., at 47). More specifically, [*16] the company prohibits any form of "harassment, intimidation, and coercion based on or related to race, sex, religion, national origin, age, disability, or any other classification protected by law" in the workplace. (RX 6; Tr., at 47). Defined in the policy as "unwelcome comments about a person's clothing, body, or personal life," "offensive or abusive physical conduct," "offensive nicknames or terms of endearment," "offensive jokes, comments or suggestions," "displaying offensive objects or pictures," and any other conduct "even if not objectionable to some employees, [that] creates a working environment that may be considered by others to be offensive or hostile," *harassment* is prohibited specifically to avoid undermining the integrity of employment relationships and human dignity at Dominion. (RX 6). The policies described by Mr. Barker have been in effect at Dominion since January 2001.

The company also maintains specific guidelines governing the use of the company's electronic and communication equipment. Generally, the use of computers and other communications equipment at Dominion is intended for company business and activities. (RX 4; Tr., at 47). And, like many businesses, [*17] Dominion tolerates some limited personal use. However, any use, according to company policy, should be "responsible and professional." (RX 4). The company specifically instructs employees to "avoid making statements that would reflect unfavorably on an employee or the Company," and specifically prohibits communications "that may be perceived as harassing, offensive or insulting," including, but not limited to, "threats," "those containing sexual content," and "profanity." (RX 4).

As recent as early 2002, the company has circulated internal memoranda for the purpose of reminding its employees of the company's behavioral expectations, which describe in more detail the meaning of "appropriate" and "inappropriate" behavior. (RX 8, 9). Reiterating the company's commitment to "a work environment that is professional and respectful," two memos circulated to all employees provide examples of "inappropriate" behavior, such as:

. Making any comments about a person's physical appearance, including those comments which may be sexually oriented, or which may include racial slurs/or insinuations.
. Creating intimidating relationships with co-workers and management by using abusive or foul language.
[*18] . Displaying or sending disrespectful screen-savers, e-mail or voicemail messages.
. Communicating demeaning or offensive jokes, stories or comments.
. Referring to co-workers, customers or other people as "honey," "sweetie," "old man," or "the girls."
. Using threatening tones, words or profanity.
. Telling derogatory stories and jokes that make fun of any group or individual.
. Possessing or displaying sexually suggestive visual materials, including in lockers, company vehicles, etc.

(RX 8, 9). Employees are further reminded to report any incidents or concerns about inappropriate behavior to supervisors or to the HR department, and that any violation of company policy is cause for discipline. (RX 8, 9).

In 2002, Dominion began monitoring e-mails in an attempt to remove offensive content from its computers. (Tr., at 160). In a company-wide, daily notice called Connect Today, all Dominion East Ohio Gas employees were advised that

2005 DOLSOX LEXIS 79, *18
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

inappropriate e-mail use could lead to disciplinary action. (RX 10, 12).

Finally, the company maintains policies designed to ensure compliance with standards, laws, rules, and regulations that, if violated, could subject the company to criminal or [*19] civil liability. n9 (RX 5; Tr., at 47). According to the policy, any non-union employee who knows about or suspects misconduct, illegal activities, fraud, misuse of company assets or violations of company policies is required to report those concerns to a supervisor, the legal department, internal auditing, or the HR department. Again, any violation of the company's compliance or conduct policies or any legal requirement, law, or regulation is grounds for disciplinary action. (RX 5).

    n9 Respondent's Exhibit 5 applies expressly to non-union employees.

Should a violation of company policy occur, Dominion has a system in place by which a manager or director of a department determines the appropriate disciplinary penalty to be imposed. In fact, Mr. Barker testified that Dominion has disciplined employees under the system in the past for inappropriate behavior at the workplace. n10 (Tr., at 86-88). More specifically, Mr. Barker and Ms. Kathleen Johnson, who is an HR generalist with Dominion East Ohio Gas and who works specifically with customer service and Ken Barker, testified about the disciplinary process at Dominion, and specifically about Mr. Grant's suspension. (Tr., at 506). [*20]

    n10 It should be noted that virtually every employee of Dominion and Dominion East Ohio Gas who testified at the hearing explained that they know and understand it is a violation of company policy to engage in offensive conduct, including sexually suggestive conduct, and that some form of discipline may be imposed for such an infraction. (Tr., at 149, 165-68, 374-76). In fact, Mr. Grant testified that he knew sending sexually suggestive e-mails was a violation of company policy even during the time before the merger, when East Ohio Gas operated under CNG. (Tr., at 376). Furthermore, Mr. Grant testified that "shop talk" and dirty language are considered inappropriate under company policy if it offends another person. (Tr., at 382).

According to Mr. Barker and Ms. Johnson, the company's policies instruct any employee to raise a question, concern, or complaint about an alleged policy violation with his or her supervisor, the HR department, or even a corporate officer. (Tr., at 75, 83). Because an HR generalist acts as the "first point of discipline issues," according to Ms. Johnson, the notified manager or supervisor is to bring the alleged misconduct directly to the HR department. [*21] (Tr., at 508). Subsequently, the HR department conducts an investigation into the incident, which entails interviews and reviews of the employee's personal records. (Tr., at 508-9). The employee's personal discipline history is then reviewed, along with a "discipline log" listing the details of every other penalty imposed throughout the company for any reason. (Tr., at 508-10). The HR department then attempts to assign an appropriate penalty to the conduct at issue by considering the employee's history and comparing the employee's conduct to the penalties others received for similar conduct as noted in the discipline log. After applying the company's "progressive discipline" system and considering similar incidences, the HR department ultimately recommends to the directors or corporate officers what it believes is an appropriate sanction for that particular infraction, consistent with company history. (Tr., at 54, 508). In other words, the HR department plays an advisory role, leaving the ultimate determination to the employee's manager, director, or corporate officers. n11 Once approved, the decision is then relayed to the employee under investigation, and the penalty is administered. [*22]

    n11 Mr. Barker further testified that managers are generally responsible for giving any infraction or misconduct the attention he or she thinks it deserves, but should an incident be brought to the HR department or a corporate officer, the ultimate decision of discipline comes from the corporate officer. Thus, depending upon the severity of the infraction or misconduct, a supervisor has the discretion to handle it in a manner he or she sees fit. (Tr., at 74).

Lorraine Gray, who is the local union representative at the North Canton office, described "progressive discipline" at the hearing. She has participated in discipline investigations involving policy violations at Dominion. Under the "progressive discipline" system, according to Ms. Gray, if an employee is disciplined for improper personal conduct and

2005 DOLSOX LEXIS 79, *22
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

then commits another offense of improper personal conduct, that individual is subject to a greater discipline for the second offense. Kathleen Johnson further explained "progressive discipline" as follows: each offense is first categorized into one of 20-25 topics, such as "personal conduct." Second, the severity of the misconduct determines which "Type" of penalty will be [*23] imposed (Type I discipline is a verbal warning; Type II discipline is a written warning; Type III discipline is a suspension; and Type IV discipline is termination). And finally, based upon the number of times an employee has engaged in that category or topic of misconduct, the penalty level or "Type" is progressively "bumped up one notch" to the next level. (Tr., at 508-10, 516-17).

Kenneth Lee, an engineering technician at Dominion East Ohio Gas and the Department Steward for the Union acting as a union member representative, also testified about the concept of "progressive discipline." (Tr., at 214). Having been disciplined himself in 1999 for committing an improper personal conduct infraction, see footnote 15 infra, Mr. Lee explained that under the company's "progressive discipline" system, someone with a spotless personnel record at Dominion "should receive a lighter punishment than someone who [has] a history of offenses." (Tr., at 228-29). While "progressive discipline" is the current discipline guideline in place at Dominion, the penalty imposed for each infraction is ultimately dependent upon many factors, including the seriousness of the incident and the individual's [*24] history in the workplace. (Tr., at 183-84, 228-29).

In 1999, Mr. Grant was an unwilling participant in the company's discipline process for an incident involving his behavior in the men's restroom at the North Canton office. At the time of the 1999 incident, Ms. Lorraine Gray, a member of the company's building maintenance department, was working alongside a male plumber on repairs in the men's restroom. (Tr., at 180-81). There was no sign on the exterior of the men's room indicating that repair work was being performed or that maintenance personnel were inside. Mr. Grant walked into the men's room while Ms. Gray was working and proceeded to urinate in the urinal within just feet of Ms. Gray. (Tr., at 180-81). After an investigation, Mr. Grant ultimately received a Type III disciplinary penalty for violating company policy governing personal conduct; he was suspended for three days. (RX 22). Although Mr. Grant did not formally challenge the discipline through the grievance process, he did testify at the hearing that he still believes he was the "victim" in the 1999 restroom incident and the company was at fault for "not providing the expected privacy for men in the locker room." n12 [*25] (Tr., at 389).

n12 The labor union's collective bargaining agreement with Dominion provides that when an employee fails to contest a penalty imposed, the level of discipline remains as part of the employee's record for purposes of "progressive discipline." (Tr., at 389). Moreover, the letter notifying Mr. Grant of his Type III discipline dated September 17, 1999 states, "You are hereby put on notice that the recurrence of similar inappropriate conduct will result in more serious discipline up to and including termination." (EX 22).

At issue in the instant claim is Mr. Grant's second occasion to participate in Dominion's disciplinary process. In late 2003, Employee Assistance Personnel (hereinafter "EAP") member Lori Yuan created a committee made up of four Dominion East Ohio Gas employees from management and four from the labor union to plan an EAP sponsored program for all employees in December 2003. (Tr., at 491). As part of the program, Ms. Yuan came up with the idea of an "Open Couch Christmas Party," encouraging employees to sit and speak their mind with EAP and Human Resources. (Tr., at 491-92; EX 19). The event was designed to take advantage of the EAP's new office and [*26] invite employees to the Cleveland office for an open house-like session. (Tr., at 491-92).

