(d))." However, not only is there no evidence in the record to support such a conclusion, but OSHA's findings are not binding in any way in the instant proceedings. Instead, once a claim is before this Office on appeal from OSHA, an ALJ is required to conduct a *de novo* review of the evidence presented before this Court at a formal hearing. Simply stated, OSHA's findings are irrelevant to my determination in this matter. Nor is it dispositive of the issue that neither party has raised this concern before or during the formal hearing. It is well-established that subject matter jurisdiction is never waivable, and the issue of subject matter jurisdiction may be raised by any party at any time, including the Court.

[*93]

Here, Complainant not only failed to name a publicly traded company as Respondent, he made no attempt to prove that Respondent or its parent company is in fact publicly traded, or otherwise covered by the Act. The Complainant--despite sufficient opportunity to do so--provided no testimonial evidence or documentation establishing that either Dominion East Ohio Gas or its parent company, Dominion Resources, Inc., is required to register a class of securities under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l) or that it is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d), as plainly prescribed in the Act. As noted above, the record contains no Form 10-K, Form 8-K, Form 10-Q, a NASDAQ or New York Stock Exchange certificate, or any other evidence establishing that Respondent or its parent company ever was or is publicly traded. Instead, the record merely contains passing testimonial reference to Dominion East Ohio Gas as a wholly-owned subsidiary of Dominion Resources, Inc., and only brief and general references to stock and stockholders [*94] without clear explanation of the source of the stock or whether it is *publicly traded stock.* n31 Without establishing that the named Respondent.or even its non-party parent company for that matter--falls within the language of the Act, Complainant cannot sustain the instant cause of action.

n31 For example, Complainant submitted CX 1, at 43, in which Mr. Grant noted in an e-mail to Dominion officer, Thomas Capps that Mr. Capps had exercised "stock options" from Dominion. However, nothing in the e-mail indicates exactly which company issued that stock, or if it is publicly offered stock. Complainant's Exhibit 1, at 44 is a list of Dominion corporate officers and the number of shares of stock each owns. It is not clear from the list whether the stock and listed values are Dominion stock, and certainly not whether the stock is publicly traded. Complainant's Exhibit 16, at 117 is an e-mail in which Mr. Grant states that he is a "DEO stockholder." Similarly, this reference provides no explanation regarding the public or non-public nature of the stock, or if he is referring specifically to Dominion East Ohio Gas or Dominion Resources, Inc. Finally, Complainant's Exhibits contain CX 11, which is a transcript of a speech given by Dominion President and CEO, Thomas Capps in January 2003. The speech contains placid reference to market trends and stockholders, but in no way mentions Dominion stockholders particularly or whether Dominion or any one of its subsidiaries is publicly traded.

[*95]

I should also note that, even assuming Complainant established that Dominion Resources, Inc. is publicly traded, Complainant's failure to name a publicly traded company as Respondent cannot be overcome by corporate principles of vicarious liability. Dominion East Ohio Gas and Dominion Resources, Inc. are without question separate corporate entities. Therefore, naming a wholly-owned subsidiary as a party to a cause of action is not the equivalent of naming the parent corporation.

It is well-established within the realm of corporate law that a parent corporation is not liable for the acts of its subsidiaries. In other words, the mere fact of a parent-subsidiary relationship between two corporate entities does not make one company liable for the torts of its affiliate. *United States v. Bestfoods, et al., 524 U.S. 51, 61 (1998).* Thus, even assuming Dominion Resources, Inc. is a publicly traded company and was actually named as a Respondent to this cause of action, Complainant's claim against Dominion East Ohio Gas does not automatically subject the parent company to the Act's proscriptions. Only in certain circumstances has it been held that employees of [*96] non-public subsidiaries of publicly traded companies can be covered by the whistleblower protection provisions of the Act. *Platone v. Atlantic Coast Airlines Holdings, Inc.,* 2003-SOX-27 (ALJ Apr. 30, 2004) (ALJ found sufficient evidence existed to

2005 DOLSOX LEXIS 79, *96
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

justify piercing the corporate veil and ignoring the separate corporate entities); *see also Morefield v. Exelon Services Inc., and Exelon Corp.*, 2004-SOX-2 (ALJ Jan. 28, 2004) (holding that non-public subsidiaries which are an integral part of a publicly traded company, and are inseparable for purposes of evaluating the integrity of its financial information, may be covered by the Act) and *Klopsenstein v. PCC Flow Technologies Holdings, Inc. and Allen Parrot*, 2004-SOX-11 (ALJ July 6, 2004) (ALJ recognized that sufficient "commonality of management and purpose between the two companies" is grounds for holding a parent company liable for its subsidiary's actions under the Act); *see also Gonzalez v. Colonial Bank & The Colonial Bancgroup, Inc.*, 2004-SOX-39 (ALJ Aug. 20, 2004). Complainant, however, has not presented any argument or evidence sufficient to hold Dominion Resources, Inc. liable under any theory or standard of vicarious [*97] liability.

Even assuming Complainant presented the argument and submitted sufficient evidence to justify piercing the corporate veil, thereby establishing that Dominion Resources, Inc. is liable for the acts of its subsidiary, pronouncing a parent company liable for the acts of its subsidiaries does not cure the deficiency of not naming a company covered by the Act as Respondent. *Klopsenstein*, 2004-SOX-11 (where complainant worked for a subsidiary of a publicly traded company, ALJ dismissed the claim for complainant's failure to name the publicly traded parent as a Respondent; "I find the commonality of management and purpose between the two companies sufficient to most likely bestow whistleblower protection upon Complainant had he sued the parent company. He did not, however."); *Powers v. Pinnacle Airlines, Inc.*, 2003-SOX 18 (ALJ Mar. 5, 2003) (where complainant never filed a motion to amend the complaint, ALJ dismissed the Sarbanes-Oxley Act claim because complainant failed to name a publicly traded company as the Respondent); *compare Gonzalez*, 2004-SOX-39 (holding the publicly traded parent company liable for the acts of its subsidiary *after* parent company was added [*98] as Respondent by motion to amend the complaint). In other words, neither the doctrine of piercing the corporate veil, nor agency law principles generally operate to pull a parent company into litigation if the parent company is not named as a party in the first place.

Complainant--who was represented by counsel--filed his complaint against Dominion East Ohio Gas, not Dominion Resources, Inc. Dominion East Ohio Gas was the only Respondent at the administrative level, and thus Dominion Resources, Inc. has never been a party to this claim. Furthermore, Complainant took no steps to cure this patent deficiency at any time since filing his claim. Consequently, Complainant's claim against Dominion East Ohio Gas cannot be maintained under the Act.

Based on the foregoing, I find that Dominion East Ohio Gas--standing alone--is not a covered party under the Act, and Claimant's claim must therefore be dismissed on this ground.

Merits of the Claim

Notwithstanding my previous findings, I will examine the merits of the claim that Complainant was subjected to an adverse employment action due to protected activity, along with the evidence as it relates thereto.

In a Sarbanes-Oxley whistleblower [*99] case, the Complainant must establish by a preponderance of the evidence that: (1) he engaged in protected activity as defined by the Act; (2) his employer was aware of the protected activity; (3) he suffered an adverse employment action; and (4) circumstances are sufficient to raise an inference that the protected activity was likely a contributing factor in the unfavorable action. n32 *Mackial v. U.S. Dep't of Labor*, 171 F.3d 323, 327 (5th Cir. 1999); *Collins v. Benzer Homes USA, Inc.*, 334 F.Supp.2d 1365, 2004 WL 2023716 (N.D.Ga. Sept. 2, 2004); *Platone v. Atlantic Coast Airlines Holdings, Inc.*, 2003-SOX-27 (ALJ Apr. 30, 2004). The foregoing creates an inference of unlawful discrimination, and with respect to the nexus requirement, proximity in time may be sufficient to raise an inference of causation.

n32 It is well-settled that in order to bring a successful claim under the Act, the *Complainant* bears the burden of production and persuasion of establishing the elements making up a *prima facie* claim by a preponderance of the evidence. Thus, Complainant's argument in his brief that "Respondent has failed to demonstrate that there is no evidence of protected activity," is a complete misstatement of the law. Indeed, the case to which Complainant

cites in making such a claim, *Harvey v. The Home Depot, Inc.*, 2004-SOX-20 (ALJ May 28, 2004), does not support the contention. Instead, the *Harvey* decision recites the elements and proper burden in virtually identical terms as stated here.

[*100]

When a whistleblower case proceeds to a formal hearing before an Administrative Law Judge, a complainant must demonstrate by a preponderance of the evidence that protected activity was a contributing factor in the unfavorable action alleged in the complaint. *See, Trimmer v. U.S. Dep't of Labor, 174 F.3d 1098, 1101-02 (10th Cir. 1999); Dysert v. Sec'y of Labor, 105 F.3d 607, 609-10 (11th Cir. 1997)*. Once a complainant meets this requirement, he is entitled to relief unless the respondent demonstrates by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of any protected behavior.

In *Marano v. Dep't of Justice, 2 F.3d 1137 (Fed. Cir. 1993)*, interpreting the whistleblower protections of 5 U.S.C. § 1221(e)(1), the Court observed:

> The words "a contributing factor" . . . mean any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision. This test is specifically intended to overrule existing case law, which requires a whistleblower to prove that [*101] his protected conduct was a "significant," "motivating," "substantial," or "predominant" factor in a personnel action in order to overturn that action.

*Id.* at 1140 (citations omitted).

If the Complainant meets this burden of proof, the Respondent may avoid liability by presenting evidence sufficient to clearly and convincingly demonstrate a legitimate purpose or motive for the adverse personnel action. *Yule v. Burns Int'l Security Serv.*, Case No. 1993-ERA-12 (Sec'y May 24, 1995). While there is no precise definition of "clear and convincing," the Secretary and the courts recognize that this evidentiary standard is higher than a preponderance of the evidence, but less than beyond a reasonable doubt.

If the Respondent is able to meet this burden, the inference of discrimination is rebutted. In order to prevail, the Complainant must show that the rationale offered by the Respondent was pretextual--i.e., not the actual motivation. *Overall v. Tennessee Valley Auth.*, Case No. 1997-ERA-53, ARB Nos. 98-111, and 128 (ARB April 30, 2001). As the Supreme Court noted in *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502 (1993), [*102] a rejection of an employer's proffered legitimate, nondiscriminatory explanation for adverse action permits rather than compels a finding of intentional discrimination.

## Protected Activity

"Protected activity," as defined under the Act and regulations, includes providing to an employer information regarding any conduct which the employee reasonably believes constitutes a violation of various fraud provisions of Title 18 of the U.S. Code (18 U.S.C. §§ 1341, 1343, 1344, or 1348), any rule or regulation of the SEC, or any provision of Federal law relating to fraud against shareholders. The Act does not evaluate the validity or falsity of the reported conduct--that is, an actual violation of the law is not required--but requires the Complainant to show that he had a reasonable belief that the Respondent violated one of the enumerated statutes or regulations. "Thus, complainant's belief 'must be scrutinized under both subjective and objective standards, i.e., he must have actually believed that the employer was in violation of [the relevant laws or regulations] and that belief must be reasonable.'" *Lerbs v. Buca di Beppo, Inc.*, 2004-SOX-8 [*103] (ALJ June 15, 2004) quoting *Melendez v. Exxon Chemicals Americas*, ARB No. 96-051, ALJ No. 193-ERA-6 (ARB July 14, 2000). "Reasonableness" under the Act, then, "is to be determined on the basis of the knowledge available to a reasonable person in the circumstances with the employee's training and experience." *Id.* (internal quotations and citations omitted); *see also Collins*, 334 F.Supp.2d 1365, 2004 WL 2023716 ("The legislative history of Sarbanes-Oxley states that the reasonableness test is intended to impose the normal

2005 DOLSOX LEXIS 79, *103
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

reasonable person standard used and interpreted in a wide variety of legal contexts.") (internal quotations omitted).

Complainant alleges that he reported a number of complaints and concerns about the company's accounting software, erroneous accounting entries, and retention of counsel to "the bosses"--all of which he describes as "accounting irregularities." As support for his contentions, Complainant relies heavily on the testimony of Mr. Martin Wynne-Brown. At the outset, I acknowledge that Mr. Wynne-Brown is highly experienced in areas of accounting principles and accounting fraud, and he possesses a decorated [*104] educational background. The factual circumstances about which Mr. Wynne-Brown was called to testify, however, are not appropriate for expert testimony. And, given that Mr. Wynne-Brown admitted not knowing many of the facts underlying Mr. Grant's allegations and therefore did not have first hand knowledge of the factual circumstances of the instant claim, I find that his testimony has no probative value.

The regulations governing the Rules of Practice and Procedure Before the Office of Administrative Law Judges found at 29 C.F.R. §18 provide:

§18.702 Testimony by experts.

If scientific, technical, or other specialized knowledge will assist the judge as trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

This regulation provision is similar in form and operation to Rule 702 of the Federal Rules of Evidence. Thus, like the Federal Rules of Evidence, the Rules of Practice and Procedure permit an ALJ to exclude expert opinion testimony when that opinion is unhelpful or superfluous. See generally Ladd, [*105] Expert Testimony, 5 Van.L.Rev., 414, 418 (1952) ("There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently as to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.").

