LEXSEE

MARK D. LIVINGSTON, Plaintiff, v. WYETH INC., BRUCE KAYLOS and
DAVID McCUAIG, Defendants.

1:03CV00919

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
NORTH CAROLINA

2006 U.S. Dist. LEXIS 52978; 88 Empl. Prac. Dec. (CCH) P42,638; 24 I.E.R. Cas.
(BNA) 1561

July 28, 2006, Decided

COUNSEL: [*1] For MARK D. LIVINGSTON, Plaintiff: JOANNE ROYCE, WASHINGTON, DC. JOY RHYNE WEBB, BROWNE FLEBOTTE WILSON, HORN & WEBB, PLLC, DURHAM, NC. THAD M. GUYER, MEDFORD, OR.

For WYETH INC., BRUCE KAYLOS, Wyeth Sanford Managing Director, Defendants: MICHAEL DELIKAT, ORRICK HERRINGTON & SUTCLIFFE, LLP, NEW YORK, NY. TERRY ALLEN CLARK, CONSTANGY BROOKS & SMITH, LLC, WINSTON-SALEM, NC.

For DAVID McCUAIG, Wyeth Sanford Human Resource Director, Defendant: KEVIN W. STURM, EDWARDS BALLARD BISHOP STURM CLARK & KEIM, P.A., SPARTANBURG, SC. MICHAEL DELIKAT, ORRICK HERRINGTON & SUTCLIFFE, LLP, NEW YORK, NY. TERRY ALLEN CLARK, CONSTANGY BROOKS & SMITH, LLC, WINSTON-SALEM, NC.

JUDGES: P. Trevor Sharp, United States Magistrate Judge.

OPINION BY: P. Trevor Sharp

OPINION

MEMORANDUM OPINION AND ORDER

Sharp, United States Magistrate Judge

This matter comes before the Court on the motion for

summary judgment filed by Defendants Wyeth Inc., Bruce Kaylos and David McCuaig. (Pleading No. 44.) Plaintiff Mark Livingston has responded in opposition to Defendants' motion, and Defendants have filed a reply. Also before the Court is Plaintiff's motion to strike the affidavits of Defendants' expert witnesses. [*2] (Pleading Nos. 55, 56.) The Court heard oral argument on March 7, 2006. The motions are ready for a ruling.

I. Procedural History

Plaintiff Mark Livingston filed a Complaint on September 29, 2003 (Pleading No. 1) and a First Amended Complaint on December 15, 2003 (Pleading No. 12, "First Am. Compl."), alleging violation of the employee protection provisions of Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, and wrongful discharge under North Carolina law. Plaintiff alleges federal question jurisdiction over his federal claims and supplemental jurisdiction over his state law claims. (First. Am. Compl.) Plaintiff seeks reinstatement to his previous position or a comparable position, back pay, front pay, compensatory and punitive damages, restored benefits, attorney's fees and costs, and any other legal or equitable relief to which he may be entitled. Id.

After an extensive period of discovery, Defendants have now moved for summary judgment. (Pleading No. 44.) Plaintiff opposes the motion (Pleading No. 53, Pl.'s Mem. in Opp'n to Mot. for Summ. J., & App.) and has filed separate motions seeking to exclude the affidavits of Defendants' [*3] two expert witnesses. (Pleading Nos. 55, 56.) The motions, supporting memoranda and appendices are all filed under seal.

Page 1

2006 U.S. Dist. LEXIS 52978, *3; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

## II. Statement of Facts

This case arises out of Mark Livingston's employment with and termination from Wyeth, Inc. ("Wyeth"). Wyeth develops and manufactures pharmaceutical, consumer health and animal health products, operates more than two dozen facilities worldwide and is subject to regulation by a number of federal, state, local and foreign government agencies. (Pleading No. 46, App. in Supp. of Def.'s Mot. for Summ. J. ("Defs.' App."), Tab 24 at 1-1, 1-12, 1-16.) At its Sanford, North Carolina facility, Wyeth manufactures components used in the production of PREVNAR (R), a vaccine for infants and toddlers. (Id., Tab 4, Deposition of John Bruce Kaylos ("Kaylos Dep.") at 85-86, 96-97; First Am. Comp. P 13.) Livingston was employed by Wyeth at its supply chain facility in Sanford, North Carolina between August 7, 2000 and December 19, 2002. Bruce Kaylos is, and at all relevant times was, the Managing Director of the Sanford facility and was Livingston's immediate supervisor. (Kaylos Dep. at 7.) David McCuaig served as Director of Human Resources at the Sanford [*4] facility from approximately September of 2002 through January 2004. (Defs.' App.. Tab 7, Deposition of David McCuaig ("McCuaig Dep.") at 8.)

Wyeth's operations are regulated pursuant to the Federal Food, Drug, and Cosmetic Act ("the Act") and regulations thereunder. See 21 U.S.C. §§ 331, 351(a)(2)(B); 21 C.F.R. §§ 210, 211, and 212. The regulations establish a complex scheme that, among other things, requires current good manufacturing practices ("GMPs") by all manufacturers of pharmaceutical vaccine products. Id. The FDA may seize impure or adulterated drugs and may seek to enjoin any company practice in violation of the statute. Id. The GMP for training requires that each employee engaged in the drug manufacturing process must have the education, training, and experience, or any combination thereof, to enable that person to perform his or her assigned functions. See 21 C.F.R. § 211.25. (Pleading No. 53, Pl.'s App., Tab 23.) The regulations do not state exactly what training is required, leaving it to the regulated entity to create and implement training programs, subject to FDA inspection. Wyeth's [*5] standard operating procedure for training at the Sanford facility is contained in GMP 4024 Rev. G. (Id., Tab 5, Kaylos Dep. at 200.)

Wyeth hired Livingston in August 2000 to serve as Manager of Training and Continuous Improvement ("TCI") at the Sanford, North Carolina facility. As part of his job responsibilities, Livingston was required to ensure that adequate training systems were in place for purposes of complying with federally mandated GMPs. [1] (Pleading No. 12, First Am. Compl. P 13.)

> 1   Plaintiff and Defendants disagree to some extent over Plaintiff's precise job responsibilities. However, for purposes of Defendants' motion for summary judgment, the Court views the facts and the inferences to be drawn therefrom in the light most favorable to the plaintiff non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

On October 3, 2000, Wyeth entered into a Consent Decree with the FDA following seizures of certain allegedly adulterated product. The seizures were based on FDA [*6] inspection reports identifying alleged GMP manufacturing and quality assurance violations at manufacturing sites in Marietta, Pennsylvania and Pearl River, New York. (Pl.'s App. Tab 16.) The Consent Decree did not specifically target the Sanford, North Carolina facility, but it is undisputed that Wyeth was required to retain a consultant to conduct a "division-wide assessment of its quality programs." Following entry of the Consent Decree, Wyeth sought to address compliance issues in all of its facilities, including the Sanford facility. Id. Tab 13; Tab 3. The Consent Decree required Wyeth to respond to the consultant's report and to submit a timetable for responsive actions. Id. Wyeth committed to implementing revised Level II guidance documents relating to training by September 30, 2002. (Def.'s App. Tab 13, Sakers Dep. at 27-30.)

Wyeth retained a consultant as required, who advised the company of certain steps that needed to be taken. Livingston claims that Wyeth advised its officers, managers and employees that non-compliance with the Consent Decree would impact negatively on shareholder value because Wyeth could face fines of $ 15,000 per day for missed commitments. [*7] Id. P 99; First. Am. Compl. P 24. On May 31, 2001, Wyeth submitted a response to the consultant's report, advising that it would, among other things, revise the quality system guidance documents ("Level II documents") used at Sanford and other facilities. Wyeth provided the FDA with a September 30, 2002 target date for implementing the revisions and verifying compliance. (Livingston Aff. P

2006 U.S. Dist. LEXIS 52978, *7; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

14; Tab 4, Kaylos Dep. at 4-5.) Wyeth used an electronic document control system, known as ISOTrain, to track participation in its training programs. (*Id.*, Kaylos Dep. Ex. 4.) Livingston was appointed project team leader of the Sustainable Compliance Initiative ("SCI"), a group set up to ensure site-wide compliance with the GMP training system. (Livingston Aff. PP 16-19, 23-25.) In this capacity, Livingston directed and oversaw preparations for training system audits at Sanford between January of 2001 and September 2002. *Id.*

The final internal verification before the September 30, 2002 commitment date was to be conducted by Wyeth's Office of Compliance between July 29, 2002 and August 1, 2002. (Pleading No. 53, Pl.'s App. Tab 13, Sakers Dep. at 93-97.) Livingston presents evidence of [*8] what he perceived to be serious gaps in the training documentation and training GMPs, including the results of an outside audit by The Quantic Group in 2000 and an internal audit in 2001. (Pleading No. 46 at pp. 12-14 and App. 13, 16, 17 and 23.) In Livingston's view, the state of documented training at the Sanford facility in the summer of 2002 was so abysmal that it mirrored the conditions in Pearl River, New York and in Marietta, Pennsylvania that prompted entry of the Consent Decree. (Pleading No. 46 at 14 and App. 25 at 1.) According to Livingston, as the deadline for the July/August internal audit approached, the ISOTrain report revealed that only sixty percent of all GMP positions at Sanford had training curricula entered into the system. (*Id.* App. 19, 20)

Livingston became convinced that Wyeth would be unable to meet the commitment date. There is record evidence, however, that even if the required training curricula had not been fully developed and implemented by the FDA commitment date, the Sanford site would nevertheless be deemed compliant provided that a satisfactory "legacy plan" was adopted. (Def.'s App. 2, DeFillipo Dep. at 47-48.) A legacy plan is a means of closing [*9] compliance gaps after the date for compliance passes. (Pl.'s Dep. at 390-95, 544.) Livingston had drafted legacy plans in the past, including a legacy plan addressing GMP 4024 dated April 29, 2002. *Id.* Livingston does not dispute that he subsequently signed off on the September 30, 2002 verification because a legacy plan was in place by that time. *Id.* Further, he admits that having a legacy plan in place by the end of September 2002 would adequately address any open items related to training. *Id.* at 544.

