LEXSEE

**ESTHER SMITH, Individually And On Behalf Of All Others Similarly Situated, Plaintiff-Appellee, -against- LOCAL 819 I.B.T. PENSION PLAN; THE BOARD OF TRUSTEES OF THE LOCAL 819 I.B.T. PENSION PLAN, Defendants-Third-Party Plaintiffs-Appellants. THE BOARD OF TRUSTEES OF TEAMSTERS LOCAL 819 PENSION FUND, Individually And On Behalf Of The Teamsters Local 819 Pension Fund, Third-Party Plaintiff-Appellant, -against- CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Third-Party Defendant-Appellee.**

Docket No. 01-7583

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

291 F.3d 236; 2002 U.S. App. LEXIS 9547; 27 Employee Benefits Cas. (BNA) 2833

February 28, 2002, Argued
May 20, 2002, Decided

**PRIOR HISTORY:**      [**1]  Third-party plaintiffs administer a pension plan and are (in that capacity) defendants in a class action suit alleging noncompliance with federal and state law. They appeal from the judgment of the United States District Court for the Southern District of New York (McKenna, J.), which dismissed their third-party action seeking indemnification and/or contribution from an insurance company that participated in formulation, reformation, and administration of the pension plan during part of the alleged period of noncompliance.
Smith v. Local 819 I.B.T. Pension Plan, 2001 U.S. Dist. LEXIS 422 (S.D.N.Y., 2001) Smith v. Local 819 I.B.T. Pension Plan, 2001 U.S. Dist. LEXIS 12505 (S.D.N.Y. Aug. 16, 2001)

**DISPOSITION:**      District Court's dismissal of third-party complaint reversed and remanded. District Court's certification of interlocutory ruling as final judgment affirmed.

**COUNSEL:** CHARLES PERGUE, New York, NY (LARRY CARY, Vladeck, Waldman, Elias & Engelhard, P.C., on the brief), for Defendants-Third-Party-Plaintiffs-Appellants and Third-Party Plaintiff-Appellant.

THOMAS A. MARTIN, New York, NY (STEVEN R. SHAPIRO, Putney, Twombly, Hall & Hirson, LLP, on the brief), for Third-Party Defendant-Appellee.

**JUDGES:** Before: KEARSE, JACOBS, KEITH, Circuit Judges. *

  *   The Honorable Damon J. Keith, Senior Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

**OPINION BY:** DENNIS JACOBS

**OPINION**

  [*238]  DENNIS JACOBS, *Circuit Judge*:

Local 819 I.B.T. Pension [**2] Plan and its Board of Trustees (the "Trustees") are defendants in a putative class action brought by plan participant Esther Smith, alleging that the plan has been non-compliant with the Employee Retirement Income Security Act of 1974 ("ERISA") since 1976 (and non-compliant with state law as well), and that these deficiencies were uncorrected or insufficiently cured by a 1997 revision made by the Plan and its Trustees in response to earlier litigation. The Plan and its Trustees appeal from the judgment of the United States District Court for the Southern District of New York (McKenna, J.), dismissing their third-party complaint for indemnification and/or contribution against Connecticut General Life Insurance ("Connecticut General"). It is alleged (or conceded) that Connecticut General designed the plan in 1966, administered it until 1995 (exercising sole discretion over its assets), reformed it on October 1, 1976 to bring it into compliance with

291 F.3d 236, *238; 2002 U.S. App. LEXIS 9547, **2;
27 Employee Benefits Cas. (BNA) 2833

ERISA, reformed it again in 1986, and represented to the Trustees that it complied with all applicable laws and regulations, including ERISA.

The district court dismissed the third-party complaint for failure to state a claim, pursuant [**3] to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the ground that the class action complaint cited the 1997 reformation (in which Connecticut General played no part) and alleged that it fails to remedy the plan's deficiencies.

On appeal, the Trustees argue that the district court misconstrued the class action as limited to the insufficiency of the 1997 reformation undertaken by the Trustees, and therefore as unconnected to Connecticut General's drafting, redrafting, and administration of the plan in prior years. The Trustees attribute the error to the district court's failure to consider that [i] the noncompliance existed since 1976, and [ii] Smith seeks relief retroactive to that year. Connecticut General challenges the district court's certification of its interlocutory ruling as a final judgment, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

Preliminarily, we hold that the district court did not abuse its discretion by certifying its ruling as a final judgment. [1] As to the merits, we conclude that the Trustees sufficiently state ERISA and state claims for indemnity and contribution because: [1] Smith seeks relief retroactive to the time when [**4] Connecticut General administered the plan; and [2] notwithstanding the 1997 reformation, which is not as a matter of law a superseding event, deficiencies in the plan attributable to Connecticut General may have proximately caused (under a negligence theory) or "enabled" (under an ERISA theory, 29 U.S.C. § 1105) any deficiencies in the reformation.

> 1    On appeal, Connecticut General briefs a number of defenses that were not presented to the district court or that the district court did not address: statute of limitations, ERISA preemption of state claims, etc. Because the district court did not rule on these questions, we decline to reach them.

1

In 1990, plan participant Jennie DeVito initiated suit against the Trustees alleging that the plan was "back-loaded," that is, designed in violation of ERISA to provide excessively low rates of accrual in an employee's early years of employment. DeVito v. Pension Plan of Local 819 I.B.T. [*239] Pension Fund, 975 F. Supp. 258, 269-70 (S.D.N.Y. 1997); [**5] see also 29 U.S.C. § 1054. The Trustees served a third-party complaint seeking indemnification and contribution from Connecticut General as the entity that developed and administered the plan.

In 1995, while the DeVito action was pending, the Trustees altered their contractual relationship with Connecticut General. For $ 4.6 million in consideration paid by the Plan, Connecticut General agreed to the termination of its contract, except to the extent that Connecticut General remained liable under the plan "for providing an annuity to participants receiving a benefit as of June 7, 1995." Smith v. Local 819 I.B.T. Pension Plan, 2001 U.S. Dist. LEXIS 422, 2001 WL 55733, at *1 (S.D.N.Y. Jan. 23, 2001) (internal quotation marks omitted).

DeVito prevailed in 1997, and the Trustees were ordered "to reform the Plan consistent with the requirements of ERISA retroactive to October 1, 1976." DeVito, 975 F. Supp. at 270. The Trustees reformed the plan in 1997, settled their suit with DeVito in 1999, and settled their third-party action against Connecticut General in 2000 (Connecticut General having made no admission of third-party liability).