Ms. Yuan, a member of the EAP team in Cleveland, testified at the hearing. The EAP is responsible for providing various counseling, assessment, referrals, training, drug tests, and other services for problems an employee may encounter at the workplace or at home. As a member of the EAP, Ms. Yuan is responsible for conducting training sessions for supervisors and employees in order to alert and advise employees about how to respect others at the workplace. n13 (Tr., at 489-90). Ms. Yuan is a licensed social worker, dependency counselor, and certified employee assistance professional. (Tr., at 482).

n13 Ms. Yuan testified that she has held a number of training sessions, which are voluntary, at the North Canton

2005 DOLSOX LEXIS 79, *26
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

office. (Tr., at 489-90).

The "Open Couch" session created by Ms. Yuan was publicized throughout the company's offices by way of an e-mail invitation and mini-posters identical to the e-mail; the invitation reached almost 2000 employees. (Tr., at 492-93). Ms. Yuan worked with the committee to design the invitation, which was ultimately approved by her boss Dennis Grant, manager of [*27] the EAP program. (Tr., at 492). The Open Couch invitation (hereinafter "EAP invitation" or "invitation") posted in the offices and on the e-mail system stated, "You're Especially Invited to an 'Open Couch' Sponsored by your Employee Assistance Program (EAP)." (EX 19). The invitation contained a picture of a couch, the date, time and location of the event, and the purpose of the event: "To reintroduce EAP in an informal 'break in the couch session.' Stop by and say hi, win a prize and leave an impression on the couch." (EX 19). The invitation also stated that the EAP would provide "goodies to snack on!!," and "free back or neck massages by a licensed professional." (EX 19).

On the morning of November 24, 2003, Mr. Grant--like all Dominion East Ohio Gas employees--received the mass e-mail containing the EAP invitation. (EX 19). Mr. Grant had also seen the mini-posters throughout the North Canton office. (Tr., at 339). Mr. Grant testified that when he first noticed the EAP invitation posters he "thought [it was] one of the creative people at work having fun," and he "didn't think it was official." (Tr., at 340). He recalled discussing the invitation with others in the office, wondering [*28] if it was simply a joke. (Tr., at 340). Upon learning that it was not a joke, Mr. Grant testified that he "viewed it inappropriate in the business place" as it was "sexually suggestive." n14 (Tr., at 340). After expressing his concerns about the sexual nature of the invitation to manager Frank Martin, including his anxiety over potentially "getting an erection or whatever" during the massage, Mr. Grant decided to inform his "bosses" of his discontent. (Tr., at 342). Mr. Grant did not reply directly to Ms. Yuan expressing his alleged disgust with the "Open Couch" invitation.

n14 The hearing testimony contains varying views among those who received the invitation as to whether it was offensive or not.

At 9:34 a.m. on Tuesday, November 25, 2003, Mr. Grant forwarded the EAP invitation e-mail along with what he has described as his concerns regarding its sexually suggestive content to his immediate supervisor Jerry Williams, Frank Martin, director of engineering Mark Messersmith, Vice-President Ken Barker, and Senior Vice-President Thomas Hyman. (EX 20). Mr. Grant's e-mail read as follows:

Dear Bosses:

Now I know you guys want me to participate in these company sponsored programs [*29] like "OPEN COUCH". However, since I am a very sensitive guy I don.t think I could make it through snacking on the goodies and a back massage on the couch without getting a woodie [sic]. So fellows, please forgive me for not participating in this EAP function. I best just stay here in North Canton and do my job.

Sincerely,

Fat Jack

(EX 20). At the hearing, Mr. Grant described this e-mail as an attempt to complain about the sexual suggestiveness of the invitation and to express to his bosses that he took offense to the invitation. He described his interpretation of the EAP invitation language at the hearing in great detail. According to Mr. Grant, he equated "the couch" to "romance"; "leave an impression on the couch" to "romance on a couch"; "breaking in the couch" to "the first time romance on a couch"; "goodies to snack on" to "women are goodies to snack on"; and "free back and neck massage by a licensed professional" to a sexual situation. (Tr., at 399-400). Mr. Grant's November 25 e-mail to the "bosses" did not include this explanation; nor did Mr. Grant expressly state in the e-mail that he was offended by the sexual innuendos he believed were contained in the invitation. [*30]

2005 DOLSOX LEXIS 79, *30
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

Vice President Ken Barker read Mr. Grant's e-mail in his Cleveland office and reacted immediately. According to his testimony, Mr. Barker was first surprised to see an e-mail containing sexual innuendos addressed to an officer of the company. Second, he was angry that an employee would directly challenge upper level management in such a way. Mr. Barker instantly believed Mr. Grant's actions deserved discipline. (Tr., at 55). Shortly after Mr. Barker read the e-mail, Thomas Hyman and Bruce Klink walked into his office expressing similar disgust over Mr. Grant's message. (Tr., at 56). Not knowing anything about the EAP Open Couch program or John Grant himself, Mr. Barker discussed Mr. Grant's e-mail with Mr. Hyman and Mr. Klink in the context of company policy. (Tr., at 56-57). They agreed that Mr. Grant's e-mail violated "every policy [Dominion has] on workplace ethics with sexual innuendoes," and Mr. Hyman agreed with Mr. Barker that Mr. Grant should be terminated. (Tr., at 56-57, 629). At the hearing, Mr. Barker explained that it was "unacceptable" for Mr. Grant "to flaunt disrespect for the [company] policy that we so carefully laid out for our employees, and [he] thought it was [*31] just a total disregard for the Dominion policy in East Ohio." (Tr., at 59).

That afternoon, Mr. Barker met with the director of engineering, Mark Messersmith, in the Cleveland office and told him that Mr. Grant's e-mail was "totally unacceptable" and that he deserved to be terminated. (Tr., at 57). Mr. Barker instructed Mr. Messersmith to conduct a complete investigation into Mr. Grant's actions with Human Resources and to suspend Mr. Grant indefinitely without pay until an appropriate discipline could be determined. (Tr., at 57; 629-30). Mr. Messersmith immediately telephoned Kathy Johnson, the HR representative assigned to engineering, Alex Soja, who is the Human Resources Consultant, Charles Johnston, manager of Human Resources customer services, and Jerry Williams, explaining to each what was happening. (Tr., at 630). Mr. Soja and Mr. Williams rearranged their schedules to report to North Canton in order to conduct an initial investigative meeting with Mr. Grant the following day, Wednesday, November 26, 2003. (Tr., at 630).

At the investigative meeting, Mr. Grant was informed of the pending investigation into his actions. Mr. Grant admitted to sending the e-mail and expressed [*32] no regret, explaining that he saw nothing wrong with the e-mail. (Tr., at 544-45). Mr. Soja told Mr. Grant of his indefinite suspension during the investigation. Later that afternoon, Mr. Messersmith called Mr. Barker to update him regarding the suspension and the investigation. (Tr., at 57). On the following Monday, December 1, 2003, immediately after the Thanksgiving holiday, Kathy Johnson, Alex Soja, Mark Messersmith, and Charles Johnston met to discuss Mr. Grant's discipline. (Tr., at 512-13). Although they knew that Mr. Barker favored the most serious course of action--termination--the group members did not believe termination was appropriate and instead examined the possibility of imposing a 20-day suspension, which is the most serious Type III discipline available to Human Resources under the company's policy. (Tr., at 513; 547-48; 632-34). The group considered the seriousness of the infraction, the fact that the e-mail was addressed to officers of the company, Mr. Grant's prior discipline record, and other similar personal conduct infractions. (Tr., at 632). Mr. Messersmith again updated Mr. Barker and explained that they believed suspension was more appropriate. (Tr., [*33] at 632).

After further investigation into Mr. Grant's conduct, Mr. Messersmith, Alex Soja, Kathy Johnson, Becky Aruda, who is the director of Human Resources, Sandy Brill, Ms. Aruda's boss at the time, and Charles Johnston participated in a phone conference on Wednesday, December 3, 2003 to further discuss the appropriate course of action. While Mr. Johnston was adamant about imposing a 20-day suspension, Mr. Messersmith and the rest of the group felt 10 days was more appropriate, considering the seriousness of the offense when compared to other penalties imposed on other employees for similar conduct, n15 and the likelihood that a 10-day suspension would survive a grievance complaint in front of an arbitrator. (Tr., at 516; 546-47). Thus, under the company's "progressive discipline" system, 10 days was considered a "fair" penalty following Mr. Grant's 3-day suspension for personal conduct in 1999. (Tr., at 516; 550). According to Mr. Soja, the group believed that the 10-day suspension was suitable to grab Mr. Grant's attention and ensure that his behavior would change without punishing him too severely. (Tr., at 549-50). In support of HR's recommendation, Mr. Messersmith notified [*34] Mr. Barker of the recommended 10-day suspension. (Tr., at 637-38).

n15 The group responsible for recommending the appropriate discipline considered similar conduct on the part of an engineering technician named Ken Lee. In 2002, Mr. Lee received a Type II discipline after he directed highly insulting words toward a female associate of the company, who took serious offense to Mr. Lee's language. Mr. Lee had never been disciplined by the company before the 2002 telephone incident. Mr. Lee

admitted that he was wrong, was asked to apologize, and because it was his first offense, received a written reprimand as a penalty under the company's "progressive discipline" system. (Tr., at 173-75, 227-29, 551; RX 23).

In the meantime, Mr. Barker's supervisor, Senior VP Thomas Hyman, instructed Mr. Barker to make the ultimate decision once HR issued its recommendation. (Tr., at 58). After the investigative group reached its conclusion, Mr. Messersmith advised Mr. Barker about the recommended 10-day suspension. Mr. Barker then discussed the incident with the Vice President of Human Resources, Ann Greer, for her input. Despite Mr. Barker.s continued belief that Mr. Grant committed a very serious [*35] infraction, he agreed with the Human Resources department to impose the Type III, 10-day penalty. (Tr., at 58; 634).