Given his experience and educational background, Mr. Wynne-Brown may very well qualify as an expert in accounting fraud or accounting practices under the evidentiary rules. n33 The question here, though, is whether his testimony will help the trier of fact understand the evidence or determine a fact in issue. That means, in the context of this particular case, that Mr. Wynne-Brown's testimony must help me resolve the issue of whether Mr. Grant reasonably believed the Respondent was violating one of the enumerated statutes or regulations in the Act. But expert opinion testimony is typically reserved for subject matter that is technical and beyond common experience--not normally for analysis under a reasonable person standard. n34 To be sure, the Act does not require the Complainant [*106] to prove that actual accounting fraud took place. Nor is the standard whether an accounting expert reasonably believes fraud occurred. Instead, Complainant must show that he had a reasonable belief that accounting fraud had occurred, given his experience and training. Thus, Mr. Wynne-Brown's expert opinion as to whether the factual circumstances described by Mr. Grant, if true, would constitute a violation of one of the enumerated statues or regulations in the Act adds nothing to the inquiry.

n33 See Kumho Tire Co. v. Carmichael, 119 S.Ct. 1167 (1999) (holding that Rule 702 and the judge's determination regarding the reliability of expert testimony is applicable to all expert testimony, not just expert testimony based on science).
n34 That is not to say that the issue of protected activity is never appropriate for expert testimony. The facts in evidence in this particular case, however, do not lend themselves to the need for an expert to explain Complainant's reasonable belief. For example, Mr. Grant did not describe any particular conduct on the part of Respondent involving specific accounting principles that needed to be explained by an accounting expert. Nor is it helpful for Mr. Wynne-Brown to explain what circumstances generally amount to actual violations of the enumerated statutes or other laws related to fraud against shareholders.

[*107]

2005 DOLSOX LEXIS 79, *107
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

Because Mr. Wynne-Brown has sufficient experience and knowledge in identifying accounting fraud and in accounting principles, his testimony could conceivably help resolve a concern raised by Complainant here of whether Respondent should have investigated his allegations. Unfortunately, that issue is irrelevant under the Act and to the instant inquiry n35; particularly when the Complainant has failed to describe specific facts upon which he based his alleged belief of illegal conduct, beyond merely discovering an accounting error he did not understand. To sustain a claim under the Act a complainant is not required to show that the company should have further investigated the allegations. Any testimony Mr. Wynne-Brown presented in an attempt to establish that fact has little relevance to my determination in this matter--i.e., whether *Mr. Grant* had a subjective and reasonable belief, given his experience and training, that accounting fraud had occurred. Again, Mr. Wynne-Brown's testimony did not assist the trier of fact in determining whether under a reasonable person standard, Mr. Grant believed accounting fraud was taking place.

> n35 It is important to note that Mr. Barker testified that the company did in fact investigate Mr. Grant's allegations once he became aware of them sometime after Mr. Grant's suspension. In this age of high profile corporate scandal, corporate watchdogs, and since the term "whistleblower" has become routine headline, it is in any company's best interest to investigate each and every allegation of wrongdoing no matter how insignificant or ludicrous. Although one court has held that the fact a company investigated the allegations is a "strong indicator" of a reasonable belief, *Collins v. Beazer Homes USA, Inc.*, 334 F.Supp.2d 1365, 2004 WL 2023716 (N.D.Ga. Sept. 2, 2004), the mere fact that the Respondent actually addressed or investigated some of Mr. Grant's complaints alone is not enough to establish that he had a reasonable belief of illegal conduct. Unlike in *Collins,* Mr. Grant's allegations were not investigated immediately, but only after Mr. Grant initiated the instant claim, suggesting that Respondent was not aware of any particular facts it understood as falling within the zone of protected activity. In fact, Mr. Grant has provided no specific details upon which he based his "reasonable belief" of illegal conduct, but instead merely raised questions and concerns that he felt were simply not resolved to his satisfaction.

[*108]

The helpfulness standard under 29 C.F.R §18.702 aside, Mr. Wynne-Brown did not provide any testimony that even remotely bolstered Complainant's case. Mr. Wynne-Brown admitted that he did not know all of the facts of Mr. Grant's specific allegations, he confessed that he did not review any of the company's books upon which many of the allegations were based, and he concluded that only "if true" would Mr. Grant's allegations amount to a violation under the Act. He never once testified about whether the facts as understood by Mr. Grant would amount to a reasonable belief that accounting fraud was being perpetuated. Nor did he testify that in his experience the factual circumstances presented in this case could amount to a reasonable belief that the company engaged in illegal conduct. In other words, even if the subject at issue here is appropriate for expert testimony--which it is not--Mr. Wynne-Brown did not provide testimony specifically addressing Mr. Grant's reasonable belief. Instead, Mr. Wynne-Brown provided testimony about what facts, if true, would amount to an actual accounting fraud violation--which I have already determined is not relevant to the specific inquiry at hand. [*109] Thus, while I permitted Mr. Wynne-Brown to testify at the hearing, I have not granted him "expert" status under 29 C.F.R. §18.702 and I have afforded his testimony little-to-no evidentiary weight.

The remainder of the evidence presented at the hearing also fails to establish that Mr. Grant engaged in protected activity under the Act. As stated above, Complainant must show that he actually and reasonably believed Respondent violated one of the laws and regulations enumerated in the Act.

Viewing the evidence as a whole, I initially find that the Complainant has not established that he had even an actual, subjective belief that the Respondent violated one of the provisions enumerated in the Act or committed any violation related to fraud against shareholders. Not one of Mr. Grant's complaints or criticisms--whether by e-mail or verbal communication--contained any reference to fraud or implication that the company had acted intentionally to mislead shareholders or misstate the company's bottom line. n36 In fact, *Mr. Grant admitted at the hearing that none of his concerns or allegations was a complaint about fraud.* n37 Instead, Mr. Grant simply voiced discontent and requested explanations [*110] about projects, accounting, and software he simply did not understand. As a result,

2005 DOLSOX LEXIS 79, *110
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

Complainant's alleged complaints regarding this activity fail to satisfy the definition of "protected activity" set forth in the Act. 18 U.S.C. § 1514A (a)(1); see also 29 C.F.R. § 1980.102.

n36 In his post hearing brief, Complainant contends that his use of the words "jail" (in a conversation with Greg Theirl) and "state auditor" (in an e-mail to Gary Abbate about his difficulty estimating project expenses with the company's accounting program), is "sufficient to demonstrate the presence of protected activity." Post Hearing Brief of Complainant, at 4 (February 25, 2005). I disagree. When read in the context of the entire e-mail, it is obvious that Mr. Grant's warning of the "state auditor" to the accounting department was nothing more than a means to express his discontent with the accounting program and his concern that it could cause accounting problems if not corrected--which is very different than accusing someone of fraud. Indeed, Mr. Grant testified that his e-mail to Gary Abbate, in which he warned about the "state auditor," was "not a complaint of fraud," (Tr., at 414), and nothing else in the record supports or corroborates Mr. Grant's concern that certain charges were "unexplainable" in a sense that implies wrongdoing. Moreover, Mr. Grant's use of the term "jail" in a conversation with Mr. Theirl--which was not corroborated by any other witness--was part of Mr. Grant's initial questions about the Wal-Mart project, which was ultimately resolved to everyone's satisfaction, and the facts of which Mr. Grant admittedly did not know. In short, I cannot accept Complainant's untenable position that using the terms "jail" and "state auditor" without any other evidence demonstrating a reasonable belief of illegal conduct constitutes protected activity under the Act.

[*111]

n37 Frankly, it defies common sense to argue that Mr. Grant had a reasonable belief that accounting fraud was taking place, when he explicitly testified that when he actually "complained" about accounting, he was not complaining about fraud or any other illegal conduct.

It is important to note that Mr. Grant is not an accountant and he is not a project manager, and thus--as he admitted during the hearing--is not fully aware of every aspect of a project, including the accounting involved. Mr. Grant testified that he often did not understand the accounting principles used to track certain projects, that he did not know the company had retained the Roderick Linton law firm for certain projects and to finish others that it had previously worked on, and that those in the accounting department were not obligated to keep him abreast on every accounting decision or entry made. Mr. Grant was, instead, upset that once he questioned an accounting entry or the retention of legal counsel, he was never provided an explanation to his satisfaction as to how the error or situation was ultimately resolved. The tenuous connection Complainant has attempted to establish between the company's failure [*112] to fully inform him to his satisfaction as to how certain issues were resolved, and the ultimate conclusion that Respondent was engaged in illegal conduct, is not supported by a shred of evidence in the record and requires a number of large assumptions that simply defy common sense.

Second, even assuming Mr. Grant had a subjective belief that the alleged "accounting irregularities" constituted illegal conduct, n38 I find that Complainant failed to show that his belief was reasonable. In simplest terms, nothing in the record supports Complainant's allegations that the "accounting irregularities" were anything but the result of basic errors, miscommunications, or misunderstandings. Part of Mr. Grant's duties as an engineering technician is to monitor project accounts for errors, mistakes, and cost "hits," and bring irregularities to the attention of the project manager, his supervisors, and/or the accounting department for resolution. Thus, by questioning accounting discrepancies, Mr. Grant was simply doing his job. The fact that his questions and concerns happened to involve accounting and finances in some way does not automatically mean or imply that fraud or any other illegal conduct [*113] took place, and would certainly not lead a reasonable person to reach that conclusion. To be sure, an accounting error does not amount to fraud under the Act. n39 And simply raising questions and lodging complaints without any reference to or suspicion about fraud against shareholders is not protected activity. Accepting Complainant's contentions would lead to the conclusion that any time Mr. Grant raised a question about the company's accounting programs or procedures, or about anything else regarding the everyday functioning of the company, he would be engaging in protected activity. The purpose of the Act simply does not support such a conclusion. n40

2005 DOLSOX LEXIS 79, *113
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

n38 It is noted again that such an assumption also requires this Court to ignore Mr. Grant's own testimony that he did not believe the Respondent was engaging in fraudulent activity.

n39 Complainant's own "expert" witness testified that an error does not amount to fraud.

n40 The particular criminal code provisions relating to fraud enumerated in the Act include "fraud and swindles," "fraud by wire, radio, or television," bank fraud, and securities fraud. *See* 18 U.S.C. §§1341, 1343, 1344, 1348. The Act also protects those blowing the whistle about violations of rules or regulations of the Securities and Exchange Commission, or any provisions of Federal law relating to fraud against shareholders. The Act's legislative history makes it clear that fraud is an integral element of a cause of action under the whistleblower provision. *Hopkins v. ATK Tactical Systems*, 2004 SOX-19 (ALJ May 27, 2004) *citing* S. Rep. No. 107-146, 2002 WL 863249 (May 6, 2002). Thus, "an element of intentional deceit that would impact shareholders or investors is implicit." *Hopkins*, 2004-SOX-19.

[*114]

"The pertinent case law makes it clear that, in order for the whistleblower to be protected by the Act, the reported information must have a certain degree of specificity." *Lerbs v. Buca di Beppo, Inc.*, 2004-SOX-8 (ALJ June 15, 2004) *citing Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 931 (11th Cir. 1995). In other words, general inquiries do not constitute protected activity. Instead, "a whistleblower must state particular concerns which, at the very least, reasonably identify a respondent's conduct that the complainant believes to be illegal." *Id.* The record is clear that Mr. Grant did not fully understand the circumstances involved in any of the incidents he alleges were "irregularities." Therefore, and more importantly, he has yet to describe any particular facts or circumstances that would support the conclusion that a reasonable person would believe illegal conduct was taking place--that is, beyond purely unfounded suspicion. Instead, Mr. Grant's "protected activity" begins and ends with the complaints he lodged or questions he raised about matters he admittedly did not fully understand. He conducted no further investigation to verify [*115] his assumptions or in an attempt to simply understand the facts about which he was complaining. Now, upon reflection, he believes that because he did not always receive an answer (to which he was not necessarily entitled), he was blowing the whistle on some "suspicious behavior."

Furthermore, the record contains no evidence that any particular individual in the company was acting deliberately to perpetuate a fraud on the shareholders or cover one up. In fact, Mr. Grant has described no specific, deliberate conduct by the Respondent at all to support his contention that he engaged in protected activity. The fact that Mr. Grant did not always receive an answer to his questions is not sufficient to establish that he had a reasonable belief fraudulent activity was taking place. Moreover, the answers he did receive easily explain away any suspicions he may have had and clearly demonstrate that Mr. Grant's current claims of fraud are not based in fact. n41

n41 For example, Mr. Grant alleges that the company was improperly paying lawyers for a project on which they were no longer working. If the record were to contain other facts to support such a contention, then perhaps Mr. Grant's belief would have been reasonable. However, as the record demonstrates, the services of Roderick Linton, LLP were in fact not being used improperly. The e-mails to Mr. Grant from the legal department clearly explain that the law firm was permitted to finish up some of the work it had previously done. Mr. Grant simply did not know the facts when he sent the e-mail, and a reasonable person would not have believed the legal department was involved in a scheme to defraud shareholders based on what Mr. Grant knew.