Livingston relies on several memoranda, including a memorandum dated July 10, 2002, to support his claim that he reasonably believed that Wyeth was about to commit wrongdoing. In the July 10, 2002 memorandum, Livingston formally expressed his concerns about gaps in training that might delay verification. The memorandum was addressed to Jim Svitanek (site SCI manager), Bruce Kaylos (site manager and Livingston's supervisor), and other members of the Site Quality Control team, including Margaret Savage, Judy Vollmer, and Mary Ellen DiFillipo. *Id.* Vollmer and DiFillipo were affiliated with Wyeth's corporate office. In the memorandum, Livingston opined that the training [*10] system at Sanford was deficient, and that the facility would not be able to meet the internal audit verification deadline. (Pleading No. 53, Pl. App. Tab 19.) He further stated that any attempt to verify compliance would be providing "false and misleading information to outside auditors, including the FDA" and that he would not be willing to sign off on the verification of compliance. *Id.*

Because he was on vacation, Kaylos allegedly did not receive Plaintiff's memorandum until on or about July 17, 2002. Kaylos and Livingston met in Kaylos' office on July 24, 2002 to discuss the July 10, 2002 memorandum. According to Livingston, Kaylos threatened to fire Livingston or to alter his job responsibilities at Sanford if he persisted in his criticism of the company's compliance status. (Livingston Aff. P 94.) Kaylos denies threatening Livingston in this manner, but testifies that he reminded Livingston that Livingston bore no responsibility for departments that did not meet their internal training commitments. (Pleading No. 53, App. 4, Kaylos Dep. at 161-162 & Ex. 4.) Kaylos further contends that he attempted to discuss performance issues Livingston had been having since the beginning [*11] of 2002, but Livingston would not discuss these issues. (*Id.;* Pleading No. 53, App. Ex. 5.) After the meeting, Kaylos contacted McKnickle in Human Resources to discuss a personal improvement plan ("PIP") for Livingston. *Id.*

Wyeth proceeded with its internal verification process between July 29 and August 1, 2002. Marlene Raschiatore from the Wyeth office of Compliance conducted the internal verification of Sanford's training system and found the system satisfactory, while noting, among other things, that gaps in training documentation would need to be addressed in a legacy plan. (Def.'s App. 12, Raschiatore Dep. at 29-30; Pl.'s App. 22.) Livingston admits that he signed off on Raschiatore's verification,

2006 U.S. Dist. LEXIS 52978, *11; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

but claims that he did so only on the limited terms stated by Raschiatore and because he intended to file complaints regarding Kaylos' conduct with the Compliance and Ethics offices. (Pl.'s App. 1, Livingston Aff. PP 102-104.) There is no dispute that, in the summer and fall of 2002, Livingston knew what a legacy plan was, and knew that if a legacy plan were in place, any open items in compliance by Wyeth by the FDA commitment date would likely be deemed adequately addressed. [*12] (Pl's Dep. at 390-95, 544.)

On or about July 29, 2002, Livingston filed a complaint with Wyeth's Office of Sustainable Compliance ("Office of Compliance") and Office of Ethics and Business Conduct (Office of Ethics), alleging that Kaylos had ignored Livingston's criticism of training system compliance, had threatened Livingston with termination, and had indirectly conveyed the message that Sanford was going to conceal facts, data, and information from the internal verification auditor to the extent that it reflected negatively on operations at Sanford. (Pleading No. 46, App. Tab No. 5, Exs. 56 and 57.) The Compliance Office initiated an investigation of this complaint, which was led by Edward Babiarz. (Def.'s App. 1, Babiarz Dep. at 67-68 & Ex.7.) On or about August 5, 2002, Livingston also met with Wyeth attorney Kenneth O'Brien to discuss Kaylos' conduct. (Pl.'s App. 1, Livingston Aff. at P 106.) Livingston claims that he told both Babiarz and O'Brien not only of his concerns about gaps in training documentation, but also of "widespread GMP compliance failures at the site and [his] concerns of adulterated release of vaccine." Id. P 113. Livingston provides no specific evidence [*13] of release or impending release of adulterated vaccine. By the term "adulterated," in this context, Plaintiff apparently means any vaccine that was in fact prepared by a person whose training is not adequately documented.

On or about July 11, 2002, allegedly prior to Kaylos' receipt of the July 10, 2002 memorandum, Kaylos and McKnickle discussed the possibility of placing Livingston on a PIP to address Livingston's performance issues, including: absences from the site, inaccessibility, and abusive conduct toward team members. After Livingston filed his complaint with the Office of Ethics and Business Conduct and the Office of Compliance on July 29, 2002, Wyeth's legal department recommended that Livingston not be placed on the PIP until the office had investigated his internal complaint against Kaylos. On October 9, 2002, after conducting an investigation of

Livingston's complaint, the Compliance Office closed the file without finding any violations by Kaylos or others. (Def.'s App. 11, O'Brien Dep. at 33-34; Def.'s App. 3, Grantland Dep. Ex. 7; Def.'s App. 1, Babiarz Dep. at 67-68.)

On September 30, 2002, the Sanford GMP training system received full verification by the Wyeth Office [*14] of Sustainable Compliance. (Def.'s App. 5, Livingston Depo. at 445, 565, 572-75, Exs. 58, 59, 64.) Livingston himself signed the necessary approval documentation verifying that Wyeth met the FDA verification deadline subject to implementation of a legacy plan to address training compliance gaps. Id.

After the September 30, 2002 verification and completion of the Compliance Office's investigation, Kaylos and the new Human Resources Director, David McCuaig, [2] placed Livingston on a 90-day PIP on or about October 16, 2002. (Def.'s App. 4, Kaylos Dep. Ex. 1.) The PIP outlined ten separate improvement expectations, including the requirement that, with the investigation closed and the verification accomplished, Livingston must stop making non-constructive comments to internal and external staff or contacts regarding Wyeth's alleged defrauding of the FDA or other departments' non-compliance with training GMPs. (Def.'s App. 4, Ex. 1.) Livingston refused to sign the PIP. Id.

2    In September 2002, Wyeth terminated McNickle and hired David McCuaig as Director of Human Resources for the Sanford facility. (Kaylos Dep. at 63.)

[*15] The tension between Livingston, Kaylos and McCuaig increased, with Livingston becoming increasingly suspicious that he was about to be terminated. Livingston asserts that on several occasions between October and his termination in December, Human Resources Director McCuaig stalked him at staff meetings and generally led Livingston to believe that he would be terminated in front of his team members. (Pleading No. 53, Pl.'s Brief in Opp. at 24.) On or about December 13, 2002, Livingston and McCuaig had a public confrontation at an off-site holiday party. McCuaig had not been invited to the party but showed up to wish the group a happy holiday. There was a tense exchange between Livingston and McCuaig in which Livingston told McCuaig to leave the party. (Pl.'s App. 1, Livingston Aff. at PP 147-152.) Livingston testified on deposition as follows:

2006 U.S. Dist. LEXIS 52978, *15; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

I approached Mr. McCuaig, and I asked him, "What are you doing here," and said, "This is a holiday party for the Central Training Team. You're not invited. We have a gift exchange. You have no gift. We have limited food," because of cost-cutting efforts at the plant. I asked Mr. McCuaig, "Why are you bird-dogging me?"

I said, This is why [*16] I'm filing a retaliation lawsuit against you, Kaylos and Wyeth. I need you to leave. If you do not leave, I'm going to ask the police escorting holiday traffic downstairs or directing holiday traffic downstairs to escort you out. Please leave. Thank you."

(Pl.'s Dep. at 193.)