In 2000, plan [**6] participant Esther Smith commenced the present class action on behalf of herself and similarly situated plan participants. Her complaint sought injunctive and equitable relief "to reform the plan in accordance with ERISA's minimum standards retroactive to October 1, 1976," alleging, specifically, that the plan remains "back-loaded" (and thereby noncompliant with ERISA), because the 1997 reformation did "nothing to change the rate of accrual of the normal retirement benefit." Joint App. at 9, 12-13 ("J.A.") (emphasis added). In short, Smith maintained that the Trustees' 1997 reformation of the benefit formula failed to correct the formula's previously-adjudicated noncompliance with ERISA.

The Trustees then filed their third-party complaint against Connecticut General, alleging that: [1] under ERISA, Connecticut General owes indemnification or contribution because Connecticut General was a fiduciary of the Plan, see 29 U.S.C. §§ 1002(21)(A), 1104, 1105;

and [2] even if it was not a fiduciary, Connecticut General owes indemnification or contribution under state law for breach of contract, or of other express and implied duties. Specifically, the third-party [**7] complaint seeks indemnification for the plan's noncompliance with ERISA resulting from Connecticut General's administration of the plan between 1976 and 1995, and contribution to the extent Connecticut General's breach caused any subsequent noncompliance by the Trustees.

The district court granted Connecticut General's motion to dismiss the third-party complaint for failure to state a claim, on the ground that

> it was the Trustees who modified the benefit formula in May of 1997, not [Connecticut General]. Without any facts linking [Connecticut General] to the May Reformation, considering the May Reformation is the basis of Smith's complaint, the Court cannot find any basis for sustaining the third-party action against [Connecticut General].

*Smith*, 2001 U.S. Dist. LEXIS 422, 2001 WL 55733, at *2.

The Trustees moved for an order, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, certifying the interlocutory ruling as a final judgment from which the Trustees could appeal. The district court granted the Rule 54(b) motion, citing "an increased risk" otherwise that there would be "a duplicative action between third-party plaintiffs and third-party defendant [*240] in [**8] the future." *Smith v. Local 819 I.B.T. Pension Plan*, 2001 U.S. Dist. LEXIS 12505, No. 00 Civ. 0781 (Aug. 16, 2001).

II

We review for abuse of discretion a district court's decision to certify an order as a final judgment (under Fed. R. Civ. P. 54(b)). *See Maurizio v. Goldsmith*, 230 F.3d 518, 520 (2d Cir. 2000). Notwithstanding the "historic federal policy against piecemeal appeals," judicial efficiency may require certification in the "infrequent harsh case [where] there exists some danger of hardship or injustice through delay which would be alleviated by immediate appeal." *Hogan v. Consolidated Rail Corp.*, 961 F.2d 1021, 1025 (2d Cir. 1992) (internal

citations and quotation marks omitted). Accordingly, Rule 54(b) "authorizes certification of an interlocutory appeal where there is no just cause for delay." *Maurizio*, 230 F.3d at 520.

The district court's discretionary certification was appropriate. Certification in this case avoids [i] potentially duplicative litigation, and [ii] an insufficiency of Plan funds to support a possible judgment.

III

We review *de novo* the district court's dismissal of the third-party complaint for failure [**9] to state a claim. *See Castellano v. City of New York*, 142 F.3d 58, 66 (2d Cir. 1998). [2]

> 2  At oral argument, Connecticut General urged us to review the Trustees' appeal under an abuse of discretion standard, arguing that the district court's ruling was akin to a denial of a motion to implead a third-party defendant under Rule 14(a) of the Federal Rules of Civil Procedure. The law of impleader does not bear upon this dismissal for failure to state a claim. *See Bank of India v. Trendi Sportswear, Inc.*, 239 F.3d 428, 437-38 (2d Cir. 2000) (holding that a motion to implead presents a procedural question "distinct" from the issue of whether a third-party complaint alleges a substantive claim). In any event, the Trustees filed their third-party complaint within ten days of serving their answer, and were therefore entitled to do so without leave. *See* Fed. R. Civ. P. 14(a) ("The third-party plaintiff need not obtain leave to make the service if the third-party plaintiff files the third-party complaint not later than 10 days after serving the original answer.").

[**10] Dismissal for failure to state a claim is proper where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999) (internal citation and quotation marks omitted). All factual allegations in the complaint are therefore presumed to be true. *See Zinermon v. Burch*, 494 U.S. 113, 118, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990); *Charles W. v. Maul*, 214 F.3d 350, 356 (2d Cir. 2000). And all reasonable inferences are drawn in favor of the plaintiff. *See* Fed. R. Civ. P. 12(b)(6); *EEOC v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000). However, "conclusory allegations or

291 F.3d 236, *240; 2002 U.S. App. LEXIS 9547, **10;
27 Employee Benefits Cas. (BNA) 2833

legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Gebhardt v. Allspect, Inc.*, 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000) (internal citation and quotation marks omitted).

### A. ERISA Claims

Congress created no explicit cause of action for contribution or indemnity. *Cf.*, 29 U.S.C. § 1105 (providing only for liability [**11] for breach of co-fiduciary). However, our reading of ERISA is informed by Congress's intent "to develop a federal common law of rights and obligations . . . guided by principles of trust law." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110-11, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989) (internal quotation marks omitted). "Rather than explicitly enumerating *all* [*241] of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility." *Varity Corp. v. Howe*, 516 U.S. 489, 496, 134 L. Ed. 2d 130, 116 S. Ct. 1065 (1996) (internal citations and quotation marks omitted) (emphasis in original); *see also Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 16 (2d Cir. 1991) (citing *Firestone*, 489 U.S. at 110).

Courts applying trust law principles have implied federal common law rights between defaulting fiduciaries. *See, e.g., Chemung*, 939 F.2d at 16 (holding that under ERISA a breaching fiduciary is entitled to contribution protection traditionally granted fiduciaries under equitable provisions [**12] of trust law); *Free v. Briody*, 732 F.2d 1331, 1337 (7th Cir. 1984) (holding that breaching fiduciary is entitled to indemnification under trust law principles).

The first disputed question is whether the third-party complaint sufficiently alleges that Connecticut General was a fiduciary. ERISA Section 3(21)(A) provides that a party is a fiduciary with respect to a plan only to the extent that

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or

other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

The Trustees' complaint alleges that Connecticut General breached its fiduciary duty to the Plan and to the Trustees because

> Connecticut General exercised discretionary authority and control with respect to the [**13] administration of the Fund and the management and disposition of the Fund's assets. . . . Third-party plaintiffs relied on Connecticut General's representations, either expressed or implied, that all versions of the Plan drafted by Connecticut General were in full compliance with all applicable laws and regulations, including ERISA, that the Plan was required to satisfy.