In determining Mr. Grant's punishment, according to those who testified at the hearing, the HR department, the investigative group, and Mr. Barker neither considered nor knew of Mr. Grant's complaints about "accounting fraud" for which he claims he was suspended. n16 (Tr, at 60, 91-92, 510-11, 517, 552-53, 563, 634). Mr. Barker specifically testified that he did not know of any accounting or environmental misconduct allegations made by Mr. Grant until late December 2003--weeks after his suspension--when Mr. Grant sent Mr. Barker a document containing information about those allegations. n17 (Tr., at 89-92). In fact, Mr. Grant himself admitted at the hearing that he never reported any accounting concerns to Mr. Barker or Mr. Hyman directly; nor did Mr. Grant "know for a fact of anybody conveying any accounting concerns [to Mr. Barker or Mr. Hyman]." (Tr., at 384-85). Instead, Mr. Grant "[made] the assumption . . . the information was passed up the line.. (Tr., at 385). Mr. Barker and Kathy Johnson testified that they did not even know who Mr. Grant was before learning [*36] about the inappropriate e-mail he sent to the company's corporate officers. (Tr., at 56-57; 510-11). Greg Theirl, to whom Mr. Grant directed many of his "allegations," and who did not participate in Mr. Grant's discipline proceedings, made clear at the hearing that he did not "recall having any conversation" with Mark Messersmith, Ken Barker, or Tom Hyman about Mr. Grant's claims of accounting errors. (Tr., at 588). Mr. Messersmith, who admitted knowing of Mr. Grants past "complaints" generally, testified that he provided no input to Mr. Barker regarding Mr. Grant's discipline other than simply relaying the HR department's recommendation. (Tr., at 629).

> n16 Mr. Messersmith, who was involved in Mr. Grant's discipline proceedings, testified that he was not aware of any allegations of fraud levied by Mr. Grant; but he did know that Mr. Grant "made complaints" concerning accounting issues. (Tr., at 634).
> n17 Upon learning of Mr. Grant's "allegations," Mr. Barker ordered an investigation into those allegations. (Tr., at 92-94).

Instead, Mr. Messersmith testified that the HR department and investigative team considered Mr. Grant's personal record and the seriousness of the infraction; [*37] particularly, the fact that Mr. Grant used the word "woody" in an e-mail to an officer of the company. (Tr., at 648). According to Mr. Messersmith, Mr. Grant's language in the e-mail was not acceptable in a discussion with or message to an officer of the company. (Tr., at 651). He explained that the fact that Mr. Grant's e-mail in which he used the word "woody" was sent directly to an officer of the company "was a contributing factor" in determining which level of discipline was appropriate. (Tr., at 651).

On the following Friday morning, December 5, 2003, Mr. Messersmith and Ms. Johnson, along with a few others, met with Mr. Grant in order to officially issue the suspension. (Tr., at 634). They explained the Type III discipline to Mr. Grant and delivered a letter dated December 5, 2003 setting forth the infraction and penalty in greater detail. (RX 21). Mr. Grant served his full suspension.

During his suspension, Mr. Grant consulted with an attorney, and decided to file the instant complaint against the Respondent under the Sarbanes-Oxley Act. At the heart of Mr. Grant's complaint are what he describes as "accounting irregularities" at Dominion East Ohio Gas. Specifically, Mr. Grant [*38] alleges to have questioned Dominion East Ohio Gas management regarding seven (7) unrelated episodes of .accounting fraud. dating back to as early as January 2002, activities that Mr. Grant believes gave rise to his suspension.

2005 DOLSOX LEXIS 79, *38
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

*Questioning Attorney Services*

Mr. Grant first claims that he was suspended for complaining about the details of the Respondent's retention of Roderick Linton, LLP as counsel for a project known as the "Reserve at Emerald Estates." While it is not clear from Mr. Grant's testimony or any other part of the record, it appears as though Respondent's legal department, headed by Michael Zontini, had at one time retained Roderick Linton, LLP to assist Respondent with a number of projects, including a land dispute with a developer regarding the Emerald Estates. Before the completion of the project, which apparently began sometime in the winter of 2001, Mr. Grant claims that Mr. Zontini told him that Roderick Linton, LLP no longer worked for the company due to unsatisfactory work in the past. (Tr., at 299). At some point in January 2002, Mr. Theirl asked Mr. Grant to speak directly with the land developer and his attorney to work out some lease details of the [*39] project. (Tr., at 298-99).

By letter dated January 21, 2002, attorney Stephen Pruneski of Roderick Linton, LLP provided Greg Theirl with an update regarding some of the work it had performed for Dominion on the Emerald Estates project. (CX 16, at 118). Specifically, Mr. Pruneski asked Mr. Theirl to execute a Partial Release of Right of Ways he had previously received from the developer's attorney.

At some point--again it is unclear from the record--Mr. Grant learned of the letter and spoke with Mr. Pruneski of Roderick Linton, LLP by telephone to discuss the Emerald Estates project. At that time, Mr. Grant indicated that the developer was upset with Roderick Linton, LLP and asked them to turn everything over to him to handle the project, because Mr. Grant believed Roderick Linton, LLP was no longer assigned to the project on behalf of Dominion East Ohio Gas. (Tr., at 300-01). Mr. Grant also expressed concern to Mr. Pruneski that Roderick Linton, LLP did not fully explain to the developer and his attorney that Roderick Linton, LLP did not represent the company on that particular project. Mr. Pruneski then called Mr. Zontini at DEO to complain of Mr. Grant.s involvement.

Mr. Grant testified [*40] that on February 12, 2002, Mr. Zontini questioned Mr. Grant's handling of the situation, accusing him of acting unprofessionally. (Tr., at 301, 437-38; see CX 16, at 117, 121; CX 13, at 107, 108). Mr. Grant then responded in an e-mail by brazenly questioning Mr. Zontini's loyalty and professionalism and accusing him of "supporting [his] outsourced lawyer pals." (CX 16, at 117).

One week earlier, Mr. Grant, Mr. Zontini, and Mr. Theirl had engaged in an e-mail discussion regarding the status of Roderick Linton, LLP as Dominion East Ohio Gas' counsel. (CX 16, at 119). Initially, Mr. Grant noted that it was his "understanding that Roderick Linton was DEO's legal counsel until we fired them in July, 2000," and that "Zontini [told him] that he no longer uses Roderick Linton, LLP." Mr. Zontini responded to Mr. Grant explaining that he no longer used Roderick Linton, LLP for his work, but others at Dominion East Ohio Gas did. He also explained that the legal department had decided to allow Roderick Linton, LLP to finish a few projects they had previously been working on since they were familiar with those particular projects. n18 (CX 16, at 119). Finally, Mr. Theirl responded in an attempt [*41] to clarify the purpose of the January 21, 2002 letter from Mr. Pruneski, explaining that Mr. Pruneski sent the letter "merely to 'clean up' something that was agreed to" previously between the parties. (CX 16, at 119).

n18 See also CX 13, at 107; an e-mail in which Mr. Zontini explains the same.

Ultimately, after Mr. Grant accused Mr. Zontini of acting unprofessionally and in the interest of his "lawyer pals," Mr. Grant's supervisor, Frank Martin, called him into his office. (Tr., at 301). According to Mr. Grant, Mr. Martin had been "instructed to reprimand [Mr. Grant] on insubordination or whatever with the legal department." (Tr., at 301). Mr. Grant told Mr. Martin that he was following orders to handle the Emerald Estates project. The two of them seemingly resolved the issue to everyone's satisfaction.

At the hearing, Mr. Grant testified that he was questioning Mr. Zontini's loyalty and professionalism because it appeared as though the legal department "had a lawyer, or a law firm on payroll that wasn't providing any service for

2005 DOLSOX LEXIS 79, *41
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

the particular project," and "it is questionable when corporate officers or people in the company misuse the shareholders funds." (Tr., at 303). [*42] Mr. Grant then made clear at the hearing that he never received any feedback from anyone in the company about whether Roderick Linton, LLP had in fact been retained or if they were paid for the project. (Tr., at 304).

However, during cross-examination Mr. Grant admitted that he never actually complained that Roderick Linton lawyers were getting paid without performing any work. (Tr., at 446-47). Instead, Mr. Grant simply did not approve of the work the law firm was doing, and he was concerned the company was paying the law firm for six months of work without a resolution to the project. (Tr., at 446). When asked whether he knew of any instance of fraud involving payment of attorney's fees, Mr. Grant answered, "...on the book here, I have no evidence of fraud of attorney's fees." (Tr., at 447). n19

> n19 Mr. Grant also offered brief testimony regarding a situation in which he claims Mr. Theirl directed him to charge BP $ 10,000 for 15 minutes worth of work. Mr. Grant provided very little additional explanation. Mr. Theirl explained more thoroughly, however, that BP had hired Dominion to help it deliver gas via pipeline. (Tr., at 580-81). After Dominion East Ohio Gas looked into the project further, BP decided not to proceed. Dominion East Ohio Gas asked to be reimbursed for the work it did perform up to that point. (Tr., at 582). Mr. Theirl charged BP for his time, the marketing department's time, and Mr. Schniegenberg's technical support at about $ 10,000. He asked Mr. Grant to send BP an invoice for the costs, which BP was expecting. (Tr., at 582-83). Mr. Grant, according to Mr. Theirl, was not involved in any of the preliminary work performed before making the proposal to BP; nor did Mr. Theirl provide any details to Mr. Grant about the project. (Tr., at 589). In short, like the other incidences in which Mr. Grant alleges he engaged in protected activity, Mr. Grant knew no facts about the extent of the work performed for BP. Moreover, there is nothing in the record that suggests any wrongdoing on the part of Respondent, or that BP ever suspected any illegal conduct. Thus, there is absolutely nothing in the record to corroborate Mr. Grant's allegation of any wrongdoing with regard to the BP project.

[*43]
*Questioning Wal-Mart Project Billing*

At one time, Mr. Grant was assigned to a project which involved filling an existing storage well that was situated on land to be developed by Wal-Mart. Dominion East Ohio Gas entered into an agreement with the developer by which Dominion East Ohio Gas would fill the existing well and build a new storage well at another location. (Tr., at 354, 567). Per the contract, Wal-Mart agreed to pay Dominion East Ohio Gas $ 600,000 in advance to complete the project. In addition, Dominion East Ohio Gas agreed to reimburse Wal-Mart the difference in price if the overall costs fell below $ 600,000; should the project cost more than $ 600,000, Dominion East Ohio Gas would simply absorb those costs. (Tr., at 354-55). Two accounting logs were set up for the project; one for filling or "plugging" the existing well and one for constructing the new well. Initially, a cost of $ 60,000 was allocated to plugging the existing well, and a cost of $ 540,000 was allocated to drilling and constructing the new well. (Tr., at 592).