[*116]

The Complainant has not articulately marshaled what little coherent evidence is in the record to support his contentions. Nevertheless, I will briefly address Mr. Grant's allegations in turn. First, Mr. Grant's inquiries into the retention of the Roderick Linton law firm--the facts of which Mr. Grant admittedly did not know--do not constitute protected activity since he never identified particular concerns or described any particular conduct on behalf of the Respondent that he may have believed was illegal. Instead, Mr. Grant simply questioned the legal department's use of a particular law firm, and Mr. Zontini's professionalism, not knowing that Dominion East Ohio Gas used the law firm's services for certain projects. Without knowing the facts and without any attempt to understand the facts, Mr. Grant simply assumed the legal department was not acting in the best interest of the company. Mr. Grant admitted that he did

2005 DOLSOX LEXIS 79, *116
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

not suspect fraud at the time. Therefore, I find that Mr. Grant did not believe, nor would a reasonable person believe that the Respondent's legal department was defrauding shareholders.

Likewise, Mr. Grant's general inquiries into the use of the company's accounting [*117] system--which Mr. Grant admittedly did not understand--do not implicate particular conduct by Respondent that could conceivably be viewed as relating to fraud against shareholders. By complaining about the complexity of the company's accounting system, Mr. Grant was simply raising concerns that the accounting programs used were difficult to understand. There is nothing in the record to support the inference that Mr. Grant or a reasonable person would have suspected fraud. The fact that Mr. Grant simply expressed difficulty in estimating project expenses because of the accounting programs and urged the accounting department to reconcile "unexplainable" charges does not lead to the conclusion that Mr. Grant was engaged in protected activity, particularly when Mr. Grant himself testified that his e-mails about the accounting programs were not complaints of fraud.

Next, Complainant contends that his discovery of accounting irregularities led to his suspension. Arguably, by monitoring project accounts and discovering potentially significant accounting errors, Mr. Grant was providing the Respondent with a valuable service. However, Mr. Grant was not engaged in protected activity by doing [*118] so. Again, the record contains very little evidence to support Complainant's contentions that he reasonably believed fraud was taking place. Specifically, Mr. Grant acknowledged that the Wal-Mart project account contained an "error," (CX 1, at 46), and without further investigation assumed Wal-Mart should have received a larger refund under the contract. n42 But Complainant provided no additional evidence to support the conclusion that he reasonably believed those involved were committing fraud. In fact, Mr. Grant, along with Mr. Theirl, to whom he allegedly "blew the whistle" on the Wal-Mart "accounting irregularity," worked together to resolve the issue, and nothing in the record suggests that anyone involved in the Wal-Mart project was acting to defraud shareholders. Even Mr. Grant testified that he and Mr. Theirl "basically corrected [his] concerns." (Tr., at 427). The record contains nothing suggesting that Wal-Mart personnel suspected improper conduct on the part of Respondent. Indeed, every discrepancy which arose during the course of the Wal-Mart project was resolved to every party's satisfaction, including Wal-Mart. Again, Mr. Grant did not know all of the facts involved [*119] in the Wal-Mart project and simply assumed a mistake was made without further investigation.

> n42 In his post hearing brief, Complainant suggests that because he questioned the Wal-Mart project accounting, the Respondent returned $ 35,000 to Wal-Mart. Post Hearing Br. of Complainant, at 2-3. However, this is a complete misstatement of the facts. The record clearly demonstrates that the contract between the Respondent and Wal-Mart called for a return of funds to Wal-Mart if the project costs fell below the up-front payment of $ 600,000. The $ 35,000 was returned to Wal-Mart under the terms of the contract and only after Respondent and Wal-Mart met to resolve the confusion that arose out of Mr. Grant's misunderstanding of the accounting involved.

Mr. Grant's inability to determine the value of the pipeline purchased from Buckeye also does not constitute protected activity. Mr. Grant, again, acknowledged that he did not fully understand the facts involved in the Buckeye transaction, specifically, that the transaction involved an asset exchange as opposed to an outright purchase, which may explain the discrepancy between the cash purchase price of $ 90,000 and the actual value of [*120] the asset reported at $ 450,000. But again, Mr. Grant did not pursue his concern beyond what he knew and what was immediately in front of him, and provided no other evidence to support his contention that he reasonably believed the misunderstanding to be fraud. It is simply not reasonable to conclude that Respondent was engaged in fraudulent activity. Mr. Grant was not provided a full explanation of how the issue was resolved, and he later assumed something was wrong. Despite Mr. Grant's hearing testimony that he believed the company "overstated the asset of the [pipeline]...to better the financial books," there is nothing in the record to support Mr. Grant's belief or that that was in fact Mr. Grant's belief at the time. Given that Mr. Grant later testified that his e-mail to Mr. Theirl about the value of the pipeline was not a complaint of fraudulent activity, it is difficult to accept his contention. (Tr., at 421).

Also, Mr. Grant's questions regarding the application of certain fire codes and the use of double-wall tanks is not

2005 DOLSOX LEXIS 79, *120
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

protected activity. There are no indicia of fraud anywhere in the record surrounding Mr. Grant's inquiry into the use of single- or double-wall tanks. Mr. [*121] Grant did nothing more than raise a question about the company's policy with regard to certain compliance provisions. Although he did not receive an answer right away, he has pointed to nothing suggesting illegal conduct on the part of Respondent. Eventually, after Respondent consulted its own experts, Mr. Grant received an answer, which he then disseminated to others in the company. There is nothing in the record demonstrating that Respondent was acting to mislead or deceive shareholders and misstate its bottom line by using single-wall tanks. There is also nothing in the record suggesting that the Respondent was violating any laws, codes, or regulations in an attempt to save money. Instead, the record reflects that the company was acting in full compliance with the applicable regulations, and happened to save money by doing so. Unfortunately for Complainant, saving money by legal means is not fraud, and no reasonable person would think otherwise. Thus, I find that Mr. Grant did not reasonably believe the Respondent was engaged in illegal conduct designed to defraud shareholders simply because he did not receive an immediate answer to his question regarding the use of single- or [*122] double-wall tanks.

Most curiously, Complainant presented testimony at the hearing that he complained to his supervisors about a project in Jackson Township in which he refused to participate. Mr. Grant's e-mail to Frank Martin regarding the Jackson Township Garage project was, however, not protected activity. The only evidence of record regarding that project suggests that there was some disagreement between Mr. Grant and his supervisors and the legal department about certain codes and engineering regulations applicable to relocating a Dominion facility. But nothing in the record relevant to the Jackson Township project is remotely related to securities or accounting fraud, as even Mr. Grant admitted during the hearing. Thus, I again find that Mr. Grant was not engaged in protected activity.

Finally, Mr. Grant's concerns about the inability of field laborers to effectively monitor encroachments do not relate in any way to securities or fraud against shareholders. As with many of his other complaints, Mr. Grant raised general concerns about managing projects through the company's software. Mr. Grant's incoherent explanation of the encroachment issue and how it relates to fraud against [*123] shareholders, *supra* at 22, further demonstrates that no reasonable person would have believed that Respondent was engaged in fraudulent conduct just because there was no efficient way--in Mr. Grant's view--to monitor encroachments.

In sum, there is absolutely nothing in the record that remotely demonstrates the Complainant was engaged in protected activity. The limited scope and application of the Sarbanes-Oxley Act does not cover the complaints and allegations lodged by Complainant here. Sarbanes-Oxley is a corporate governance statute designed to ensure ethical and legal corporate practices by providing protection from retaliation or discrimination to employees who report *reasonable* beliefs based in *articulable fact* of *illegal activity designed to defraud shareholders*. The Act does not protect an employee who simply raises questions about virtually everything with which he disagrees or does not understand. The Act also does not protect an employee who simply assumes a company has retaliated against him because he raised a lot of questions, lodged a lot of complaints, and labels himself a "whistleblower." The Act affords protections only to so-called whistleblowers [*124] who blow the whistle about something covered by the Act. n43 Stated another way, an employer's "retaliation" or "discrimination" is only a violation under the Act if it is in response to that employee's reasonable and articulated belief of fraud related to shareholders or a violation of one of the statutes enumerated in the Act. Here, Complainant has provided no evidence satisfying the requirements of the Act in that regard.

n43 Quite frankly, there is nothing in the Act that prohibits a company from firing or otherwise retaliating against an employee just because that employee lodged a number of general complaints, or is otherwise a "loose cannon," as Mr. Grant likes to believe.

Accordingly, after careful review of the entire evidentiary record, I find that the overwhelming weight of the evidence demonstrates that Complainant was not engaged in protected activity when he raised any one or all of his questions and complaints about "accounting irregularities" described herein.

*Respondent's Knowledge of Complainant's Allegations*

2005 DOLSOX LEXIS 79, *124
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

An essential element of a whistleblower complaint under the Act is that the Respondent was aware, or had knowledge of, the Complainant's alleged [*125] protected activity. *macktal, 171 F.3d 323; collins, 334 F.Supp.2d 1365, 2004 WL 2023716; platone,* 2003-SOX-27 (ALJ Apr. 30, 2004). Here, Respondent maintains that there is "no evidence that any manager with knowledge of Grant's alleged 'protected activity' played any role in initiating or deciding on the discipline to be imposed," and that those involved in Mr. Grant's discipline did not know about his allegations. Respondent's Post Hearing Brief, at 30 (Feb. 24, 2005). Complainant, on the other hand, claims that "Respondent had constructive knowledge of the Protected Activity." Post Hearing Br. of Complainant, at 20 *citing Platone,* 2003-SOX-27 (ALJ Apr. 30, 2004). For the following reasons, I agree with Respondent.

Mr. Barker, who I find to be a highly credible witness, testified without any evidence to the contrary that upon reading Mr. Grant's e-mail about the "Open Couch" invitation, he wanted to discipline Mr. Grant immediately. More specifically, Mr. Barker, along with Mr. Hyman, believed Mr. Grant's actions warranted immediate termination. The record also demonstrates that Mr. Barker was the [*126] ultimate decision maker regarding Mr. Grant's discipline, and he testified that he did not know about Mr. Grant's complaints regarding "accounting irregularities" or any other alleged "protected activity" until after Mr. Grant's suspension n44; in fact, Mr. Barker explained that he did not even know who Mr. Grant was when he received his e-mail. Thus, the record does not support Complainant's contention.

> n44 The record contains no evidence that either Mr. Hyman or Mr. Klink knew of Mr. Grant's alleged "protected activity."

Mr. Barker, through Mark Messersmith, ordered the HR department to investigate Mr. Grant's conduct and provide a recommendation as to the appropriate discipline. The record indicates that the group responsible for the investigation included Ms. Johnson, Mr. Messersmith, Mr. Soja, Ms. Aruda, Mr. Johnston, Ms. Brill and eventually Ann Greer. Among that group, only Mr. Messersmith was aware of Mr. Grant's complaints about his difficulty with accounting software. However, without anything in the record to the contrary, it is clear that Mr. Messersmith, who I also find to be a highly credible witness, did not communicate his knowledge of the accounting software [*127] complaints to any other member of the investigating group, to Mr. Barker, to Mr. Hyman, or to anyone else who may have been involved in the decision to discipline Mr. Grant. If fact, the only input Mr. Messersmith provided was to encourage Mr. Barker to impose the 10-day suspension over an outright termination. Additionally, Mr. Theirl, who was not involved in determining Mr. Grant's discipline, did not advise the HR department, Mr. Barker, or anyone else involved in disciplining Mr. Grant about his complaints of "accounting irregularities." n45 Thus, not only did the ultimate decision maker, Mr. Barker, not know of Mr. Grant's allegations, but the few who were aware of Mr. Grant's allegations did not substantially contribute to the decision to suspend him or even advise anyone involved in Mr. Grant's discipline about the allegations.

> n45 There is also no evidence in the record suggesting that Mr. Grant directly informed Mr. Barker or any other corporate officer of the "accounting irregularities."

Nevertheless, Complainant argues that because Respondent "had a corporate compliance program," "it is disengenious [sic] to believe that [Complainant's protected activity]...was not [*128] discussed with management." Complainant's Amended and Corrected Post Hearing Brief, at 20 (Feb. 28, 2005). However, without a shred of evidence--direct or circumstantial--suggesting Mr. Grant's "protected activity" was discussed "up the line" or within the "chain of command," I cannot accept Complainant's contention that the ultimate decision maker had constructive knowledge of Mr. Grant's allegations and complaints. n46 There is nothing in the record suggesting that Mr. Barker or anyone else involved in the disciplinary process was acting to isolate Mr. Messersmith and Mr. Theirl--the only individuals with any knowledge of Mr. Grant's complaints--from the rest of the group in order to insulate those making the decision from any knowledge of "alleged activity." Indeed, the decision to discipline Mr. Grant was made by a relatively large group of people from all areas of the company; which suggests the company wished to proceed cautiously and thoroughly and with as much input as possible. Unlike in *platone,* where the complainant presented evidence that someone with actual knowledge of the protected activity initiated the decision to terminate the complainant, and where a select [*129] few were part of the decision to terminate the employee, Complainant has not

2005 DOLSOX LEXIS 79, *129
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

established that those who decided Mr. Grant's fate knew of his alleged "protected activity," constructively or otherwise, or that the Respondent devised a plan to prevent Mr. Barker or those in HR from knowing about Mr. Grant's allegations.