On December 16, 2002, Wyeth suspended Livingston pending investigation of the holiday party incident. *Id.* at P 154. Wyeth formally terminated Livingston on December 19, 2002 as a result of his conduct at the holiday party. (Def.'s App. 11, O'Brien Dep. at 130.) To place Livingston's conduct in context, Defendants point to other unprofessional conduct engaged in by Livingston in the past, prior to his expressing concerns about noncompliance with training requirements. In 2001 and 2002, the Human Resources office received complaints from a number of Wyeth employees about abusive and inappropriate language used by Livingston. Among other things, his colleagues and subordinates complained to the Human Resources Director that Livingston was a poor leader, was often unavailable or absent, routinely lost his temper, was argumentative and unstable, had an inability to relate to his colleagues and regularly [*17] abused his subordinates. (Pleading No. 46, Def.'s Br. at pp. 5-7 & Def.'s App. 18, McNickle Aff. & Ex. 2; App. 8, McKnickle Dep. at 71-74, 81-82, 138-143; Def.'s App. 2, DeFillipo Dep. at 23-25; Def.'s App. 16, Bowden Aff.) The record suggests, and Livingston does not appear to dispute, that a number of employees complained, resigned and/or asked for transfers as a result of Livingston's conduct. (*Id.* Def.'s App. 8, McKnickle Dep. at 138-143.) On May 13, 2002, Wyeth issued Livingston a written warning for use of "foul and abusive language and unprofessional behavior" toward subordinates.

(Def.'s App. 5, Livingston Dep. at 277-78, 295, 329-32 & Ex. 11; App. 18, McKnickle Aff. P 5.) The written warning stated that "further difficulties in this area will result in further discipline up to and including termination." (*Id.*, Livingston Dep. Ex. 11.) Livingston refused to sign the warning. *Id.* Shortly thereafter, on or about May 15, 2002, Livingston sent identical e-mail apologies to eight Wyeth employees regarding his "inappropriate language," "salty remarks," "intense debating style," and behavior "which may have caused [them] personal pain and discomfort." (Def.'s App. 5, [*18] Livingston Dep. at 287-88, 291-95 & Ex. 10.) Defendants also point to evidence that Livingston was inaccessible and was absent from SCI, team meetings and staff meetings more than others. (Def.'s App. 8, McKnickle Dep. at 102, 109.)

Livingston does not deny using harsh and/or profane language toward his subordinates during his tenure. He instead argues that the job was inherently stressful and confrontational; that use of profanity was common at the facility; and that, in any event, by the time he was alerted to his performance issues, he had voiced sufficient criticism of training compliance deficiencies to render any disciplinary action retaliatory in nature. (Pleading No. 53 at 16-18.) Livingston disputes Defendants' contention that he failed to attend critical meetings and has testified in response that he was either not required to be at certain meetings or had work conflicts that prevented him from attending. *Id.* at 18-19. Livingston denies that he behaved inappropriately at the holiday luncheon. *Id.* Livingston claims that he was retaliated against for engaging in protected whistleblowing activity, with the retaliation taking the form of a hostile work environment, the [*19] PIP and his ultimate termination. *Id.*

### III. Motions to Strike Expert Affidavits

Livingston claims that he made disclosures protected under Sarbanes-Oxley and that his employer retaliated against him because of those disclosures. Defendants have moved for summary judgment dismissing the Sarbanes-Oxley claim and, among their supporting materials, have included the affidavits of two proposed expert witnesses, Daniel Michels and Roberta Karmel. Livingston moves to strike the affidavits as inadmissible. (Pleading Nos. 55, 56.)

Federal Rule of Evidence 702 permits the admission of expert testimony covering "scientific, technical, or

2006 U.S. Dist. LEXIS 52978, *19; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

other specialized knowledge [which] will assist the trier of fact to understand the evidence or to determine a fact in issue." *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Michels has been retained by Defendants as an expert in the field of FDA regulatory practices and Karmel has been retained by Defendants as an expert in the field of securities law. The affidavits consist primarily of factual summary but also offer opinions on whether it was objectively reasonable for Livingston [*20] to believe that the company was about to engage in conduct that represented shareholder fraud.

The Court finds that both Mr. Michels and Ms. Karmel are well qualified in their proffered areas. However, while the summaries of FDA regulatory practices offered by Mr. Michels and securities law offered by Ms. Karmel may be helpful, their application of law to the facts of this case on an ultimate legal question is not. *See generally Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 366 (4th Cir. 1986) (trial court properly excluded expert opinion as to whether applicable securities law required particular disclosures). For this reason, the Court grants Plaintiff's motion to strike the expert witness evidence from consideration on Defendants' summary judgment motion.

## IV. Motion for Summary Judgment

### A. Summary Judgment and Standard of Review

The summary judgment standard of review under Rule 56 of the Federal Rules of Civil Procedure is well established. A party is entitled to judgment as a matter of law upon a showing that "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c) [*21] . The material facts are those identified by controlling law as essential elements of claims asserted by the parties. A genuine issue as to such facts exists if the evidence forecast is sufficient for a reasonable trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In evaluating a forecast of evidence on summary judgment review, the court must view the facts and inferences reasonably to be drawn from them in the light most favorable to the nonmoving party. *Anderson*, 477

U.S. at 255.

When the moving party has carried its burden, the nonmoving party must come forward with evidence showing more than some "metaphysical doubt" that genuine and material factual issues exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), *cert. denied*, 481 U.S. 1029, 107 S. Ct. 1955, 95 L. Ed. 2d 527 (1987). A mere scintilla of evidence [*22] is insufficient to circumvent summary judgment. *Anderson*, 477 U.S. at 252. Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. *Id.* at 248-49. Trial is unnecessary if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993).

### B. Sarbanes-Oxley Whistleblower Claims

Plaintiff's claims under Counts I and II of the First Amended Complaint arise under the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"). Sarbanes-Oxley was enacted on July 30, 2002. Title VIII of Sarbanes-Oxley is designated as the Corporate and Criminal Fraud Accountability Act of 2002. Section 806, codified at 18 U.S.C. § 1514A, is the provision that provides "whistleblower" protection to employees of publicly traded companies. Pursuant to section 806, an employer may not discriminate against any employee in the terms and conditions of employment because of any lawful act done by the employee to provide information to the [*23] employer, a federal agency or Congress concerning violations of 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1344 (bank fraud), or 1348 (securities fraud), or any federal law relating to fraud against shareholders. 18 U.S.C. § 1514A(a)(1).

Under the evidentiary framework of Sarbanes-Oxley, the plaintiff must first make a *prima facie* case by establishing by a preponderance of the evidence that: (1) the employee engaged in protected activity as defined by the Act; (2) the employer was aware of the protected activity; (3) the employee suffered an adverse employment action; and (4) circumstances exist which are sufficient to raise an inference that the protected activity was likely a contributing factor in the unfavorable action. *Collins v. Beazer Homes USA, Inc.*, 334 F. Supp. 2d 1365 (N.D. Ga. 2004). Once an employee has met this burden, he is entitled to relief

2006 U.S. Dist. LEXIS 52978, *23; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

unless the employer demonstrates by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of any protected activity. *Id.*

### 1. Retroactivity of Sarbanes-Oxley

The Sarbanes-Oxley Act became effective [*24] July 30, 2002, after Livingston's July 10, 2002 memorandum but prior to certain other alleged protected activity. Defendants argue that the statute has no retroactive application to activity that occurred before its effective date.

The statute does not state that it shall apply retroactively, and courts have acknowledged that in the absence of a retroactivity clause, the statute should not be applied retroactively. *See In re ADC Telcoms., Inc. Sec. Litig., 409 F.3d 974, 977 (8th Cir. 2005)* (refusing to retroactively apply 28 U.S.C. §§ 1658(b) of Sarbanes-Oxley); *see also Martin v. Hadix, 527 U.S. 343, 352, 119 S. Ct. 1998, 144 L. Ed. 2d 347 (1999)*(statutes generally presumed non-retroactive). This Court has found no judicial authority addressing whether 18 U.S.C. § 1514A applies retroactively. However, the parties cite several decisions of the Office of Administrative Law Judges from the United States Department of Labor, the entity charged with administrative review of claims under 18 U.S.C. § 1514A and whose opinions, in certain circumstances, represent final decisions under Sarbanes-Oxley. Due to the dearth [*25] of federal court decisions addressing the issue, the Court will consider these administrative decisions useful for guidance, although the Court is not bound by them. *Cf. Collins, 334 F. Supp. 2d at 1375 n.10.*

Administrative law judges addressing the retroactivity argument generally have found that Sarbanes-Oxley's whistleblower provision does not apply to conduct that occurred before the date the statute was enacted. *See McIntyre v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 2003-SOX-23 (ALJ Jan. 16, 2004); *Gilmore v. Parametric Technology,* 2003-SOX-1 (ALJ Feb. 6, 2003); *Kunkler v. Global Futures & Forex, Ltd.,* 2003-SOX-6 (ALJ Apr. 24, 2003). However, at least one administrative law judge has found that the Act may apply where the alleged retaliatory action occurred after the statute's enactment. *Lerbs v. Buca Di Beppo, Inc.,* 2004-SOX-8 (ALJ June 15, 2004).

Livingston claims that he engaged in protected activity through September 2002. There is no question that, although he memorialized his complaints in a July 10, 2002 memorandum and again in a July 29, 2002 complaint before Sarbanes-Oxley was enacted, he persisted in communicating those complaints [*26] into the time period after the passage of Sarbanes-Oxley on July 30, 2002. Further, the alleged retaliatory discharge occurred on December 19, 2002, well after enactment of Sarbanes-Oxley. Accordingly, the Court finds that Livingston's Sarbanes-Oxley claim is not barred by the doctrine of non-retroactivity, because protected activity occurred in August and September 2002, after Sarbanes-Oxley was enacted, and the alleged retaliatory discharge occurred in December 2002.