J.A. at 53-54. Although Connecticut General denies that it possessed discretionary authority over the plan, we accept the Trustees' allegation as true for the purposes of a motion to dismiss, as did the district court. *Smith*, 2001 U.S. Dist. LEXIS 422, 2001 WL 55733, at *1 ("[Until 1995, Connecticut General] exercised exclusive discretion with respect to the management and investment of the Plan's assets.").

The next disputed question is whether the pleadings sufficiently allege that Connecticut General violated this fiduciary duty. ERISA Section 404 provides that a fiduciary owes a duty of reasonable care:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances [**14] then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

29 U.S.C. § 1104(a)(1)(B). And ERISA Section 505 provides in relevant part that a fiduciary is liable if the fiduciary's failure to exercise reasonable care leads to a co-fiduciary's breach:

> [*242] [A] fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach.

29 U.S.C. § 1105(a)(2).

Smith's complaint seeks damages retroactive to 1976 on the theory that the plan is back-loaded in violation of ERISA. [3] And it is alleged in the Trustees' third-party complaint (or conceded by Connecticut General) that: [1] in 1976 Connecticut General designed the formula that is alleged by Smith to have caused the illegal back-loading; [2] between 1976 [**15] and 1995, Connecticut General maintained, redesigned and exercised discretionary control over the formula; and [3] the Trustees relied on warranties of ERISA compliance made by Connecticut General while it was a fiduciary. These allegations are enough to state a claim for indemnification for the period between 1976 and 1995.

> 3 Smith's claim for retroactive relief is supported under ERISA Section 204, which provides that "the accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." ERISA section 204, 29 U.S.C. § 1054(g)(1). Therefore, no argument can be made that the 1997 reformation completely undid everything that came before. See Amato v. Western Union Int'l, Inc., 773 F.2d 1402, 1407-14 (2d Cir. 1985).

The allegations also state a claim for contribution, though that is a closer question. The Trustees allege that "Connecticut General has breached its fiduciary duty to the Plan," citing §§ 1104 and 1105. Among the inferences [**16] that fairly could be drawn from these allegations and citations is that Connecticut General's non-compliant design of the plan did not lend itself to retroactive correction; specifically, that Connecticut General's

fiduciary breach of its duty of reasonable care "enabled" the Trustees' subsequent failure to correct the preexisting default. See 29 U.S.C. §§ 1104(a)(1)(B), 1105(a)(2). Therefore, it was error for the district court to focus on the 1997 reformation in isolation, especially since Smith's underlying complaint charges the Trustees with failing to correct the very same noncompliant rate of accrual initially developed by Connecticut General.

### B. State-Law Claims

No fiduciary duty need be alleged in order to state a claim for indemnification under state law. A state-law claim for indemnity may rest upon (inter alia) breach of a quasi-contractual relationship or warranty. See McDermott v. City of New York, 50 N.Y.2d 211, 216, 428 N.Y.S.2d 643, 406 N.E.2d 460 (1980). And a state-law claim for contribution may arise where the defendant and a third party both caused the same injury--albeit nonconcurrently or under alternative [**17] theories of causation. See Board of Educ. of the Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley, 71 N.Y.2d 21, 27, 523 N.Y.S.2d 475, 517 N.E.2d 1360 (1987); see also N.Y. C.P.L.R. § 1401 (McKinney 2001) (codifying Dole v. Dow Chem. Co., 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972)).

The Trustees' third-party complaint alleges that Connecticut General is liable under state law for "breach of duty, [and] breach of contract or implied obligation to third-party plaintiffs." J.A. at 57. Under these theories, the Trustees could shift their liability to Connecticut General: [1] under indemnity, because (during a portion of the period for which Smith seeks damages) Connecticut General may have breached its contractual obligations to the Plan by developing [*243] and applying a back-loaded formula, while misrepresenting that the formula was compliant; or [2] under contribution, because the formula was negligently developed and administered in a way that impaired the Plan's ability to effect a full correction in 1997.

As indicated earlier, the indemnity theory may be more plausible, but the contribution theory may be viable as [**18] well; even if the alleged failure of the 1997 reformation to correct the illegal back-loading reflects negligence on the part of the Trustees, their "actions will not break the necessary chain of causation where those [actions] are 'a normal or foreseeable consequence of the situation created by [Connecticut General's] negligence.'" Stagl v. Delta Airlines, Inc., 52 F.3d 463, 473 (2d Cir.

291 F.3d 236, *243; 2002 U.S. App. LEXIS 9547, **18;
27 Employee Benefits Cas. (BNA) 2833

1995) (quoting *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 414 N.E.2d 666 (1980)).

The judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with this decision.

**CONCLUSION**

LEXSEE

In the Matter of: PRISCILLA CATHERINE TEUTSCH, Complainant v. ING GROEP,
N. V. / NATHAN ESHELMAN / JEREMY EAVES / SECURITY LIFE OF DENVER
INSURANCE / ING AMERICA INSURANCE HOLDINGS / ING NORTH
AMERICAN INSURANCE / LION CONNECTICUT HOLDINGS, INC., Respondents

Case Nos.: 2005-SOX-00101, 00102, 00103

U.S. Department of Labor
Office of Administrative Law Judges

2006 DOLSOX LEXIS 104

September 25, 2006

[*1]

RECOMEMENDED DECISION AND ORDER GRANTING RESPONDENTS MOTION FOR SUMMARY
DECISION

RICHARD K. MALAMPHY, Administrative Law Judge

OPINION:

Complainant, Priscilla Catherine Teutsch, filed a complaint with the Occupational Safety and Health
Administration (OSHA) of the United States Department of Labor on April 29, 2005 alleging that Respondent ING and
its employees, Respondents Nathan Eshelman and Jeremy Eaves, discriminated against her in violation of Section 806
of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (2003)(hereinafter "the Act" or "SOX").

The Act provides protection from discrimination or retaliation to whistleblower employees of publicly traded
companies when those employees provide information to their employer, a federal agency, or a member of Congress
regarding what the employee reasonably believes are violations of U.S. Security and Exchange Commission rules and
regulations and other laws relating to preventing fraud against sharebrokers.