Mr. Grant testified that while reviewing the accounting for the new well, he discovered $ 60,000 in labor charges he believed should not [*44] have been charged to the account because no work had been performed. (Tr., at 354). He asked Mr. Theirl about the charges; according to Mr. Grant, Mr. Theirl told him "don't worry about it." (Tr., at 354). According to Mr. Theirl, he was very busy at the time with a number of projects and could not take the time to deal with Mr. Grant's questions. (Tr., at 594-95). Mr. Grant then testified that he "left it alone for a while." (Tr., at 355). Mr. Grant approached Mr. Theirl at a later time during the project with similar concerns, this time questioning $ 116,000 in additional charges. (Tr., at 570, 355). Mr. Theirl indicated that everything was going well. Mr. Grant testified, on the other hand, that he thought charges unrelated to the Wal-Mart project were being applied to the account. After reviewing the total costs, Mr. Theirl too noticed some charges that should not have been applied to the Wal-Mart account. (Tr., at 570). Mr. Theirl agreed some charges were made in error and directed Mr. Grant to have the accounting department transfer the improperly charged expenses to another account in order "to clean up project costs." (Tr., at 571). Mr. Theirl explained at the hearing that [*45] it is not unusual to have to transfer charges during a project because the company deals with a large number of projects at one time and uses a complex accounting system. (Tr., at 571).

2005 DOLSOX LEXIS 79, *45
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

On October 2, 2002, Mr. Grant e-mailed Gary Abbate in the accounting department about the Wal-Mart project. (CX 1, at 47). Mr. Grant explained, "in error we charged a bunch of money to [the Wal-Mart project] that should have been charged [to another project]," and that a correction needed to be made. He then explained exactly how much money needed to be transferred from the Wal-Mart account in accordance with his discussion with Mr. Theirl. Mr. Abbate then asked Gail Butler of the accounting department to make the transfer. (CX 1, at 46). Ms. Butler asked Mr. Grant for some clarification. By e-mail dated October 3, 2002, Mr. Grant explained the transfer to Ms. Butler in more detail; he copied his explanation to Gary Abbate, Frank Martin, and Greg Theirl. (CX 1, at 45). The accounting department made the necessary transfers.

When the project was complete and it came time to settle the accounting with Wal-Mart, Mr. Grant reviewed the account and billing itemization to make sure all costs had hit and [*46] all of the adjustments had been made correctly. He concluded that Dominion East Ohio Gas owed Wal-Mart almost $ 72,000 per the contract. (Tr., at 358, 573). Without discussing it with Mr. Theirl, and without consulting the accounting department, Mr. Grant told Wal-Mart to expect a $ 72,000 refund. (Tr., at 428). Some months later, Mr. Grant discussed this with Mr. Theirl, who had concluded the company owed Wal-Mart only $ 35,000. (Tr., at 359, 573). After their discussion with Mr. Grant, Wal-Mart was naturally expecting a refund of $ 72,000. Wal-Mart, Mr. Theirl, and the accounting department then met to discuss and resolve the confusion. Mr. Theirl explained that from the time Mr. Grant initially concluded the company owed Wal-Mart $ 72,000, "additional costs hit the project that [Mr. Grant] was unaware of." (Tr., at 573). According to Mr. Theirl, costs "regularly" hit project accounts after the project is actually completed, and depending upon the size and complexity of the project, costs can appear months later. (Tr., at 573-4). The accounting department double-checked the itemization and explained it to Wal-Mart. Wal-Mart was satisfied with the explanation and was ultimately reimbursed [*47] roughly $ 35,000. (Tr., at 574).

At the hearing, Mr. Theirl testified that at no time did Mr. Grant express concern that the Wal-Mart project accounting practices were fraudulent in any way. (Tr., at 572). Mr. Grant instead complained at the hearing that although Wal-Mart was satisfied with the accounting, he "never saw or got an explanation of what actually happened." (Tr. at359). During cross-examination Mr. Grant testified that he and Mr. Theirl had "basically corrected [his] concerns" regarding the accounting error, and admitted that at the time he sent the October 2, 2002 e-mail to Gary Abbate in accounting he did not think fraud was occurring. (Tr., at 427). Mr. Grant also testified that he "had no facts" on hand to suggest fraud or corruption during the Wal-Mart project. (Tr., at 431-31). And other than bringing his accounting questions to Mr. Theirl and a petroleum engineer working on the plugging project, Mr. Grant testified that he communicated his concerns to no other person in the company. (Tr., at 433).

*Questioning the Reported Value of an Asset*

Mr. Grant has also alleged that he was suspended for "providing information and asking questions" regarding the value [*48] of a pipeline and the impact that value had on a project account. (Tr., at 307, 576). In the mid-1990's Greg Theirl was involved in a project he described as a "creative deal" in which Dominion Transmission, Inc. (another Dominion Resources, Inc. subsidiary) wanted to purchase segments of inactive pipeline from a company named Buckeye in order to prevent a Dominion competitor from purchasing those segments. (Tr., at 307, 576). Having some previous experience working with Buckeye, Mr. Theirl offered to coordinate the deal. Buckeye also expressed reciprocal interest in a Dominion-owned pipeline and suggested to Mr. Theirl that the two companies essentially swap pipelines. (Tr., at 577). In closing the deal, East Ohio Gas paid $ 90,000 in addition to the pipeline exchange. In the end, Dominion East Ohio Gas acquired two pipeline segments from Buckeye, and according to Mr. Theirl, the "rest of the accounting was between Dominion Transmission and Buckeye." (Tr., at 577).

Some years later--again it is unclear from the record--Dominion East Ohio Gas negotiated a deal with Wal-Mart (coincidentally) allowing it to develop land upon which the pipeline acquired from Buckeye was situated. The deal required [*49] Dominion East Ohio Gas to deactivate the existing pipeline and replace it with a new pipeline in another location, thereby allowing Wal-Mart to develop the land. (Tr., at 307). Mr. Grant was assigned to work on the project; he negotiated a deal worth "roughly $ 210,000." (Tr., at 307). While working out the details of Wal-Mart's plan to

2005 DOLSOX LEXIS 79, *49
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

deactivate and relocate the pipeline, the accounting department approached Mr. Grant with questions regarding the details of the pipeline, including the amount East Ohio Gas paid for the pipeline. (Tr., at 308). According to Mr. Grant, he "looked on the books which was part of this SAP program where we have asset values." (Tr., at 308). Using rough estimates during his testimony, Mr. Grant explained that he provided accounting with the asset values posted on the company's system--$ 450,000--and "calculated for them the price per foot based upon the purchase price" and the length of the pipe, and provided a "rough number for, you know, a one-third capital gain." (Tr., at 308-09).

After some apparent confusion, Mr. Theirl asked Mr. Grant to look into the numbers "some more" because he recalled paying only $ 90,000 for the two segments. (Tr., at 309). [*50] As instructed, Mr. Grant reviewed the records, which reflected a number of roughly $ 450,000 and another stating $ 80,000. (Tr., at 309). So, according to Mr. Grant's testimony, "I sent a copy of all of this--and sent a copy to my boss, and I sent a copy to the land--I basically said you guys figure it out, you know, my deal is basically done here." (Tr., at 309). According to Mr. Grant, an e-mail exchange ensued regarding the purchase price and value of the pipeline over the next few months.

On October 13, 2003, Ms. Lou Ann White of the accounting department e-mailed Greg Theirl regarding the Buckeye pipeline valuation. (CX 1, at 54). In her e-mail, Ms. White explained that during the period some years ago in which East Ohio Gas changed accounting systems, "there were items we were never able to locate" and the department attempted to reconcile an apparent discrepancy within the accounts involving the pipelines purchased from Buckeye. (CX 1, at 54-55). Although it is not apparent from the text of the e-mail, and no witness articulately clarified the accounting involved at the hearing, it seems as if Ms. White was explaining that a credit entry of $ 417,904.23 (amounting to $ 468,956.84 [*51] after taxes and other charges were applied) mistakenly appeared twice on the account and needed to be moved by debiting the account. Mr. Theirl then forwarded the message on to Mr. Grant asking for .[an] English language version.. (CX 1, at 54). Mr. Grant responded to Mr. Theirl on October 14, 2003 as follows:

> Dear Theirl:
>
> I would not touch this Accounting snafu with a ten foot pole. It.s my understanding that Lou Ann is asking you how to resolve the 1996-97 Accounting errors associated with DEO purchasing [two pipelines] from Buckeye; and remember Greg, I already sent Lou Ann a pile of scoop on this Buckeye purchase for Dominion Accounting to make their own corrections. My preference for Lou Ann, is for her to determine how to correct the accounting, then correct the accounting.
>
> Considering that on [one account] we paid $ 80,000 total for [one pipeline]; and on [another account] we paid $ 10,000 total for [another pipeline], I got no idea where Lou Ann gets numbers like $ 417,904.23 and $ 468,956.84.

(CX 1, at 54).

At the hearing, Mr. Grant explained further his understanding of what the accounting department was attempting to accomplish--that is, that "the company had [*52] to determine for real what they purchased the pipeline for because that would affect what the capital gain would be for this little piece here that they would have to declare." (Tr., at 310). According to Mr. Grant's testimony, his e-mail reproduced above was an attempt "to boil from the accounting issue because I don't understand it." (Tr., at 310). Mr. Grant further admitted that he "wouldn't really know when the records are right or wrong," but "all [he] could do was question them." (Tr., at 311). By questioning why the computer system indicated an amount of more than $ 450,000 and his paper records indicated a purchase price of $ 80,000, Mr. Grant testified he was simply doing his job. (Tr., at 311-12). Ultimately, Mr. Grant testified that he was concerned because the people in accounting did not provide him with an explanation of how or whether they resolved the problem. (Tr., at 312). At the time of the hearing, Mr. Grant noted that he still did not know how the "accounting snafu," as he described it, was resolved. Moreover, when asked by his counsel to explain the conclusion he drew at the time, Mr. Grant testified that "it appears that they overstated the asset of the--to [*53] better the financial books." (Tr., at 312).