> n46 I also note that it is unreasonable to conclude that Complainant's managers would have ever relayed his complaints, questions, or allegations to corporate officers who were in a position to make the ultimate determination regarding discipline. Given that part of Mr. Grant's responsibilities is to raise questions regarding accounting and assure compliance with engineering regulations for projects to which he was assigned, he was doing nothing more than simply performing his job duties during the regular course of business. Thus, there was no reason for Mr. Theirl, or Mr. Williams, or Mr. Messersmith to inform corporate officers of Mr. Grant's complaints about the "accounting irregularities."

Because Complainant's argument is based on nothing more than speculation and supposition that Mr. Barker *must have* known about Mr. Grant's complaints, I find that he has [*130] failed to establish a *prima facie* case of retaliation under the Act.

*Adverse Employment Action*

There is no dispute that the Complainant suffered an adverse employment action -- he was suspended for ten days. Therefore I find that the Complainant has established that he suffered an adverse employment action at the hands of the Respondent.

*Contributing Factor*

In order to sustain a claim of unlawful retaliation under the Act, the Complainant must describe circumstances sufficient to raise an inference that the protected activity was likely a contributing factor in the unfavorable action. I agree with Respondent that the Complainant "has not presented a shred of evidence linking his ten-day suspension to any complaint or criticism of Respondent's accounting practices." Respondent's Br., at 25. More specifically, I find that there is neither direct evidence establishing that Complainant's alleged "protected activity" contributed in any way to his suspension, nor circumstantial evidence from which one could infer Mr. Grant's complaints were a contributing factor in his suspension.

Initially, I note here that the record contains absolutely no direct evidence--either [*131] testimonial or documentation (hearsay or otherwise)--establishing that Mr. Barker or anyone else initiated disciplinary action against Mr. Grant because of all or any one of the many complaints lodged by Complainant described herein.

Admittedly, the lack of direct evidence in the record is not necessarily dispositive of the issue. *see Platone,* 2003-SOX-27 (ALJ Apr. 30, 2004) ("[A] complainant is not required to demonstrate specific knowledge that the respondent had the intent to discriminate against her."). Stated another way, the Complainant may demonstrate the Respondent's motivation through circumstantial evidence of discriminatory intent. *see Id.; Frady v. Tennessee Valley Authority,* 92-ERA-19 and 34 (Mar. 26, 1996); *Mackowiak v. University Nuclear Systems, Inc.,* 735 F.2d 1159, 1162 (9th Cir. 1984). Thus, Complainant urges this Court to infer that his alleged "protected activity" was a contributing factor in Respondent's decision to suspend him because of the temporal proximity between his claims of "accounting irregularities" and the adverse employment action.

While temporal proximity of the adverse action to the time the respondent learned [*132] of the protected activity may be held sufficient to infer unlawful discrimination under the Act in certain circumstances, it does not compel such a conclusion, particularly when there is a legitimate intervening basis for the adverse action. *platone,* 2003-SOX-27 (ALJ Apr. 30, 2004) (citations omitted).

Other than the fact that Mr. Grant's most recent complaints occurred in October of 2003 n47--roughly one month before his termination--Complainant has pointed to no other circumstantial evidence from which one could reasonably

infer his alleged "protected activity" was a contributing factor in his suspension. Simply stated, the temporal proximity upon which Complainant has hung his hat is not enough to infer discriminatory animus on the part of Respondent. The remainder of Mr. Grant's "protected activity" took place months before his November 26, 2003 suspension; in fact, Mr. Grant's complaints about Respondent's retention of Roderick Linton, LLP as counsel occurred before the enactment of the Sarbanes-Oxley Act. More significantly, there is nothing in the record indicating that Respondent's managers or corporate officers took *any* steps to suspend or otherwise discipline Mr. [*133] Grant *before* his November 25, 2003 e-mail to Mr. Barker, and certainly not because of any "protected activity" thereafter. Nor is there any evidence that any individual or group at Dominion East Ohio Gas ever contemplated removing Mr. Grant from his post for any amount of time because of any one specific instance of "protected activity" or because of all of his complaints considered together.

n47 In October of 2003, Mr. Grant requested clarification of the company's policy on the use of double-wall tanks, and also sent e-mails about the Buckeye pipeline transaction.

To be sure, Mr. Grant often provided constructive insight into the every day functions of the North Canton office. Mr. Barker and others testified that the company gladly accepts complaints, questions, or concerns from employees. Some of Mr. Grant's complaints about the accounting programs even led Respondent to actually consider changes to its use of the WMIS system. Likewise, Mr. Grant's questions about the use of double-wall tanks prompted expert consultation to ensure the company was complying with the proper regulations. Moreover, witnesses testified that Mr. Grant was a good worker whose abilities as an [*134] engineering technician were valued by the company. Thus, Complainant raised no concerns or complaints that could have been perceived as threatening to Respondent in any way, so as to prompt it to retaliate against or "get rid of" Mr. Grant.

In sum, without anything else to support Complainant's contention, the very loose temporal correlation between Claimant's alleged "protected activity" and the adverse employment action is insufficient to infer unlawful discriminatory action by Respondent in violation of the Act. As alluded to above, this is particularly apparent given the fact that Respondent has produced a legitimate intervening basis for Mr. Grant's suspension sufficient to sever any causal connection remotely suggested because of the temporal proximity.

Based on the foregoing, I find that Complainant has not established a *prima facie* case necessary to raise an inference of unlawful discrimination under the Act.

*Legitimate Nondiscriminatory Rationale for Adverse Action*

Even assuming Complainant has established each element sufficient to raise an inference of unlawful discrimination, I find, after viewing the record as a whole, that Respondent has introduced a legitimate [*135] nondiscriminatory rationale to justify suspending Mr. Grant, which Complainant has not shown to be a pretext.

Respondent presented much evidence explaining its clear and strict policy regarding employee behavior, along with evidence that Dominion East Ohio Gas employees--including Mr. Grant--have been disciplined in the past for violating the company's code of conduct. More specifically, it is clear that Respondent maintains an express policy prohibiting employees from using electronic communication devices--including e-mail--in a vulgar, inappropriate, or otherwise offensive manner. There is also no question that Mr. Grant was fully aware of the company's policies. And, despite Complainant's untenable argument that his November 25, 2003 e-mail to Mr. Barker and others was a legitimate complaint about the "Open Couch" invitation, n48 it is clear (as Respondent determined) that Mr. Grant violated the company's policy.

n48 Mr. Grant's November 25, 2003 e-mail to Mr. Barker and others, which included the term "woody" and commented on the "Open Couch" session with the EAP in an inappropriate way, contains absolutely no language--either express or implied--suggesting he was complaining about the sexual or offensive nature of the "Open Couch" invitation. Frankly, I find it unlikely that Mr. Grant was offended by the "Open Couch" invitation in the first place as he claims, given some of the blatantly vulgar e-mails Mr. Grant included in the record, but to

which he apparently never took offense. In other words, it is hard to believe that of all of the vulgar e-mails Mr. Grant either sent or received in the record here, he was most offended by the "Open Couch" invitation, which included no offensive vulgar language or images. Moreover, Mr. Grant's alleged attempt at complaining about the offensive nature of the "Open Couch" invitation in his November 25, 2003 e-mail reads more like a failed attempt to be humorous and chummy with the corporate officers. Had he truly wished to lodge a complaint about the nature of the "Open Couch," it is reasonable to assume that Mr. Grant would have either directed his complaint to those in the EAP, or via a more tactful complaint directly to the corporate officers—that is, one that did not contain vulgar sexual references.

[*136]

Mr. Grant's November 25, 2003 e-mail contained vulgar, sexually charged language that offended Mr. Barker. As Mr. Barker testified, typical "shop talk" language crosses the line to become a violation of company policy if it offends or harasses others. Mr. Barker was undoubtedly offended by Mr. Grant's use of the term "woody." Indeed, whether "shop talk" is used in normal conversation and e-mail communications among those in the North Canton office is irrelevant to whether *mr. Barker* took offense to Mr. Grant's e-mail. Once it has been established that an employee has violated company policy, the record is clear that Respondent's policies call for disciplinary action. Thus, I find Respondent has met its burden of producing a legitimate nondiscriminatory reason for suspending Mr. Grant.

In response, Complainant argues that the justification offered by Respondent to explain Mr. Grant's suspension is a pretext. I disagree. Initially, it is significant that Respondent acted to discipline Mr. Grant within just days of his inappropriate conduct; in fact, Mr. Barker initiated the proceedings the very afternoon he received the e-mail. Moreover, Respondent followed its disciplinary process [*137] to a "T". Thus, there is nothing that occurred within the few days after Mr. Grant's e-mail to Mr. Barker that would remotely suggest that Respondent conjured up a story about how Mr. Grant violated company policy in order to distract from a more sinister plan to suspend Mr. Grant because of "protected activity"—which of course did not occur.

Complainant argues that because others who sent vulgar or sexually charged e-mails were never disciplined for violating company policy, Mr. Grant's discipline is not consistent with its practice of "allowing rude, crude and socially unacceptable behavior, such as shop talk." Complainant's Amended Br., at 5. Instead, Complainant believes Respondent "arbitrarily" and "discriminatorily" disciplined employees for "shop talk" use. n49 *Ibid.* However, the evidence of record does not support Complainant's contention.

n49 Complainant curiously contends that Respondent is not consistent in its application of company policy—and its reason for suspending Mr. Grant is therefore a pretext—because "the Company did not protect Complainant from being offended" when he was disciplined for urinating next to a woman in the men's room in 1999. To date, Mr. Grant believes that he was the "victim" in the 1999 incident, when he walked into the men's room and without hesitation, urinated within feet of a woman working on the restroom facilities. I find it hard to believe that Mr. Grant took offense or was otherwise uncomfortable in 1999 as he alleges when he saw Ms. Gray in the men's room, but continued to relieve himself anyway. Even so, whether Mr. Grant took offense to a woman in the restroom, or to the "Open Couch" invitation for that matter, is not germane to establishing that *his* violation of company policy four years later is a pretext.

[*138]

Respondent admits—and it is unreasonable to suspect otherwise—that "shop talk" occurs at the work place in North Canton. In fact, Mr. Barker confessed that "shop talk" is inevitable, and cannot always be policed. But such an admission does not mean Mr. Grant did not violate company policy, and in no way leads to the conclusion that each and every instance of vulgar language, either verbal or electronic, is grounds for disciplinary measures. This would have to be the case to accept Complainant's argument that Mr. Grant was acting no differently than anyone else at Dominion by sending a vulgar, sexually suggestive e-mail to a corporate officer. To the contrary, Mr. Grant's e-mail was not average, everyday "shop talk;" it crossed a line into prohibited conduct according to an officer obligated to enforce company policy.

2005 DOLSOX LEXIS 79, *138
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

Mr. Grant sent a vulgar and sexually charged e-mail to a *corporate officer* who was offended by his use of the term "woody." Of the myriad of other inappropriate e-mails made part of the record, none was sent to a corporate officer who was offended upon receipt. n50 Nor is there any evidence that any employee ever used "shop talk" or any other inappropriate language [*139] around corporate officers. Mr. Grant even testified that corporate officers are entitled to a certain amount of respect from Dominion employees. n51 Additionally, it is insignificant that some Dominion managers use "shop talk" or have been recipients of vulgar e-mails. Managers, who deal with other employees on a day to day basis, may understandably be more receptive or immune to an endless barrage of foul language. But a corporate officer looking from the outside into an office culture with which he has limited familiarity may have legitimately been offended by his unsolicited inclusion in that culture. Clearly, Mr. Barker was.

n50 Complainant points out that on December 20, 1999, he sent an e-mail to Bruce Klink (who is now Vice President) in which he used the phrase "whoring around," implying that such e-mails do not warrant discipline, and Respondent's justification for Mr. Grant's suspension is pretextual. But this December 20, 1999 e-mail was sent before Dominion's merger with CNG, and before Dominion implemented its more stringent policy with regard to inappropriate e-mails. Moreover, there is nothing in the record establishing that Mr. Klink was in fact a corporate officer at the time, and Mr. Klink did not testify at the hearing in order to explain his reaction to the e-mail.

[*140]

n51 In addition, Ken Lee, who had himself been disciplined for inappropriate language, stated he would not send a sexually suggestive e-mail to a corporate vice-president, "Unless I lost my mind and just went nuts." (Tr., at 232).

Accordingly, I find that not only did Respondent have a legitimate, non-pretextual rationale for Mr. Grant's suspension, but also that Respondent has established by clear and convincing evidence that it would have suspended Mr. Grant even in the absence of any alleged "protected activity." As noted above, Respondent followed its disciplinary procedure swiftly and precisely. More specifically, Respondent painstakingly compared Mr. Grant's November 2003 inappropriate conduct to his actions in 1999 and to the actions of others who had received discipline. Mr. Grant's complaints about "accounting irregularities" were not considered. Under its system of "progressive discipline," Respondent imposed a penalty that can only be described as predictable, and is arguably lenient. Because Mr. Grant had been previously disciplined for his conduct, for which he received a Type III suspension, Respondent had every reason to terminate Mr. Grant and still remain within [*141] the bounds of its "progressive" system. Nothing in the record suggests that Respondent would have reacted any differently to Mr. Grant's e-mail had he not lodged complaints about "accounting irregularities." I accept Mr. Barkers' testimony that vulgar and offensive language is not tolerated in the company, and that he believed Mr. Grant's conduct warranted immediate discipline under the company's established policies.