### 2. Protected Activity

Defendants contend that Livingston's claims should be dismissed because the conduct he disclosed could not have constituted a violation of federal laws regulating shareholder fraud and therefore is not "protected activity" within the meaning of section 806 of Sarbanes-Oxley.

Sarbanes-Oxley prohibits covered employers from taking adverse actions (including discharge, demotion, suspension, threats, and harassment) against an employee because of the employee's protected activity. The Act defines protected activity as

(a) . . . any lawful act done by the employee

(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct [*27] which the employee reasonably believes constitutes a violation of section 1341 [using Postal Service or interstate commerce for frauds and swindles], 1343 [using interstate commerce, wire, radio or television for frauds], 1344 [bank fraud], or 1348 [securities fraud] . . . or any provision of federal law relating to fraud against shareholders, when the assistance is provided to or the investigation is conducted by (A) a federal regulatory or law enforcement agency; (B) any member of Congress or any committee of Congress; or (C) a person with supervisory authority over the employee (or such other person working for the employer who has

2006 U.S. Dist. LEXIS 52978, *27; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

the authority to investigate, discover or terminate misconduct).

18 U.S.C. § 1514A (Supp. 2005). Sarbanes-Oxley was enacted to address corporate fraud on shareholders. One way it does so is by protecting employees who report violations of laws that relate to shareholder fraud. It is clear from the plain language of the statute and its legislative history that fraud is an integral element of a whistleblower cause of action. To be protected, the whistleblower must not only subjectively believe that the reported conduct [*28] may constitute fraud on shareholders, there must also be a reasonable, objective basis for suspecting such fraud. *See, e.g.,* S. Rep. No. 107-146, 2002 WL 863249, at * 18-19 (May 6, 2002). The "reasonableness" test used under Sarbanes-Oxley is the same test as that generally used in a variety of legal contexts. *See* Cong. Rec. S7418, S7420 (daily ed. July 26, 2002), reprinted at 2002 WL 32054527.

Livingston alleges that his protected activity consisted of his July 10, 2002 memorandum, his July 29, 2002 internal ethics and compliance complaint, his conversations with Babiarz and O'Brien in August 2002, and persistence through September 2002 in his complaints about training deficiencies and a perceived cover-up of those deficiencies. [3] He claims that he had a reasonably objective basis for believing that if Sanford went forward with compliance verification as scheduled, it would be providing false and misleading information to compliance auditors, including the FDA, thereby potentially subjecting Wyeth to fines and penalties. (First. Am. Compl. PP 79-80.) According to Livingston, based on the history of FDA compliance issues at Wyeth, the gravity of [*29] the Consent Decree (as portrayed by management itself), and management's stubborn refusals to heed his criticisms, it was reasonable for him to believe that Wyeth was "probably violating some SEC 'rule or regulation,' or some 'provision of Federal law *relating* to fraud against shareholders.'" (Pl.'s Mem. in Opp'n to Summ. J., at 30-31.) In support, he points to: the July 10 and 24 memoranda; his own affidavit testimony regarding his concerns; and documents chronicling the Consent Decree and compliance initiatives, including documents suggesting that, as of June 2002, only 60% of the Sanford employees had documented participation in training. [4]

3   Plaintiff's evidence of a "cover-up" is his own affidavit testimony that when he met with Bruce

Kaylos on July 24, 2002, Kaylos told him not to share his assessment with corporate headquarters. In that same affidavit, however, Plaintiff says he directed his July 10 assessment to Kaylos with copies to two persons at corporate headquarters, negating any reasonable perception by Plaintiff of a potential conceal of information from corporate headquarters. (Pl.'s Aff. PP 82-93.) Moreover, it is undisputed that Plaintiff's assessment was not suppressed in any fashion during the internal audit in late July.

[*30]

4   In the Sarbanes-Oxley count of his Complaint, Livingston cites only the July 10, 2002 memorandum as protected activity that *contributed to* the retaliatory conduct. (First Am. Compl. P 82.) In his opposing brief and affidavit, however, he asserts that he feared that the Sanford facility was releasing adulterated product as a result of GMP compliance deficiencies and disclosed this concern to O'Brien and Babiarz in connection with the ethics complaint.

Defendants argue that none of the evidence adduced by Livingston would have provided a reasonable basis for believing that Wyeth was about to commit some form of wrongdoing. Having reviewed the entire record on summary judgment, the Court agrees. To be protected under Sarbanes-Oxley, an employee's disclosures must be related to illegal activity that, at its core, involves shareholder fraud. It may be that the employee need not know precisely what securities law is about to be violated, but there must be some basis for an objectively reasonable belief, considering the employee's experience and knowledge, that the corporation is about to commit [*31] wrongdoing. There is nothing in the record -- or in Livingston's allegations -- indicating that Wyeth made false or misleading statements, or omitted relevant information, in any documents provided to its shareholders. (See First Am. Compl. PP 49-51.) Disclosures made in 2000 and 2001 regarding the Consent Decree do not relate to the statements of Livingston that he alleges caused his termination. The annual report from 2002, also cited by Livingston in his Complaint, contains information consistent with the compliance efforts signed off on by Livingston and documented in the summary judgment record.

Nor was there an objectively reasonable basis, at the time of the allegedly protected activity, for Livingston to

2006 U.S. Dist. LEXIS 52978, *31; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

equate the perceived training deficiencies with imminent wrongdoing. On the record before the Court, it is entirely speculative to say that because Defendants disagreed with Livingston's belief that the facility could not meet the September 30, 2002 deadline, this meant that management planned to conceal critical information. Aside from Livingston's self-serving averments in his Affidavit, on matters of which he does not have personal knowledge or which are contradicted by [*32] his deposition testimony, the record is insufficient to support a finding that Defendants appeared to be ready to commit wrongdoing. Livingston admits in his affidavit that "the Consent Decree did not specifically require [training compliance standards] to be implemented by a specific date." (Pl.'s App. 1, P 14.) Although Defendants concede that Wyeth had committed to a September 30, 2002 target for implementing certain training guidelines, Livingston admits that even if compliance concerns persisted on that date, a legacy plan could be created for purposes of avoiding penalties under the Consent Decree. (Pl.'s Dep. at 390, 544.) This concession is fatal to Plaintiff's claims. No reasonable employee in Plaintiff's position could have believed Wyeth was headed toward wrongly concealing training deficiencies. Any such deficiencies, as Livingston well knew, would be deemed by the FDA to be adequately addressed if a legacy plan were adopted by Wyeth to afford it additional time to close any compliance gaps.

Livingston contends that the potential financial impact of non-compliance was so significant that the concerns about training deficiencies should have been communicated to shareholders. [*33] Even if it were reasonable to believe that the FDA might, in the future, take some type of enforcement action based on GMP and/or training compliance issues at Sanford, it is not clear that Wyeth would have been obligated to report these alleged violations before the FDA took any action. Information must be sufficiently material to a company's financial picture before it will form the basis for securities fraud. Under Supreme Court authority, for information to be material, there must be "a substantial likelihood that a reasonable shareholder would consider [the matter] important to his decision to invest." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976); *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988). Given the importance of "materiality" under the securities laws, Administrative Law Judges have rejected whistleblower retaliation claims where the

information disclosed would not be sufficiently material to shareholders. Livingston's disclosures about issues of potential concern to the FDA, particularly where those concerns could be alleviated for the foreseeable future through legacy plans, are similar to the complaints [*34] advanced by the employee in *Minkina v. Affiliated Physician's Group*, 2005-SOX-19 (Dept. of Labor, Feb. 22, 2005) (Pleading No. 46, Def.'s App. 36.) Minkina claimed retaliation for reports she made to OSHA concerning what she believed to be dangerous air quality conditions in her workplace. In finding that her complaints were not protected activity under Sarbanes-Oxley, the Administrative Law Judge stated, "quite simply, while the Complainant may have a valid claim for poor air quality, Sarbanes-Oxley was enacted to address the specific problem of fraud in the realm of publicly traded companies and not the resolution of air quality issues, even if there is a possibility that poor air quality might ultimately result in financial loss." *Id.* at 5-6. *See also Nixon v. Stewart & Stevenson Servs., Inc.*, 2005-SOX-1, at 13-14 (Dept. of Labor, Feb. 6, 2005) (Defs.' App.37) (complaint regarding alleged failure to disclose potential violations of environmental regulations not material because mere possibility of future legal proceedings too speculative); *Harvey v. Safeway, Inc.*, 2004-SOX-21, at 31-32 (Dept. of Labor, Feb. 11, 2005) (Defs.' App. 32) (complaint of wage irregularities [*35] under Fair Labor Standards Act not material and not protected activity).