Factual History

Complainant began working at Security Life of Denver (hereinafter "Security Life") on April 14, 2003.
Complainant's business cards, earnings statements, retirement statements,  [*2] and performance reviews all bore the
name "ING" with the company logo. Respondents terminated her employment on February 3, 2005.

Procedural History

Complainant filed her SOX complaint on April 29, 2005. Complainant alleged that her employer, ING, and ING
employees Nathan Eshelman, Head of Life Specialty Markets, and Jeremy Eaves, Lead Human Resources Consultant,
retaliated against her for whistleblowing activities protected under the Act. Complainant claimed her employment was
terminated when she "opposed a directive given to one of her employees to change language to cover up illegal rebating
and destroy documents." SOX Complaint, Apr. 29, 2005 at 1.

The Occupational Safety and Health Administration (OSHA) completed its investigation of this complaint against

Page 1

2006 DOLSOX LEXIS 104, *2
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

ING and issued its findings on July 18, 2005. "The investigation revealed that there is no legal entity known as ING." Secretary's Findings, Jul. 18, 2005 at 1. Rather, according to the Secretary's findings, "Complainant was an employee of ING Security Life of Denver Insurance Company, a subsidiary of ING Groep N.V." Id. The Secretary dismissed the claim based on the Complainant's failure to "provide evidence to [*3] support an employment relationship between her employer and ING Groep, N.V. nor has investigation revealed evidence sufficient to establish that ING Groep, N.V. and ING Security Life of Denver are a single employer subject to the provisions of 18 U.S.C. § 1514A." Id.

In an order issued on February 1, 2006, the undersigned allowed the Complainant to amend her complaint to name additional respondents and to serve those parties.

The complainant filed a motion to join additional parties. Thereafter, the Respondent filed a motion to dismiss on the basis that ING Groep, N.V. had not been properly served, and as there was no jurisdiction over a publicly traded company.

On May 9, 2006, the undersigned issued an order directing the Complainant to serve ING Groep N.V. by July 1, 2006.

On July 7, 2006, Complainant stated that she had attempted service in good faith. However, the Respondent has not conceded that service has been made. In the June 30, 2006 submission, the Complainant stated that the Netherlands Central Authority has confirmed acceptance and processing of Claimant's request for service pursuant to Art. 5 of the Hague Convention. However, [*4] as this one particular Hague Convention method of service is of indefinite duration and out of Complainant's control the Complainant sought a deferment for the third party Netherlands Central Authority to act within sixty (60) days.

On July 24, 2006, an order was issued which left the record open until August 14, 2006. On August 18, 2006, the Complainant was directed to respond to the Respondent's first set of interrogatories and first request for production of documents. The undersigned assumed that the Respondent was not pressing the motion to dismiss at that time.

The parties requested a conference call and this was held on September 15, 2006. The Complainant requested more time to attempt service on ING Groep, N.V. The Respondent requested consideration of the motion to dismiss.

The undersigned acknowledges that the Complainant has made a good faith effort to serve ING Groep, N.V., which is the only publicly traded corporation in this case. However, at this point it is uncertain as to whether or not proper service will be obtained.

In the motions to dismiss, the Respondent has stated

ING Groep is a corporation organized pursuant to the laws of The Netherlands and has its corporate [*5] headquarters located in The Netherlands. ING Groep has subsidiary companies that conduct business in the United States. One such indirect subsidiary is Security Life, a company based in Denver, Colorado. ING Groep, however, has no contacts with the State of Colorado where the events giving rise to this action took place.

ING Groep also had no involvement in Complainant's employment with Security Life. ING Groep did not employ Complainant, nor did it have any involvement in hiring Complainant, or have any control over Complainant's day-to-day activities during her employment with Security Life. ING Groep did not take part in disciplining and counseling Complainant for her poor job performance, nor was ING Groep involved in the elimination of Complainant's position at Security Life. Simply put, ING Groep was not involved in any way in the events giving rise to this action.

DISCUSSION OF LAW AND FACTS

Any party may move with or without supporting affidavits for summary decision on all or part of the proceeding. 29 C.F.R. § 18.40(a)(2004). Summary judgment is granted for either party if the administrative law judge finds "the

pleadings, affidavits, material obtained by discovery or otherwise [*6] show that there is no genuine issue as to any material fact and that a party is entitled to summary decision. Id. Thus, in order for a motion for summary decision to be granted, there must be no disputed material facts and the moving party must be entitled to prevail as a matter of law.

In deciding a motion for summary decision, the court must consider all the material submitted by both parties, drawing all reasonable inferences in a matter most favorable to the non-moving party. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). The moving party has the burden of production to prove that the non-moving party cannot make a showing sufficient to establish an essential element of the case. Once the moving party has met its burden of production, the non-moving party must show by evidence beyond the pleadings themselves that there is a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). A court shall render summary judgment when there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law, and reasonable minds could come [*7] to but one conclusion, which is adverse to the party against whom the motion is made. Lincoln v. Reksten Mgmt., 354 F.3d 262 (4th Cir. 2003); Green v. Ingalls Shipbuilding, Inc., 29 BRBS 81(1995)(stating the purpose of summary decision is to promptly dispose of actions in which there is no genuine issue as to any material fact). However, granting a summary decision is not appropriate where the information submitted is insufficient to determine if material facts are at issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The legislative history of the Act indicates that Congress did not intend for the Act to view subsidiaries and parent companies as one entity. In fact, while discussing the bill before the Senate, Senator Sarbanes specifically addressed the limited scope of the Act. Senator Sarbanes stated that he wished to "make very clear that [the Act] applies exclusively to public companies -- that is, to companies registered with the Securities and Exchange Commission. 148 Cong. Rec. S7351 (daily ed. July 25, 2002)(statement of Sen. Sarbanes). Therefore, I disagree with Complainant's [*8] interpretation of the Act. To include non-publicly traded subsidiaries as a "company" merely because it has a publicly traded parent, would widen the scope of the Act beyond the intentions of Congress. If Congress had wanted to include non-publicly traded subsidiaries of publicly-traded parent companies as covered employers, it could have done so in drafting the statute. See Getman v. Southwest, Inc., ARB No. 04-059 (7/29/05).

At this point, this forum does not have jurisdiction over ING Groep, N.V., the only publicly traded firm in this case. The record does not reveal that ING Groep, N.V. and its officers had control over the management of the subsidiaries, or Nathan Eshelman or Jeremy Eaves.