2005 DOLSOX LEXIS 79, *53
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

Mr. Theirl described the "accounting snafu" much differently at the hearing. Admitting that he too did not fully understand the accounting involved, (Tr., at 578), Mr. Theirl testified that he was not surprised about the accounting error given the complexity of the deal and that three parties were involved. (Tr., at 579). He simply left the issue to accounting to resolve. At no time did Mr. Theirl ever discover a reference to fraud regarding the Buckeye pipeline accounting error. (Tr., at 579-80). Nor did he receive any indication from Mr. Grant that the accounting error was the result of fraud. (Tr., at 579). Instead, Mr. Theirl testified that he believed Mr. Grant simply expressed in his October 13, 2003 e-mail that he did not understand the accounting involved. (Tr., at 579). In fact, Mr. Grant testified he did not know what the value of the pipeline was and did not know the details of the transaction, n20 and he admitted that his October 14, 2003 e-mail to Greg Theirl was "not a complaint by me that someone is engaging in fraudulent activity," (Tr., at 421); and "looking at the facts I had so far I cannot say that the company was at fraud [*54] because I did not know the conclusions." (Tr., at 422). Rather, Mr. Grant stated, "I would have felt more comfortable on these type of things when they got the final answer if they conveyed that to me." (Tr., at 422).

> n20 Complaint's "expert" witness, Mr. Wynne-Brown, also testified that he did not fully understand the facts of this transaction; particularly that it involved an asset exchange, and not an outright cash purchase of the pipeline.

### Questioning the Use of Double-Wall Tanks

Mr. Grant also alleges that he was suspended in violation of the Sarbanes-Oxley Act for raising engineering compliance questions regarding the use of single- or double-wall storage tanks. Depending upon the project at hand, Dominion East Ohio Gas--like any other utility company--is required to comply with a number of federal and state regulations governing storage facilities, pipeline transmission facilities, etc., including the Spill Prevention Regulations/Code (hereinafter "SPC") and the National Fire Protection Association Code (hereinafter "NFPA"). n21 On January 8, 2003, while working on a project in which Dominion East Ohio Gas was required to replace a storage tank, Mr. Grant sent [*55] out a mass e-mail to the Dominion East Ohio Gas North Canton office directing the office's attention to NFPA 30, which deals with testing "100 barrel brine/oil tanks."--or double-wall storage tanks--before their use. (CX 1, at 63). Mr. Grant, who in connection with his job is responsible for building facilities in compliance with the applicable regulations, also asked Mr. Theirl at some point about the code requirements for the company's well tanks. The "100 barrel" tanks, according to Mr. Theirl's testimony, are used at most of Dominion's well sites. (Tr., at 583).

Shortly thereafter, Mr. Grant was told by a number of individuals in the engineering department, including Frank Martin and John Schniegenberg, that the use of double-wall tanks is not required. (Tr., at 324). Mr. Grant testified that he requested the company's official position on the issue in writing so that he could circulate it throughout the office. (Tr., at 324). After no response, and having heard conflicting directives from different "bosses," and at the direction of Mr. Theirl, Mr. Grant finally e-mailed Pamela Walker, Dominion East Ohio Gas' deputy general counsel for compliance, asking two specific questions: [*56] first, whether the company had to comply with NFPA 30; and second, whether the company had to use "double wall" tanks, as opposed to single-wall tanks. (CX 1, at 63). The record contains no response from Ms. Walker.

> n21 The record contains only brief descriptions of these two regulatory codes without any reference to their specific citations, the specific text, or the specific industries to which they apply.

Mr. Grant never received an answer from Ms. Walker, so he directed the same two questions to Bob Westbrooks, the head of Dominion's legal department. (Tr., at 325; CX 1, at 66). Mr. Westbrooks then told Mr. Grant that he would look into the matter and get an answer back to him by November 14, 2003. (CX 1, at 66). Mr. Grant had also discussed the issue with Mr. Theirl, who told Mr. Grant that the company is not required to use double-wall tanks. (Tr., at 326). At the hearing, Mr. Theirl explained that he was not initially convinced that the NFPA code was applicable; he believed the project was instead subject to the SPC. So Mr. Theirl arranged for the company's engineering expert to present an explanation of the regulations to the employees of the North Canton office. (Tr., [*57] at 583). On November 12, 2003, Mr. Westbrooks e-mailed Mr. Grant notifying him that Tim Jackson, of the "Environmental Engineering group,"

2005 DOLSOX LEXIS 79, *57
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

would be conducting a training seminar in the North Canton office to clarify the regulations. (CX 1, at 67). Mr. Grant then thanked Mr. Westbrooks for his "intervention," and suggested that the policy to use single-wall tanks was only designed to save money. (CX 1, at 68; Tr., at 339). According to Mr. Theirl, the company's engineering expert, Mr. Jackson, concluded that the company "did not have to comply with the fire standards." (Tr., at 584). There is nothing in the record indicating whether or not Mr. Grant attended Mr. Jackson's presentation on regulatory compliance.

Mr. Theirl explained further at the hearing that "from time to time, we do use double wall tanks" in situations where the installation of a "secondary containment" system is physically unworkable, or if the tank is installed in an environmentally sensitive area. (Tr., at 584). In other words, if the project allows for the engineers to install a tank along with a surrounding dike, the company will not use double-wall tanks. Double-wall tanks, according to Mr. Theirl, are used [*58] on rare occasions: "only where there [is] a site specific reason to do that in our judgment." (Tr., at 584). Thus, the company's policy, according to Mr. Theirl, is to use singlewall tanks along with a dike containment system around the tank in case of a spill or leak as required by the SPC regulations.

Based upon Mr. Theirl's representation, Mr. Grant then sent an e-mail to a large number of individuals to whom he refers in the message as "DEO T&S Associates" and "DEO T&S Contractors," n22 on November 18, 2003, explaining that his initial e-mail in which he indicated that the company was required to use double-wall tanks was wrong. (CX 1, at 69; Tr., at 452-454). Mr. Grant then wrote that the "official company position is that Dominion does not have to use double wall tanks." (CX 1, at 69). According to Mr. Grant, the general reaction to the policy was delight, as double-wall tanks require much more work and money to install. (Tr., at 327). At the hearing, Mr. Grant explained that the purchase price of a single-wall tank is $ 4,000 and a double-wall tank costs $ 12,000; the installation costs are also higher for double-wall tanks. (Tr., at 327). In addition, Mr. Grant testified that [*59] it was around the time of his November 18, 2003 e-mail that "the legal people and everybody around me were treating me different." (Tr., at 328).

n22 "T & S" refers to "transmission and storage."

Although no one specifically objected to Mr. Grant's November 18, 2003 e-mail, Mr. Grant testified that he "sensed" the "corporate officers" and "legal department" were "shunning" him because of what he describes as "hardships on the company." (Tr., at 327-332). Specifically, Mr. Grant testified that there is now a "friction" between him and Frank Martin that has affected their working relationship. (Tr., at 333-34). And, according to Mr. Grant, he and Mr. Theirl are no longer "comfortable" around each other. (Tr., at 334). Meanwhile, Jerry Williams, according to Mr. Grant, has "indicated that he is upset with me when I take issues outside of the office." (Tr., at 336). Although, when asked directly about his relationship with the corporate officers, Mr. Grant noted that he and Ken Barker still "get along great," he believes that "since a year ago," Vice Presidents Bruce Klink and Thomas Hyman no longer communicate with him. (Tr., at 336).

When asked specifically during cross-examination [*60] whether at the time he asked the compliance questions regarding the use of doubled-wall tanks and compliance with NFPA 30 he thought fraud was involved, Mr. Grant responded that he believed there was "suspicious behavior" because no one would initially give him an answer in writing. (Tr., at 449-50). According to Mr. Grant, "It would have been very easy in January for somebody to give me a written response saying this is the way we are going to go." (Tr., at 450). And although Mr. Grant expressed suspicion that the company was trying to save money by using single-wall tanks, he also testified that his e-mail dated November 18, 2003 finally explaining the official company policy regarding the use of single- or double-wall tanks was not a complaint about fraud. (Tr., at 452). Furthermore, Mr. Grant stated that he was not retaliated against for sending the e-mail about the use of double-wall tanks. (Tr., at 456).

*Questioning the Jackson Township Garage Project*

On March 6, 2003, Mr. Grant sent an e-mail to Frank Martin regarding the "Jackson Twp. Garage" project, in which Mr. Grant asked Mr. Martin to review a "proposed letter" to the Jackson Township Trustees. (CX 1, at 60-61). [*61] The proposed letter--apparently prepared by Mr. Grant--contains Dominion East Ohio Gas' position that it would

not proceed with the township's plans for relocating a Dominion East Ohio Gas facility because they did not appear to conform to the governing regulations. (CX 1, at 61; Tr., at 318). Mr. Martin responded to Mr. Grant as follows:

> I think we can accommodate the request for relocation. Refer to the final design plans provided to us. We should prepare plans to lower pipelines and the reimbursement agreement for Jackson Township to review.

(CX 1, at 60). Mr. Grant responded on March 6, 2003 by refusing to work any further on the Jackson Township Garage project:

> Due to everything that I have reviewed on this project or associated to this project thus far, my general engineering knowledge, personal ethics, safety concerns, legal concerns, compliance concerns, etc., I decline to follow your instructions and decline to have any further personal participation in the so called Jackson Township Maintenance Garage Improvement Project or any Dominion Facility Relocation Plans associated to said project.

(CX 1, at 60).

Mr. Grant testified about this e-mail exchange. (Tr., [*62] at 318). After explaining that the township's plan, in his view, "did not comply with Dominion's restrictions, and some of their improvements did not comply with federal DOT code as I understand the code," Mr. Grant noted that he and Mr. Martin discussed the issues with Mr. Zontini of the legal department; all was "resolved to Zontini's satisfaction." (Tr., at 319). However, Mr. Martin, according to Mr. Grant, pressured him "to proceed, proceed, proceed, without, you know, Zontini's input or authorization or whatever." (Tr, at 319).