Under these circumstances, I find that Respondent has established by clear and convincing evidence that it would have suspended Mr. Grant for violating company policy governing employee behavior even in the absence of his alleged "protected activity."

*Attorney Fees*

Lastly, Respondent contends that it "is entitled to attorneys' fees of $ 1,000" pursuant to the applicable regulations because Mr. Grant's complaint "was both frivolous and brought in bad faith." Respondent's Br., at 36. Specifically, Respondent claims that because Mr. Grant expressly conceded that none of the complaints alleged to be "protected activity" contained allegations of fraud, Mr. Grant "could not have held a sincere belief that he engaged in protected activity." *ibid.* I disagree.

Title [*142] 29, Part 1980.109(b) of the Code of Federal Regulations, 29 C.F.R. §1980.109(b), provides:

(b) If the administrative law judge concludes that the party charged has violated the law, the order will provide all relief necessary to make the employee whole, including reinstatement of the complainant to that person's former position with the seniority status that the complainant would have had but for the discrimination, back pay with interest, and compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney's fees. If, upon the request of the named person, the administrative law judge determines that a complaint was frivolous or was brought in bad faith, the judge may award to the named person a reasonable attorney's fee, not exceeding $ 1,000.

It has been held that a Sarbanes-Oxley complaint is frivolous when there is no "arguable basis in law or fact" to maintain an action under the Act, *hopkins v. ATK Tactical Systems*, 2004 SOX-19 (ALJ May 27, 2004) citing *Brown v. Bargery*, 207 F.3d 863, 866 (6th Cir. 2000), or when "the claim was brought for purposes [*143] of harassment, delay or other improper purposes,'" *id., quoting Wilton Corporation v. Ashland Castings Corp.*, 188 F.3d 670, 676 (6th Cir. 1999).

Although the strength of Mr. Grant's claim is in serious question here, his complaint does not rise to the level of being frivolous. In other words, a complaint is not considered frivolous merely because the complainant was not able to sustain a successful claim based on the merits. *see Hopkins*, 2004 SOX-19. As Administrative Law Judge Pamela Wood explained in *hopkins*, the "relative newness" of the Act permits a complainant to explore the parameters of what it means to be engaged in protected activity or whether the alleged protected activity was a contributing factor under the Act. Here, Mr. Grant consulted an attorney regarding his knowledge of what he described as "accounting irregularities." That Mr. Grant did not have a strong argument or strong factual basis to establish that he engaged in "protected activity" as defined by the Act, does not mean he did not have a sincere belief a legitimate claim could be brought. Mr. Grant did allege facts that conceivably could have affected Respondent's accounting [*144] procedures and ultimately its bottom line; and the Act allows Complainant to explore the possibility that those facts may amount to a violation of law--even if that possibility is slight.

Accordingly, I find that after consulting counsel, Mr. Grant held a sincere belief he could maintain a viable claim under the Act against Respondent. Indeed, Respondent admitted that it initiated some--albeit minimal--investigation into Mr. Grant's allegations once Mr. Barker learned of them. And, there is nothing in the record indicating that Mr. Grant filed his claim to harass, intimidate, cause delay, or for any other improper purpose. Thus, I find that Respondent's request for sanctions in the form of attorney fees must be denied.

Conclusion

I find first that Complainant untimely filed his request for a formal hearing before this Office under 29 C.F.R. §1980.106(a), and the doctrine of equitable tolling does not apply to excuse Complainant's untimeliness. Therefore, Complainant's claim is dismissed for that reason alone. I also find that the named-Respondent Dominion East Ohio Gas is not covered by the terms of the Act, and that Complainant has not met his burden of establishing that [*145] fact. Thus, Complainant's claim is dismissed for want of subject matter jurisdiction. I further find that Complainant has not established a *prima facie* claim under the Act, as Mr. Grant was not engaged in protected activity, Respondent had no knowledge of any alleged "protected activity," and Complainant failed to allege facts sufficient to infer the alleged "protected activity" was a contributing factor in his adverse employment action. For that reason, Complainant's request for relief under the Act is denied. Finally, I find that Complainant's complaint was not frivolous, and Respondent's request for attorney fees is therefore denied. Accordingly,

IT IS HEREBY ORDERED that Complainant's request for relief under the Act is DENIED.

SO ORDERED.

2005 DOLSOX LEXIS 79, *145
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

NOTICE OF APPEAL RIGHTS: This decision shall become the final order of the Secretary of Labor pursuant to 29 C.F.R. § 1980.110, unless a petition for review is timely filed with the Administrative Review Board ("Board"), U.S. Department of Labor, Room S-4309, 200 Constitution Avenue, NW, Washington DC 20210, and within 30 days of the filing of the petition, the ARB issues an order notifying the parties that the case has [*146] been accepted for review. The petition for review must specifically identify the findings, conclusions or orders to which exception is taken. Any exception not specifically urged ordinarily will be deemed to have been waived by the parties. To be effective, a petition must be filed within ten business days of the date of the decision of the administrative law judge. The date of the postmark, facsimile transmittal, or e-mail communication will be considered to be the date of filing; if the petition is filed in person, by hand-delivery or other means, the petition is considered filed upon receipt. The petition must be served on all parties and on the Chief Administrative Law Judge at the time it is filed with the Board. Copies of the petition for review and all briefs must be served on the Assistant Secretary, Occupational Safety and Health Administration, and on the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor, Washington, DC 20210. *see* 29 C.F.R. §§ 1980.109(c) and 1980.110(a) and (b).

LEXSEE

GTE PRODUCTS CORPORATION vs. JEFFERSON DAVIS STEWART, THIRD;
DEAN T. LANGFORD & others, [1] defendants-in-counterclaim.

1  Earl E. Lawson and Rolfe D. Trevisan.

SJC-06749

SUPREME JUDICIAL COURT OF MASSACHUSETTS

421 Mass. 22; 653 N.E.2d 161; 1995 Mass. LEXIS 324; 10 I.E.R. Cas. (BNA) 1507

May 3, 1995, Argued
August 1, 1995, Decided

PRIOR HISTORY:      [***1] Essex. Civil action commenced in the Superior Court Department on October 16, 1991. A motion for summary judgment was heard by John P. Forte, J., sitting under statutory authority. The Supreme Judicial Court granted an application for direct appellate review.

COUNSEL: Arthur G. Telegen for the plaintiff.

Earle C. Cooley (Paul F. Beckwith with him) for Jefferson Davis Stewart, III.

JUDGES: Present: Abrams, Lynch, O'Connor, & Greaney, JJ.

OPINION BY: GREANEY

OPINION

[*23]  [**163] GREANEY, J. We granted the defendant's application for direct appellate review in this case to decide whether summary judgment was properly granted to GTE Products Corporation (GTE), and individual officers and officials of the company on counterclaims brought by Jefferson Davis Stewart, III, a former in-house counsel for the lighting companies of GTE. Stewart's counterclaims were raised in his answer to an action brought by GTE seeking the return of documents, papers, and other materials taken or retained by Stewart when he left GTE's employment. (Some of the background of the case is reported in the appeal concerning [***2] GTE's seeking injunctive relief and damages, 414 Mass. 721 [1993].) The counterclaims were based on the assertion by Stewart that he had been wrongfully discharged in retaliation for his continual attempts to convince GTE management to warn the public about safety risks associated with the use of certain GTE products, and his insistence that GTE comply with Federal law governing the disposal of hazardous waste. [2] We conclude that summary judgment properly was ordered in [*24] favor of GTE and the remaining defendants in counterclaim, and we direct the entry of an appropriate judgment. [3]

2  Stewart's answer stated four counterclaims. The first was for wrongful discharge in retaliation for legal advice given by Stewart to GTE; the second was for breach of the implied covenant of good faith and fair dealing in the employment relationship between himself and GTE; the third was for conspiracy to commit wrongful discharge; and the fourth was for intentional infliction of emotional distress. The judge's order allowed summary judgment as to all claims in favor of all the defendants-in-counterclaim. The parties have focused exclusively on Stewart's claim for wrongful discharge. We conclude, as it appears the parties have, that all of the claims depend on whether Stewart was wrongfully discharged by GTE, and, accordingly, a decision on that claim in favor of GTE resolves the other three counterclaims. Stewart makes no argument to the contrary.

We also note that Stewart has not appealed from the judge's order that he return all copies of documents, papers, and other materials to GTE, as

421 Mass. 22, *24; 653 N.E.2d 161, **163;
1995 Mass. LEXIS 324, ***2; 10 I.E.R. Cas. (BNA) 1507

well as copies of his work product, and that he be enjoined from disclosing confidential information learned in the course of his employment with GTE.

[***3]

3    No judgment has entered in this case. The appeal was taken from the orders contained in the judge's memorandum of decision on the motion for summary judgment filed by GTE on its behalf and on behalf of the other defendants-in-counterclaim. The parties appear to have treated the orders as a final judgment. We shall deal with the merits of the matter. See *Flood v. Midland Nat'l Life Ins. Co.*, 419 Mass. 176, 177 n.1 (1994); *G.J.T., Inc. v. Boston Licensing Bd.*, 397 Mass. 285, 286 n.3 (1986).

The facts, stated in the light most favorable to Stewart based on the materials in the summary judgment record, see *Alioto v. Marzall*, 402 Mass. 36, 37 (1988), are as follows.

Stewart began working for GTE in March, 1980, as an attorney in GTE's electrical equipment group. In 1986, he was named general counsel to GTE's lighting businesses, which included U.S. Lighting and Sylvania Lighting. In his capacity as general counsel, Stewart wrote a series of communications to corporate officers and officials concerning safety and liability issues related to three products manufactured [***4] by GTE's lighting businesses. [4] In these communications, he [**164] advocated that the company take aggressive and (presumably) costly measures to protect consumer safety and guard against possible corporate liability. In addition, when new Federal regulations on the disposal of hazardous waste were adopted, he advised GTE that a subsidiary of the company which provided lighting maintenance services would have to take the costly step of treating fluorescent and incandescent light bulbs as hazardous waste for purposes of [*25] disposal. [5] Stewart asserts that his advice was disregarded on some occasions and generally was not well received.

4    Stewart retained copies of certain documents, papers, and materials after he left GTE's employment. Descriptions of the products at issue, and legal advice given concerning them, are contained in memoranda, some written by Stewart and some by outside counsel. Copies of some of these documents were attached to Stewart's

opposition to GTE's motion for summary judgment. Among the attachments are copies of documents marked "privileged and confidential." GTE has not waived its attorney-client privilege against disclosure of the material retained by Stewart. At GTE's request, and by order of a judge in the Superior Court, "the action has proceeded under seal." *GTE Prods. Corp. v. Stewart*, 414 Mass. 721, 723 (1993). Our recitation of the facts respects GTE's interest in the confidentiality of what is undoubtedly privileged material.

[***5]

5    Stewart has admitted that he has no evidence that GTE has not complied with applicable Federal regulations governing the disposal of hazardous waste. He appears to take credit, in fact, for designing a program to bring the company into compliance with the newly adopted regulations. He nonetheless suggests that his advice in this regard was held against him.

Stewart's immediate supervisor was Rolfe Trevisan, general counsel for GTE. Trevisan had consistently given Stewart high annual performance ratings, raised his salary each year, and recommended that he receive substantial bonuses. A few months before Stewart left the company, Trevisan told Stewart that his performance was "above expectations" and gave him a good rating, a raise and a bonus of over $ 30,000. At some point during 1991, however, Trevisan lowered Stewart's confidential promotability rating on the law department's executive continuity charts from "promotable immediately" to the lowest promotability rating of "not promotable for three to five years." [6]

6    Trevisan did not inform Stewart that his confidential promotability rating had been changed. Stewart learned this information from Trevisan's secretary.

[***6] According to Stewart, it became clear to him that he was being "squeezed out" of the company after a meeting he had with Trevisan on August 7, 1991. Trevisan told him that Earl Lawson, a corporate officer and manager, had become dissatisfied with Stewart's domineering and "confrontational" style and that Stewart was going to have to learn to get along with Lawson or his future with GTE would be at risk; that Stewart should stop being the "social conscience" of the company; and

421 Mass. 22, *25; 653 N.E.2d 161, **164;
1995 Mass. LEXIS 324, ***6; 10 I.E.R. Cas. (BNA) 1507

that Trevisan intended to develop a set of performance objectives to "rehabilitate" Stewart as a productive member of the law department. Based on his experience advising the company on how to terminate employees, Stewart believed that Trevisan's actions likely were intended as a precursor to discharge. Concluding that he would have to abandon unpopular but (in his opinion) legally sound positions were he to remain, Stewart resigned from his employment [*26] with GTE on August 8, 1991. After Stewart left, Trevisan tried unsuccessfully to persuade him to return.

1. As a threshold question, we must decide whether Stewart's status as an attorney and in-house counsel for GTE should bar him from maintaining any action [***7] for wrongful discharge. As a general rule, an employee at will (Stewart was employed at will) may be terminated by an employer, without notice, "for almost any reason or for no reason at all." *Jackson v. Action for Boston Community Dev., Inc.*, 403 Mass. 8, 9 (1988). In company with a majority of other jurisdictions, however, this court has recognized that an at-will employee may sue a former employer for wrongful discharge when that discharge can be shown to be in violation of a clearly defined public policy. [7] "Redress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch.*, 404 Mass. 145, 149-150 (1989). In limited circumstances, we also have permitted redress "for employees terminated for performing important public deeds, even though the law does not absolutely require the performance of such a [**165] deed." *Flesner v. Technical Communications Corp.*, 410 Mass. 805, 810-811 (1991) (employee [***8] terminated for cooperating with criminal investigation of employer permitted to sue for retaliatory discharge). It has been suggested that a "whistleblower" might be entitled to protection on this basis. See *id.* at 811 n.3.