Finally, the evidence does not support a finding that it was reasonable for Livingston to believe that the Sanford facility was shipping (or would ship) adulterated product. Even assuming that at some point Livingston had a *subjective* belief that gaps in training might increase the chances that adulterated product would be released to the public, that belief was not an *objectively* reasonable one on the evidence adduced. *Cf. Tuttle v. Johnson Controls Battery Division*, 2004-SOX-76 (ALJ Jan. 3, 2005) (granting summary judgment against Complainant where Complainant alleged that he was terminated due to complaints that Respondent had shipped significant numbers of defective batteries, finding that the activities alleged did not involve intentional deceit or result in fraud against shareholders or investors). Moreover, it appears that Plaintiff's allegations about "adulterated product" refer solely to product that is "presumed" adulterated because it was prepared in part by a worker whose training was not fully documented. The Court has already found that there is no

Page 9

2006 U.S. Dist. LEXIS 52978, *35; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

evidence to have supported an objective [*36] belief in mid-2002 that Wyeth was about to be found in violation of the Consent Decree by reason of training issues at the Sanford facility.

### 3. Causation

Defendants further maintain that even assuming Livingston could show that he engaged in activity protected by Sarbanes-Oxley, his protected activity was not a contributing factor in the decision to discharge him in December 2002. In support, Defendants submit evidence that they contend shows that Livingston had relationship problems with his subordinates, peers and supervisors; was inaccessible; missed meetings; and exhibited insubordinate conduct. According to Defendants, Livingston was terminated for reasons other than his criticism of GMP compliance efforts.

To establish causation, Livingston must be able to demonstrate by a preponderance of the evidence "that protected behavior or conduct was a contributing factor in the unfavorable personnel action alleged in the complaint." 29 C.F.R. § 1980.109(a). This is not a demanding standard. The allegedly protected conduct need not be the sole factor, but only a factor in the unfavorable personnel action. *Collins*, 334 F. Supp.2d at 1379 [*37] (citing 49 U.S.C. § 42121(b)(2)(B)(iii); *Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed.Cir. 1993)). Temporal proximity between the protected conduct and the unfavorable action has been found to establish causation. *Id.* (citing 29 C.F.R. § 1980.104(b)(2)).

Defendants contend that the passage of time between Livingston's July 10, 2002 memorandum and his termination on December 19, 2002 precludes a finding of causation based upon temporal proximity. However, there is other evidence of at least some allegedly hostile conduct following more closely on the heels of Livingston's criticism of compliance efforts.

Defendants may still prevail if they can prove by clear and convincing evidence that the adverse action was motivated by legitimate, non-discriminatory reasons. 29 C.F.R. § 1980.109. Defendants argue that they fired Livingston based solely on his insubordination toward McCuaig at the holiday party. It is undisputed that Livingston not only asked McCuaig, the Director of Human Resources, to leave the holiday party, he threatened to have the police remove McCuaig from the

party. There also is undisputed [*38] evidence that Livingston had been counseled and reprimanded for professional misconduct well before July 2002. The Court finds as a matter of law that Defendants have established by clear and convincing evidence that a non-discriminatory rationale independently caused Plaintiff's termination. Based on Livingston's own testimony, no reasonable trier of fact could disagree that Livingston would have been discharged for his insubordination at the holiday party, irrespective of his alleged protected activity. Plaintiff, acting in front of subordinate employees, threatened to have a superior official removed from an office party *by police officers* who were nearby. Such an act of insubordination and insolence without question called for and supported Plaintiff's immediate termination, and Plaintiff was in fact suspended immediately and fired within six days on the basis of his actions at the holiday party.

In conclusion, the evidence adduced, viewed in the light most favorable to Plaintiff Livingston, does not support an inference that Livingston had a objectively reasonable belief in August and September 2002 that Wyeth was about to engage in wrongdoing that would impact shareholders. [*39] Moreover, even if there were protected activity, Defendants have pointed to clear and convincing evidence that Livingston would have been terminated for insubordination unrelated to the protected activity. Summary judgment will therefore be granted on Counts I and II.

### C. Claim for Wrongful Discharge Under North Carolina Law

In Count III of his First Amended Complaint, Livingston asserts a claim for wrongful discharge in violation of North Carolina law. He alleges that although his employment was at will, his discharge violated a public policy of North Carolina because he was discharged for reporting concerns about non-compliance with training GMPs and/or refused to sign off on the company's verification. Defendants move for summary judgment dismissing this claim.

North Carolina recognizes the common law doctrine of employment at will. That is, an employee may be discharged at any time and for any reason at the will of the employer, absent a contract for a definite term. *See Tuttle v. Kernersville Lumber Co.*, 263 N.C. 216, 139 S.E.2d 249 (1964). However, since 1985 North Carolina courts have recognized at least one exception to the

2006 U.S. Dist. LEXIS 52978, *39; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

employment-at-will doctrine: discharge [*40] in violation of public policy. See *Sides v. Duke Hospital*, 74 N.C. App. 331, 338, 328 S.E.2d 818 (1985). In *Sides*, the plaintiff, a nurse anesthetist, alleged that she refused a doctor's request to administer what she considered a dangerous dose of anesthesia to a patient. *Id.* at 333. The doctor then personally administered the anesthesia and the patient went into cardiac arrest and suffered permanent brain damage. He then sued the doctor and the hospital. Before plaintiff was deposed, several physicians who worked at the hospital and hospital attorneys advised her not to tell all that she knew about what happened and that she would "be in trouble" if she did. *Id.* Rejecting this advice, plaintiff testified truthfully at both the deposition and trial, and the jury returned a large verdict for the patient. *Id.* Three months later, plaintiff was discharged. *Id.* at 334. She sued for wrongful discharge. The trial court dismissed the case for failure to state a claim, but the Court of Appeals recognized a cause of action in circumstances where, as in *Sides*, discharging an employee for refusing to testify untruthfully clearly contravened public [*41] policy. Id.

The North Carolina Supreme Court first considered the public policy exception in *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 175, 381 S.E.2d 445 (1989). The plaintiff, a truck driver, alleged that his employer required him to falsify his logs so as to show the company's compliance with federal regulations. Id at 173. He was also instructed that he would have to continue driving for periods of time which violated the regulations if he wanted to maintain his employment. When he refused, he was informed that his pay would be cut in half. *Id.* at 173-74. The Supreme Court held that these facts -- which involved falsification of federal records -- came "within the reasoning of *Sides* and that the complaint stated a cause of action for wrongful discharge." *Id.* at 175. The court noted that the North Carolina Administrative Code incorporated the federal regulations and that a North Carolina statute provided for criminal penalties for seeking to evade or defeat such regulations. *Id.* at 176. The court found that the actions of defendant would impair and violate that policy, because they essentially encouraged the plaintiff [*42] to violate the public policy. *Id.* at 176.

The *Coman* court did not define what constitutes "public policy" for purposes of a wrongful discharge claim. Indeed, "there is no bright-line test for determining when the termination of an at-will employee violates

public policy." *Teleflex Info. Sys., Inc. v. Arnold*, 132 N.C. App. 689, 691, 513 S.E.2d 85 (1999). The North Carolina Supreme Court has said that

> Although it may be tempting to refine the definition of "public policy" in order to formulate a more precise and exact definition, we decline to do so. Any attempt to make the definition more precise would inevitably lead to at least as many questions as answers. True to common law tradition, we allow this still evolving area of the law to mature slowly, deciding each case on the facts before us.

*Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353, 416 S.E.2d 166 & n. 1 (1992) (plaintiffs stated claim by alleging that employer discharged them for refusing to work for less than the statutory minimum wage in violation of North Carolina public policy expressed in the Wage Act, N.C.G.S. § 95-25.3). Since *Amos*, the North Carolina courts, [*43] in identifying "public policy," have looked not only to state statutes but also to the state constitution and state and federal regulations to define "public policy." See, e.g., *Deerman v. Beverly Cal. Corp.*, 135 N.C. App. 1, 12, 518 S.E.2d 804 (1999) (Board of Nursing regulations); *Lenzer v. Flaherty*, 106 N.C. App. 496, 515, 418 S.E.2d 276 (1992) (the state constitution). "At the very least, public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes." *Amos*, 331 N.C. at 353. The courts of North Carolina have further noted that the exception is "grounded in considerations of public policy designed either to prohibit status-based discrimination or to insure the integrity of the judicial process or the enforcement of the law." *Kurtzman v. Applied Analytical Indus., Inc.*, 347 N.C. 329, 333-34, 493 S.E.2d 420 (1997).

According to Livingston, the public policy at issue in this case is the policy against distribution of adulterated drugs, as expressed in the North Carolina Food, Drug and Cosmetic Act, and in the federal Food, Drug and Cosmetic Act. See N.C. Gen. Stat. § 106-122 et seq. [*44] (2003); 21 U.S.C. § 301 et seq (1999 & Supp. 2005). Both of these statutes prohibit the distribution of adulterated drugs and require compliance with good manufacturing practices. Id. Livingston contends that he was terminated for internally reporting that Defendant Wyeth was not in compliance with these laws or for

2006 U.S. Dist. LEXIS 52978, *44; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

refusing to violate these laws.