RECOMMENDED ORDER

ING Groep, N.V.'s Motion for Summary Decision is hereby GRANTED, on the basis that it has not been properly served in this case and the claim shall be DISMISSED. The other named Respondents are dismissed as not being subject to the Act.

NOTICE OF APPEAL RIGHTS: To appeal, you must file a Petition for Review ("Petition") with the Administrative Review Board ("Board") within ten (10) business days of the date of the administrative law judge's decision. See 29 C.F.R. [*9] § 1980.110(a). The Board's address is Administrative Review Board, U S Department of Labor, Room S-4309, 200 Constitution Avenue, NW, Washington, DC 20210. Your Petition is considered filed on the date of its postmark, facsimile transmittal, or e-mail communication; but if you file it in person, by handdelivery or other means, it is filed when the Board receives it. See 29 C.F.R. § 1980.110(c). Your Petition must specifically identify the findings, conclusions or orders to which you object. Generally, you waive any objections you do not raise specifically. See 29 C.F.R. § 1980.110(a).

At the time you file the Petition with the Board, you must serve it on all parties as well as the Chief Administrative Law Judge, U.S. Department of Labor, Office of Administrative Law Judges, 800 K Street, NW, Suite 400-North, Washington, DC 20001-8002. The Petition must also be served on the Assistant Secretary, Occupational Safety and Health Administration and the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor, Washington, DC 20210.

2006 DOLSOX LEXIS 104, *9
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

If no Petition is timely filed, the administrative law judge's decision becomes the final order of the Secretary of Labor [*10] pursuant to 29 C.F.R. § 1980.109(c). Even if you do file a Petition, the administrative law judge's decision becomes the final order of the Secretary of Labor unless the Board issues an order within thirty (30) days after the Petition is filed notifying the parties that it has accepted the case for review. See 29 C.F.R. § 1980.109(c) and 1980.111(a) and (b).

LEXSEE

**TRANSATLANTIC MARINE CLAIMS AGENCY, INC., a/s/o Daewoo Automotive
Components, Ltd., Plaintiff-Appellee; M/V HYUNDAI EMPEROR, etc., her
engines, boilers, etc., Defendant, HYUNDAI MERCHANT MARINE, Defendant,
BURLINGTON NORTHERN RAILROAD, Defendant, CONRAIL, Defendant - v. -
ACE SHIPPING CORP., division of Ace Young Inc., Defendant-Appellant**

Docket No. 96-7583

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

109 F.3d 105; 1997 U.S. App. LEXIS 4632; 37 Fed. R. Serv. 3d (Callaghan) 531; 1997
AMC 1772

January 8, 1996, Argued
March 13, 1997, Decided

**PRIOR HISTORY:** [**1] The District Court
(S.D.N.Y., Cedarbaum, J.) entered a default judgment
against defendant-appellant on a contract claim.
Defendant moved to vacate the default judgment, under
Federal Rule of Civil Procedure 60 (b)(4), arguing that
the case is not one in admiralty (the only ground upon
which plaintiff invoked federal jurisdiction). Because
further fact-finding is necessary to determine its
admiralty status, we remand to the District Court.

**DISPOSITION:** REVERSED and REMANDED.

**COUNSEL:** James F. Campise, Marcigliano & Campise,
New York, New York, for Plaintiff-Appellee.

Stephen A. Frank, Badiak Will & Maloof, New York,
New York, for Defendant-Appellant.

**JUDGES:** Before: NEWMAN, Chief Judge;
McLAUGHLIN, Circuit Judge; and SAND, District
Judge *

> * Hon. Leonard B. Sand of the United States
> District Court for the Southern District of New
> York, sitting by designation.

**OPINION BY:** McLAUGHLIN

**OPINION**

[*106] McLAUGHLIN, *Circuit Judge*:

**Background**

In March 1994, Daewoo Automotive Components,
Ltd. ("Daewoo") hired defendant-appellant Ace Shipping
Corp. ("Ace") to transport automobile parts from New
York to Pusan, Korea. Daewoo and Ace executed six
bills of lading (which are simply contracts [**2] of
carriage) calling for transportation of the parts from New
York, through Seattle, to Pusan.

Ace is a non-vessel-owning common carrier
("NVOCC"), which means that it arranges for the
shipment of cargo, but does not itself own a ship. Ace
accepted Daewoo's relatively small cargo, consolidated it
with cargo from other customers, and placed the whole
load in a "container"--a boxcar-sized storage unit that can
be carried by trucks, trains or ships. Ace delivered the
container to Hyundai Intermodal, Inc. ("Hyundai"),
which, in turn, conveyed it to Burlington Northern
[*107] Railroad Co. ("Burlington Northern") for
transport by rail from New York to Seattle. The train
carrying the cargo derailed in Montana. Most of
Daewoo's automobile parts were damaged; some were
totally destroyed.

The loss was covered by insurance and the cargo
underwriter paid Daewoo. On March 21, 1995,
plaintiff-appellee Transatlantic Marine Claims Agency
("Transatlantic"), an agent for the cargo underwriter,
brought this action as a subrogee of Daewoo, naming
Ace, Hyundai, Burlington Northern, and Conrail as
defendants. On April 10, 1995, Ace signed a waiver of

109 F.3d 105, *107; 1997 U.S. App. LEXIS 4632, **2;
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

service, acknowledging that it had received a copy of Transatlantic's [**3] complaint, and that it recognized its obligation to file an answer or a motion. Ace, however, failed to file an answer or a motion, failed to attend an initial pre-trial conference on July 21, 1995, and ignored a letter (apparently sent as a professional courtesy) from Transatlantic warning Ace that it would be subject to a default judgment if it did not appear in the action.

On August 18, 1995, Transatlantic filed a motion--on notice to Ace--to enter a default judgment against Ace. Ace again failed to respond, and on October 25, 1995, the District Court entered a default judgment for $ 51,753.86 (the amount Transatlantic sought in its complaint--$ 45,976.83--plus interest and costs). Transatlantic entered into a stipulation with the remaining defendants, discontinuing its case against them.

On March 7, 1996, Ace finally reacted by filing a motion to vacate the default judgment. Ace argued that because its principals are Korean, unfamiliar with our legal system, its failure to appear should be deemed "excusable neglect" under Federal Rule of Civil Procedure 60(b)(1). The District Court denied Ace's motion and Ace filed a timely notice of appeal.

On appeal, Ace now abandons its [**4] claim of "excusable neglect," and asks us, instead, to vacate the default judgment for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 60(b)(4) and 12(h)(3). Transatlantic vigorously disputes this contention.