In response, Mr. Grant sent the March 6, 2003 e-mail notifying Mr. Martin of his refusal to proceed with the project because "[Mr. Martin] was persistent." (Tr., at 321). Mr. Grant's counsel then asked Mr. Grant to identify "the accounting problem that you were communicating, if any" in that e-mail. (Tr., at 321). Mr. Grant answered: "I don't see accounting entering into it." (Tr., at 321). The record contains no other reference to the Jackson Township project, and no other witness testified about it.

*Raising Concern of Field Laborers' Ability to Monitor Encroachments*

On August 6, 2002, Mr. Grant e-mailed Maureen Critchfield, who was Dominion [*63] East Ohio Gas' manager of pipeline integrity at the time, and Frank Martin. (CX 1, at 59; Tr., at 315). The subject line of the e-mail reads, "Encroachments, the ship is sinking." In his message, Mr. Grant expressed his concern about complaints he had received from "DEO men in the field (management and labor)" regarding their inability to effectively handle encroachments on certain easements owned by the company, because of what Mr. Grant describes as "DEO imposed apathy" by company Directors and Officers toward the field laborers. (CX 1, at 59).

Mr. Grant testified that if a landowner encroaches onto a Dominion-owned easement, the field laborers have to create an encroachment report and provide the landowner with a number of restrictions by which they must abide. (Tr., at 313-14). In short, Mr. Grant explained that the field laborers were frustrated because after performing their encroachment-related duties, months would pass before the encroachment was removed or resolved. (Tr., at 314).

In addition to "conveying what the guys in the field were telling [him]," (Tr., at 315), Mr. Grant e-mailed Ms. Critchfield to suggest a solution. That is, Mr. Grant suggested that the company create [*64] "an encroachment database on the network" by which all employees may view encroachment reports to track their progress. (CX 1, at 59). According to his e-mail, Mr. Grant believed such a system would "improve their moral [sic] and attitudes" giving them more incentive to maintain safety and enforce compliance around DEO facilities." (CX 1, at 59). The record contains no response to the e-mail from either Ms. Critchfield or Mr. Martin.

At the hearing, Mr. Grant's counsel asked him to clarify his concerns expressed in CX 1, at 59, as they relate to "issues of accounting fraud impact to the shareholders." (Tr., at 316). Mr. Grant responded as follows:

> Well, how this effects accounting is, and this is my understanding of the federal regulations. Dominion is obligated to monitor construction activity around its high pressure pipelines. Dominion is obligated to keep its easement areas or the land around these pipelines reasonably unencumbered by encroachments or they present problems. If Dominion does not direct the resources, being the manpower and the enforcement list, Dominion could possibly be put in, you know, the stockholders equity in jeopardy in the future. If because of Dominion's [*65] lack of action in the future it causes an accident, and lawsuits, and personal injuries, property damages, and that kind of stuff. That is the only relevance of accounting I can see here.

(Tr., at 316). When asked directly during cross-examination to further explain his e-mail to Ms. Critchfield as it related to accounting fraud, Mr. Grant acknowledged that the e-mail was not an allegation of accounting fraud. (Tr., at 449). No other witness testified at the hearing regarding Mr. Grant's e-mail to Ms. Critchfield or about the concerns he raised therein.

*Dominion East Ohio Gas' Accounting System*

The record also contains a number of references to, and a number of witnesses testified generally about the Dominion East Ohio Gas accounting system--that is, the system used to track the charges, tasks, credits, debits, progress, etc. of a particular project. Mr. Grant specifically described random instances in which he questioned the accounting system and its application on certain projects generally.

On February 12, 2003, Mr. Grant challenged the use of a specific aspect of that system in an e-mail to Lou Ann White of the accounting department. (CX 1, at 52). According to Mr. [*66] Grant's testimony, the company at some point--again, it is not clear from the record--"switched to a new accounting program called--a Standard Accounting Program [or SAP]." (Tr., at 305). And, after "a year or so, as an extending program to it, they came out with a program called WMIS."s (Tr., at 305). He explained that the SAP program was simple to use because he "could pull one project and do 18 different functions on different type of facilities all on the same project"; whereas the WMIS program requires him to "have to pull a separate project" to perform "every little task." (Tr., at 305). The result of using WMIS, according to Mr. Grant, "is like 18 times as much clerical work." (Tr., at 305-06).

Clearly frustrated with the difficulty he was having using the system, Mr. Grant e-mailed Ms. White expressing his concerns and requesting that the company "make things simple" by going back to using the SAP program only. (CX 1, at 52; Tr., at 306). The record contains no response from Ms. White.

During cross-examination, Mr. Grant was questioned by counsel about his knowledge of the accounting system at Dominion East Ohio Gas. Mr. Grant acknowledged that he is not an accountant, but [*67] he and the accounting department work together to correct mistakes that would appear from time to time. (Tr., at 407-08). He also admitted that at times he does not understand the accounting involved, but he was forced to learn some of the accounting system out of necessity. (Tr., at 408-09). Thus, Mr. Grant was not aware that the SAP software program and the WMIS (or "Work Management Information System") program serve separate functions. (Tr., at 410-12). In any event, Mr. Grant testified in response to a direct question that his e-mail to Lou Ann White on February 12, 2003, in which he requested a simplification of the accounting system, (CX 1, at 52), was not a complaint of accounting fraud. (Tr., at 412).

Mr. Messersmith also testified about the company's use of the SAP and WMIS programs. (Tr., at 635). Referring to Mr. Grant's complaint about the use of the WMIS program, (CX 1, at 52); Mr. Messersmith explained that he was familiar with the programs used to track project charges. According to Mr. Messersmith, WMIS "tracks work tasks," and it is not an accounting program. (Tr., at 635). He understood Mr. Grant's e-mail, in which he requested that the company go back to the SAP [*68] program, to simply be a complaint that the current software required redundant data

entries; but "absolutely not" an allegation of accounting fraud. (Tr., at 636). Mr. Messersmith acknowledged that the WMIS program requires multiple entries and that the company was reviewing the software to evaluate the appropriateness of its continued use. (Tr., at 636). No other witness testified specifically about the company's SAP and WMIS programs.

During another episode of questioning the accounting system, Mr. Grant e-mailed Gary Abbate of the accounting department on August 14, 2003, requesting "a new accounting program for estimating jobs." (CX 1, at 53; Tr., at 413). More specifically, Mr. Grant indicated that he was having difficulty "estimating a job within 10% accuracy, due to unexplainable accounting charges." (CX 1, at 53). In addition, Mr. Grant explained to Mr. Abbate that a particular project had a "questionable" debit balance increase and an overestimation of preliminary engineering costs; he warned, "Gary get ready for the State auditor." (CX 1, at 53). However, during cross-examination Mr. Grant again admitted that his e-mail to Mr. Abbate was "not a complaint of fraud." (Tr., [*69] at 414). Instead, Mr. Grant was "conveying to Gary" that if he "can't estimate the jobs within 10 percent, you've got to answer to an audit." (Tr., at 414). In fact, Mr. Grant testified that his request to Mr. Abbate was for a new computer program because the one he was using was not accurate, and the "unexplainable charges" to which Mr. Grant was referring was simply unexplainable to him. (Tr., at 413-14). Mr. Grant conducted no further inquiry or investigation into the so-called "unexplainable charges" and the record contains no other reference or discussion about this particular project.

The record also contains a number of e-mails exchanged between Mr. Grant and Mr. Abbate, and others as copy recipients, regarding "DEO Project #9694." (CX 1, at 48-51). Specifically, the e-mail exchange involved questions initiated by Mr. Grant about the debit balance of a project containing additional charges for which Mr. Grant requested an explanation. (CX 1, at 49). Mr. Abbate assured Mr. Grant that he would look into the additional charges. (CX 1, at 50). On October 23, 2002, Mr. Abbate provided Mr. Grant an explanation of the charges to the project. (CX 1, at 48-49). On October 28, 2002, [*70] Mr. Grant sent an e-mail to Mr. Abbate stating, "DEO's accounting is not understandable to me; however, you're the DEO Manager of Accounting Gary, so if you say it's correct, that's OK with me." (CX 1, at 48). Mr. Grant then instructed Mr. Abbate to prepare a "Federal form #3357 'Summary of Billing'" invoice in order to bill the client. (CX 1, at 48). He also warned Mr. Abbate that "the last summary of billing you prepared did not even closely compare to the preliminary estimate I turned in." (CX 1, at 48).

Mr. Theirl, who was a copied recipient of this series of e-mails, testified briefly about the "project #9694" e-mail exchange. (Tr., at 606). According to Mr. Theirl, while he appreciated his inclusion in the e-mail, he did not respond to Mr. Grant's inquiries, but he let accounting handle it. Mr. Messersmith was also copied on the e-mail message. He understood the e-mail--CX 1, at 53--to be a "complaint regarding the accounting software that was being used to estimate jobs," not an allegation of accounting fraud. (Tr., at 636-37). Instead, according to Mr. Messersmith, "[Mr. Grant] wasn't happy with some of the software that him and other technicians were using to do their job." [*71] (Tr., at 637). No other witness testified about the #9694 project.

It is not clear from the record which, if any, of these incidences in which he questioned the accounting system, Mr. Grant is claiming actually contributed to his suspension. Indeed, Mr. Grant did not expressly testify or allege that his requests for accounting system clarification were specifically considered by the company in determining his discipline. Mr. Theirl testified that Mr. Grant has never suggested to him that any employees have engaged in illegal activities; rather, Mr. Theirl testified that Mr. Grant "does bring up accounting concerns from time to time, and how invoices and costs should be processed." (Tr., at 563). Moreover, Mr. Theirl stated that Mr. Grant never alleged that any of the accounting practices were illegal, and "he just indicated a lot of frustration with the system." (Tr., at 564).

It is clear from the hearing testimony, however, that Mr. Grant now believes he was suspended because he continuously questioned accounting errors, the use of certain legal counsel, and compliance with certain engineering codes/regulations. In response to a direct question during cross-examination about his [*72] general understanding of why he was "retaliated against" and who was responsible for that "retaliation," Mr. Grant testified as follows:

Well, in reviewing all the facts, my opinion is, that when I sent out the final summary e-mail of the tank

2005 DOLSOX LEXIS 79, *72
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

situation, when I copied the--and the previous one, when I copied Pamela Walker's boss, who I think was vice-president of legal, I think was jointly communicated between the people in Richmond, and Pamela Walker, her boss, Jay Johnson, Tom Hyman, Bruce Klink. I think everybody got together and said this is how we are going to handle Grant. I think they got together and they thought that Grant is a loose cannon and we don't know where he is going to go off, and let's get rid of him at the next opportunity. Now that might be correct and that might be wrong, but that is my take of looking at everything for the last year.