> 7  At a recent count, forty-three jurisdictions had recognized the public policy exception to the general rule allowing unrestricted termination of at-will employment. See Note, In-House Counsel's Right to Sue for Retaliatory Discharge, 92 Colum. L. Rev. 389, 394 n.22 (1992).

Courts in jurisdictions which generally recognize an

employee's action for wrongful or retaliatory discharge have, however, differed on the question whether an attorney, employed as in-house counsel, should be permitted the same right to sue for wrongful discharge as that enjoyed by other [*27] corporate employees. In *Balla v. Gambro, Inc.*, 145 Ill. 2d 492, 501 (1991), the Supreme Court of Illinois concluded "that, generally, in-house counsel do not have a claim . . . of retaliatory discharge." [8] The court based [***9] its decision on the destructive impact recognition of the claim would have on the attorney-client relationship that exists between an employer and in-house counsel, *id.*, and on its conclusion that the policy of preserving public health and safety, the basis for recognizing an employee's wrongful discharge claim, is protected adequately without recognition of the claim by the attorney's obligations under the Illinois Rules of Professional Conduct to attempt to prevent his employer from committing an illegal or harmful act and to withdraw from employment if he is requested to engage in conduct that would violate those obligations. *Id.* at 501-502, 504. It has also been noted that ethical canons and disciplinary rules give to a client the unfettered right to discharge an attorney in whom the client has lost confidence, and it has been reasoned that this precept should apply with full force to an attorney employed as in-house counsel. See *Willy v. Coastal Corp.*, 647 F. Supp. 116, 118 (S.D. Tex. 1986) (applying Texas law), rev'd on other grounds, 855 F.2d 1160 (5th Cir. 1988), aff'd, 503 U.S. 131 (1992). See also *Herbster v. North Am. Co. for Life & Health Ins.*, 150 [***10] Ill. App. 3d 21, 28-30 (1986), cert. denied, 484 U.S. 850 (1987). [9] The judge granted GTE's motion [*28] for summary judgment largely on the basis of the reasoning in these decisions.

> 8  The defendant company in *Balla v. Gambro, Inc.*, 145 Ill. 2d 492 (1991), was a distributor of kidney dialysis equipment. The attorney whose claim was considered in that case alleged that he had been fired in retaliation for informing the president of the company that he, the attorney, would do whatever necessary to stop the company's sale of dialyzers not in compliance with regulations of the United States Food and Drug Administration and posing a hazard to persons treated with the machines. *Id.* at 496-497.
> 9  The objection voiced in these decisions to the continuation of an attorney-client relationship no longer desired by the employer might be viewed as relevant mainly to the scope of the remedy

Page 3

421 Mass. 22, *28; 653 N.E.2d 161, **165;
1995 Mass. LEXIS 324, ***10; 10 I.E.R. Cas. (BNA) 1507

available to in-house counsel who claims to have been wrongfully discharged. A successful claimant in this situation might be limited to the remedy of compensatory damages, and not entitled to seek reinstatement as legal counsel to an employer with whom his relations might be strained. See General Dynamics Corp. v. Rose, 7 Cal. 4th 1164, 1176-1177 (1994) (in-house counsel may pursue wrongful discharge claim but judgment ordering reinstatement is not an available remedy).

[***11] In contrast, in the case of General Dynamics Corp. v. Rose, 7 Cal. 4th 1164 (1994), decided after the judge in this case ruled on GTE's motion for summary judgment, the Supreme Court of California concluded that there were sound reasons for recognizing the right of in-house counsel to sue for wrongful discharge in certain limited situations. The court noted that a claim of wrongful discharge protects more than the private interests in job security and professional reputation of the claimant. Protection of the policy expressed in the statute or rule claimed to have been violated by the employer is equally at stake, and the claimant's status as an attorney does not diminish the public interest in the furtherance of that policy. Id. at 1181.

In the view of the Supreme Court of California, certain mandatory obligations and prohibitions in the ethical rules of California governing an attorney's professional conduct embody "by their nature and goals . . . important [**166] values affecting the public interest at large." Id. at 1181-1182. The court observed that "among other strictures on their conduct, [attorneys] may not be a party to the commission of a crime, destroy evidence [***12] or suborn perjury." Id. at 1186. Thus, "the case for shielding the in-house attorney . . . from retaliation by the employer for either insisting on adhering to mandatory ethical norms of the profession or for refusing to violate them is . . . clear," id. at 1182, and in-house counsel should be permitted to pursue a claim for wrongful discharge if the claim is "founded on allegations that an in-house attorney was terminated for refusing to violate a mandatory ethical duty embodied in [California's code of professional conduct]." Id. at 1188.

In addition, the court reasoned, in-house counsel should be permitted to pursue a claim in the "limited circumstances in [*29] which in-house counsel's

nonattorney colleagues would be permitted to pursue a [wrongful] discharge claim and governing professional rules or statutes expressly remove the requirement of attorney confidentiality" (emphasis in original). Id. The court pointed out, however, that instances in which disclosure of client confidences is permissible are rare, and emphasized that it would not condone any dilution of the obligation of secrecy in the context of the attorney-client relationship between a corporate [***13] employer and in-house counsel.

We find the latter approach more persuasive. We would be reluctant to conclude that an employee, solely by reason of his or her status as an attorney, must be denied all protection from wrongful discharge arising from the performance of an action compelled by a clearly defined public policy of the Commonwealth. As was pointed out in a treatise critical of the decision in the Balla case, "it is clear that there would have been a right of action had the employee not been a lawyer. It thus seems bizarre that a lawyer employee, who has affirmative duties concerning the administration of justice, should be denied redress for discharge resulting from trying to carry out those very duties" (footnote omitted). 1 G.C. Hazard & W.W. Hodes, Law of Lawyering § 1.16:206, at 477 (Supp. 1994). We agree with the Supreme Court of California that public interest is better served if in-house counsel's resolve to comply with ethical and statutorily mandated duties is strengthened by providing judicial recourse when an employer's demands are in direct and unequivocal conflict with those duties. See General Dynamics Corp. v. Rose, supra at 1188.

We stress, however, [***14] that a claim for wrongful discharge brought by in-house counsel will be recognized only in narrow and carefully delineated circumstances. To the extent that in-house counsel's claim depends on an assertion that compliance with the demands of the employer would have required the attorney to violate duties imposed by a statute or the disciplinary rules governing the practice [*30] of law in the Commonwealth, [10] that claim will only be recognized if [**167] it depends on (1) explicit and unequivocal statutory or ethical norms (2) which embody policies of importance to the public at large in the circumstances of the particular case, and (3) the claim can be proved without any violation of the attorney's obligation to respect client confidences and secrets. See S.J.C. Rule 3:07, Canon 4, DR 4-101 (A) and (B), as appearing in

421 Mass. 22, *30; 653 N.E.2d 161, **167;
1995 Mass. LEXIS 324, ***14; 10 I.E.R. Cas. (BNA) 1507

382 Mass. 778 (1981). [11]

10  This court has, in the past, expressed doubt concerning whether "the ethical code of a private professional organization can be a source of recognized public policy." *Wright v. Shriners Hosp. for Crippled Children,* 412 Mass. 469, 473 (1992). The point was not resolved in the *Wright* case because the code of ethics by which the plaintiff claimed to be governed had not been introduced in evidence.

We need not decide to what extent we would recognize an explicit command in an ethical code other than the disciplinary rules governing the practice of law in the Commonwealth as a source of recognized public policy. Among other obligations, an attorney engaged in the practice of law in the Commonwealth, may not "counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent." S.J.C. Rule 3:07, Canon 7, DR 7-102 (A) (7), as appearing in 382 Mass. 785 (1981). An attorney may not knowingly participate in a fraud on a tribunal, and must, to the extent permitted by his obligation to guard his client's confidences, disclose the occurrence of the fraud. See S.J.C. Rule 3:07, Canon 4, as appearing in 382 Mass. 778 (1981); S.J.C. Rule 3:07, Canon 7, DR 7-101 (B), as appearing in 382 Mass. 784 (1981). An attorney also has a right to reveal client confidences and secrets indicating that a client intends to commit a crime, and the information necessary to prevent commission of that crime. See S.J.C. Rule 3:07, DR 4-101 (C) (3). In view of the inherent ability of a legal practitioner to affect the resolution of controversies affecting private parties and the public good, an attorney's discharge for compliance with these precepts at least, may, in appropriate circumstances, give rise to a claim for wrongful discharge.

[***15]

11  The present disciplinary rule governing an attorney's obligation to keep client confidences provides as follows:

"DR 4-101. Preservation of Confidences and Secrets of a Client.

"(A) 'Confidence' refers to information protected by the attorney-client privilege under applicable law, and 'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely detrimental to the client."

"(B) Except when permitted under DR 4-101(C), a lawyer shall not knowingly: (1) Reveal a confidence or secret of his client (2) Use a confidence or secret of his client to the disadvantage of the client. (3) Use a confidence or secret of his client for the advantage of himself or of a third person unless the client consents after full disclosure"

[*31]  "Except in those rare instances when disclosure is explicitly permitted . . . [by the disciplinary rules governing the practice of law in the Commonwealth], it is never the business of the lawyer to disclose publicly the secrets [***16] of the client." *General Dynamics Corp. v. Rose, supra* at 1190. The exceptions to an attorney's obligation to guard client confidences under S.J.C. Rule 3:07, Canon 4, DR 4-101 (C), as appearing in 382 Mass. 778 (1981), are extremely limited. [12] [*32]  While confidentiality concerns may to some degree be ameliorated by a trial court's use of protective orders and other protective devices, the circumstances in which in-house counsel may pursue a claim for wrongful discharge will, of necessity, be limited by the broad obligation to guard client confidences. See G.M. Tuoni, Massachusetts Attorney Conduct Manual [**168] § 4-12 (1992) (discussing breadth of definition of client confidences). Similarly, if the claim for wrongful discharge is one that might be brought by a nonattorney colleague, based on the public policy exception as delineated in the *Smith-Pfeffer* and *Flesner* cases, it must be established that the claim can be proved without any violation of the attorney's obligation to respect client confidences and secrets.

12  The present disciplinary rule explaining the

421 Mass. 22, *32; 653 N.E.2d 161, **168;
1995 Mass. LEXIS 324, ***16; 10 I.E.R. Cas. (BNA) 1507

circumstances in which an attorney may disclose client confidences permits disclosure in only four situations:

"A lawyer may reveal:

"(1) Confidences or secrets with the consent of the client or clients affected, but only after a full disclosure to them.

"(2) Confidences or secrets when permitted under Disciplinary Rules or required by law or court order.

"(3) The intention of his client to commit a crime and the information necessary to prevent the crime.

"(4) Confidences or secrets necessary to establish or collect his fee or to defend himself or his employees or associates against an accusation of wrongful conduct."

S.J.C. Rule 3:07, DR 4-101 (C). In addition, as was previously noted, see note 10, *supra*, an attorney must, to the extent permitted by the obligation to preserve client confidences, reveal information concerning a fraud committed by a client in the course of the attorney's representation.

Adoption of a modified version of the American Bar Association's Model Rules of Professional Conduct is currently under consideration by this court. Those rules would appear to permit disclosure of client confidences in some circumstances in which disclosure is forbidden as unethical under the present disciplinary rules, and might, therefore, affect the ability of in-house counsel to prove a claim of wrongful discharge.

The text of Rule 1.6 of the Proposed Massachusetts Rules of Professional Conduct, the proposed new rule on disclosure of client confidences, is as follows:

"(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b).

"(b) A lawyer may reveal such information:

"(1) with the consent of the client or clients affected, but only after a full disclosure to them.

"(2) when permitted under these rules or required by law or court order.

"(3) to the extent that the lawyer believes necessary to prevent the commission of a crime.

"(4) to the extent the lawyer believes necessary to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client.

"(5) to the extent the lawyer believes necessary to rectify client fraud in which the lawyer's services had been used, except as provided in Rule 3.3(e) [governing criminal defense's counsel obligations with respect to false client testimony]."