Defendants contend that there is insufficient record evidence from which a jury could find that they violated the law or that they required Livingston to violate the law. The Court agrees, noting that this case is in a different procedural posture from the vast majority of the cases addressing wrongful discharge claims. The most helpful cases on the issue before this Court, *e.g. Coman, Amos* and *Deerman,* were decided at an earlier stage of the proceedings, when the moving defendant was challenging only the allegations contained in the pleadings. The posture of this case is summary judgment, and Livingston must be able to forecast sufficient evidence to go to a jury.

Having reviewed the record, the Court finds insufficient evidence to create a triable issue on whether Livingston was discharged [*45] for reporting the violation of a law expressing the public policy of North Carolina. At the time Livingston wrote the July 10, 2002 memorandum, Wyeth was about to conduct an internal audit to gauge its readiness for the September 30, 2002 commitment date. Even if there were gaps in compliance at that time, it was entirely speculative, from the evidence adduced, for Livingston to believe that Wyeth planned to misrepresent facts during the September verification or that the company was about to ship adulterated product. Admittedly, there is sharp disagreement -- particularly between Kaylos and Livingston -- about how Livingston expressed his concerns. That disagreement, however, does not support a finding that Plaintiff believed Wyeth was about to violate the law. Indeed, he admits in his affidavit that "at no time [during his meeting with Kaylos] did I claim that 'Kaylos and Wyeth were trying to mislead the FDA and those involved with the July 29 verification.'" (Livingston Aff. P 95.) In spite of the picture that Livingston attempts to paint now, the evidence shows that he was *not* telling his supervisors about violations of the law, as he now urges, but rather, consistently with [*46] his job duties, was telling them that additional measures were necessary to be ready for verification. This was but one step in the process of complying with the Consent Decree and FDA regulations. The Court does not consider Livingston's conduct comparable to those cases in which the courts of North Carolina have found a predicate for a wrongful discharge claim. It is obviously not this Court's intent to discourage employees from voicing concerns about their company's compliance with the law. The Court simply

holds that a plaintiff alleging wrongful discharge under the public policy exception must show something more than existence of a public policy and complaints intended to address internal compliance procedures. There must be a forecast of evidence that rests on more than speculation that laws grounded in public policy will be violated at some future date. [5]

> 5   Defendants cite *Guy v. Travenol Labs., Inc.,* 812 F.2d 911 (4th Cir. 1986) as authority for rejecting Livingston's claim. In *Guy,* the Fourth Circuit rejected a wrongful discharge claim when the employee alleged he had told his employer that others in the company were falsifying records about the quality and quantity of pharmaceuticals the company manufactured, and refused to falsify those records himself. *Id.* at 917. The North Carolina Supreme Court subsequently decided *Coman,* and that decision has been said by some courts to undermine the decision in *Guy.* Indeed, the plaintiffs in *Coman, Amos* and *Deerman* all were found to have stated a claim for wrongful discharge where the alleged policy was expressed in federal or state statutes or regulations and the plaintiffs alleged that they were discharged due to their refusal to violate those laws. The Court need not rely on *Guy* to decide the instant motions.

[*47] Further, there is insufficient evidence to support a finding that Defendants required Livingston to violate the law or risk losing his job. At best, the evidence shows that Livingston was criticized by Kaylos for his internal memorandum. (Livingston Aff. PP 93, 100, 102.) Livingston signed off on an internal checklist that, according to Livingston, did not attest to compliance. (Livingston Aff. P 122 ("The document I signed on September 30, 2002 focused on completion of these action items as identified by verification auditor Raschiatore. There was no understanding that the Office of Compliance verification document 1 signed had anything to do with attesting to the GMP compliance status of the Wyeth Sanford site."); *see also* Livingston Aff. P 95.) Simply put, Livingston's own testimony contradicts his argument that he was forced to violate the law or lose his job.

Finally, as discussed hereinabove, Defendants point to evidence that Plaintiff Livingston would have been terminated for reasons independent of his alleged protected activity -- his inexcusable insubordination

2006 U.S. Dist. LEXIS 52978, *47; 88 Empl. Prac. Dec. (CCH) P42,638;
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

toward the Human Resources Director at the December 2002 holiday party. Defendants having demonstrated [*48] that an essential elements of Livingston's claim for wrongful discharge do not exist, and Livingston having failed to produce evidence to support the claim, Defendants are entitled to summary judgment on the claims under North Carolina law for wrongful discharge (Count III).

## Conclusion

For the reasons stated above, **IT IS HEREBY ORDERED** that Plaintiff's motions to strike Defendants' experts (Pleading Nos. 55 and 56) are **GRANTED. IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (Pleading No. 44) is **GRANTED** with respect to Plaintiff Livingston's claims under Sarbanes-Oxley (Counts I and II) and under North Carolina law (Count III) and that those claims are **DISMISSED with prejudice.** The Court having found in favor of Defendants on the substantive claims, Livingston's claim for punitive damages (Count IV) is

also **DISMISSED.**

A separate judgment will be entered contemporaneously with this Memorandum Opinion and Order.

## JUDGMENT

For the reasons set forth in the Memorandum Opinion and Order filed contemporaneously with this Judgment,

**IT IS HEREBY ORDERED AND ADJUDGED** that this action be, and the same hereby is, dismissed [*49] with prejudice.

/s/ P. Trevor Sharp

United States Magistrate Judge

Date: July 28, 2006

LEXSEE

ROBERT J. MAHONY, Plaintiff, -against- KEYSPAN CORPORATION,
Defendant.

04 CV 554 (SJ)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW
YORK

2007 U.S. Dist. LEXIS 22042

March 12, 2007, Decided
March 12, 2007, Filed

COUNSEL: [*1] EDWARD F. WESTFIELD, P.C.,
New York, NY, By: Edward Westfield, Esq., Attorney
for Plaintiff.

CULLEN AND DYKMAN LLP, Garden City, NY, By:
Thomas B. Wassel, Esq., Attorneys for Defendant.

JUDGES: Sterling Johnson, Sr. U.S.D.J.

OPINION BY: Sterling Johnson

OPINION

MEMORANDUM AND ORDER

JOHNSON, Senior District Judge:

Plaintiff Robert J. Mahony filed this action under 18
U.S.C. § 1514A (the Sarbanes-Oxley Act or "SOX"),
which provides whistleblower protection to employees of
publicly traded companies. Defendant KeySpan
Corporation ("KeySpan") now moves for summary
judgment. For the following reasons, Defendant's Motion
is DENIED.

A. Background [1]

1 Unless otherwise indicated, the following facts
are undisputed and taken in the light most
favorable to Plaintiff.

Plaintiff was employed by KeySpan and its
predecessor company, Brooklyn Union Gas Company

("BU"), from 1988 until his termination in May 2003.
During Plaintiff's tenure at the company, he was in
charge of media relations until [*2] he was promoted in
September 2001, to the position of Director of Strategic
Planning of the Corporate Affairs Department (Fanning
Aff. at P 4).

In June 1998, Frank Fanning, KeySpan's Director of
Accounting Research, told Plaintiff that he had learned
that Dr. William Catacosinos, then KeySpan's chairman
and Chief Executive Officer ("CEO"), had received much
more severance compensation than the $ 42 million that
was publicly reported (Mahony Aff. at P 3; Mahony Dep.
at 127:1-128:12). That year, the Attorney General for the
State of New York conducted an investigation into the
actual amount given to Catacosinos (Mahony Dep. at
129:20-130:13). Fanning did not ask Plaintiff to report
the excess at that time and Plaintiff played no role in the
Attorney General's investigation (Mahony Dep. at
130:20-131:11). Plaintiff and Fanning had no other
conversations regarding Catacosinos' compensation in
1998 or 1999 (Mahony Dep. at 132:10-18).

In July 2001, Fanning told Plaintiff that he was
concerned about several serious accounting issues,
including the Catacosinos compensation and that the
company was not properly reporting "other
post-employment benefits" ("OPEB") (Mahony Dep. at
141:5-10). [*3] Fanning also informed Plaintiff that a
KeySpan receivable of $ 250 million had no
corresponding Long Island Power Authority ("LIPA")
payable and that LIPA believed that it did not have any
financial obligation to KeySpan (Mahony Dep. at
143:2-8). Fanning explained to Plaintiff that the

2007 U.S. Dist. LEXIS 22042, *3
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

accounting errors resulted in KeySpan's assets being overstated by approximately $ 150 million (Mahony Aff. at P 5).

Plaintiff had no knowledge of the company's accounting practices other than what Fanning told him (Mahony Dep. at 157:19-158:2). Plaintiff's knowledge of accounting was limited to a few nonprofessional courses he took while working for KeySpan (Mahony Dep. at 27: 22 - 28:17). However, based on those courses, Plaintiff thought that the accounting scenarios that Fanning pointed out were in violation of General Accepted Accounting Principles (Mahony Dep. at 144:21-24; Mahony Aff. at P 7). Further, because Fanning was the "director of financial reporting," was responsible for the publication of the company's financial statements, and reviewed the financial information contained in the company's press releases, Plaintiff trusted his judgment and expertise (Mahony Dep. at 120:20-121:7; Mahony [*4] Aff. at P 9).