In its complaint, Transatlantic invoked only admiralty jurisdiction (probably because the $ 50,000 amount in controversy requirement for diversity jurisdiction was not satisfied). Transatlantic attached to its complaint a document entitled "Schedule B" (purportedly based on the bills of lading themselves) which imparted the following information about the transport of Daewoo's automobile parts:

Vessel: HYUNDAI EMPEROR

Place to Delivery to First Carrier: NEW YORK

Intended Port of Shipment: Seattle

Intended Port of Discharge: Busan, ** Korea

** This appears to be a peculiarly British spelling of Pusan, a place of unhappy memory to many Americans of a certain age.

On appeal, the parties have submitted copies of the actual bills of lading, listing the following information:

Pier: NEW [**5] YORK

Ocean Vessel: HD EMPEROR V. 14

Port of Loading: SEATTLE

Port of Discharge: BUSAN, KOREA

For Transhipment to: [BLANK]

Onward Inland Routing: [BLANK]

Place of Delivery: CFS BUSAN

While it is clear that Daewoo and Ace agreed that the parts would journey from New York to Seattle to Pusan, nothing in the record addresses whether the first leg of the trip, from New York to Seattle, would be by train or by ship. Again, the derailment occurred in Montana, and this appeal requires us to determine whether there is admiralty jurisdiction in this somewhat peculiar situation.

## Discussion

*A.* Papers and Evidence to be Considered.

It is undisputed that the issue of subject matter jurisdiction was never raised before the District Court. This, however, poses no obstacle because "the failure of the parties to contest the district court's authority to hear a case 'does not act to confer [federal] jurisdiction . . . since a challenge to subject matter jurisdiction cannot be waived and may be raised [either by motion or] *sua sponte*'" at any time. *United Food Local 919 v. Centermark* [*108] *Properties*, 30 F.3d 298, 301 (2d Cir. 1994) (quoting *Alliance* [**6] *of Am. Insurers v. Cuomo*, 854 F.2d 591, 605 (2d Cir. 1988)); Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."); *see generally* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350.

Ace argues that in deciding whether there is subject matter jurisdiction, we must examine only Transatlantic's complaint. Hence, runs the argument, we cannot consider the bills of lading because they were not included in the

109 F.3d 105, *108; 1997 U.S. App. LEXIS 4632, **6;
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

record before the District Court, and are introduced for the first time on appeal. Ace advances two arguments to support this contention.

First, Ace suggests that its challenge to jurisdiction is a "facial challenge," viz., that the "jurisdictional allegations of the complaint are insufficient on their face to demonstrate the existence of subject-matter jurisdiction." Therefore, Ace concludes, our review is confined to the allegations of the complaint.

Ace relies on an Eighth Circuit case, *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990), which does indeed make a distinction between a "facial attack" [**7] on jurisdiction--which challenges only whether jurisdiction is sufficiently pled--and a "factual attack"--which looks beyond the pleadings and challenges the factual basis of jurisdiction. *Osborn*, however, does not compel us to make a choice between the two approaches.

Even if Ace challenges only the sufficiency of Transatlantic's complaint, we are entitled at any time *sua sponte* to delve into the issue of whether there is a factual basis to support the District Court's exercise of subject matter jurisdiction. *See Maryland Cas. Co. v. W.R. Grace and Co.*, 23 F.3d 617, 621 (2d Cir. 1993); *United States v. Burmah Oil Co., Ltd.*, 558 F.2d 43, 46 (2d Cir. 1977); *Bernstein v. Universal Pictures, Inc.*, 517 F.2d 976, 979 (2d Cir. 1975). In so doing, the case law does not limit our right to refer to any material in the record. *See Land v. Dollar*, 330 U.S. 731, 735 & n.4, 91 L. Ed. 1209, 67 S. Ct. 1009 (1947); *United Food Local 919 v. Centermark Properties*, 30 F.3d 298, 303, 305 (2d Cir. 1994); *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir. 1991) ("on a motion . . . challenging jurisdiction the court may resolve disputed jurisdictional fact issues by reference [**8] to evidence outside the pleadings") *vacated on other grounds*, 505 U.S. 1215, 112 S. Ct. 3020, 120 L. Ed. 2d 892 (1992); *see generally* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350.

Second, at argument, Ace maintained that we particularly cannot examine the bills of lading because "in default, the plaintiff is limited to its pleadings." It is, of course, ancient learning that a default judgment deems all the well-pleaded allegations in the pleadings to be admitted. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 69-70 (2d

Cir.), *rev'd on other grounds*, 409 U.S. 363, 34 L. Ed. 2d 577, 93 S. Ct. 647 (1971). This principle, however, has no bearing on an inquiry into whether the default judgment itself is void for lack of subject matter jurisdiction.

### B. Admiralty Jurisdiction.

Turning to the fundamental question whether this case falls within admiralty jurisdiction, we start by noting that the injury to Transatlantic (as Daewoo's subrogee) occurred on land--in Montana--where the train carrying the parts derailed. Conceivably, this injury could still fall within admiralty jurisdiction as: (1) [**9] an admiralty tort (negligence); or (2) a breach of an admiralty contract.

#### 1. Tort.

We conclude that this case does not fall within admiralty tort jurisdiction. The Supreme Court, in *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 673-74, 73 L. Ed. 2d 300, 102 S. Ct. 2654 (1982), and again in *Sisson v. Ruby*, 497 U.S. 358, 364, 111 L. Ed. 2d 292, 110 S. Ct. 2892 (1990), [*109] has emphasized that all admiralty torts must have "a substantial relationship to traditional maritime activity." An important--although not necessarily determinative--consideration in ascertaining whether such a "relationship" exists is whether the tort occurred on navigable waters. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 115 S. Ct. 1043, 1048, 130 L. Ed. 2d 1024 (1995).

Under these standards, it is clear that since the incident at issue in the instant case occurred solely on land--as the result of a train derailment having no relationship whatsoever to admiralty activity--admiralty tort jurisdiction does not lie. *See Jerome B. Grubart, Inc.*, U.S. at , 115 S. Ct. at 1048 ("a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity") [**10] (citations omitted) (internal quotations omitted); *J. Lauritzen A/S v. Dashwood Shipping, Ltd.*, 65 F.3d 139, 142 (9th Cir. 1995).