(Tr., at 369-70). When asked directly why he believed he was not in fact terminated or gotten "rid of," Mr. Grant stated:

To my knowledge before I was back to work I was suspended for 10 days. In this 10 day period, I talked to numerous lawyers being Sally Henning, Richard Henning, and Randy Wilson, and they consulted [*73] friends and accountants being Martin Brown, with I think Sally being the one who is the lead attorney communicating what they think is going on here. I think she had three discussions over a 10 day period with Bob Westbrooks because we were --

• • •

Well, I think the reason why I wasn't terminated is because of my help on my side communicating with Westbrooks, and him responding to these hierarchies of the gas company. And they probably figured out that if thy terminated me that would have great legal controversy and it would go on further. So it was best to drop back to a 10-day suspension.

(Tr., at 370-71).

In the course of investigating and filing the present claim, Mr. Grant consulted Martin Wynne-Brown as an expert in accounting fraud. Complainant's counsel called Mr. Wynne-Brown to testify at the hearing as an "expert." (Tr., at 102). Mr. Wynne-Brown has a Masters degree in business administration and an FCCA certification from the British Chancellor--a CPA equivalency--and is a certified financial accountant, a member of the "Certified Fraud Examiners," a "member of the Certified and General Auditors," and "an associate of the Certified Management Accountants." (Tr., [*74] at 102; See CX 17, at 124-127). Mr. Wynne-Brown testified that he is "a financial person," who has served as CFO for a number of "various companies." Most recently, according to Mr. Wynne-Brown, he has served as a "forensic accountant" for a company in Cleveland where he investigates financial accounting services and accounting frauds. (Tr., at 103).

Complainant's counsel tendered Mr. Wynne-Brown as an expert witness in Sarbanes-Oxley compliance and forensic accounting. (Tr., at 105, 114, 116). After repeated requests by the Court to explain the relevancy of Mr. Wynne-Brown's expert testimony, Counsel presented the following issues: (1) whether Mr. Grant's allegations amounted to an objectively reasonable belief that securities or fraud laws were violated; (2) whether Mr. Grant's allegations, if true, should have been investigated by the company; and (3) if Mr. Grant's allegations were ignored by the company, whether filing a claim with OSHA was frivolous. n23 (Tr., at 120-21).

n23 See discussion *infra* regarding Mr. Brown's status as an expert and whether the stated issues are subject to expert testimony. After lengthy discussion about whether Mr. Wynne-Brown's testimony was suitable for an "expert" label, I permitted the Complainant to present his testimony, reserving judgment as to its relevance and weight.

[*75]

Mr. Wynne-Brown interviewed Mr. Grant 6 months before the hearing. He also reviewed the many e-mails contained in the record in which Mr. Grant raised questions or complaints about accounting errors, compliance concerns, and retention of legal counsel, and discussed them with Mr. Grant. (Tr., at 128-29). At the hearing, Mr. Wynne-Brown testified, however, that he never actually reviewed "the company books" as they related to Mr. Grant's

allegations; nor did Mr. Wynne-Brown discuss Mr. Grant's allegations with any person at Dominion East Ohio Gas. (Tr., at 129). Nonetheless, Mr. Wynne-Brown concluded that if Mr. Grant's allegations, as presented at the hearing, were true, it would have been a "major problem," and those matters should have been investigated by the company. (Tr., at 130). He also opined that if factually accurate, Mr. Grant's complaints "would constitute a violation of Sarbanes-Oxley." (Tr., at 130).

More specifically, Complainant's counsel asked Mr. Wynne-Brown whether a $ 15,000.00 charge for preliminary engineering "when no preliminary engineering had been engaged in" is "improper conduct." (Tr., at 130-31). Mr. Wynne-Brown responded that "it was improper conduct [*76] because [Mr. Grant] was--at this time and the discharge came from somewhere else, and for events that had never really occurred apparently." (Tr., at 131). And, with regard to Mr. Grant's concern about the stated value of the Buckeye pipeline, Mr. Wynne-Brown testified that "it was a major violation," and that the company should have investigated it. (Tr., at 131).

Finally, Mr. Wynne-Brown also testified about Mr. Grant's questions regarding the use of double-wall tanks. The following exchange ensued during direct-examination between Complainant's counsel and Mr. Wynne-Brown:

> Q: Were you--did you become aware of an example from talking [to] Mr. Grant or reading the e-mails where Mr. Grant was complaining of using the wrong type of materials in order to save corporate funds?
>
> A: Yes, they used the single oil tanks which were necessary under the federal and state law, and he was seeking confirmation from higher management because it was legal to be using single tanks to save money.
>
> Q: Is that an accounting issue?
>
> A: Well, it is an accounting issue, yes. You are going with inferior materials to save money which profits--
>
> Q: And you understand that under Sarbanes-Oxley that [*77] is a potential violation?
>
> A: Yes, it is a misstatement. Well, it is mostly changing the accounting, and unfortunately, a violation of the federal and state laws to save money which again--in my mind, of course, the aspect is dangerous and frightening to think of--

(Tr., at 132).

During cross-examination Mr. Wynne-Brown acknowledged, however, that "without access to company books," he could not "say [he] knew everything" about Mr. Grant's allegations; instead, he believed that "from everything [he] saw it seemed fairly clear." (Tr., at 133). What is clear is that Mr. Wynne-Brown's understanding of the facts of each allegation or complaint about a particular project simply mirrors and is limited to Mr. Grant's recitation of the facts--which is clearly misguided. For example, when asked specifically about the Wal-Mart job in which the project was broken down into two accounts and an expense for one account was mistakenly placed onto the account of another, Mr. Wynne-Brown admitted that if that was in fact an error--and the wrong account was charged--"that wouldn't be fraud." (Tr., at 134). However, he did not recall Mr. Grant characterizing the Wal-Mart accounting issue as an error. [*78] (Tr., at 134). Moreover, Mr. Wynne-Brown did not know that Dominion East Ohio Gas, purchase of the pipeline from Buckeye involved an asset exchange in which Buckeye also acquired a pipeline from Dominion East Ohio Gas. (Tr., at 135). Thus, he acknowledged that the accounting for such an asset exchange requires more than simply assessing the dollar amount paid for the asset, but also takes into account the value of the asset exchanged. (Tr., at 135).

When asked about the company's use of single- or double-wall tanks, Mr. Wynne-Brown stated that he knew that it was part of Mr. Grant's job to be concerned with compliance to federal and state codes. Initially, he indicated that

2005 DOLSOX LEXIS 79, *78
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

violating regulations in order to save money would amount to misconduct. But Mr. Wynne-Brown then testified that he knew that Mr. Grant learned that the applicable regulations did not in fact require the use of double-wall tanks as he initially thought. (Tr., at 136-37). He testified further that Mr. Grant told him the company was "going back and changing out singles for doubles." (Tr., at 137). Mr. Grant's concern then arose, according to Mr. Wynne-Brown, when he received "no factual response" as he requested.  [*79]  Mr. Wynne-Brown acknowledged that if the applicable regulations were technically satisfied, the use of much less expensive materials would not be fraud. (Tr., at 136).

## DISCUSSION

### Untimely Request for Hearing Before Office of Administrative Law Judges n24

> n24 By letter dated November 8, 2004, Respondent filed its Motion to Dismiss based upon Complainant's untimely filing of his objections and request for a formal hearing. Complainant filed a response to Respondent's motion shortly thereafter. At the hearing in this matter, the parties presented oral argument related to the issue of timeliness. I deferred ruling on the issue until after the conclusion of the hearing as I felt it appropriate to allow the parties the opportunity to introduce evidence relevant to the issue of timeliness. (Tr., at 12-13).

Respondent filed its Motion to Dismiss, contending that the Complainant's claim should be dismissed for failure to timely request a formal hearing before this Office. Complainant, on the other hand, argues that the filing request deadline should be tolled based on equitable considerations. For the reasons stated below, I agree with Respondent.

The regulations governing [*80]  claims filed under the Sarbanes-Oxley Act whistleblower provisions, found at 29 C.F.R. §1980, provide in pertinent part as follows:

> (a) Any party who desires review, including judicial review, of the findings and preliminary order, or a named person alleging that the complaint was frivolous or brought in bad faith who seeks an award of attorney's fees, must file any objections and/or a request for a hearing on the record within 30 days of receipt of the findings and preliminary order pursuant to paragraph (b) of Sec. 1980.105. The objection or request for attorney's fees and request for a hearing must be in writing and state whether the objection is to the findings, the preliminary order, and/or whether there should be an award of attorney's fees. The date of the postmark, facsimile transmittal, or e-mail communication will be considered to be the date of filing; if the objection is filed in person, by hand-delivery or other means, the objection is filed upon receipt.

29 C.F.R. §1980.106(a). As the regulations clearly state, a party may file objections and request a formal hearing before the Office of Administrative Law Judges within thirty (30) days from the date of receiving [*81] OSHA's determination. No additional provisions exist within the Act's implementing regulations addressing the time limits for filing a formal hearing request, or providing a basis on which the filing deadline may be tolled. n25

> n25 See footnote 27, infra.

By letter dated May 17, 2004, OSHA completed the "Secretary's Findings," concluding that there was no reasonable cause to believe the Complainant was terminated in violation of the Act's whistleblower protection provisions. The Secretary's Findings also stated that "Complainant and Respondent have 30 days from receipt of these Findings to file objections and request a hearing on the record, or they will become final and not subject to court review." Mr. Grant signed for and received via Certified Mail (U.S. Postal Service) the Secretary's Findings on Friday, May 21, 2004. Thus, Mr. Grant had 30 days from May 21, 2004--or until Monday, June 21, 2004 n26 --in which to file any objections to the Secretary's Findings and request a formal hearing before this Court.