[***17] 2. Having concluded that we shall, in limited circumstances, recognize the right of in-house counsel to bring suit for wrongful discharge, we turn to whether summary judgment was, nonetheless, properly

Page 6

421 Mass. 22, *32; 653 N.E.2d 161, **168;
1995 Mass. LEXIS 324, ***17; 10 I.E.R. Cas. (BNA) 1507

granted. GTE, as the moving party, having met its initial burden of demonstrating by indicia of admissible evidence, see Mass. R. Civ. P. 56 (b) and (e), 365 Mass. 824 (1974), that Stewart cannot prevail, we inquire whether Stewart has established that there exists a genuine dispute as to essential factual elements of his claim. See *Kourovacilis v. General Motors Corp.*, 410 Mass. 706, 711, 716 (1991). [*33]

Stewart maintains that officials at GTE plotted his dismissal in retaliation for the tenor of the legal advice he offered with respect to product safety in three specific instances, and for advising the company that it must comply with Federal regulations despite the cost entailed by compliance. For the most part, Stewart's claims appear to rest on his advice relating to the avoidance of possible legal liability, rather than with compelling issues of product design directly affecting public health and safety. His insistence that GTE conduct its business "in compliance with the [***18] highest ethical business standards," by doing more than was absolutely required by law, met some resistance from others legitimately concerned about profitability. We would be reluctant to conclude that disagreements over the wording of a product warning label, or the hypothetical risk posed by a product, which are matters committed to the business judgment of a company and do not rise to the requisite level of public concern, could be the basis for a wrongful discharge claim. See *King v. Driscoll*, 418 Mass. 576, 583 (1994) ("internal administration, policy, functioning, and other matters of an organization cannot be the basis for public policy exception"); *Wright v. Shriners Hosp. for Crippled Children*, 412 Mass. 469, 474 (1992); *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., supra* at 151; *Mello v. Stop & Shop Cos.*, 402 Mass. 555, 560-561 (1988); *Mistishen v. Falcone Piano Co., Inc.*, 36 Mass. App. Ct. 243, 245-246 (1994). However, we need not decide whether Stewart's allegations are sufficient in this regard because we conclude, as matter of law, that Stewart has failed to present sufficient proof of constructive discharge. [***19] [13]

> 13    All issues raised in GTE's motion for summary judgment are properly before us.

Stewart has not claimed that he was formally terminated from his position at GTE. Thus, to sustain his claim for wrongful discharge, it must appear that he will be able to prove that he was constructively discharged

from his position as general counsel. A "constructive discharge occurs when [*34] the employer's conduct effectively forces an employee to resign. Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation." *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1244-1245 (1994).

We have not had occasion to address what an employee must prove to establish a constructive discharge. The elements for proof of constructive discharge have been discussed in a number of cases decided by Federal and State appellate courts, however, [***20] and there is general agreement on the elements pertinent to a decision in this case. See, e.g., *id.* at 1247. See also *Slack v. Kanawha County Hous. & Redevelopment Auth.*, 188 W. Va. 144, 153 (1992) (collecting cases). In a frequently cited decision, the United States Court of Appeals for the First Circuit has stated that in order for a constructive discharge to be found, "the trier of [**169] fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977). The test is met if, based on an *objective* assessment of the conditions under which the employee has asserted he was expected to work, it could be found they were so difficult as to be intolerable. See *Turner v. Anheuser-Busch, Inc., supra* at 1248. See also *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 481 (1st Cir. 1993); *Aviles-Martinez v. Monroig*, 963 F.2d 2, 6 (1st Cir. 1992); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983).

A single, isolated act of an employer (or an agent of the [***21] employer) usually will not be enough to support a constructive discharge claim. Thus, evidence of a single unfavorable performance review or even of a demotion generally will not be deemed sufficient to support a claim. See *Turner v. Anheuser-Busch, Inc., supra* at 1247. "In order to amount to a constructive discharge, adverse working conditions must be [*35] unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." *Id.*

For example, in *Aviles-Martinez v. Monroig, supra* at 6, the court held that an employee had presented

421 Mass. 22, *35; 653 N.E.2d 161, **169;
1995 Mass. LEXIS 324, ***21; 10 I.E.R. Cas. (BNA) 1507

sufficient evidence to go to trial on the issue of constructive discharge where it was alleged that the employer had removed all of the employee's files and then chastised him for not doing his work; told the staff that the office was not up to date because of the employee's irresponsibility; and scolded and ridiculed the employee in front of clients almost every day. Conversely, mere dissatisfaction with the nature of assignments, criticism of an employee's performance, and dissatisfaction with compensation have been held insufficient to establish a triable question of fact on the issue of constructive [***22] discharge. See *Stetson v. NYNEX Serv. Co., 995 F.2d 355, 361* (2d Cir. 1993).

Viewing the evidence in the light most favorable to Stewart, and drawing all reasonable inferences in his favor, we nonetheless conclude that the conditions under which Stewart alleges he would have been forced to work had he remained at GTE were not so intolerable that a reasonable person would have felt compelled to resign as general counsel. Stewart was not faced with a demotion, or a loss of job responsibilities or compensation. In addition, nothing in the evidence submitted in support of his opposition to the motion for summary judgment supports his assertion that remaining in his position would have required him to violate his ethical obligations as an attorney. He was not asked to further, commit, or conceal any illegal or fraudulent acts. See *Turner v. Anheuser-Busch, Inc., supra* at 1258. Any inference he drew in this regard from his interview with Trevisan is purely speculative.

Stewart had a single, distressing interview with Trevisan, a supervisor with whom his relations had been cordial. He immediately assumed, without further inquiry, that he would be unable to meet new performance [***23] goals which were to be established for him, and therefore concluded, based on his perception of the company's actions, that the setting of those [*36] goals would necessarily lead to his dismissal. He left summarily, and then disregarded requests that he return to work. "Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast" (emphasis in original). *Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987).* Had Stewart remained at GTE, he might have been required to compromise his own vision of his role in the company, but this cannot be the ground for a claim of constructive discharge. A reasonable person intent on preserving his career would not have construed the interview with Trevisan as the prelude to necessarily intolerable conditions in the work place.

3. The judge granted GTE's motion for summary judgment principally on the strength of the *Balla* decision which precludes any action by in-house counsel for wrongful discharge. The judge did not have the benefit of the *General Dynamics* decision [**170] which, as has been discussed, establishes what appears to this court to be the better [***24] rule. We have concluded that summary judgment was proper because no triable issue exists on the issue of constructive discharge. An order "which is correct on the facts will be upheld even though the stated ground for the judgment is unsound." *West Broadway Task Force v. Boston Hous. Auth.,* 414 Mass. 394, 398 (1993). See *Aetna Casualty & Sur. Co. v. Continental Casualty Co.,* 413 Mass. 730, 734-735 (1992). The case is remanded for entry of a judgment in favor of GTE and the remaining defendants-in-counterclaim as to all counts of Stewart's counterclaim.

*So ordered.*

LEXSEE

ROBERT W. HERBSTER, Plaintiff-Appellant, v. NORTH AMERICAN
COMPANY FOR LIFE AND HEALTH INSURANCE, Defendant-Appellee

No. 85-0042

Appellate Court of Illinois, Second District

150 Ill. App. 3d 21; 501 N.E.2d 343; 1986 Ill. App. LEXIS 3146; 103 Ill. Dec. 322; 1
I.E.R. Cas. (BNA) 1392; 105 Lab. Cas. (CCH) P55,626

November 26, 1986, Filed

**PRIOR HISTORY:**    [***1] Appeal from the Circuit
Court of Kane County; the Hon. Marvin D. Dunn, Judge,
presiding.

**DISPOSITION:**   Judgment affirmed.

**COUNSEL:** John M. Bowlus, of Chicago, for appellant.

Russell M. Pelton, of Peterson, Ross, Schloerb & Seidel,
of Chicago, and Matthew H. Patton, of Kilpatrick &
Cody, of Atlanta, Georgia, for appellee.

**JUDGES:** JUSTICE STROUSE delivered the opinion of
the court. NASH, P.J., and HOPF, J., concur.

**OPINION BY:** STROUSE

**OPINION**

   [*23] [**344] The plaintiff, Robert W. Herbster, a
licensed attorney, brought suit for retaliatory discharge
against his employer, North American Company for Life
and Health Insurance (North American). The suit was
premised on plaintiff's refusal to destroy or remove
documents from North American's files which had been
requested in lawsuits pending in the Federal court in
Alabama against North American and other insurance
companies. These documents were generated by North
American in its actuarial department and contained
information which, if made available to the Alabama
plaintiffs, tended to support allegations of fraud in the
sale of so-called flexible annuities sold by North
American. On December 28, 1984, the trial court granted
North [***2] American's motion for summary judgment.

This appeal followed.

   The plaintiff was employed as chief legal officer and
vice-president in charge of the legal department for North
American under an oral contract which was terminable at
will. Plaintiff claimed that he was discharged for
refusing to destroy or remove discovery information. He
further alleged that if he had not refused, it would have
constituted a fraud on the Federal court of Alabama and
would have caused him to violate Rules 1 -- 102(5) and 7
-- 109(a) of the Code of Professional Responsibility (87
Ill. 2d Rules 1 -- 102(5), 7 -- 109(a)).

   North American filed its motion for summary
judgment charging that: (1) there was no genuine issue as
to any material fact; (2) there was no cause of action for
retaliatory discharge by an attorney who is terminated by
his client; (3) plaintiff was discharged because of the
quality of his work; and (4) they never ordered,
demanded, or directed plaintiff to destroy or remove any
discovery information.

   The trial court granted summary judgment to North
American because of the attorney-client relationship.
Plaintiff appeals.

   There are two elements to a claim for retaliatory
discharge: [***3] (1) the employer discharged the
employee in retaliation for the employee's activities, and
(2) the discharge was in contravention of a clearly
mandated public policy. *Midgen v. Sacket-Chicago, Inc.*
(1984), 105 Ill. 2d 143, 148, 85 Ill. Dec. 475, 473 N.E.2d
1280; *Palmateer v. International Harvester Co.* (1981),
85 Ill. 2d 124, 52 Ill. Dec. 13, 421 N.E.2d 876.

150 Ill. App. 3d 21, *23; 501 N.E.2d 343, **344;
1986 Ill. App. LEXIS 3146, ***3; 103 Ill. Dec. 322

There is no question that there are public policy considerations in [*24] this case to support the second element of the tort. Supreme Court Rules would be contravened (87 Ill. 2d Rules 1 -- 102, 7 -- 102(a)(3), 7 -- 109(n)); justice would be obstructed (see, e.g., Ill. Rev. Stat. 1983, ch. 38, par. 31 -- 4(n)); and destroying documents would be fundamentally incompatible with this State's broad discovery policies ( Consolidation Coal Co. v. Bucyrus-Erie Co. (1982), 89 Ill. 2d 103, 118, 59 Ill. Dec. 666, 432 N.E.2d 250). Clearly, these matters "strike at the heart of a citizen's social rights, duties, and responsibilities." Palmateer v. International Harvester Co. (1981), 85 Ill. 2d 124, 130, 52 Ill. Dec. 13, 421 N.E.2d 876.

We must decide, however, whether an attorney, as general counsel and an employee [***4] of a corporation, is entitled to bring a claim for retaliatory discharge. Counsel does not cite nor does our research disclose any case on point. Therefore, we must examine the historical considerations of the tort itself and whether plaintiff is an employee within the meaning of established case law.

In 1978, our supreme court determined that an employee discharged for taking advantage of the benefits of the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1977, ch. 48, par. 138.1 et seq.), even though he was terminable at will, could sue for the tort of retaliatory discharge. ( Kelsay v. Motorola, Inc. (1978), 74 Ill. 2d 172, 23 Ill. Dec. 559, 384 N.E.2d 353.) The tort was recognized as an exception to the general rule that an at-will employee has no recourse for discharge. The court held that an employer's otherwise absolute power to [**345] terminate at will should not prevail when it was exercised to prevent an employee from asserting his statutory rights under the Act and that the Act itself would be seriously undermined if such conduct were permitted. In so holding, the court realized that many employees whose common law rights had been supplanted [***5] by the Act would be left without a remedy since they would want to keep their jobs rather than seek compensation under the Act. ( Kelsay v. Motorola, Inc. (1978), 74 Ill. 2d 172, 182, 23 Ill. Dec. 559, 384 N.E.2d 353.) The court refused to accept a construction of the Act which allowed employers to place employees in the position of choosing between their jobs and seeking compensation. 74 Ill. 2d 172, 184, 23 Ill. Dec. 559, 384 N.E.2d 353.

In Palmateer v. International Harvester Co. (1981), 85 Ill. 2d 124, 52 Ill. Dec. 13, 421 N.E.2d 876, the supreme court again considered the tort of retaliatory discharge. An employee of International Harvester alleged that he was discharged both for supplying information to local law-enforcement authorities that another employee might be involved in a violation of the Criminal Code and for agreeing to assist in the investigation and trial of the employer if requested. The court emphasized the growing need for the tort of retaliatory discharge as an exception to the general rule that an at-will employment is terminable without cause at any [*25] time. 85 Ill. 2d 124, 128, 52 Ill. Dec. 13, 421 N.E.2d 876

With the rise of large corporations [***6] conducting specialized operations, and the employment of relatively immobile workers who often have no other place to market their skills, this exception realistically recognized that an employer and an employee do not stand on equal footing. The exception also recognized that unchecked employer power presented a distinct threat to public policies adopted by society as a whole. Thus, the court maintained a proper balance between the employer's interest in operating a business efficiently, the employee's interest in earning a livelihood, and society's interest in seeing that public policies are carried out. ( Palmateer v. International Harvester Co. (1981), 85 Ill. 2d 124, 129, 52 Ill. Dec. 13, 421 N.E.2d 876.) The court reviewed retaliatory-discharge cases from other States. The cause of action was generally allowed when a well-defined public policy was at stake. Where purely private interests were concerned and there was no well-defined public policy, the claim was disallowed. 85 Ill. 2d 124, 131, 52 Ill. Dec. 13, 421 N.E.2d 876.