Fanning also showed Plaintiff a series of emails Fanning wrote to officers of the company advising them of accounting errors (Mahony Aff. at P 10). After Plaintiff saw these emails, he believed that "top management was more interested in covering up than uncovering fraud" (Mahony Aff. at P 10). Fanning told Plaintiff that he was concerned that if KeySpan did not rectify the accounting errors, its public financial disclosures would be false and misleading (Mahony Aff. at P 5). Plaintiff agreed to help Fanning have his concerns addressed by upper management (Mahony Aff. at P 8).

In the late summer of 2001, Plaintiff had a conversation with Steven Zelkowitz, KeySpan's general counsel, during which Zelkowitz expressed concern that Fanning might take "information outside the company" (Mahony Dep. at 162:1-16). Plaintiff told Zelkowitz that Fanning would inform the press that KeySpan was involved in accounting frauds and that such information could be damaging to the company (Mahony Dep. at 186:2-8). Zelkowitz described Fanning as a disgruntled employee (Mahony Dep. at 162:16-24). Although Plaintiff did not discuss the substance of Fanning's allegations with Zelkowitz, it [*5] was clear to Plaintiff that Zelkowitz knew about Fanning's allegations (Mahony Dep. at 163:6-9).

In March 2002, Plaintiff reached out to Fred Lowther, KeySpan's outside legal counsel, and told him that he hoped KeySpan would not "hurt [Fanning's]

efforts to make this information known" (Mahony Dep. at 164). Plaintiff expressed concern that the stress Fanning was under because of his discussions with KeySpan officials about the accounting frauds would negatively impact Fanning's health (Mahony Dep. at 164:2-165:15). Lowther told Plaintiff, "Bob, you shouldn't be doing this," (Mahony Dep. at 168:19), and that Fanning had gone "outside the company with" information, (Mahony Dep. at 168:22-23). Plaintiff did not discuss the nature of the accounting frauds that Fanning was concerned about, but believed that Lowther knew of the allegations because of a planned meeting between Lowther and Fanning (Mahony Dep. at 165:16-18).

Shortly before April 5, 2002, Plaintiff told Robert Catell, KeySpan's CEO, that there was a meeting scheduled between Frank Fanning, Steve Zelkowitz, and Fred Lowther (Mahony Aff. at P 13). Plaintiff recommended to Catell that he attend the meeting to "hear directly [*6] from Frank Fanning the details of accounting frauds at the company" (Mahony Dep. at 155:2-4). Catell asked Plaintiff why he believed that it was important to attend the meeting, and Plaintiff briefly told Catell about Fanning's allegations (Mahony Aff. at P 13). Catell responded by saying, "[s]ometimes my people keep too much away from me" (Mahony Aff. at P 13). Catell attended the meeting with Fanning, Lowther, and Zelkowitz on April 5, 2002 (Catell Dep. at 13:14-6). Two days after the meeting on April 5, 2002, David Manning, the person who would eventually choose to fire Plaintiff, received a document detailing Fanning's allegations and marked it to be placed in Plaintiff's personnel file (Mahony Aff. Ex. L). [2]

> [2]  Elaine Weinstein, KeySpan's Senior Vice President for Human Resources, stated that the document was placed in Plaintiff's personnel folder by someone in the company but could not explain why the document was there. Weinstein Dep. at 81.

After April 5, 2002, Plaintiff experienced a change in the [*7] company's attitude towards him (Mahony Aff. at P 14). Plaintiff observed that he was being isolated within the company, (Mahony Aff. at PP 14-15), that his performance evaluations changed dramatically, (Mahony Aff. at PP 16-17; Pl.'s Ex. H, I, and J), and that his previously close relationship with Catell became nonexistent (Mahony Aff. at PP 19-21). KeySpan's cooling attitude towards Plaintiff continued until he was

terminated on May 16, 2003, although the decision to terminate Plaintiff was made in March 2003 (Manning Aff. P 7; Manning Dep. at 81-85, 101). Plaintiff was terminated as part of a company-wide budget cut during which 55 non-union employees were also let go (Weinstein Dep. at 46-47).

On August 12, 2003, Plaintiff filed a complaint with the Department of Labor, Occupational Health and Safety Administration (DOL/OSHA) pursuant to 18 U.S.C. § 1514A against Defendant alleging violations of the "whistleblower" provisions of SOX. Plaintiff's complaint was dismissed by the DOL/OSHA on December 12, 2003. Plaintiff filed timely objections, but then sought to withdraw his complaint on February 10, 2004, because the arbitrator had not rendered a decision [*8] 180 days after Plaintiff's complaint was filed (Def.'s Ex. K). Plaintiff then commenced this action.

**B. Summary Judgment Standard**

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The court should view the evidence and any inferences that may be drawn in the most favorable light to the nonmovant. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). If there is enough evidence such that a jury could return a verdict for the nonmoving party, then there is a genuine dispute as to a material fact. Id.

A party seeking summary judgment bears the initial burden of showing the basis for its motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The movant must identify the portions of the pleadings and discovery that demonstrate the absence of a genuine dispute of material fact. Id. When the movant's opponent will bear the burden [*9] of proof at trial, as is the case here, the movant can prevail merely by demonstrating a lack of evidence to support the opponent's claim. Id. at 325. If the moving party meets its initial burden, the opposing party must then "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

**C. The Sarbanes-Oxley Act**

The Sarbanes-Oxley Act protects employees that:

> [P]rovide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal Law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct.

18 U.S.C. § 1514A(a)(1).

Therefore, in order to recover under SOX, a plaintiff [*10] must show by a preponderance of the evidence that (a) he engaged in protected activity; (b) his employer was aware of the activity; (c) he suffered an adverse employment action; and (d) that the protected activity was a contributing factor to the unfavorable employment action. Fraser v. Fiduciary Trust Co. Int'l, 417 F. Supp. 2d 310, 322 (S.D.N.Y. 2006).

**1. Protected Activity**

SOX protects an employee who assists in investigations into matters which the employee "reasonably believes constitute a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders." 18 U.S.C. § 1514A(a)(1). Defendant argues in its Motion that Plaintiff did not engage in protected activity because Plaintiff cannot show (a) that there was any investigation to assist; (b) that he provided information or actually assisted in an investigation into corporate conduct; or (c) that he reasonably believed there was a violation of any federal law that protects shareholders.

**a. The Existence of an Investigation**

As an initial matter, Defendant's [*11] contention that there was no investigation at all is without merit. Zelkowitz stated that he consulted with KeySpan

Page 3

2007 U.S. Dist. LEXIS 22042, *11
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

employees to follow up on Fanning's allegations. Zelkowitz Dep. at 14:23-15:4; 28:5-17. Further, Lowther wrote a letter to Plaintiff's attorney which stated that Plaintiff was "helpful in identifying issues and concerns, and his actions were appreciated." Pl.'s Ex. M. A reasonable juror could consider the above-mentioned facts and conclude that there was, in fact, an investigation being conducted.

### b. Assistance in an Investigation

Defendant next argues that it is entitled to summary judgment because Plaintiff did not personally investigate any matter, provide information to an investigator, or assist in an investigation. Plaintiff's position is that he assisted in Fanning's investigation into accounting frauds in three ways: (a) having conversations with Zelkowitz regarding Fanning's claims and the detrimental effect they could have on the company; (b) having a conversation with Lowther in which he informed Lowther that he was concerned about Fanning's health and that Fanning was a "good man"; and (c) urging Catell to attend a meeting with Fanning, Lowther, and [*12] Zelkowitz to ensure that Fanning's concerns were heard by KeySpan's highest corporate officer.

Plaintiff's first two claims fail as a matter of law. Merely expressing concern or support for a whistleblower cannot be considered to be protected activity under SOX. Plaintiff's conversations with Lowther and Zelkowitz did nothing to advance the investigation. Indeed, Lowther and Zelkowitz already knew about Fanning's allegations when they spoke to Plaintiff. Whether a whistleblower provides information to or assists in an investigation, a plaintiff must point to affirmative acts that advance the investigation. Accordingly, there is no interpretation of SOX under which Plaintiff's conversations with Lowther or Zelkowitz constitute providing information, causing information to be provided, or otherwise assisting in an investigation.

Plaintiff's third contention is more persuasive. If Fanning experienced difficulty having his concerns addressed or heard by officers of the company, then Plaintiff's assistance in opening a channel of communication with the company's CEO would constitute assistance to the investigation. Indeed, Plaintiff's close relationship with Catell was the reason why [*13] Fanning sought his assistance. Fanning believed that Plaintiff's relationship with Catell put Plaintiff in a position to suggest to Catell that he remove

the "filter" and hear Fanning's allegations directly. This is exactly what Plaintiff did.