#### 2. Contract.

When assessing admiralty contract jurisdiction, "the 'nature and subject matter' of the contract at issue [is] the crucial consideration." *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 611, 114 L. Ed. 2d 649, 111 S. Ct. 2071 (1991). The general rule is that admiralty

109 F.3d 105, *109; 1997 U.S. App. LEXIS 4632, **10;
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

jurisdiction arises only when the subject-matter of the contract is "purely" or "wholly" maritime in nature. *See Rea v. The Eclipse*, 135 U.S. 599, 608, 10 S. Ct. 873, 34 L. Ed. 269 (1890); *Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l, Inc.*, 968 F.2d 196, 199 (2d Cir. 1992); *The Ada*, 250 F. 194, 196 (2d Cir. 1918). A "mixed" contract, i.e., a contract that contains both admiralty and non-admiralty obligations is, therefore, usually not within admiralty jurisdiction. *Atlantic Mutual*, 968 F.2d at 199; *Compagnie Francaise v. Bonnasse*, 19 F.2d 777, 779 (2d Cir. 1927); *Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874, 880 (3d Cir. 1992) [hereinafter *Berkshire*].

We must determine therefore, whether Daewoo and Ace, at the time they executed the bills of lading, contemplated [**11] that the automobile parts would travel from New York to Seattle by rail, or by ship. If the former, then the contract is "mixed", and not within admiralty jurisdiction. If the latter, then the contract is wholly maritime, and within admiralty jurisdiction. We stress that the question is not how the goods were *actually* transported (or, more accurately, attempted to be transported) from New York to Seattle but what the parties *intended* or at least expected when they executed the bills of lading. *Berkshire*, 954 F.2d at 881.

We are aware that there are two exceptions to the general rule that "mixed" contracts fall outside admiralty jurisdiction. Assuming, *arguendo*, that the bills of lading are "mixed" contracts, those exceptions clearly do not pertain to this case. They apply only when the non-maritime portion of a "mixed" contract is either (1) severable from the maritime obligations or (2) "merely incidental" to the maritime obligations. *See Sirius Ins. Co. v. Collins*, 16 F.3d 34, 36 (2d Cir. 1994); *Atlantic Mutual*, 968 F.2d at 199 ("The extensive cross-United States transport of the goods would not be an 'incidental' aspect of the contract."); *Berkshire*, [**12] 954 F.2d at 881; *New York Marine & Gen'l Ins. Co. v. S/S Ming Prosperity*", 920 F. Supp. 416, 420 (S.D.N.Y. 1996) (transportation from coast to coast across the United States may not be considered incidental).

The question whether the contract between Daewoo and Ace (assuming that it is a mixed contract) is severable is irrelevant in this case because the loss undoubtedly occurred during non-maritime activity, and we could not exercise admiralty jurisdiction over that portion of a "mixed" contract. *See New York Marine*, 920 F. Supp. at 420 ("severability of the non-maritime portion

[is] impossible where 'the loss occurred during the non-maritime leg of the journey'").

The mode of transportation from New York to Seattle that was contemplated by the parties remains the core of this case. In determining whether the parties contemplated a train trip, which would defeat admiralty jurisdiction, we turn first to the face of the bills of lading:

[*110] Pier: NEW YORK

Ocean Vessel: HD EMPEROR V. 14

Port of Loading: SEATTLE

Port of Discharge: BUSAN, KOREA

For Transhipment to: [BLANK]

Onward Inland Routing: [BLANK]

Place of Delivery: CFS BUSAN

The bills, as we noted above, [**13] are unenlightening as to how the goods would travel from New York to Seattle. On the one hand, the fact that New York is designated as the "pier," and that the designation "onward inland routing" is left blank, would seem to indicate that the parties intended the goods to go by ship from New York to Seattle. On the other hand, the fact that Seattle--not New York--is designated the "port of loading," and that the *shortest* sea route from New York to Seattle is a circuitous course through the Panama Canal, would suggest that the parties anticipated that the goods would be transported by rail from New York to Seattle.

In *Berkshire*, the Third Circuit faced a strikingly similar dilemma. A Taiwanese corporation contracted (via a bill of lading) to have a freight forwarder transport several hundred cartons of umbrellas from Taiwan to New York. "The Bill of Lading . . . described in general terms how the goods would travel from Taiwan to New York, but not specifically. While the Bill stated that the goods would be loaded onto the ship M.V. Hakusan II at Keelung, Taiwan . . . and that the place of delivery was New York, it did not specify the means of transporting the containers between [**14] these two ports. The Bill neither provided that the Hakusan II would transport the umbrellas all the way to New York, nor did it specifically mention land transport." *Berkshire*, 954 F.2d at 878.

109 F.3d 105, *110; 1997 U.S. App. LEXIS 4632, **14;
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

Finding that the bill of lading was ambiguous, the *Berkshire* court remanded the case to the District Court. The Third Circuit directed the District Court to take evidence on whether the course of dealing between the parties, and customary practice in the industry, involved shipping goods from Taiwan to Los Angeles, and then completing the trip cross-country via rail to New York. Only from such evidence, the Third Circuit concluded, could it be determined "whether, in executing the initial Bill of Lading, the parties entertained a reasonable expectation of only maritime transport of the umbrellas." *Berkshire*, 954 F.2d at 885.

Much the same can be said of the instant case. Additional fact-finding in this case may reveal, for example, that the designation of New York as a "pier," does not actually imply that the goods will be put on a ship in New York. It may be that the practice in the industry is to use large industrial areas such as piers to load and maneuver the large containers [**15] that are used both in rail and ocean transportation. It is possible that the goods were delivered to the pier but were to be placed in a container at the pier and the container then put on a train.

It is also possible that designating Seattle as the "port of loading" does not mean that the goods could not have traveled to Seattle "loaded" on a different ship. The term may refer only to "loading" on the ship that will take the goods to their ultimate destination, or on which the goods will travel the greatest distance.

It may also be that, despite the length of the route, it made economic sense for Ace to arrange for the parts to be shipped through the Panama Canal. Fact-finding may reveal that Ace had other customers who needed to ship goods through the Panama Canal, and that by consolidating Daewoo's cargo with these other customers, Ace could obtain a discount rate for the journey.

We must, therefore, remand this case to the District Court for a determination as to whether the parties contemplated a mixed contract or a purely maritime route. If the District Court finds that the parties contemplated a mixed contract, and that, therefore, admiralty jurisdiction is not present, [**16] it must, of course, dismiss the case. In a letter to this court, Ace represents that, if there is such a dismissal, it will waive the statute of limitations defense to any subsequent action brought by Transatlantic in state court within six months from the date of the dismissal order. We express no

opinion as to whether the other defendants could successfully invoke the statute of limitations, or any other defense for that matter, to any future action by Transatlantic on this claim.