> n26 Because the 30-day deadline fell on Sunday, June 20, 2004, the observed filing deadline for purposes of "timeliness" was Monday, June 21, 2004. See 29 C.F.R. §18.4(a).

2005 DOLSOX LEXIS 79, *82
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

[*82]

Complainant subsequently filed a request for a formal hearing before this Office by United Parcel Service (hereinafter "UPS"). Although the envelope in which his request for formal hearing arrived cannot be located within the case file, the first page of the request itself was date-stamped upon its arrival in this Office on June 22, 2004--one day beyond the filing deadline. Moreover, I take notice that this Office's computerized internal docket system reflects that Mr. Grant's claim was received and docketed on June 22, 2004. n27

n27 Nor does Mr. Grant contest that his request for appeal was received in this Office on June 22, 2004.

The Act's implementing regulations make clear that "if the objection is filed in person, by hand-delivery or other means, the objection is filed upon receipt." 29 C.F.R. §1980.106(n). Complainant did not file his objections and request for formal hearing by mail, facsimile, or e-mail, but instead by UPS--i.e., by "other means." Consequently, Complainant's request for a formal hearing before this office was not deemed "filed" under the implementing regulations until it was received by this Office on June 22, 2004.

Complainant maintains that although [*83] he may have filed his appeal beyond the deadline, his claim should not be dismissed for failure to timely file based on the doctrine of "equitable tolling." Specifically, Complainant argues that he should be excused from the deadline because he was not represented by counsel during a very short period of time in which the filing deadline fell. There is no question that Mr. Grant was represented by counsel while his claim was before OSHA, and he was represented by the same counsel as soon as the case was docketed with this Court, and throughout these proceedings. Nonetheless, due to a failed relationship between him and his counsel (which was later resurrected), Mr. Grant fired his counsel and was not represented by an attorney during the short time that happened to coincide with the timetable for meeting the filing deadline. (Tr., at 10-11). For that reason, Complainant's counsel argued at the hearing that Mr. Grant filed his objections on his own in every way in which he was capable. (Tr., at 11). Respondent, on the other hand, argues that "equitable tolling" is not appropriate in this case. I agree.

The doctrine of "equitable tolling"--as its name suggests--is rooted in notions [*84] of equity and fairness, and typically provides an adjudicating officer a means to modify a limitations period in certain circumstances. Recently, an administrative law judge held in a Sarbanes-Oxley Act whistleblower case that the Act's 30-day filing provision--also at issue here--while not a statute of limitations per se, "does not establish a jurisdictional requirement," and is, therefore, also "subject to equitable tolling." *Lerbs v. Buca di Beppo, Inc.*, 2004-SOX-8 (ALJ Order Denying Motion to Dismiss Dec. 30, 2003). In other words, because filing periods do not bear on an ALJ's subject matter jurisdiction to hear a claim, such deadlines are analogous to Statutes of Limitations, which have consistently been held subject to equitable tolling. *Id.*, citing *Swint v. Net Jets Aviation, Inc.*, 2003-AIR-26 (ALJ July 9, 2003) *and Donovan v. Hahner, Forman & Harness, Inc.*, 736 F.2d 1421 (10th Cir. 1984). But while the doctrine may apply to the Act's 30-day filing provision, there must be some factual basis in the record upon which equitable tolling is warranted. Complainant has provided none.

Equitable tolling, unlike equitable estoppel, does not depend [*85] upon any wrongdoing by the opposing party; but instead "focuses on whether there was excusable delay by the plaintiff." *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1178 (9th Cir. 2000). Counsel argues that because Mr. Grant was not represented by counsel at the time, because he is not "sophisticated," and because he "did everything he could do to have it filed within 30 days," (Tr., at 11), his lack of timeliness should be excused. n28 However, Complainant has presented no facts demonstrating that he "did everything he could do" but was unable, because of extraordinary circumstances, to file his appeal on time, nor has he provided this Court with any other sufficient reason to excuse his error. Indeed, the Complainant himself offered no testimony or other evidence to explain his last-minute and untimely filing, or to support a conclusion that he was not capable of submitting a timely filing. Apparently, he is strictly on the bald and unsupported arguments of his counsel.

n28 Again, I stress that the Complainant himself offered no testimony or other evidence to explain his last-minute and untimely filing; he is apparently relying strictly on the arguments presented by his counsel.

[*86]

It should be noted that "statutory filing periods are to be strictly construed and 'restrictions on equitable tolling must be scrupulously observed'" *Buca di Beppo*, 2004-SOX-8, *quoting Swint*, 2003-AIR-26 at 8 *citing City of Allentown v. Marshall, 657 F.2d 16 (3rd Cir. 1981)*. Absence of prejudice to the Respondent alone does not automatically invoke equitable remedies. *Marshall, 657 F.2d at 20* (in which the Third Circuit concluded, "prejudice to defendant, or lack of it, is simply irrelevant when Congress has drawn a line at the point where it believed claims should be barred. As the Court said in Mohasco [Corp. v. Silver, 447 U.S. 807, at 826 (1980)], '(e)ven if the interest of justice might be served in this particular case by [permitting this claim to be heard], in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law'."). Instead, equitable tolling "may be appropriate when the complainant demonstrates that extraordinary circumstances prevented him from 'managing [*87] his affairs and thus from understanding his legal rights and acting upon them.'" *Buca di Beppo*, 2004-SOX-8, *quoting Hall v. EG&G Defense Materials, Inc.*, ARB Case No. 98-076 (ARB Sept. 30, 1998).

Here, Complainant has not demonstrated (or even alleged) that he was misled in any way, that he was prevented from asserting his rights in any way, that he received inadequate notice, or that he filed a defective pleading. *See Buca di Beppo*, 2004-SOX-8. Instead, Mr. Grant missed the deadline by delivering his objections at the eleventh hour. The fact that Mr. Grant is not an attorney and was not represented by counsel at the time is also not enough to excuse his failure to meet the filing deadline. Presumably, by alleging that he is not "sophisticated," Complainant is claiming that he did not understand the process. Unfortunately, however, whether represented by an attorney or not, ignorance of the law does not warrant equitable tolling. *See Gatewood v. Railroad Retirement Board*, 88 F.3d 886 (10th Cir. 1996) (where an unrepresented claimant, who was also an attorney, sought compensation under the Railroad Retirement Act of 1964, the Tenth Circuit [*88] held equitable tolling was not appropriate simply because claimant lacked knowledge of the applicable statute).

Even so, nothing in the record even suggests that Mr. Grant did not understand his rights under the Act. I had the opportunity to observe Mr. Grant at the hearing, and I acknowledge that he is an intelligent individual. To be sure, despite Mr. Grant's lack of representation and "sophistication," he was able to submit a request for a hearing--albeit untimely--that was substantively satisfactory. In short, Mr. Grant's delinquency in filing his objections is the direct result of *his* lack of diligence--nothing more.

Based on the foregoing, I find that the Complainant here has not provided sufficient grounds to equitably toll the 30-day filing deadline. n29 As a result, Respondent's Motion to Dismiss is granted.

n29 As Complainant argues, the Act's implementing regulations provide an ALJ with the ability to waive any rule that justice or the administration of the Act requires in "special circumstance" or "upon good cause shown." 29 C.F.R. §1980.115. Naturally, Complainant requests that this Court waive the 30-day filing provision. However, as the equitable tolling analysis demonstrates, Complainant has presented no "special circumstances" and certainly no "good cause" to justify such a waiver.

[*89]

However, in the interest of thoroughness, and to be fair to the parties and witnesses who endured four days of presenting evidence and oral argument during the formal hearing, I will address the substantive issues of Mr. Grant's claim.

The Act

The Sarbanes-Oxley Act states in pertinent part:

No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934

2005 DOLSOX LEXIS 79, *89
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

(15.U.S.C. 78l) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15.U.S.C..78o(d), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee --

(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of sections 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission or any provision [*90] of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by --

(A) a Federal regulatory or law enforcement agency;

(B) any Member of Congress or any committee of Congress; or

(C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)

18 U.S.C. § 1514A (a)(1); *see also* 29 C.F.R. § 1980.102.

Because of its recent enactment, the Sarbanes Oxley Act lacks a fully developed body of case law. As the whistleblower provisions of Sarbanes-Oxley are similar to whistleblower provisions found in many federal statutes, it is appropriate to refer to case authority interpreting these whistleblower statutes.

The Respondent is not a Publicly Traded Company Covered by the Sarbanes-Oxley Act

The Sarbanes-Oxley Act provides whistleblower protection to employees of publicly traded companies. While neither party has specifically raised the issue, I must address the viability of the Complainant's claim against Dominion East Ohio Gas as a wholly-owned [*91] subsidiary of Dominion Resources, Inc. In simplest terms, the named Respondent in this claim--Dominion East Ohio Gas--is not a publicly traded company and is therefore not covered by the Act.

Although the status of the named Respondent--i.e., whether it is a publicly traded or non-public entity--is not an element of a *prima facie* case necessary to establish wrongdoing under the Act, it is an attendant circumstance by the terms of the Act necessary to sustain an actionable claim against the Respondent. And, like each *prima facie* element of the claim, the Complainant bears the burden of establishing that circumstance. In expressly prohibiting any *"company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15.U.S.C. 78l) or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)"* from retaliating or discriminating against an employee engaged in protected activity as defined by the Act, Congress expressly incorporated the status of the company as a material and essential element of a Sarbanes-Oxley whistleblower [*92] claim. The plain language of the statute provides no cause of action against a non-public subsidiary standing alone. Thus, Complainant simply cannot maintain the instant claim unless he names a publicly traded company as Respondent, *and* establishes that the named Respondent is actually covered by the Act. *See Flake v. New World Pasta Company,* ARB No. 03-126 (Feb. 25, 2004) (Administrative Review Board held, "the whistleblower protection provisions of Sarbanes-Oxley cover only companies with securities registered under §12 or companies required to file reports under §15(d) of the Exchange Act.").

n30 I should note here that the Secretary's Findings at the OSHA level concluded that "Respondent is a company with a class of securities registered under section 12 of the Securities and Exchange Act of 1934 (15.U.S.C. 78l) and/or required to file reports under section 15(d) of the Securities and Exchange Act of 1934 (15 U.S.C. 78o

Page 25