As the lower courts in Illinois applied the law, they were not in accord when employees were covered by a union contract with a grievance procedure [***7] to protect them. Midgett v. Sackett-Chicago, Inc. (1984), 105 Ill. 2d 143, 85 Ill. Dec. 475, 473 N.E.2d 1280, resolved that conflict in holding that there was no valid reason to protect noncontractual employees while limiting contractual employees to remedies under collective-bargaining agreements. The punitive damages remedy afforded by the tort of retaliatory discharge added a remedy not provided for in union contracts, and such damages should discourage an employer's misconduct in the future. Midgett v. Sackett-Chicago, Inc. (1985), 105 Ill. 2d 143, 150, 85 Ill. Dec. 475, 473 N.E.2d 1280.

150 Ill. App. 3d 21, *25; 501 N.E.2d 343, **345;
1986 Ill. App. LEXIS 3146, ***7; 103 Ill. Dec. 322

Recently, the supreme court again extended the tort of retaliatory discharge to apply to a municipal employee who sought benefits under the Workers' Compensation Act. ( *Boyles v. Greater Peoria Mass. Transit District* (1986), 113 Ill. 2d 545, 101 Ill. Dec. 847, 499 N.E.2d 935.) The court, however, limited its expansion by upholding a statute prohibiting punitive damages against municipalities.

Although the tort has been extended since it was recognized less than a decade ago, the supreme court admonished against expanding it in *Barr v. Kelso-Burnett Co.* (1985), 106 Ill. 2d 520, [***8] 88 Ill. Dec. 628, 478 N.E.2d 1354. The court stated:

"[T]his court has not, by its *Palmateer* and *Kelsay* decisions, 'rejected a narrow interpretation of the retaliatory discharge tort' and does not 'strongly support' the expansion of the tort. The common law doctrine that an employer may [**346] discharge an employee-at-will for any reason or for no reason is still the law in Illinois * * *." (106 Ill. 2d 520, 525, 88 Ill. Dec. 628, 478 N.E.2d 1354, citing *Palmateer v. International* [*26] *Harvester Co.* (1981), 85 Ill. 2d 124, 128-30, 52 Ill. Dec. 13, 421 N.E.2d 876.)

Following this admonishment, one court refused to expand the retaliatory-discharge tort to allow a former special assistant Attorney General to sue his supervisors rather than his employer. ( *Morton v. Hartigan* (1986), 145 Ill. App. 3d 417, 421-22, 99 Ill. Dec. 424, 495 N.E.2d 1159.) And, in *Graf v. Elgin, Joliet & Eastern Ry. Co.* (7th Cir. 1986), 790 F.2d 1341, plaintiff's State tort action for retaliatory discharge was limited by the preemption of Federal law. *Cf. Wheeler v. Caterpillar Tractor Co.* (1985), 108 Ill. 2d 502, 508, 92 Ill. Dec. 561, 485 N.E.2d 372 (State [***9] law is preempted to the extent that it actually conflicts with Federal law).

The question remains whether we should extend the tort of retaliatory discharge to the plaintiff.

Plaintiff argues that although he is an attorney, he is only an employee of North American and as such is entitled to bring this action for retaliatory discharge. In support of his argument, plaintiff states that he was a salaried employee of the corporation, his position was terminable at will, and it was his only employment. He owed duties to the corporate board of directors and shareholders, as well as to its officers. His work was subject to review by his superiors. Plaintiff's relationship with the corporation was of a permanent nature, unlike the usual attorney-client relationship. He looked to North American for his compensation, career development, and job security. Like the president, vice-president, and directors, plaintiff was an employee of North American.

However, we cannot separate plaintiff's role as an employee from his profession. Unlike the average employee, plaintiff was a registered attorney subject not only to North American's review but also, like other attorneys, subject to disciplinary [***10] review and the Code of Professional Responsibility. His duties with the corporation were primarily restricted to legal matters. His job title was legally descriptive. Although he owed duties to corporate superiors, it is significant that Supreme Court Rule 721 allows attorneys to form professional service corporations where they are permitted to practice law as corporate employees, officers, directors, and shareholders. (87 Ill. 2d R. 721.) Moreover, the rule "does not diminish or change the obligation of each attorney engaged in the practice of law in behalf of the corporation or association to conduct himself in accordance with the standards of professional conduct applicable to attorneys licensed by" the court. (87 Ill. 2d R. 721(b).) Furthermore, as an employee, there is no dispute about his recompense being for legal services only. ( *Atwood v. Curtiss Candy Co.* (1959), 22 Ill. App. 2d 369, 371, 161 N.E.2d 355.) Plaintiff's duties were legal in nature, and his relationship with his profession as an attorney [*27] was and will continue to be pervasive.

Moreover, unlike the employees in the present retaliatory-discharge cases, attorneys occupy a special position in [***11] our society. As professionals closely supervised by the Supreme Court of Illinois, their conduct is governed by State statutes and legal precedent. In representing clients in civil and criminal matters, their authority is extremely broad. The attorney is placed in the unique position of maintaining a close relationship with a client where the attorney receives secrets, disclosures, and information that otherwise would not be divulged to intimate friends.

150 Ill. App. 3d 21, *27; 501 N.E.2d 343, **346;
1986 Ill. App. LEXIS 3146, ***11; 103 Ill. Dec. 322

Confidential communications related by a client remain inviolate by the attorney both during the attorney-client relationship and after it has been terminated. For example, attorneys are not freely permitted to breach the attorney-client confidences to promote their own cause. ( *Cannon v. U.S. Acoustics Corp.* (N.D. Ill. 1975), 398 F. Supp. 209, 222.) The attorney-client privilege is the oldest of the privileges of confidential communications known to the common law. ( *Upjohn Co. v. United States* [**347] (1981), 449 U.S. 383, 389, 66 L. Ed. 2d 584, 591, 101 S. Ct. 677, 682.) Its purpose is to encourage and promote full and frank consultation between a client and legal advisor by removing the fear of compelled [***12] disclosure of information. *Consolidation Coal Co. v. Bucyrus-Erie Co.* (1982), 89 Ill. 2d 103, 117-18, 59 Ill. Dec. 666, 432 N.E.2d 250.

Accordingly, the law places special obligations upon an attorney by virtue of this close relationship. Those obligations are referred to generally as the fiduciary duty of the attorney. It permeates all phases of the relationship, including the contract for employment. An attorney's duty to his client includes not taking advantage of the client's trust. An attorney must inform his client of all basic material facts affecting his employment. This protection of the client is so important that all transactions between an attorney and a client are subject to the closest scrutiny. Thus, where an attorney's fiduciary duty comes into play, the attorney has a burden of showing fairness, good faith, adequacy of consideration, and freedom from undue influence. ( *Neville v. Davinroy* (1976), 41 Ill. App. 3d 706, 709, 355 N.E.2d 86.) In the relation of client and attorney, "there is that confidence reposed in the latter which gives rise to very strong influences over the actions, rights and interests of the former. Hence the law, with a wise providence, [***13] not only watches over all the transactions of parties in this relation, but often interposes to declare transactions void, which, between other persons, would be good." *Miller v. Solomon* (1964), 49 Ill. App. 2d 156, 163, 199 N.E.2d 660, quoting *Jennings v. McConnel* (1855), 17 Ill. 148, 150.

In construing a contract between an attorney and his client, the [*28] court said:

"The reason for the doctrine is to be found in the nature of the relation, which exists between attorney and client. That

relation is one of confidence, and gives the attorney great influence over the actions and interests of the client. In view of this confidential relation, transactions between attorney and client are often declared to be voidable, which would be held to be unobjectionable between other parties. The law is thus strict, 'not so much on account of hardship in the particular case, as for the sake of preventing what might otherwise become a public mischief.'" *Elmore v. Johnson* (1892), 143 Ill. 513, 525, 32 N.E. 413.

Generally, the authority of an attorney terminates when the matter for which he has been retained itself ends. However, the general rule is that a client may [***14] terminate the relationship between himself and his attorney with or without cause. ( *Tobias v. King* (1980), 84 Ill. App. 3d 998, 1000, 40 Ill. Dec. 400, 406 N.E.2d 101.) This right is implied in every contract of employment and is deemed necessary because of the deeply embedded concept of the confidential nature of the relationship between the attorney and the client and the evil that would obviously be engendered by any friction or distrust. *Rhoades v. Norfolk & Western Ry. Co.* (1979), 78 Ill. 2d 217, 228, 35 Ill. Dec. 680, 399 N.E.2d 969; *Savich v. Savich* (1957), 12 Ill. 2d 454, 457-58, 147 N.E.2d 85.

Thus, it has been held that the right to terminate the relationship includes the client's right to substitute other counsel. *Savich v. Savich* (1957), 12 Ill. 2d 454, 457, 147 N.E.2d 85.

"'A client is always entitled to be represented by counsel of his own choosing. [Citation.] The attorney-client relationship is consensual, highly fiduciary on the part of counsel, and he may do nothing which restricts the right of the client to repose confidence in any counsel of his choice. [Citation.] No concept of the practice of the law is more deeply rooted. The lawyer's [***15] function is to serve, but serve he must with fidelity, devotion and erudition in the highest

150 Ill. App. 3d 21, *28; 501 N.E.2d 343, **347;
1986 Ill. App. LEXIS 3146, ***15; 103 Ill. Dec. 322

traditions of his noble profession." *Corti v. Fleisher* (1981), 93 Ill. App. 3d 517, 522-23, 49 Ill. Dec. 74, 417 N.E.2d 764, quoting *Dwyer v. Jung* (1975), 133 N.J. Super. 343, 347, 336 A.2d 498, 500.

Moreover, because of the confidential nature of the relationship, a client [**348] has exclusive control over the subject matter of the litigation and may dismiss or settle a cause of action regardless of the attorney's advice (7. Am. Jur. 2d *Attorneys at Law* sec. 179 (1980)) or objections (7. Am. Jur. 2d *Attorneys at Law* sec. 181 (1980)). The litigant, despite a contingent-fee contract and the service of an attorney's [*29] lien, can dismiss his lawsuit at will, and the attorney has no cause of action absent proof of settlement. A lawyer cannot compel continuation of litigation to protect his lien rights, which are inferior to the client's right to dismiss his action. ( *Marcus v. Wilson* (1973), 16 Ill. App. 3d 724, 732, 306 N.E.2d 554; *Anastos v. O'Brien* (1972), 3 Ill. App. 3d 1015, 1021, 279 N.E.2d 759.) A client has the right to compromise his [***16] cause in order to avoid the anxiety resulting from it. If a lawyer attempts to draw a contract whereby the client is prevented from settling or continuing his own suit, the contract is void. *Cameron v. Boeger* (1902), 200 Ill. 84, 92, 65 N.E. 690.

The law is clear that upon termination of the relationship by the client, the attorney is entitled to fees for the reasonable value of his services, which may be in addition to the contract fee. However, the client's interests are not overlooked. For example, one attorney relied on legal advice to continue his obligation to prepare a case after he was discharged by the client. The court held that he was not entitled to compensation after discharge, although the attorney was commended for seeking professional advice and continuing his efforts on behalf of his client. Once discharged, the court could not continue to recognize the attorney against the wishes of his former client. *Meeker v. Gray* (1986), 142 Ill. App. 3d 717, 724, 97 Ill. Dec. 72, 492 N.E.2d 508.

On reasonable notice, an attorney may also end the attorney-client relationship with or without cause so long as the client is not left in a position where he is prejudiced. [***17] (87 Ill. 2d R. 13.) The right to terminate the relationship includes failing to pay money due, refusal to cooperate in the appropriate handling of matters, or conduct which degrades or humiliates the attorney. A lawyer may also withdraw when it becomes apparent he may be called as a witness. Withdrawal from representation is not only an appropriate response but may be mandated for an attorney when the client threatens to commit a crime. (See *Nix v. Whiteside* (1986), 475 U.S. 157, ___, 89 L. Ed. 2d 123, 136, 106 S. Ct. 988, 996.) *Anders v. California* (1967), 386 U.S. 738, 18 L. Ed. 2d 493, 87 S. Ct. 1396, permits an appointed lawyer to withdraw from a criminal case when he has thoroughly reviewed the record, considered any issues raised or that might be raised by his client, and determines that the case is wholly frivolous. See also *People v. Jones* (1967), 38 Ill. 2d 384, 231 N.E.2d 390; *People v. Richards* (1983), 118 Ill. App. 3d 550, 73 Ill. Dec. 943, 454 N.E.2d 1192.

The mutual trust, exchanges of confidence, reliance on judgment, and personal nature of the attorney-client relationship demonstrate the unique position attorneys occupy in our society. Attorneys [***18] are governed by different rules and have different duties and responsibilities [*30] than the employees in recent retaliatory-discharge cases. Most employees do not have the mutuality of choice that is inherent in the professional relationship which attorneys enjoy. The attributes of the relationship are so important that we cannot permit this expansion of the exception to the general rule which would have a serious impact on that relationship. The attorneys in their briefs and arguments focused on the privilege aspect of the relationship only. We find that all aspects are so necessary to our system of jurisprudence that extending this tort to the attorney-client relationship here is not justified. Accordingly, we hold that the tort of retaliatory discharge is not available to an attorney under these circumstances.

Affirmed.