In order to reach the conclusion that Defendant wishes this Court to reach, this Court would have to hold that SOX applies only to those who blow the whistle but not to those who make the whistle audible. This interpretation not only flies in the face of the plain language of the statute, which clearly includes those who assist in an investigation, but also leads logically to a point that isolates the whistleblower in a way that Congress could not have intended. See Hendrix v. American Airlines, Inc., 2004-AIR-10, 2004-SOX-23 (Dec. 9, 2004). Given that SOX is a statute designed to promote corporate ethics by protecting whistleblowers from retaliation, it is reasonable to construe the statute broadly. See 149 Cong. Rec. S1725-01, S1725, 2003 WL 193278 (Jan. 29, 2003)("The law was intentionally written to sweep broadly, protecting any employee of a publicly traded company who took such reasonable action to try to protect investors [*14] and the market"). Therefore, although Plaintiff's actions clearly did not rise to the level of Enron whistleblower Sherron Watkins, the "mere fact that the severity or specificity of [his] complaints does not rise to the level of action that would spur Congress to draft legislation does not mean that the legislation it did draft was not meant to protect [him]." Collins v. Beazer Homes USA, Inc., 334 F. Supp. 2d 1365, 1375-76 (N.D. Ga. 2004). As a result, Defendant cannot establish that, as a matter of law, Plaintiff did not assist in an investigation.

### c. Reasonable Belief

Defendant further contends that Plaintiff did not engage in protected activity because Plaintiff could not have reasonably believed that KeySpan was engaging in fraud. To satisfy this prong of protected activity, a plaintiff need only show a reasonable belief that his employer violated a federal law relating to fraud against shareholders. Beazer Homes, 334 F. Supp. 2d at 1375. A plaintiff need not show an actual violation of law, nor must a plaintiff cite a particular statute that he believed was being violated. Id. "The reasonableness of a complainant's belief regarding [*15] illegality of a respondent's conduct is to be determined on the basis of the knowledge available to a reasonable person in the circumstances with the employee's training and experience." Lerbs v. Buca Di Beppo, Inc., 2004-SOX-8 at 31 (June 15, 2004).

2007 U.S. Dist. LEXIS 22042, *15
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

Under this standard, Plaintiff can demonstrate that he was reasonable in his belief that there were accounting irregularities. Although Plaintiff admits he had neither personal knowledge of the fraud nor the educational background to discover the fraud on his own, there is no requirement that a whistleblower have any particular expertise. Plaintiff understood the basic accounting principles that Fanning believed were violated while compiling a fraudulent financial statement. Plaintiff's lack of expertise was supplemented by the credibility Fanning derived from his position as director of financial accounting. Further, Plaintiff was shown emails which confirmed Fanning's allegations. In short, a fair and reasonable juror could find that Plaintiff reasonably believed that the company was engaging in accounting practices that needed to be corrected before its financial statements misled shareholders.

In sum, the Court finds that Defendant [*16] cannot establish as a matter of law that Plaintiff did not engage in protected activity under SOX. "Though this is a close case, considering the posture of the case, the lack of guidance in the caselaw and the broad remedial purpose behind SOX, the Court finds that there is a genuine issue of material fact whether Plaintiff engaged in protected activity." Beazer Homes, 334 F. Supp. 2d at 1375.

## 2. Causation

Defendant also contends that even if Plaintiff engaged in protected activity, Plaintiff cannot show a causal relationship between that protected activity and his termination. Defendant claims that the 13-month gap in time between the protected activity and his termination indicates that the two events were unrelated. However, employment actions for retaliation have been sustained even when the gap between the alleged protected activity and the adverse employment action has been substantial. See Getman v. Southwest Sec., Inc., 2003-SOX-8 (Feb. 2, 2004)(sustaining action involving 8 month gap between protected activity and adverse employment action); Thomas v. Arizona Pub. Serv. Co., 89-ERA-19 (Sept. 17, 1993)(sustaining action involving a 12 month [*17] gap between protected activity and adverse employment action).

In any event, the gap in time between protected activity and adverse employment action is merely one factor which a jury can consider when determining causation. A jury may look to other facts to decide whether the protected activity precipitated the adverse

employment action, including evidence of a strained relationship between the parties that portended the employee's termination. See, e.g., Halloum v. Intel Corp., 2003-SOX-7 (Mar. 4, 2004)("An employment action is unfavorable if it is reasonably likely to deter employees from making protected disclosures. A complainant need not prove termination or suspension from the job, or a reduction in salary or responsibilities.")(citing Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000)).

In this case, Plaintiff states that he began to experience retaliation almost immediately after the meeting between Fanning, Lowther, Catell, and Zelkowitz. Plaintiff observed that he was being isolated within the company (Mahony Aff. at P14 and 15), his performance evaluations changed dramatically (Mahony Aff. at PP 16-17; Pl.'s Ex. H, I, and J), and he fell out of [*18] favor with Catell (Mahony Aff. at PP 19-21). Although Defendant focuses on the gap in time between the protected activity and Plaintiff's termination, a reasonable juror could conclude that the temporal proximity of the April 5, 2002, meeting and the shift in attitude towards Plaintiff indicates that Plaintiff was the victim of retaliation. See Beazer Home, 334 F. Supp. 2d at 1375-76 (citing Bechtel Constr. Co. v. Sec'y of Labor, 50 F.3d 926, 933-34 (11th Cir. 1995)). A reasonable juror could find that the string of retaliatory acts culminating in Plaintiff's termination is evidence that Plaintiff's protected activity was a contributing factor in the adverse employment action. See, e.g., Fraser, 417 F. Supp. 2d at 322; see also Marano v. Dep't of Justice, 2 F.3d 1137, 1140 (Fed. Cir. 1993)("[T]he words 'a contributing factor' [...] mean any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision").

## 3. Defendant's Non-Retaliatory Explanation

In a SOX action, an employer can defeat the claim by demonstrating with clear and convincing evidence that it [*19] "would have taken the same unfavorable personnel action in the absence of [protected] behavior." 49 U.S.C. § 42121(b)(2)(B)(iv). This standard is even more stringent than the already "tough standard" that employers face in other employment discrimination cases. See Beazer Homes, 334 F. Supp. 2d at 1380 (noting the different evidentiary standards in a SOX claim)(quoting Stone & Webster Eng'g Corp. v. Herman, 115 F.3d 1568, 1572 (11th Cir. 1997)).

Defendant points out that Plaintiff was terminated

2007 U.S. Dist. LEXIS 22042, *19
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

along with 54 other non-union employees in a company-wide downsizing. Defendant contends that this demonstrates that Plaintiff was not a victim of retaliation. However, Defendant fails to establish that any employees that were similar to Plaintiff were also fired. The Court is left to guess as to the salaries, titles, and seniority of these employees. That is, if Defendant showed that other employees that were similar to Plaintiff were also terminated, this argument would carry more weight; Defendant has not done so.

Defendant also contends that Plaintiff's termination was nonretaliatory because Manning, the person who decided to [*20] fire Plaintiff, was unaware of Fanning's allegations and Plaintiff's attempt to help Fanning. However, the discovery process has revealed that two days after the meeting on April 5, 2002, Manning received a document detailing Fanning's allegations and marked it to be placed in Plaintiff's personnel file. This fact not only calls Manning's credibility into question, it also acts as evidence of retaliation. As a result, this Court will to defer to a jury's judgment whether Defendant establishes by clear and convincing evidence that Plaintiff's termination was non-retaliatory.

**D. Reputational Damages**

Section 18 U.S.C. § 1514A(c)(2) states that relief for any SOX action:

> shall include (A) reinstatement with the same seniority status that the employee would have had, but for the discrimination; (B) the amount of back pay, with interest; and (C) compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees.

18 U.S.C. § 1514A(c)(2). Defendant contends that Plaintiff's request for reputational damages must be stricken because [*21] "special damages" do not include reputational damages. In Murray v. TXU Corp., 03 CV

0888, 2005 U.S. Dist. LEXIS 10945 *8 (N.D. Tex. 2005), the court held that "special damages" were limited to "litigation costs, expert witness fees, and reasonable attorney fees." This Court disagrees with that interpretation and finds that § 1514A(c)(2)(C) comprises an illustrative list of the types of special damages that may be recovered rather than an exhaustive list.

In Hanna v. WCI Communities, Inc., 348 F. Supp. 2d 1332 (S.D.Fla. 2004), the court held that the SOX's language stating that "[a]n employee prevailing in any action under subsection (b)(1) shall be entitled *to all relief necessary to make the employee whole*" should be read to include damages for loss of reputation. 18 U.S.C. § 1514A(c)(1) (emphasis added). The court reasoned that "[w]hen reputational injury caused by an employer's unlawful discrimination diminishes a plaintiff's future earnings capacity, [he] cannot be made whole without compensation for the lost future earnings [he] would have received absent the employer's unlawful activity." 348 F. Supp. 2d at 1334 [*22] (quoting Williams v. Pharmacia, Inc., 137 F.3d 944, 953 (7th Cir. 1998)). Therefore, the court held that a successful SOX plaintiff cannot be made whole without being compensated for damages for reputational injury that diminished plaintiff's future earning capacity. This Court adopts the reasoning in Hanna and denies Defendant's request to strike Plaintiff's demand for damages to his reputation.

**Conclusion**

For the above-mentioned reasons, Defendant's Motion for Summary Judgment is DENIED and Defendant's Motion to Strike is also DENIED.

SO ORDERED.

Dated: March 12, 2007

Brooklyn, New York

Sterling Johnson

Sr. U.S.D.J.