[*111] C. Damages

The default judgment entered by the District Court was in the amount of $ 51,753.86. To arrive at this number, the District Court simply accepted at face value Transatlantic's statement in its complaint that it "has sustained damages as nearly as can now be estimated in the amount of $ 45,976.83," and then added interest and costs to arrive at the $ 51,753.86 figure.

Rule 55(b)(2) of the Federal Rules of Civil Procedure provides that, in order to determine the amount of damages in the context of a default judgment, "the court may conduct . . . a hearing." We have held that, under Rule 55(b)(2), "it [is] not necessary for the District Court to hold a hearing, as long as it ensured [**17] that there was a basis for the damages specified in the default judgment." *Fustok v. ContiCommodity Services, Inc.*, 873 F.2d 38, 40 (2d Cir. 1989); *see Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir. 1993) ("not necessary for the district court to hold a hearing to fix damages after a default judgment had been entered where the court had 'relied upon detailed affidavits and documentary evidence supplemented by the District Judge's personal knowledge of the record gained during four years involvement with the litigation. . .'"); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991) (where district judge was "inundated with affidavits, evidence, and oral presentations" a full evidentiary hearing was not necessary).

While the District Court may not have been obligated to hold an evidentiary hearing, it could not just accept Transatlantic's statement of the damages. This did not satisfy the court's obligation to ensure that the damages were appropriate. If the District Court concludes that this case does fall within admiralty jurisdiction, it should take the necessary steps to establish damages with reasonable certainty. Any action by the District [**18] Court in this regard would, of course, in no way undermine the validity of the default judgment on the issue of liability.

Conclusion

While we in no way condone Ace's cavalier disregard of the earlier proceedings in this case, and we

Page 5

109 F.3d 105, *111; 1997 U.S. App. LEXIS 4632, **18;
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

deny costs on appeal to emphasize the point, *see* F. R. App. P. 39, we are nonetheless obligated to ensure that the limited jurisdiction of the federal courts is exercised properly. This case is remanded to the District Court for further fact-finding on the issue of whether the case falls within the admiralty jurisdiction. If the District Court finds that admiralty jurisdiction is proper, the default judgment as to liability will stand, but the District Court must then determine the damages based on appropriate evidence. If the District Court concludes that this case does not fall within the admiralty jurisdiction of a federal court, it must, of course, dismiss the case.

LEXSEE

David M. Wise, Respondent-Appellant, v. Consolidated Edison Company of New York, Inc., Appellant-Respondent.

3883

SUPREME COURT OF NEW YORK, APPELLATE DIVISION, FIRST DEPARTMENT

282 A.D.2d 335; 723 N.Y.S.2d 462; 2001 N.Y. App. Div. LEXIS 3885

April 19, 2001, Decided
April 19, 2001, Entered

COUNSEL: [***1] For Plaintiff-Respondent-Appellant: Kenneth McCallion.

For Defendant-Appellant-Respondent: Jeanmarie Schieler.

JUDGES: Concur--Williams, J.P., Wallach, Lerner, Rubin, Friedman, JJ.

OPINION

[*335] [**462] Order, Supreme Court, New York County (Richard Lowe, III, J.), entered on or about August 7, 2000, which, upon renewal, granted defendant's motion to dismiss the [**463] complaint pursuant to CPLR 3211 to the extent of dismissing plaintiff's cause of action for abuse of process, but otherwise denied the motion, denied defendant's motion to permanently seal the record, and denied plaintiff's request to permit him to use confidential information in discovery and at trial, unanimously modified, on the law, the facts and in the exercise of discretion, to grant the motions of defendant in their entirety, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in defendant's favor dismissing the complaint.

Renewal, sought by defendant in accordance with the motion court's instructions, was properly granted. Upon renewal, however, defendant's motion to dismiss the complaint should have been granted in its entirety, since permitting [***2] the action to go forward would entail the improper disclosure by plaintiff, an attorney who was in-house counsel to defendant prior to his termination, of client confidences, including specific corporate tax strategies (see, Code of Professional Responsibility DR 4-101 [22 NYCRR 1200.19]; State v State of New York, 268 AD2d 857, 859). The ethical obligation to maintain the "confidences" and "secrets" of clients and former clients is broader than the attorney-client privilege, and exists " 'without regard to the nature or source of information or the fact that others share the knowledge' " (Brennan's, Inc. v Brennan's Rest., 590 F2d 168, 172, quoting ABA Code of Professional Responsibility EC 4-4 [1970]; accord, Thomson U. S. v Gosnell, 181 AD2d 558, lv dismissed 80 NY2d 893). The fact that defendant mailed to plaintiff, after his termination, certain documents [*336] on which he had worked as an attorney, did not constitute a knowing waiver of confidentiality (see, Code of Professional Responsibility DR 4-101 [c] [***3] [1] [22 NYCRR 1200.19 (c) (1)]), particularly since defendant had previously warned plaintiff that the commencement of a legal action would violate his ethical duty to preserve those confidences. Plaintiff's affirmative claims against defendant for damages, grounded in the theory of wrongful discharge, do not fall within the exception permitting an attorney to disclose confidences or secrets necessary to defend "against an accusation of wrongful conduct" (see, Code of Professional Responsibility DR 4-101 [c] [4] [22 NYCRR 1200.19 (c) (4)]; Eckhaus v Alfa-Laval, Inc., 764 F Supp 34, 37-38), and plaintiff cannot circumvent the rule prohibiting such claims by reframing his claims as other related torts (see, Perrucci v CIGNA Ins. Co., 256 AD2d 87, lv denied 93 NY2d 803; see also, Fowler v Parks, 248 AD2d 210, lv denied 92 NY2d 802). Since this action involves client confidences, defendant's

282 A.D.2d 335, *336; 723 N.Y.S.2d 462, **463;
2001 N.Y. App. Div. LEXIS 3885, ***3; 10 I.E.R. Cas. (BNA) 1507

motion permanently [***4] to seal the record should have been granted.

Plaintiff's claim for abuse of process, denominated "abuse of power," for procuring two confidentiality stipulations was properly dismissed, since voluntary agreements do not constitute "process" within the meaning of the tort, and plaintiff failed to allege any specific, quantifiable damages (*see, Walentas v Johnes*, 257 AD2d 352, 354, *lv dismissed* 93 NY2d 958).

Concur--Williams, J. P., Wallach, Lerner, Rubin and Friedman, JJ.