LEXSEE

In the Matter of: DONALD J. WILLY, COMPLAINANT, v. THE COASTAL
CORPORATION AND COASTAL STATES MANAGEMENT CO., RESPONDENTS

ARB CASE NO. 98-060 (Formerly ARB CASE NO. 97-107); ALJ CASE NO. 85-CAA-1

UNITED STATES DEPARTMENT OF LABOR
ADMINISTRATIVE REVIEW BOARD

2004 DOL Ad. Rev. Bd. LEXIS 19

February 27, 2004

COUNSEL: For Complainant: Donald J. Willy, Esq.; For Respondents: J. Richard Hammett, Esq.

JUDGES: M. CYNTHIA DOUGLASS; WAYNE C. BEYER; JUDITH S. BOGGS

OPINION BY: THE ADMINISTRATIVE REVIEW BOARD: M. CYNTHIA DOUGLASS, Chief Administrative
Appeals Judge; WAYNE C. BEYER, Administrative Appeals Judge; JUDITH S. BOGGS, Administrative Appeals
Judge

OPINION:

[*1] FINAL DECISION AND DISMISSAL ORDER

Donald J. Willy filed an administrative complaint with the Wage and Hour Division (WHD) of the U.S.
Department of Labor (DOL) in October 1984, alleging that the Respondents, the Coastal Corporation (now known as El
Paso CPG Company) and Coastal States Management Co. (Coastal collectively) terminated his employment in
retaliation for activities which were protected by the whistleblower provisions of certain federal environmental statutes.
n1 Numerous decisions by DOL Administrative Law Judges (ALJs), the Secretary of Labor, this Board, and federal
courts (and Texas courts in parallel state proceedings) have followed. In this decision, the Board concludes that the
Secretary of Labor's 1994 decision in Willy's favor was based upon evidence and testimony that were improperly
admitted in contravention of the federal common law of attorney-client privilege and that Willy cannot establish that he
engaged in protected activity and was therefore discriminated against without this testimony. Therefore, we dismiss his
complaint and vacate all recommended orders for remedial relief.

> n1 The complaint was filed pursuant to the employee protection provisions of the Clean Air Act, 42 U.S.C.
> § 7622 (2000), the Water Pollution Control Act, 33 U.S.C. § 1367 (2000), the Safe Drinking Water Act, 42
> U.S.C. § 300J-9(i) (2000), the Resource Conservation and Recovery Act, 42 U.S.C. § 6971 (2000), the Toxic
> Substances Control Act, 15 U.S.C. § 2622 (2000), and the Comprehensive Environmental Response,
> Compensation and Liability Act, 42 U.S.C. § 9610 (2000). We refer to these provisions collectively as "the
> Acts."

[*2] FACTUAL AND PROCEDURAL BACKGROUND

## I. Facts n2

> n2 The facts are summarized from *Willy v. Coastal Corporation,* Case No. 85-CAA-1, ALJ's Recommended Decision and Order, Nov. 29, 1988, and the Secretary's Final Decision and Order, June 1, 1994.

Coastal hired Donald Willy as one of its in-house environmental attorneys in May 1981. In 1984 following a series of events that spanned a period of six months, Coastal terminated his employment.

## A. Belcher environmental audit report

In early 1984, Albin Smith, President of Belcher Oil Company (a subsidiary of Coastal) requested that Coastal's legal department perform an environmental audit of Belcher's facilities. Clinton Fawcett, Willy's supervisor in Coastal's legal department, assigned Willy, as well as another attorney, Troy Webb, and regulatory analyst, Keith Pardue, to conduct that audit. Webb and Pardue conducted on-site reviews and provided written findings to Willy, who in turn wrote two preliminary drafts, one dated March 9, 1984, and a second draft report [*3] dated March 22, 1984 (both drafts are referred to as "the Belcher Report").

Willy concluded in his drafts that Belcher was subject to liability for violation of federal environmental statutes. n3 Troy Dalton, Belcher's engineer in charge of environmental matters, reviewed Willy's March 9 draft, and on behalf of himself and Keith Pardue, the Coastal analyst who with Webb had done the onsite evaluation of Belcher, expressed serious disagreement with many of Willy's conclusions. Webb evidently felt that Willy was taking a harsher view of Belcher's situation than was warranted based on Webb's and Pardue's observations. n4 Webb -- without Willy's knowledge -- sent a memorandum to Belcher President Smith on March 2, 1984, asserting that in his view the environmental problems at Belcher were less serious than Willy's draft indicated. n5 In addition, Dalton and Pardue severely criticized Willy's conclusions through such notations as "overkill," "not correct," "not true," and "sets company up for lawsuit."

> n3 For reasons we later explain, the Board concludes that the information in Willy's draft Belcher Reports and related testimony are subject to the attorney-client privilege and, thus, are excluded as "evidence" in this federal whistleblower case. However, we cite the "privileged" information here because it was allowed into evidence and made public by the 1994 decision of the Secretary. Secretary's Final Decision and Order, June 1, 1994.

[*4]

> n4 Webb died before the hearing in this case. Facts regarding Webb were provided by testimony of his colleagues and supervisors.

> n5 Willy learned of Webb's memo and complained to Fawcett that Webb had "stabbed him in the back." Webb subsequently apologized to Willy for sending the memorandum without Willy's knowledge.

Fawcett, as well as Coastal's general counsel, George Brundrett, thought that the tone of the report needed revision. Although Pardue conceded at the hearing that Belcher had not been meeting its permitting and reporting responsibilities, that it had committed some unpermitted discharges of polluted water, and that the Belcher Report was factually accurate, he thought the environmental violations at Belcher had been technical in nature, and that Willy's draft was "inflammatory."

At the end of March, Fawcett asked Willy to make significant revisions to the Belcher Report, including deletions regarding legal violations, but Willy refused. Willy then discussed the matter with the general counsel, George Brundrett. Brundrett agreed with Fawcett's criticism of the report and had Fawcett [*5] make the revisions. Willy had no further involvement in the Belcher Report.

Although Fawcett criticized Willy for his work on the Belcher Report, nothing of an adverse nature occurred to Willy until several months later. n6 Shortly after the Belcher Report incident, Fawcett transferred out of the legal department. William Dunker, who had been an environmental attorney with Coastal since 1977 and was a colleague of Willy's in the legal department, became Willy's supervisor. As Dunker explained in his statement to the WHD, he reviewed Willy's draft of the Belcher Report in April 1984 at Brundrett's request. Dunker's review involved discussions with Webb, who told Dunker "the whole thing was overblown" by Willy. Dunker subsequently reported to Brundrett that "the report was inflammatory and drew conclusions that I don't like to draw." Dunker informed Willy of his concerns with Willy's presentation.

> n6 Willy testified that, although his duties did not change following the Belcher Report incident, he started "getting the cold shoulder" from William Dunker, Fawcett, Brundrett, Webb, and Pardue.

### [*6] B. Involvement with Corpus Christi refinery, call to Texas Department of Water Resources (TDWR)

The second event relevant to this case involved Willy's relationship with a Corpus Christi, Texas refinery owned by a Coastal subsidiary. This led to further conflict between Webb and Willy. Webb considered the refinery to be within his realm of responsibility. However, Willy also began doing some work relating to the refinery in late 1983 or early 1984. In early June 1984, Robert Johnston, manager of the refinery, asked Willy to call the Texas Department of Water Resources (TDWR) concerning a closure bond for the refinery. On June 19, 1984, Willy called Russell Lewis, a geologist with the TDWR, concerning financial assurance for the refinery. n7 This telephone call ultimately resulted in Willy's termination.

> n7 Willy testified that he did not recall having a telephone conversation with Lewis, that he doubted that he made such a call, but that such a call could have taken place.

In the summer of 1984, Keith Pardue and [*7] Troy Webb (Willy's colleagues on the Belcher environmental audit and critics of Willy's draft report) visited Corpus Christi and were told by the refinery's engineer in charge of environmental matters, Martin Hall, that TDWR's Lewis had told Willy that Coastal might be sued because of financial responsibility problems relating to the Corpus Christi refinery. According to Pardue, Webb was upset to hear that Willy had been in contact with the TDWR regarding a facility that Webb considered his personal responsibility. Webb was also upset that Willy had not told him of the possibility that Coastal might be sued.

On August 23, Johnston sent a memorandum to Dan Hill, his immediate supervisor, requesting that Willy replace Webb in handling a solid waste problem with the TDWR. The memorandum stated that Webb did not treat the refinery as a client, failed to advise Johnston of current solid waste problems with the TDWR and appeared to irritate TDWR personnel, and that the refinery could "be penalized by being singled out for special observance until the irritation [i.e., Webb] is relieved."

In September 1984, Pardue and Webb complained to Dunker that Russell Lewis of the TDWR told Willy that [*8] Coastal might be sued by the agency (but did not tell Webb of the conversation). Webb also told Dunker that Willy had been saying negative things about Webb and was backstabbing him. During that period Dunker also learned that Johnston wanted to replace Webb with Willy.

2004 DOL Ad. Rev. Bd. LEXIS 19, *8
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

### C. September 25 meeting on Willy's conflicts with Webb, Belcher report

On September 25, 1984, Dunker held a meeting with Willy and Webb to lessen their antagonism. Prior to the meeting, Dunker prepared a memorandum reassigning certain legal responsibilities for the Corpus Christi refinery to Willy instead of Webb. Dunker also prepared a letter of reprimand to give to Willy, because he had formed a belief that Willy was responsible for the friction between himself and Webb. However, Dunker withheld issuance of the letter because the meeting failed to resolve the backstabbing questions to Dunker's satisfaction.

Dunker surreptitiously audiotaped the September 25 meeting, which began with Willy alone. Dunker first discussed with Willy his interest in being reassigned Corpus Christi work. Dunker then focused on the antagonism between Willy and Webb, and invited Pardue, to join the meeting. Dunker [*9] asked Willy whether he had called the TDWR, and Willy denied it. Dunker then telephoned Hall at the Corpus Christi refinery in an effort to confirm what he had been told by Webb and Pardue about Willy's contact with the TDWR. Hall told Dunker that, although he had heard that TDWR's Lewis had said there might be a lawsuit, he did not recall telling Pardue and Webb that Willy had called the TDWR. Hall confirmed, however, that Willy and Webb had made disparaging remarks about each other.

After Dunker finished his call to Hall, Willy and Webb argued, accusing each other of "backstabbing." Dunker responded angrily:

> Okay. Let me make a couple of statements here to this gathered assemblage. In my seven years here at Coastal I've never had this type of problem and I'm talking about when Clint was running this outfit, and Don, I'll be frank, this problem has been generating since you've been here and it's down to a believability contest, and frankly, I think that Troy may have made a couple of statements that I think are more right, but I think, from what I hear that you've made the statements and I get this feeling, and I can't substantiate it right now, that you're causing a lot of [expletive [*10] deleted] problems and I want it to stop. I don't want anymore backstabbing out of anybody, and if I hear about any of it, any of it, I'm going to clean house and I'll clean house immediately. Is that understood? Troy?
>
> * * * *
>
> Keith? I don't want to hear anything about you, either. Don, do you understand that?
>
> * * * *
>
> Because frankly, Don, I don't believe some of the [expletive deleted] you're putting out. I don't care whether you think I'm wrong or not. I have an underlying disbelief. I'm hearing too much and I don't want any [expletive deleted] more. I don't care if somebody is lying to me. I don't want to hear about it. And if I do hear about it, that's it!

RX 18B-16 (audiotape transcript).

The Belcher Report was also a major source of contention at the September 25 meeting:

> BD [Dunker]: I know a lot of problems generated out of that Belcher affair, and frankly, I think that was handled in a [expletive deleted] poor fashion by everybody here.
>
> DW [Willy]: Yeah. I do too.
>
> BD: I think that, Troy, you made a mistake by sending out a memo . . . .
>
> TW [Webb]: I made a mistake by sending out a memo and I apologize . . . .

2004 DOL Ad. Rev. Bd. LEXIS 19, *10
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

\* \* \* \*

BD: Okay. I think that entire memo was [expletive deleted] [*11]  poor legal judgment. But that's my opinion.

DW: By the way, I might add, that you know that's not my opinion and you know, except for Al Smith it's my understanding that it's not the opinion of the rest of management.

BD: What?

DW: That that memo is poor judgment.

BD: That's [expletive deleted]. Clint Fawcett thought it was a poor memo, George Brundrett thought it was a poor memo.

DW: Bill Koerth thought it was a good idea. Did you think it was a good idea, Keith?

BD: Bill Koerth doesn't fit into our management structure right here.

DW: No, but he's the guy in charge of Risk Management, which you know, we're talking about insuring against the problem.

BD: Oh that's a bunch of [expletive deleted].

TW: How did that get to Bill Koerth?

BD: That memo should have never gotten to Bill Koerth.

DW: We circulated it among everybody who . . .

BD: [expletive deleted]! Do you know what you did? You put a smoking gun out now to the entire [expletive deleted] corporation if you circulated it.

DW: No I didn't, because it was legal work product the way it was and that legal work product (unintelligible) effective according to both Schrader and Wainer. Let's not get into an argument about that memo. [*12]  You told me a long time ago it was something not to do again and that's fine with me. Just to clear up the point, you know, normally a legal work product going to Schrader and Wainer [sic], you know, until it went over to Belcher, which I did not send it to Belcher.

BD: Okay. That's water under the [expletive deleted] bridge. To just summarize this right here, do we all understand that number one, there is going to be absolutely no more backstabbing, inuendos, or anything. If you've got a problem with anybody else's work around here, there is one person you come to and that's me. And if it goes to anybody else, anybody else, the guy who takes it there is going to be gone the next day. Is that understood? And I can do that with you, too. Even though you don't work for me.

\* \* \* \*

BD: Don, I don't know what the problem is. Maybe your problem is that you just can't work with people.

DW: But it is.

BD: You work with some people, but you alienate others. You really do.

2004 DOL Ad. Rev. Bd. LEXIS 19, *12
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

DW: As far as Troy being alienated from me and, you know, I've never understood that. I've never understood where it started from. But I know it's there because other people have told me about it. But the guy, you know, [*13] you know that Belcher thing, you've got your opinion on it and I've got my opinion on it, you know what I did was in response to what Al Smith asked us to do. It was supposed to be a legal work product. Now all of a sudden I find that Clint has called up Al and said I want Don Willy to do X Y Z and Troy Webb to do Q E D and didn't even tell me about it. And you, there I thought I was supposed to be doing this and then Al Smith calls me up two weeks later after they've done the report, the report that they did, not the one that I did, and starts yelling at me about the report. And I said, but I didn't even do that. And I thought that somebody had called you and told you that these guys were going to take it over. And it just got so far out of hand that there was just nothing I could do about it.

BD: Well, it's not going to get far out of hand from now on, and we're going start today.

DW: I hope.

* * * *

DW: That Belcher deal, I got started I was the one that asked Troy to help me. And, you know, I wanted it because I wanted the guy to develop a relationship with me. And I felt in the end that I got stabbed on it. All I'm trying to say is I'm more than willing to work with the guy. I [*14] would like to work with the guy. But, you know, I want you to somehow try at least to give me a fair chance. You see what I'm saying. That's not too much to ask. You know, I think I can be very valuable to you because I do have good relations with people.

BD: I (unintelligible) at many things. I don't know why, but you, where you work in many instances causes personnel problems.

DW: What do you mean where I work causes personnel problems?

BD: The Belcher blow-up.

* * * *

DW: Okay . . . . All I'm saying is just give me a chance and don't hold these things against me, because you and I we vehemently disagree maybe with the Belcher idea, and I think that that Belcher thing would have turned out fine, you know, had we not had the, had Clint never gotten involved, and really that's not Troy's fault. That's Clint's fault, because he told people to go, you know, two different ways at the same time, and then he called Al Smith and said one way is the right way, and you know, that's a way of killing somebody. And that's exactly what he did to me.

BD: I don't know what caused you to develop that relationship with Clint.

DW: Well,

BD: You know, figure it out. What caused it?

DW: I don't know, [*15] but I suspect that some people went into Clint's office and started saying things about me, too.

*Id.* at 18-24.

**D. Termination for lying about TDWR call**

2004 DOL Ad. Rev. Bd. LEXIS 19, *15
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

Within a day or two of this heated meeting, Dunker phoned TDWR's Russell Lewis to verify Willy's denial of prior contact with the Texas agency. Contrary to Willy's assertions, Lewis recalled such a conversation with Willy. Angered by Willy's apparent deception, Dunker decided to terminate Willy's employment and obtained Brundrett's concurrence. However, Dunker decided to first meet with Willy on October 1. During this brief and surreptitiously recorded encounter, Dunker phoned Lewis in Willy's presence. Despite Willy's questioning Lewis during his phone conversation with Dunker, Lewis maintained that he had spoken with Willy before July regarding financial assurances. Referring to Willy's apparent breach of trust in denying that conversation, Dunker requested Willy's resignation, which Willy refused. Dunker then verbally terminated Willy's employment. Brundrett's October 1 termination notice to Willy states, "The primary purpose for this termination is the fact that you failed to report certain actions taken by you with [*16] respect to the Corpus Christi Refinery environmental matters. When asked if you had taken such action, you unequivocally denied taking such action." RX9.

## II. Procedural History

### A. Proceedings on federal environmental whistleblower complaint

#### 1. Complaint to the Department of Labor

On October 29, 1984, Willy filed a complaint with the DOL, alleging that, in contravention of the whistleblower provisions of the environmental statutes, he had been discharged in retaliation for writing the Belcher Report. The WHD investigated Willy's complaint, found his allegations to be sustained, and ordered remedial relief. Coastal appealed that ruling by requesting a hearing before a DOL Administrative Law Judge (ALJ).

#### 2. ALJ order on discovery of Belcher report, privileged materials

Willy sought extensive discovery. Coastal objected to production and use of the Belcher Report and many other categories of evidence relating to the Belcher facility on the grounds that they were protected by the attorney-client or work-product privileges. In response to Willy's motion to compel, the ALJ in effect rejected Coastal's privilege claims for nondisclosure and ordered production of some of [*17] the documents. As the ALJ explained:

> A primary substantive issue in this proceeding is whether Complainant, as an attorney for Respondents, was terminated because of protected activity with respect to environmental matters in the case of the Belcher facility. Documents 1-23 of Respondents' list of privileged documents pertaining to Belcher are relevant to the subject matter of this proceeding. In fact they are central to the issues of this case. Without production of these documents Complainant is effectively barred from litigating this proceeding.

ALJ Order, Feb. 27, 1985, slip op. at 1 (emphasis added). Relying upon his understanding of the Fifth Circuit's decision in *Doe v. A Corp.*, 709 F.2d 1043, 1048 (5th Cir. 1983) (allowing former in-house counsel to prosecute action in his own behalf using confidential information outside the attorney-client privilege), the ALJ stated that notwithstanding his assumption that the documents were privileged,

> In this instance, . . . Complainant could not effectively litigate his claim without access to the documents in question. Balancing Complainant's right to vindicate his claim and Respondent's need [*18] for confidentiality, it is evident that the documents under consideration should be produced. Respondent's need for confidentiality, under these circumstances should be safe guarded by appropriate Protective Orders and In Camera procedures.

*Id.* at 2. Coastal declined to comply with the ALJ's order. Willy moved for sanctions, which Coastal opposed. The ALJ declined to order sanctions, and instead ordered Willy to seek enforcement of the ALJ's order of production in the United States District Court.

2004 DOL Ad. Rev. Bd. LEXIS 19, *18
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

### 3. ALJ recommendation of dismissal; internal complaints not protected

However, before there could be any further action, on May 6, 1985, in response to a Motion to Dismiss by Coastal, the ALJ recommended that Willy's complaint be dismissed. The ALJ ruled that the Fifth Circuit's decision in _Brown & Root, Inc. v. Donovan,_ 747 F.2d 1029, 1036 (5th Cir. 1984), holding that under the whistleblower provision of the Energy Reorganization Act, "employee conduct which does not involve the employee's contact or involvement with a competent organ of government is not protected," was controlling. Because the ALJ found that Willy's actions were solely internal, [*19] and at that time the critical language of the ERA was substantially identical to the language of the Acts under which Willy brought his complaint, the ALJ ruled that "the Secretary and the parties are bound by that precedent in the Fifth Circuit, which, as a practical matter, precludes decision on the merits of this case." n8 ALJ Rec. Dec. and Ord., May 6, 1985, slip op. at 5.

> n8 The ERA is not at issue in the Willy case currently before the Board. The environmental statutes that are at issue in this case are interpreted to cover internal complaints (see footnote 11). It is noted that in 1992 Congress amended the whistleblower provision of the ERA to specifically apply to internal complaints through Sec. 2902(a) of the Comprehensive National Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776 (Oct. 24, 1992).

### 4. Secretary's reversal of dismissal; Belcher report protected activity

On review to the Secretary, Willy asserted that he was terminated in part for contacting government environmental agencies. [*20] In 1987 the Secretary reversed the ALJ's 1985 dismissal. Sec. Dec. and Ord. of Remand, June 4, 1987. The Secretary first ruled that Willy had not had an adequate opportunity to prove that he had contacted government agencies. _Id._ at 2-3. The Secretary also held that Willy's Belcher Report, outlining environmental law inadequacies at Belcher, constituted protected activity under the Acts, notwithstanding the Fifth Circuit's holding in _Brown & Root._ The Secretary stated that, "with deference to the Court of Appeals," he believed that the Fifth Circuit should be "given another opportunity" to consider whether internal complaints were protected in light of the Tenth Circuit's more recent and favorable ERA decision in _Kansas Gas & Elec. Co. v. Brock,_ 780 F.2d 1505 (1985). _Id._ at 3-8.

In addition, the Secretary noted that Coastal also moved to dismiss "on the grounds that the employee protection provisions of the statutes involved here do not protect attorneys employed by covered employers." _Id._ at 8. The Secretary rejected this claim, ruling that there was nothing in any of the statutes or their legislative histories to indicate a congressional [*21] intent to exclude in-house attorneys from statutory protection. _Id._ The Secretary remanded the case for further proceedings consistent with his decision.

### 5. Fifth Circuit's refusal to intervene in discovery dispute over Belcher report, privileged materials

On remand, the ALJ again ordered that Willy seek enforcement of the ALJ's production order, as well as judicial resolution of Coastal's privilege claims in United States District Court. Instead, Willy petitioned the Fifth Circuit Court of Appeals pursuant to the All Writs Act to resolve the discovery dispute. Coastal joined Willy's request, but the Secretary urged the court not to involve itself in the case at that stage.

The Fifth Circuit declined review. _In re Willy,_ 831 F.2d 545 (5th Cir. 1987). The court ruled that "our intervention at this time to resolve the discovery dispute would . . . interrupt the administrative process." _Id._ at 549. The court pointed out that "it is usually 'more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages.'" [*22] _Id._ (citation omitted). Characterizing the discovery dispute as "routine," the court concluded:

> Orders denying or directing discovery are interlocutory and so not appealable except as part of the

2004 DOL Ad. Rev. Bd. LEXIS 19, *22
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

final decision disposing of the case on the merits. Willy's asserted need for the documents that are the subject of the discovery dispute does not constitute irreparable injury of the kind required to interrupt an administrative proceeding. Coastal is not a petitioner, and, while it urges us to grant Willy's petition as a matter of justice and efficiency in litigation, it has neither asserted nor shown that it faces a drastic sanction such as judgment by default. It therefore has not shown that its claim of privilege requires immediate, interlocutory review.

* * * *

Willy asserts that eventually he will appeal to this court and that our failure to decide the discovery dispute will needlessly place the ALJ, the parties, and counsel in the position of having to proceed with the trial of this case without Willy's having been given access to documents that the Judge has ruled he is entitled to have and that are essential to his case. Willy may, however, prevail on his claim that he communicated [*23] with government sources and may be able to do so without the Belcher documents; the Secretary may reverse the ALJ's discovery rulings; or it may indeed be that Coastal is correctly asserting the attorney-client privilege. Intervention at this time is therefore unnecessary.

*In re Willy,* 831 F.2d at 549-50 (citations omitted).

**6. ALJ admission of draft Belcher Report, holding for Willy on the merits of whistleblower complaint under mixed motive analysis; denial of relief because of deception about post-termination employment**

Following the Fifth Circuit's denial of relief, the case proceeded to hearing in March 1988, at which Coastal continued to resist production and use of the Belcher Report. However, over Coastal's objection, the ALJ admitted into evidence two of Willy's draft versions within Willy's personal possession. CX 81 and 84 (with critical markings, deletions and comments). Citing the attorney-client privilege, Coastal declined to put on evidence and testimony regarding the Belcher Report. n9

n9 Following the hearing, the ALJ issued a March 15, 1988 order sealing the record, including Willy's draft versions of the Belcher Report. The order stated:

In light of Respondents' privilege claims, the post-hearing procedures herein will be governed by the following:

1. The transcript of the hearing of March 7-10, 1988 and the exhibits received at that hearing are placed in camera and sealed.

2. The materials referred to in item 1 of this Order may be utilized by the parties solely for briefing purposes.

3. The Administrative Law Judge and the Secretary of Labor are free to refer to the in camera materials in their respective decisions and such decisions are to be placed on the public record. No part of such decisions are to be in camera.

4. This in camera order does not purport to bind the Secretary of Labor and the Secretary, should this matter come before him on review, is free to determine whether the provisions of this Order shall remain in effect or whether all or part of the evidentiary materials in this proceeding shall be placed in the public record.

[*24]

2004 DOL Ad. Rev. Bd. LEXIS 19, *24
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

In deposition, as well as during the hearing on the merits, Willy denied that he was currently employed. However, shortly after the close of the hearing, Coastal informed the ALJ that it had obtained evidence that Willy was, in fact, employed as an attorney for another corporation at the time of his deposition and the hearing. In light of this development, the ALJ allowed additional discovery and reopened the record on Willy's post-termination employment with the other corporation.

On November 29, 1988, the ALJ issued his recommended decision on the merits. Recommended Decision and Order (R. D. & O.). The ALJ found that Willy was fired both because of Coastal's perception that he had lied about phoning the Texas Department of Water Resources, thereby failing to inform his superiors of potential agency litigation learned in the conversation, and also because of his critical authorship of the Belcher Report. Using a "mixed motive" analysis, the ALJ concluded:

> In short, the reasons for William Dunker's animus against Donald Willy arising out of the Belcher Report and Complainant's subsequent lie about the phone call are inextricably mixed. Under the circumstances, no finding can be [*25] made that Donald Willy would have been fired solely for lying about the phone call had he not engaged in protected activity. The record compels the inference that by late September 1984 Mr. Dunker had determined to fire Mr. Willy under any circumstances whether he lied about the phone call or not.

Nov. 29, 1988 R. D. & O., slip op. at 26 (citation omitted). n10

> n10 The ALJ also held that Willy's call to the TDWR was not external protected activity because Willy denied making the call or failed to recall that such a conversation took place. R. D. & O. at 22.

However, the ALJ recommended against ordering relief because of Willy's deception regarding his post-termination employment. The ALJ ruled that "as a result of his attempted subversion of this proceeding, Complainant has forfeited his right to damages arising out of his protected activity and Respondents' subsequent, related dismissal of him." Id. at 28.

**7. Secretary's decision affirming ALJ holding for Willy under mixed motive analysis, ruling that privileged [*26] material could be introduced under defense against wrongdoing exception; but ordering relief on back-pay**

The November 29, 1988 R. D. & O. was subject to automatic review by the Secretary, and on June 1, 1994, the Secretary issued his decision. The Secretary agreed with the ALJ that Coastal had not carried its burden of proving Willy would have been fired solely for lying about the phone call had he not engaged in the protected activity of writing the Belcher Report. Sec. Fin. Dec. and Ord., June 1, 1994, slip op. at 17. The Secretary stated, in pertinent part:

> When Mr. Dunker called the TDWR employee with Complainant in his office on October 1, 1984, the agency employee said he did remember talking with Complainant about financial assurance for the Corpus Christi refinery, but Complainant said he did not remember the conversation. Mr. Dunker cut off the telephone call at that point without asking the TDWR employee whether he had commented to Complainant about a possible lawsuit against Respondent. Mr. Dunker had called the agency employee several days before the October 1 call, but on cross examination he couldn't recall if he asked the employee what he and Complainant had discussed [*27] or whether the employee had told Complainant the TDWR might sue Respondent.

> When Mr. Dunker fired Complainant on October 1, 1984, Complainant maintained he did not remember the phone call and asked Mr. Dunker why it was relevant. Mr. Dunker said "the relevance is . . . I asked you very specifically three or four times whether or not you had talked to him. You said no, unequivocally no. No, you have never talked to anybody down there. . . . I can't trust you." At the

2004 DOL Ad. Rev. Bd. LEXIS 19, *27
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

hearing, however, Mr. Dunker said the importance of the phone call was that Complainant "was going behind another attorney's back, working on something he shouldn't have been working on, found out . . . what I believe [is] a very important piece of information and didn't tell the attorney about it." The important piece of information was "the threat about the [law] suit." Mr. Dunker conceded that if the TDWR employee never made such a threat, Mr. Dunker would have been mistaken in his view of the significance of the telephone call. It should be noted again that Mr. Dunker never directly asked the TDWR employee if he had made such a threat, but relied on Mr. Webb's and Mr. Pardue's report of what they had been told by Mr. [*28] Hall, who denied their report of his conversation with them.

Thus, Mr. Dunker's suspicions about Complainant were not borne out at the September 25 meeting, and there was as much reason to believe that Mr. Webb had been undermining Complainant because of the memorandum Mr. Webb had written to the President of Belcher, without informing Complainant, and Mr. Hall's comments that both Mr. Webb and Complainant had made disparaging remarks about each other. Nevertheless, Mr. Dunker said at that meeting "I get this feeling, and I can't substantiate it right now, that you're causing a lot of [expletive deleted problems. . . . I don't believe some of the [expletive deleted] you're putting out. . . . I have an underlying disbelief." Combined with Mr. Dunker's comments about the Belcher report cited by the ALJ and the facts surrounding Complainant's disputed phone call discussed above, this strongly supports the ALJ's conclusion that Mr. Dunker was motivated both by the Belcher report and what he perceived as Complainant's lie about the phone call and Respondent did not prove it would have taken the same action had Complainant not written the Belcher report.

*Id.* at 20-22 (record citations [*29] and footnote omitted).

The Secretary also reaffirmed the prior holding of June 4, 1987, that Willy's internal complaint, the Belcher Report, was protected, notwithstanding the Fifth Circuit's decision in *Brown & Root*. He noted that *Brown & Root* was applicable only to the ERA and did not purport to interpret the environmental whistleblower laws at issue in this case. Sec. Fin. Dec. and Ord. at 13. n11

n11 The Board is not reconsidering the Secretary's holding on coverage of internal employee complaints under the environmental statutes. *See Passaic Valley Sewerage Commissioners v. United States Dep't of Labor*, 992 F.2d 474, 478-80 (3d Cir. 1993) (holding that internal complaints are covered under the Water Pollution Control Act).

The Secretary rejected Coastal's argument that the ALJ should not have admitted in evidence drafts of Willy's Belcher Report because of the attorney-client privilege:

Respondents excepted to the admission in evidence of annotated copies of Complaint's [*30] Belcher report . . ., arguing that introduction of those exhibits was prohibited by Respondent's claim of attorney-client privilege. These documents were at the heart of Complainant's case and by admitting them in evidence, Respondent argues, the ALJ not only sanctioned the violation of the privilege but placed Respondent at an unfair disadvantage. Complainant was able to present his case through use of the exhibits, but Respondent could not rebut it through other privileged documents or by permitting its employees to answer questions about the exhibits without having waived the privilege. n12

*Id.* at 7-8. Citing Supreme Court Standard 503-Lawyer Client Privilege, the American Bar Association (ABA) Model Rules of Professional Conduct, the ABA Model Code of Professional Responsibility, the Texas Disciplinary Rules of Professional Conduct, and the Fifth Circuit's decision in *Doe v. A Corp.*, 709 F.2d 1043 (5th Cir. 1983) (allowing former in-house counsel to prosecute action in his own behalf using confidential information outside the

2004 DOL Ad. Rev. Bd. LEXIS 19, *30
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

attorney-client privilege), the Secretary held that the report could be introduced into evidence and relied upon under [*31] both federal and Texas law allowing attorneys to defend themselves against client accusations of wrongdoing. *Id.* at 8-10. The Secretary specifically noted that "application of a privilege is a matter of federal law in a case such as this arising under the laws of the United States." *Id.* at 9, n.4.

> n12 The Fifth Circuit had made it clear that Coastal could not allow its witnesses to testify about the report without waiving its privilege claim. *In re Willy,* 831 F.2d at 548.

The Secretary also declined to continue the ALJ's March 15, 1988 order sealing the record.

With regard to the ALJ's recommendation that no relief be granted Willy because of his deceptive testimony regarding his post-termination employment status, the Secretary questioned whether the Acts permitted the denial of back pay to a successful claimant. The Secretary noted that the language of the Acts regarding relief is mandatory. Thus, if there is a violation of the whistleblower provisions, the "Secretary shall" [*32] order relief, including back pay. *Id.* at 22. Moreover, even if the Acts allowed the Secretary discretion to deny a back pay award, the Secretary ruled that he would not exercise that discretion in this case:

> The central purpose of the environmental whistleblower laws, to protect whistleblowers and in so doing to protect public health and safety, would be frustrated if all relief were denied even though the Secretary has found a violation . . . .

*Id.* at 24-26 (footnote omitted).

The Secretary remanded the case to the ALJ to calculate back pay based on the difference between what Willy would have earned if he had continued to be employed by Coastal and the amount he earned or with reasonable diligence could have earned from the date of his termination to the date of his subsequent discharge from the Merichem Corporation, whose employment he had concealed from the ALJ. Since Merichem terminated Willy for paying insufficient attention to his duties, the Secretary found that Willy's right to back pay was cut off as of the date of that termination. *Id.* at 27. n13

> n13 The Secretary declined to continue the ALJ's March 15, 1988 order sealing the record. *Id.* at 12.

[*33]

The Fifth Circuit denied Coastal's petition for review of the Secretary's decision on October 3, 1994. *Coastal Corp. v. Reich,* No. 94-40334. The Secretary denied reconsideration of his decision on July 13, 1995.

**8. ALJ decisions on damages, fees and costs; appeal to ARB**

Following the Secretary's remand for the fashioning of remedial relief, on June 19, 1996, the Chief ALJ requested clarification of the Secretary's decision regarding exemplary damages. On July 1, 1996, the Administrative Review Board, having succeeded the Secretary in the decisional process, n14 directed the ALJ to consider awarding exemplary damages. The ALJ then issued a May 8, 1997 Recommended Decision and Order on Damages, Fees and Costs and a December 4, 1997 Order Recommending Correction of Recommended Decision and Order on Damages, Fees and Costs to correct his previous calculation of interest. n15 Willy and Coastal appealed to the Administrative Review Board. Those appeals are now pending before us.

> n14 Sec. Ord. 2-96, 61 Fed. Reg. 19,978, May 3, 1996, establishing the Administrative Review Board.

[*34]

2004 DOL Ad. Rev. Bd. LEXIS 19, *34
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

n15 The ALJ did not recommend exemplary damages.

**B. Proceedings on separate Texas wrongful discharge complaint**

Willy's Texas action began in November 1985, following the ALJ's first decision recommending dismissal. Willy alleged that he was wrongfully discharged under the Texas public policy exception to the employment-at-will doctrine. As established by the Supreme Court of Texas, "that narrow exception covers only the discharge of an employee for the sole reason that the employee refused to perform an illegal act." *Sabine Pilot Service, Inc. v. Hauck*, 677 S.W.2d 733, 735 (Tex. 1985).

**1. Coastal's removal to United States District Court; Fifth Circuit's remand to Texas state court**

After Coastal removed the action from the Texas state court to the United States District Court for the Southern District of Texas, the district court dismissed the action. The district court interpreted the Texas Canons of Ethics and the Disciplinary Rules for attorneys as precluding a cause of action for termination of an attorney's services under *Sabine Pilot.* The court held [*35] that under these disciplinary rules, if an attorney believed that his client was intent upon pursuing an illegal act, the attorney's option was to voluntarily withdraw from employment, but if he chose to remain, the client was free to terminate his employment with impunity. *Willy v. Coastal Corp.*, 647 F. Supp. 116, 118 (S.D. Tex. 1986).

The United States Court of Appeals for the Fifth Circuit subsequently held that Willy's case was improvidently removed and that the district court lacked subject matter jurisdiction. Accordingly, it reversed the judgment of the district court and directed that the action be remanded to the Texas state courts. *Willy v. Coastal Corp.*, 855 F.2d 1160, 1173 (5th Cir. 1988), n16

n16 The Fifth Circuit also upheld the district court's decision to award Rule 11 sanctions against Willy and his attorney, but remanded the case to the district court to determine the amount. *Id.* On remand, the district court recomputed and imposed sanctions in the amount of $ 19,307, the amount of attorney's fees that Coastal had incurred in responding to Willy's sanctionable conduct. The Court of Appeals affirmed. *Willy v. Coastal Corp.*, 915 F.2d 965, 967 (5th Cir. 1990). It noted that the sanctions "were imposed for the filing of misleading and ill founded pleadings, the use of the discovery process to harass opposing parties, repeated references to non-existent disciplinary and evidentiary rules, baseless allegations of conflict of interest, and the filing of the infamous 110-page summary judgment motion accompanied by reams of irrelevant and unorganized material." 915 F.2d at 966, n.3. The United States Supreme Court affirmed the Court of Appeals' judgment, ruling that "the interest in having rules of procedure obeyed . . . does not disappear upon a subsequent determination that the court was without subject--matter jurisdiction." *Willy v. Coastal Corp.*, 503 U.S. 131, 139 (1992).

[*36] **2. Texas trial court's award of damages; appellate court's reversal on ground that Willy could not prove case without violating client confidences**

Following remand to the Texas state courts, Willy claimed at trial that Coastal discharged him for refusing to change his proposed Belcher Report. He testified that "they didn't like what I said in the Belcher Report and wanted to try to bury it so they wouldn't have to spend the money at Belcher . . . to comply with the environmental laws." *Willy v. Coastal States Mgmt. Co.*, 939 S.W.2d 193, 197 (Tex. App. -- Houston [1st Dist.] 1996). A jury found in his favor and awarded him actual and punitive damages. *Id.* at 194.

2004 DOL Ad. Rev. Bd. LEXIS 19, *36
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

On appeal, the Court of Appeals of Texas reversed the judgment of the trial court. The court held that an attorney's status as an in-house counsel did not preclude him from maintaining a claim for wrongful termination under *Sabine Pilot* "*if* the claim can be proved without any violation of the attorney's obligation to respect client confidences and secrets." *Willy,* 939 S.W.2d at 200 (emphasis in original). Under the Texas [*37] Code of Professional Responsibility in effect at the time he brought his suit and applicable to the state proceeding, "confidence" referred to "information protected by the attorney-client privilege under applicable law", Disciplinary Rule (DR) 4-101(A), and "secret" referred to "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." *Id.*

Under the Texas Code, a lawyer was prohibited from knowingly revealing client confidences or secrets, DR 4-101(C), except in limited circumstances. The appellate court interpreted the crime-fraud exception, DR 4-101(C)(3), permitting disclosure of confidential information to prevent a client from committing a crime, as inapplicable. "Willy's intention is to use client confidences to prove he was wrongfully terminated, not to prevent Coastal from committing a crime in the future." *Willy,* 939 S.W.2d at 200.

The appellate court then interpreted the Texas Code's self-defense provision that a lawyer could reveal "confidences or secrets necessary . . . to defend himself [*38] . . . against an accusation of wrongful conduct," DR 4-101(C)(4), as not permitting offensive use of privileged information by an attorney. As the court stated, "The rule does not provide that an attorney could reveal client confidences and secrets when necessary to prove a claim against the client. Willy has provided no authority, and we can find none, to support his assertion that he is entitled to reveal confidential information in order to prove his claim of wrongful termination." *Willy,* 939 S.W.2d at 200 (footnote omitted).

After examining the evidence, including Willy's draft Belcher Report, *id.* at 195, the Texas Court of Appeals concluded that Willy could not prove his claim without violating his professional obligation to maintain Coastal's confidences under the Texas Code of Professional Responsibility. Accordingly, it reversed the judgment of the trial court and rendered judgment for Coastal. *Id.* at 200-01. n17

> n17 *See* concurring opinion of Supreme Court of Texas justices in withdrawing writ of error in *Willy v. Coastal States Mgmt. Co., Inc.,* 977 S.W.2d at 567 ("The [appeals] court then proceeded to examine the evidence and held that Willy could not prove his claim without violating his ethical obligations to maintain Coastal's confidences.").

[*39]

Willy then petitioned the Supreme Court of Texas for a writ of error, which was initially granted. However, the Texas high court subsequently withdrew its order as improvidently granted. *Willy v. Coastal States Mgmt. Co., Inc.,* 977 S.W.2d 566 (Tex. 1998).

## C. ARB's November 2002 request for briefing

Following the ALJ's 1997 recommendations for remedial relief, Coastal filed a Motion to Dismiss on November 19, 1999, arguing that the Texas courts' judgment against Willy on his state claim of retaliatory discharge was fatal to his federal whistleblower claim because of the federal Full Faith and Credit Act and the related doctrine of collateral estoppel. Coastal argued that the state court judgment holding that Willy could not violate the Texas Code of Professional Responsibility to prove a state law claim of wrongful discharge had preclusive effect on Willy's case still pending before the Board.

The Texas decision had reached a result contrary to the Secretary's June 1, 1994 Final Decision and Order which ruled that privileged material (the Belcher report and related testimony) could be introduced under the defense against wrongdoing exception to attorney-client [*40] privilege under the federal rules of evidence and the Texas rules of ethics. Given the conflicting outcomes in the DOL and Texas Willy cases and the overall importance of the issue

2004 DOL Ad. Rev. Bd. LEXIS 19, *40
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

(whether an attorney could use privileged information to prosecute an environmental whistleblower claim), the Board decided to reconsider the Secretary's prior ruling.

On November 6, 2002, the Board requested briefings by the parties on whether the federal or state law of attorney-client privilege applied to Willy's Belcher Report drafts and related testimony; whether Willy's duty of confidentiality to Coastal precluded him from introducing evidence or testimony obtained through his work on the Belcher Report; whether the environmental statutes at issue negate or modify the dictates of attorney-client privilege and/or attorney-client confidentiality; whether Willy can establish that he engaged in protected activity if he is precluded from relying upon the Belcher Report drafts and/or testimony concerning their contents; and whether Coastal waived the attorney-client privilege. n18

        n18 *See* n.11.

[*41]

    Having reviewed the parties' submissions, n19 and mindful of the importance of both protecting whistleblowers from retaliation and preserving the attorney-client privilege, we now proceed to a final disposition of this case.

        n19 The Assistant Secretary declined to file a brief.


STANDARD OF REVIEW

    The Secretary has delegated authority to the Administrative Review Board to issue final decisions in appeals under the whistleblower provisions of the federal environmental statutes at 29 C.F.R. § 24.1. Sec'y Ord. 1-2002, 67 Fed. Reg. 64272 (Oct. 17, 2002). Under the Administrative Procedure Act, the Board is not bound by the findings and conclusions of the ALJ, but retains freedom to review factual and legal determinations de novo. *Trachman v. Orkin Exterminating Co., Inc.,* ARB No. 01-067, ALJ No. 2000-TSC-3, slip op. at 2 (ARB Apr. 25, 2003); *Jenkins v. United States Envtl. Prot. Agency,* ARB No. 98-146, ALJ No. 88-SWD-2, slip op. at 11-12 (ARB Feb. 28, 2003); *Masek v. Cadle Co.,* [*42] ARB No. 97-069, ALJ No. 95-WPC-1, slip op. at 7 (ARB Apr. 28, 2000).

ISSUES

    At issue are: (1) whether the law of the case doctrine prevents the Board from reconsidering prior orders, including the Secretary's Final Decision and Order of June 1, 1994; (2) whether the final judgment in Willy's Texas wrongful discharge claim preventing use of client confidences is binding on Willy's federal whistleblower claim; (3) whether Coastal waived attorney-client privilege prior to or in the prosecution of the whistleblower claim; (4) whether an exception to the federal common law of attorney-client privilege would allow introduction of the Belcher report and related testimony to prove an affirmative case against Willy's employer; and (5) whether Willy can prevail in his whistleblower claim if privileged material is excluded.

DISCUSSION

I. Law of the Case Doctrine Does Not Prevent Reconsideration

    We begin with whether the "law of the case doctrine" prevents the Board from reconsidering prior DOL orders, including the Secretary's June 1, 1994 decision that allowed Willy to use the Belcher Report drafts and related evidence to establish his whistleblower complaint.

    The doctrine of [*43] the law of the case "posits that when a court decides upon a rule of law, that decision should

continue to govern the same issues in subsequent stages of the same case." *Christianson v. Colt Indust. Operating Corp.,* 486 U.S. 800, 816-17 (1988). Nevertheless, "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loath to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Id.* at 817 (citation and quotation omitted); *Arizona v. California,* 460 U.S. 605, 618 n.8 (1983). Before entry of final judgment, "a motion to consider a *ruling* is constrained only by the doctrine of law of the case. And that doctrine is highly flexible, especially when a judge is being asked to reconsider his own ruling." *Pickett v. Prince,* 207 F.3d 402, 407-08 (7th Cir. 2000) (emphasis in original). By allowing a court to correct its mistake, the doctrine has the salutary effect of possibly limiting or altogether [*44] curtailing a subsequent appeal in the case. *Id.* at 408. "It is appropriate for an appellate court to reconsider a decision made in an earlier appeal in exceptional circumstances, such as where there has been an intervening change in the law, where new evidence has become available, or where reconsideration is necessary to prevent, clear error or a manifest injustice." *Al Tech Specialty Steel Corp. v. Allegheny Int'l Credit Corp.,* 104 F.3d 601, 605 (3d Cir. 1997).

Applying law of the case principles, the ARB has previously reconsidered and reversed its prior rulings in the same case. *See, e.g., Rund v. Westinghouse Hanford Co.,* ARB No. 99-023, 028, ALJ No. 88-ERA-33, slip op. at 14 (ARB Apr. 19, 2002) (reversing decision to disapprove settlement agreement); *In re United States Postal Serv. ANET and WNET Contracts,* ARB No. 98-131, slip op. at 12 (ARB Aug. 4, 2000) (rescinding Board's prior legal statement that Wage and Hour Administrator did not have authority to issue wage determinations challenged in the proceeding).

Similarly, the law of the case doctrine does not prevent reconsideration of previous orders in this [*45] case, including the Secretary's June 1, 1994 decision. Despite the lengthy history of this case, no final decision has been issued by the Secretary; in fact, among those matters pending before us on appeal are the ALJ's May 8, 1997 and December 4, 1997 Recommended Orders on Damages, Fees and Costs. The Texas state court judgment (precluding use of client confidences and secrets to prove a state law wrongful discharge claim) was a significant intervening event. For reasons we later discuss, we have concluded that the Secretary's June 1, 1994 decision erroneously permitted use of the Belcher evidence. Thus, we correct clear error and manifest injustice before issuing a final decision of the DOL.

Our failure to adhere to a prior ruling does not prejudice Willy within the meaning of the law of the case doctrine. "The decision whether or not to apply law-of-the-case is . . . informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." *Prisco v. A & D Carting Corp.,* 168 F.3d 593, 607 (2d Cir. 1999) (citation and quotation omitted). "Prejudice in this context does not mean [*46] harm resulting from the failure to adhere to the prior decision, but instead refers to a lack of . . . sufficient opportunity to prepare armed with the knowledge that the prior ruling is not deemed controlling." *Id. See also Phoenix Racing, Ltd. v. Lebanon Valley Auto Racing Corp.,* 53 F. Supp. 2d 199, 218-19 (N.D.N.Y. 1999); *Page Mill Asset Mgmt. v. Credit Suisse First Boston,* 2001 WL 863552 at *2 (S.D.N.Y. July 30, 2001).

The Board's December 1999 briefing order regarding Coastal's dismissal motion and its November 2002 briefing order on attorney-client privilege and related matters provided Willy with notice that the Board would reconsider the Secretary's ruling on attorney-client privilege and offered him an opportunity to respond. Indeed, the latter notice specifically stated that the "law of the case" doctrine did not prevent reconsideration of the Secretary's ruling. Willy took full advantage of these briefing orders through responses that argued his legal position. Hence, we deny the claim of prejudice.

## II. Texas Decision Does Not Collaterally Estop ARB

We next address Coastal's argument that the Texas decision [*47] in Willy's parallel state action for retaliatory discharge, *Willy v. Coastal States Mgmt. Co.,* 939 S.W.2d 193 (Tex. App. -- Houston [1st Dist.] 1996), *writ dism'd as improvidently granted,* 977 S.W.2d 566 (Tex. 1998), should be accorded collateral estoppel effect under the Full Faith and Credit Act with regard to the admissibility of the Belcher Report.

2004 DOL Ad. Rev. Bd. LEXIS 19, *47
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

The U.S. Constitution requires that a state give full faith and credit to the results of a judicial proceeding in another state. n20 In implementing the Full Faith and Credit Clause, the Full Faith and Credit Act, 28 U.S.C. § 1738 (2000), instructs a federal court to give preclusive effect to the judgment of a state court whenever the courts of the forum state would do so. n21 Accordingly, if the courts of Texas would give preclusive effect to the decision in *Willy v. Coastal States Mgmt. Co.*, so must the ARB. *Graybill v. United States Postal Serv.*, 782 F.2d 1567, 1571 (Fed. Cir. 1986) (under Full Faith and Credit Act, quasi-judicial federal agency (MSPB) will apply collateral estoppel to judgment of [*48] state agency). At issue here is collateral estoppel. "Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude the relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980), *Accord Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 77 n.1 (1984). n22

> n20 "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." U.S. Const. Art. IV, § 1.

> n21 "The . . . judicial proceedings of any court of any . . . State . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . ." 28 U.S.C. § 1738 (2000).

> n22 We are not concerned with res judicata or claim preclusion. "Under *res judicata*, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen*, 449 U.S. at 94. *Accord Migra*, 465 U.S. at 77 n.1. The Texas state courts lacked jurisdiction over Willy's whistleblower claim arising under federal statutory law. No one has suggested that the Secretary does not have jurisdiction to issue a final decision because the claim was or should have been litigated in the Texas court.

[*49]

Thus, our inquiry is whether under the Texas rule of collateral estoppel we must give full faith and credit to the Texas decision on Willy's wrongful discharge claim. *See In the Matter of Schwager*, 121 F.3d 177,181 (5th Cir. 1997) (looking to Texas rule on collateral estoppel in federal bankruptcy case); *Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1166 (5th Cir. 1981) (when federal court concerned with collateral estoppel effect of prior state determination, the state's law of collateral estoppel applies). Under Texas law, collateral estoppel bars relitigation by parties to a previous action of (1) an identical issue of law or fact, (2) actually litigated, (3) which was essential to judgment in the prior action. "Once an actually litigated and essential issue is determined, that issue is conclusive in a subsequent action between the same parties." *Van Dyke v. Boswell*, 697 S.W.2d 381, 384 (Tex. 1985). The doctrine only precludes the relitigation of *identical* issues of fact or law that were actually litigated. *Piggly Wiggly Clarkville*, 83 F. Supp. 2d at 794 (citing [*50] *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 721 (Tex. 1990)); *Matter of Pancake*, 106 F.3d 1242, 1244 (5th Cir. 1997); *United States v. Lockheed Martin Eng'g and Sciences Co.*, 186 F. Supp. 2d 711, 713-14 (S.D. Tex. 2002).

Applying this test to the matter before us, we note that the parties to the Texas action were Willy and Coastal. The Texas case arose exclusively under state law, namely a public policy exception to the employment-at-will doctrine that protected an employee from discharge for refusing to perform an illegal act. *See Sabine Pilot Serv., Inc. v. Hauck*, 677 S.W.2d 733, 735 (Tex. 1985). The issue actually decided on appeal was that Willy could not avail himself of the self-defense exception to the Texas Code of Professional Responsibility, DR 4-101(C)(4), to reveal client "confidences or secrets" to assert an affirmative claim against his employer for wrongful discharge. *Willy*, 939 S.W.2d at 200. That ruling was essential to the judgment. Without improperly disclosing "client confidences," Willy could not prove [*51] his claim. Therefore, the court of appeals reversed the judgment of the trial court and rendered judgment for Coastal. *Id.* at 200-01.

Importantly, the Texas judgment was based solely on the Texas Code of Professional Responsibility. Texas also had an evidentiary rule on attorney-client privilege, which exempts from the privilege "a communication relevant to an issue of breach of duty . . . by a client to the lawyer." Texas Rules of Evidence, Rule 503(d)(3). n23 Hence, whether Coastal as client had breached a duty to Willy as its lawyer was not decided, but is an issue necessary to our decision.

n23 Texas Rules of Evidence, Rule 503(b)(1) provides the general rule: "A client has a privilege to prevent any other person from disclosing confidential communications [between the client and the client's lawyer] made for the purpose of facilitating the rendition of professional legal services." The Rule recognizes exceptions to the privilege for: "*Furtherance of crime or fraud*" where "the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud," Rule 503(d)(1) (emphasis in original); and "*Breach of duty by a lawyer or client*": "As to a communication relevant to an issue of breach of duty by a lawyer to the client or by a client to the lawyer." Rule 503(d)(3).

[*52]

The parties in Willy's DOL environmental whistleblower action are the same as the Texas case, Willy and Coastal. However, the issues to be decided in the DOL case arise under federal rather than state law: whether Willy was discharged in part for engaging in activities protected by the federal statutes (i.e., complaining through the Belcher report that his employer was not in compliance with environmental laws). The elements of the causes of action and proof are different in the state and federal claims. The issue actually litigated and which was essential to the judgment in the Texas action was whether an exception to the Texas Code of Professional Responsibility would permit Willy to expose "client confidences and secrets" to prove an affirmative claim against his employer. The Texas rules of evidence were not at issue.

In contrast, the issue actually litigated and which is essential to the judgment in the DOL action is whether an exception to the federal common law of attorney-client privilege would allow introduction of the Belcher report and related testimony to prove an affirmative case against Willy's employer. Willy himself characterized the Belcher report as "CONFIDENTIAL [*53] -- LEGAL WORK PRODUCT." (CX 84). He sought discovery of the Belcher report and other evidence relating to the Belcher facility, to which Coastal objected, and the ALJ ordered discovery as essential to Willy's claim. *See* ALJ Order, Feb. 27, 1985. After the Fifth Circuit declined to intervene in the discovery dispute, the ALJ admitted Willy's draft copies of the Belcher report with his employer's hand-written comments (CX 81, 84) at the evidentiary hearing over Coastal's objection. Nov. 29, 1998 R. D. & O. And the Secretary's June 1, 1994 Remand Order concluded that the Belcher report had been properly admitted under the defense of wrongdoing exception to the federal common law of attorney-client privilege.

In short, the Texas judgment, although persuasive, is not controlling. While the Texas and DOL cases take parallel paths to a similar destination, their issues are not *identical*. Therefore, the ARB is not barred by collateral estoppel from reaching an independent conclusion on the use of privileged materials in Willy's federal whistleblower case.

## III. Coastal's Preservation of the Privilege

Coastal did not waive the attorney-client privilege. Willy argues that Coastal [*54] waived the attorney-client privilege when it made the quality of his advice on Belcher an issue in his firing. Under the "at issue" or implied waiver principle, a party may waive the privilege by asserting claims or defenses that put his attorney's advice in issue in the litigation. *United States Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 212 (3d Cir. 1999) (quoting *Rohno-Poulene Rores, Inc. v. Home, Indem.*, 32 F.3d 851, 863 (3d Cir. 1994)); *United States v. Workman*, 138 F.3d 1261, 1263-64 (8th Cir. 1998); *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *Conkling v. Turner*, 883 F.2d 431, 434 (5th Cir. 1989); *Apex Mun. Fund v. N-Group Sec.*, 841 F. Supp. 1423, 1430-32 (S.D. Tex. 1993). However, Coastal did not raise the issue of Willy's competence as an attorney in drafting the Belcher Report as an affirmative defense in this

2004 DOL Ad. Rev. Bd. LEXIS 19, *54
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

proceeding. Rather than Willy's work as an attorney, Coastal's defense was predicated on its perception of Willy as a Coastal employee, in particular his lying [*55] about having a conversation with the TDWR. R. D. & O. at 22, 25-26; Sec. Fin. Dec. and Ord. at 1, 7, 17, 21. Accordingly, Willy's Belcher drafts and his related testimony cannot be accepted as evidence based on the "at issue" exception.

Willy also argues that Coastal waived the privilege by providing a copy of the Belcher Report to the Florida Department of Environmental Regulation. *See United States v. Massachusetts Inst. of Tech.,* 129 F.3d 681 (1st Cir. 1997); *In re Steinhardt Partners, L.P.,* 9 F.3d 230 (2d Cir. 1993); *Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414 (3d Cir. 1991); *In re Subpoenas Duces Tecum,* 738 F.2d 1367 (D.C. Cir. 1984); *Messagephone, Inc. v. SVI Sys., Inc.,* 1998 WL 812397 (N.D. Tex. Nov. 18, 1998). He states that this can be confirmed by contacting the agency and by an exhibit, which he believes to be contained in the record. We have found no such document. Contacting the Florida agency on Willy's behalf would be inconsistent with our adjudicatory role under 29 C.F.R. § 24.8 and the [*56] concept of a closed record for decision. *See* 29 C.F.R. §§ 18.54, 24.6(e)(2), and 24.8. At most, the record consists of Willy's testimony at the hearing that Troy Webb had told him that he had sent a copy of the Belcher Report to the Florida environmental authorities. The ALJ rejected this statement as hearsay in view of Webb's death. T. 159-60. Willy testified that he had seen Webb's version in April or May 1984, that it differed from Willy's version, and that he was sure that it was in Coastal's files and had not been produced. T. 160-62.

In any event, even if the record reflected that a later version of the Belcher Report was sent to the Florida agency, that would not constitute a waiver of the attorney-client privilege with respect to Willy's earlier, and presumably more critical version, which is the focus of this proceeding. At most, that act would waive the privilege only for the version allegedly released to the state agency since Willy's proposed version was intended to remain confidential. *Apex Mun. Fund v. N-Group Sec.,* 841 F. Supp. at 1427-28 (preliminary drafts of documents and communications made between attorney and client during drafting [*57] process are privileged; only those parts of attorney-client documents that ultimately appear in published documents are outside the privilege); *Schenet v. Anderson,* 678 F. Supp. 1280, 1283 (E.D. Mich. 1988) (privilege is waived only as to those portions of preliminary drafts ultimately revealed to third parties); *In re Kidder Peabody Sec. Litig.,* 168 F.R.D. 459, 474 (S.D.N.Y. 1996) (neither public release of corporate counsel's report on internal investigation nor its use in administrative, arbitration, and litigation contexts waived attorney-client privilege for prior undisclosed drafts).

Finally, it is obvious that Coastal assiduously protected its attorney-client privilege throughout the course of these proceedings. When Willy sought extensive discovery, Coastal objected on the ground of attorney-client and work-product privilege and litigated its position before the ALJ and the Fifth Circuit. At the evidentiary hearing before the ALJ, Coastal objected to admission of Willy's draft copies of the Belcher report, and declined to offer exhibits and elicit testimony that might have compromised its position on privilege. [*58] *See* Sec. Fin. Dec. & Ord. at 8. Thus, we find and conclude that Coastal did not voluntarily waive the privilege.

## IV. Reconsideration of the Secretary's 1994 Decision on Attorney-Client Privilege

No exception to the federal common law of attorney-client privilege would allow introduction of the Belcher report and related testimony to prove an affirmative case against Willy's employer.

## A. Applicability of the federal common law of attorney-client privilege

The issue of attorney-client privilege in Willy's federal environmental whistleblower claim is an evidentiary matter, *see Doe v. A Corp.,* 709 F.2d 1043, 1046 (5th Cir. 1983), that should be resolved as a question of federal law. *National Mortgage Equity Corp. Sec. Litig.,* 120 F.R.D. 687, 690 (C.D. Cal. 1988); *Wilkinson v. FBI,* 111 F.R.D. 432 (C.D. Cal. 1986); Fed. R. Evid. § 501; 29 C.F.R. § 18.501. Because Congress has not provided any exception to the rule on attorney-client privilege in the environmental whistleblower Acts, we look to the federal common law for resolution.

At the time of the evidentiary hearing on Willy's complaint [*59] before the ALJ, the ALJ rules on evidence at 29

2004 DOL Ad. Rev. Bd. LEXIS 19, *59
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

C.F.R. § 18.44(a) (1987) n24 required that "unless otherwise provided by statute or these rules, and where appropriate, the Federal Rules of Evidence may be applied to all proceedings held pursuant to these rules." Thus, this provision incorporated the longstanding Fed. R. Evid. § 501 (2003) on privilege, which provides:

> Except as otherwise required by the Constitution of the United States, or provided by Act of Congress, or by rules or regulations prescribed by the administrative agency pursuant to statutory authority, or pursuant to executive order, *the privilege of a witness*, person, government, State, or political subdivision thereof *shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.* However with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State or political subdivision thereof shall be determined in accordance with State law.

(emphasis added).

n24 In 1990, prior to the Secretary's 1994 ruling on attorney-client privilege, 29 C.F.R. § 18.44 on evidence was replaced by a new Subpart B on Rules of Evidence, 55 Fed. Reg. 13218 *et seq.* (Apr. 9, 1990). Now 29 C.F.R. § 18.501 on privilege specifically incorporates the language of Fed. R. Evid. § 501 (substituting the words "rules or regulations prescribed by the administrative agency pursuant to statutory authority or pursuant to executive order" for "rules prescribed by the Supreme Court pursuant to statutory authority"). 55 Fed. Reg. at 13221.

29 C.F.R. § 18.501 (2002), as adopted in 1990, specifically states:

> Except as otherwise required by the Constitution of the United States, or provided by Act of Congress, or by rules or regulations prescribed by the administrative agency pursuant to statutory authority, or pursuant to executive order, *the privilege of a witness*, person, government, State, or political subdivision thereof *shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.* However with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State or political subdivision thereof shall be determined in accordance with State law.

(emphasis added). Hence, both 29 C.F.R. § 18.44 and substituted § 18.501 require adherence to Fed. R. Evid. § 501 with regard to privilege determinations.

[*60]

In the absence of exceptions specified in Fed. R. Evid. § 501, the federal common law, i.e., case law ("the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience"), governs adjudication of questions of attorney-client privilege. *See, e.g., United States v. Zolin*, 491 U.S. 554, 562 (1989); *Upjohn v. United States*, 449 U.S. 384, 386-89 (1981); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1368-69 (10th Cir. 1997); *United States v. Moore*, 970 F.2d 48, 49-50 (5th Cir. 1992); *Dombrowski v. Bell Atlantic Corp.*, 128 F. Supp. 2d 216, 218, n.2 (E.D. Pa. 2000); *Mason v. Stock*, 869 F. Supp. 828, 832 (D. Kan. 1994). Therefore, federal caselaw determines the issue of attorney-client privilege in Willy's federal environmental whistleblower claim.

Coastal's reliance on the second sentence in § 18.501 ("an element of a claim or defense as to which State law supplies the rule of decision") for application of Texas attorney-client privilege [*61] law as interpreted by the Texas appellate court in *Willy* is misplaced because that provision under corresponding language in Fed. R. Evid. § 501 pertains to cases predicated on diversity of citizenship jurisdiction, rather than those based on federal question

jurisdiction. *Wylie v. Marley*, 891 F.2d 1463, 1464-71 (10th Cir. 1989); *Consolidated Health Plans, Inc. v. Principal Performance Group, Inc.*, 2003 WL 1193663 at *4 and cases cited (E.D. La. Mar. 14, 2003); *Leonen v. Johns-Manville*, 135 F.R.D. 94, 98 (D.N.J. 1990); *Fine v. Facet Aerospace Products Co.*, 133 F.R.D. 439, 443 (S.D.N.Y. 1990). Since Willy's action before this Board clearly involves federal question jurisdiction premised on the federal environmental whistleblower statutes, we are not required to apply Texas attorney-client privilege law to this proceeding. *United States v. Wilson*, 960 F.2d 48, 50 (7th Cir. 1992); *Jackson v. Brinker*, 147 F.R.D. 189, 194 (S.D. Ind. 1993). Nevertheless, that does not signal that a different result would [*62] obtain under Texas law, since the Texas Rule of Evidence on attorney-privilege, Rule 503, see note 23, supra, matches proposed Supreme Court [Evidence] Standard 503, which we discuss below.

**B. The federal common law on attorney-client privilege and its pertinent exceptions**

The attorney-client privilege promotes trust in the representational relationship and facilitates the provision of legal services. *See, e.g., Commodities Future Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1984); *Upjohn Co. v. United States*, 449 U.S. 383, 389-90 (1981); *Trammel v. United States*, 445 U.S. 40, 51 (1980); *United States v. The El Paso Co.*, 682 F.2d 530, 538 (5th 1982). Protecting the privilege "is not without its costs" since it has the effect of withholding relevant information from the factfinder. *United States v. Zolin*, 491 U.S. 554, 562 (1989). However, without the privilege the client may not have made such communications in the first place. *Swidler & Berlin v. United States*, 524 U.S. 399, 408-09 (1988), [*63]

Although not enacted by Congress (as are the Federal Rules of Evidence), Supreme Court Standard 503, "sets forth the basic doctrines applicable to the lawyer--client privilege recognized in the federal courts . . . [and] is an excellent distillation of the principles governing application of the privilege." 3 WEINSTEIN'S FEDERAL EVIDENCE § 503-1 (Matthew Bender 2d ed.). *See Apex Mun. Fund v. N-Group Sec.*, 841 F. Supp. 1423, 1429, n.5 (D. Tex. 1993) (federal courts have uniformly held that Supreme Court Standard 503 reflects the federal common law attorney-client privilege). Supreme Court [Evidence] Standard 503 reads in part:

> (b) General Rule of privilege.--A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative
>
> * * * *
>
> (d) Exceptions.--There is no privilege under this rule:
>
> (1) Furtherance of crime or fraud.--If the services of the lawyer were sought or obtained to enable or aid anyone to commit or [*64] plan to commit what the client knew or reasonably should have known to be a crime or fraud; or
>
> * * * *
>
> (3) Breach of duty by lawyer or client.--As to a communication relevant to an issue of breach of duty by the lawyer to his client or by the client to his lawyer.

Supreme Court Standard 503(b) and (d)(1) and (3), *reprinted in* WEINSTEIN § 503 App.01[1] at 503 App.-2.

According to the general rule, Supreme Court Standard 503(b), communications between attorney and client are protected by the attorney-client privilege when engaged in for the purpose of soliciting and/or providing legal opinions and advice. *See, e.g., Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1370 (10th Cir. 1997); *In re Grand Jury Investigation*, 974 F.2d 1068, 1070 (9th Cir. 1992); *Arcuri v. Trump Taj Mahal Associates*, 154 F.R.D. 97, 103 (D.N.J. 1994); *Apex Mun. Fund*, 841 F. Supp. at 1426; *Equal Employment*

2004 DOL Ad. Rev. Bd. LEXIS 19, *64
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

*Opportunity Comm'n v. Fina Oil and Chem. Co.,* 145 F.R.D. 74, 76 (E.D. Tex. 1992); [*65] *Olen Properties Corp. v. Sheldahl, Inc.,* 1994 WL 212135 at *1 (C.D. Cal. Apr. 12, 1994). Such privileged communications include preliminary drafts of legal opinions and advice. *United States v. Lockheed Martin Corp.,* 995 F. Supp. 1460, 1465 (M.D. Fla. 1998); *In re Kidder Peabody Sec. Litig.,* 168 F.R.D. 459, 474 (S.D.N.Y. 1996); *Apex Mun. Fund,* 841 F. Supp. at 1427-28; *Schenet v. Anderson,* 678 F. Supp. 1280, 1283-84 (E.D. Mich. 1988).

Under the first exception to the privilege, Supreme Court Standard 503(d)(1) for crime-fraud, otherwise privileged communications are not protected from disclosure if they are meant to further future or ongoing criminal, fraudulent or other unlawful conduct. The federal court will conduct a two-part inquiry:

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when the client sought the advice of counsel, that the client was planning such conduct when the client sought the advice of counsel, or that the client committed a crime or fraud subsequent [*66] to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

WEINSTEIN § 503.31[4][a]. *See United States v. Zolin,* 491 U.S. at 562-63; *In re Grand Jury Investigation,* 974 F.2d 395 at 1071; *In re Sealed Case,* 754 F.2d 395, 399 (D.C. Cir. 1985); *Industrial Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elec. Co.,* 953 F.2d 1004, 1008 (5th Cir. 1992); *In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1038 (2d Cir. 1984); *Derrick Mfg. Corp. v. Southwestern Wire Cloth, Inc.,* 934 F. Supp. 813, 815 (S.D. Tex. 1995); *In re In-Store Adver. Sec. Litig.,* 163 F.R.D. 452, 459 (S.D.N.Y. 1995).

Under the second relevant exception to the privilege, Supreme Court Standard 503(d)(3) for breach of duty by attorney of client, "the attorney is permitted to disclose otherwise privileged communications to the extent reasonably necessary [*67] to defend against the charge." WEINSTEIN § 503.33. *See, e.g., Kalyawonga v. Moffett,* 105 F.3d 283, 290 (6th Cir. 1997) (attorney may reveal confidences or secrets necessary to defend against charge of wrongful conduct); *Laughner v. United States,* 373 F.2d 326, 327 n.1 (5th Cir. 1967) (rule that client waives privilege by attacking attorney's performance unanimously adopted). "The exception is required by considerations of fairness and policy when questions arise out of dealings between attorney and client, as in cases of controversy over attorney's fees, claims of inadequacy of representation, or charges of professional misconduct." Advisory Committee Note for Subdivision (d)(3), *reprinted in* WEINSTEIN § 503 App.01[2] at 503 App.-6. WEINSTEIN observes:

> The issue in the dispute between the attorney and client must, of course, be one arising out of the lawyer-client relationship, for example, the duty of the attorney to exercise favorable diligence on behalf of the client, the duty of the attorney to care faithfully and account for the client's property, or the client's duty to pay for the attorney's services.

*Id.* [*68] at § 503.33.

The "self-defense" exception therefore is unique to and "aris[es] out of the lawyer-client relationship," rather than some other or additional relationship in which the lawyer may be involved, such as employee-employer. For example, the client's duty is to pay a fee and the privilege is waived to the extent necessary to collect it. The lawyer's duty is to provide competent services. Hence, the privilege is waived when criminal clients allege ineffective assistance, *see, e.g., Johnson v. Alabama,* 256 F.3d 1156, 1178 (11th Cir. 2001) (defendant waived privilege as to conversations on trial strategy by alleging ineffective assistance), *United States v. Amlani,* 169 F.3d 1189 (9th Cir. 1999) (by claiming he discharged counsel because of prosecutor's disparaging remarks, criminal put communications with counsel at issue), *United States v. Ballard,* 779 F.2d 287 (5th Cir. 1986) (criminal defendant did not waive privilege by suing lawyer for malpractice except to extent necessary for lawyer to defend himself against accusation of wrongdoing), *United States v. Glass,* 761 F.2d 479 (8th Cir. 1985) [*69] (inadequate advice on consequences of guilty plea), *Tasby v. United States,* 504 F.2d 332, 336 (8th Cir. 1974) (ineffective assistance of counsel in post-conviction proceedings), *United States v. Mierzwicki,* 500 F. Supp. 1331, 1335 (D. Md. 1980) (by accusing attorney of incompetence, defendant placed

communications in issue), *Pruitt v. Peyton*, 243 F. Supp. 907, 908-909 (E.D. Va. 1965) (attack on attorney's performance by habeas corpus petitioner), and civil clients assert malpractice, *see, e.g., Garcia v. Zenith Electronics Corp.*, 58 F.3d 1171, 11175 n.1 (7th Cir. 1995) (alleged poor performance by appointed union counsel), *Steinfeld v. Dworkin*, 515 A.2d 1051, 1052 (Vt. 1986) (exception applies where issue was whether attorney had authority to settle lawsuit).

However, as Weinstein notes, the "self-defense" exception cannot be used offensively; the exception is "a shield, not a sword." "This exception to an attorney's duty to guard client confidences creates a *defensive* mechanism for lawyers under siege. The attorney should not [*70] be permitted to use confidential information *offensively.*" WEINSTEIN § 503.33 (emphasis in original; footnote omitted).

For example, in *Siedle v. Putnam Investments, Inc.*, 147 F.3d 7 (1st Cir. 1998), the defendant was a large, multifaceted financial services business. The plaintiff was an in-house attorney who monitored compliance with federal and state securities laws and the company's internal code of ethics. After entering into a termination agreement with a confidentiality provision, a dispute arose over the balance in the plaintiff's retirement account. Press accounts of the controversy surfaced. The plaintiff sued for breach of contract, interference with advantageous business relationships, and conversion. His complaint contained a reference to privileged materials that the defendant wanted to keep sealed based on attorney-client privilege. At issue was the self-defense exception under the state code of ethics. The court observed:

> [The plaintiff] has not pointed us to, and our research has failed to unearth, a single reported case from any jurisdiction in which an attorney has been permitted to use confidential information *offensively* [*71] when the attorney chafed at the client's criticisms of his work (even if the attorney viewed that criticism as defamatory). The only reported case dealing with a similar factual situation holds precisely to the contrary. *See Eckhaus v. Alfa-Laval, Inc.*, 764 F. Supp. 34, 37-38 (S.D.N.Y. 1991) [in-house attorney with defamation suit based on informal charges during a performance review cannot rely on accusation of wrongful conduct exception under code of professional responsibility to permit use of confidential information].

147 F.3d at 11. "We believe that the exception is designed to function only as a shield, not a sword." *Id.*

## C. Willy not entitled to use defense of wrongdoing privilege exception in whistleblower case against Coastal

Based on the foregoing analysis of federal common law of attorney-client privilege and its exceptions, we conclude that the Secretary's June 1, 1994 Remand Order erred by permitting Willy to use the Belcher report and related testimony to prove his whistleblower case against Coastal.

There is no doubt that the drafts of the Belcher Report contain legal opinion and advice and are privileged. [*72] Both his March 9 (CX 81) and March 22, 1984 (CX 84) versions contain summaries of Belcher's compliance status under the environmental laws and recommendations for remediation of perceived legal problem areas. Nov. 29, 1988 R. D. and O. at 23; Sec. Fin. Dec. and Ord. at 3-4. (The March 22 version boldly states "CONFIDENTIAL -- LEGAL WORK PRODUCT."). The report constitutes legal (as distinct from unprotected business) advice and opinion and therefore is within the privilege. *See Boca Investerings P'ship v. United States*, 31 F. Supp. 2d 9, 11-13 (D.D.C. 1998) and cases cited; *United States v. Lockheed Martin Corp.*, 995 F. Supp. at 1464.

Absent an exception to the attorney-client privilege, Willy's versions of the report (including critical annotations) and his testimony regarding Coastal's treatment thereof are inadmissible in view of Coastal's assertion of the privilege. *United States v. Sindona*, 636 F.2d 792, 803-05 (2d Cir. 1980), *Sec. & Exch. Comm'n v. Forma*, 117 F.R.D. 516, 522-23 (S.D.N.Y. 1987).

The crime-fraud exception (Supreme Court Standard 503(d)(1)) [*73] is not applicable. Willy did not make a showing that Coastal was engaged in ongoing crime, fraud, or misconduct relating to federal environmental laws, or that

2004 DOL Ad. Rev. Bd. LEXIS 19, *73
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

his advice was sought to further such violations. On the contrary, Willy's proposed versions of the Belcher Report focus on remediation of perceived violations of the environmental laws.

That leaves the breach of duty or self-defense exception. Relying on Supreme Court Standard 503-Lawyer Client Privilege, the American Bar Association (ABA) Model Rules of Professional Conduct, the ABA Model Code of Professional Responsibility, the Texas Disciplinary Rules of Professional Conduct, and the Fifth Circuit's decision in *Doe v. A Corp.*, 709 F.2d 1043 (5th Cir. 1983) (allowing former in-house counsel to prosecute action in his own behalf using confidential information outside the attorney-client privilege), the Secretary ruled that the Belcher Report could be introduced into evidence under the defense against client accusations of wrongdoing exceptions. We disagree. .

The self-defense exception is tailored to the singular circumstances of the attorney-client relationship and is limited to a breach of duty [*74] a lawyer owes a client, not the broader array of duties an employee owes to his employer, such as promoting harmony with co-workers and dealing honestly with supervisors. Here, Coastal did not assert that Willy breached a duty that he owed the company as its in-house lawyer, such as furnishing sound advice and effective representation. Rather, the wrongdoing he was accused of, and which from Coastal's point of view was central to its discharge decision, related to his conduct as an employee: against a background of interpersonal conflicts with Webb, Willy lied to Dunker about whether he called TDWR. This alleged dishonesty arose out of Willy's employment, not uniquely his attorney-client relationship. Therefore, the Secretary improperly held that the "self-defense" exception was available to Willy to defeat Coastal's preserved assertion of attorney-client privilege. In other words, Willy attempted to use the privilege exception offensively, as a sword, not a shield. We hold that Willy must prove his environmental whistleblower retaliatory discharge complaint, if at all, without the use of material protected under the attorney-client privilege.

Our ruling is confined to "client confidences" [*75] (information protected under the attorney-client privilege) and does not necessarily exclude "client secrets" (other information gained in the professional relationship). It is in accord with other decisions that have permitted former in-house counsel to advance affirmative federal claims against their employers in their individual capacity so long as the attorney-client privilege is not violated.

For instance, *Kachmar v. Sunguard Data Sys., Inc.,* 109 F.3d 173 (3d Cir. 1997) was a former in-house lawyer's action against her employer for retaliatory discharge and sex discrimination under Title VII of the Civil Rights Act of 1964, as amended. Although communications subject to the attorney-client privilege were implicated, they did not compel dismissal of the suit. *Id.* at 179. While the employer retained the right to assert claims of attorney-client privilege to limit the former in-house attorney's proof, some information learned during her employment did not directly relate to her work as an attorney:

> It is premature at this stage of the litigation to determine the range of the evidence Kachmar will offer and whether or [*76] how it will implicate the attorney-client privilege. For example, without deciding the substance of the issue, it is difficult to see how statements made to Kachmar and other evidence offered in relation to her own employment and her own prospects in the company would implicate the attorney-client privilege. It is also questionable whether information that was generally observed by Kachmar as an employee of the company, such as her observations concerning the lack of women in a SunGuard subsidiary, would implicate the privilege. Moreover, there may be a fine but relevant line to draw between the fact that Kachmar took positions on certain legal issues involving SunGard policies, and the substance of her legal opinions.

*Id.* at 181-82. Evidentiary use of confidential information outside the privilege could be protected through equitable measures, such as sealing, protective orders, limited admissibility of evidence and in camera proceedings. *Id.* at 182.

Likewise, in *Doe v. A. Corp.*, 709 F.2d 1043 (5th Cir. 1983), the court prohibited a former in-house lawyer from representing other employees [*77] in an action against his former employer for ERISA benefits, but did not preclude the suit in his personal capacity. He was permitted to use information that he acquired during his employment that was

2004 DOL Ad. Rev. Bd. LEXIS 19, *77
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

not protected by attorney-client privilege. *Id.* at 1050.

### V. Application of Privilege Requires Denial of Willy's Complaint

Since we have determined that the federal common law of attorney-client privilege and its exceptions mandate exclusion of Belcher report and related testimony, we conclude that Willy's environmental whistleblower complaint against Coastal fails.

To prevail on a complaint of unlawful discrimination under the Acts, a complainant has to establish by a preponderance of the evidence that the respondent took adverse employment action against the complainant because he engaged in protected activity. *See, e.g Jenkins v. United States Envtl. Prot. Agency,* ARB No. 98-146, ALJ No. 88 SWD-2, slip op. at 17 (ARB Feb. 28, 2003). *See also Trimmer v. United States Dep't of Labor,* 174 F.3d 1098, 1101 (10th Cir. 1999); *Hasan v. Sargent and Lundy,* ARB No. 01-001, ALJ No. 02-ERA-7, slip op. at 3 (ARB April 30, [*78] 2001). To succeed under a "dual motive" analysis, the complainant must establish that illegal motives (i.e., retaliation for protected activity) played some part in the adverse action (e.g., termination). The respondent employer can avoid liability by proving that the adverse action would have occurred in any event, regardless of the protected activity. *See, e.g., Masek v. The Cadle Co.,* ARB No. 97-069, ALJ No. 95-WPC-1, slip op. at 14-15 (ARB April 28, 2000). *See also Mt. Healthy City Sch. Dist. v. Doyle,* 429 U.S. 274 (1977); *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989); *Pogue v. United States Dep't of Labor,* 940 F.2d 1287, 1289-1290 (9th Cir. 1991).

Willy's complaint was that Coastal took adverse action because of his preparation of the Belcher Report. Affirming a 1987 decision, the Secretary ruled that, as an internal audit of environmental compliance, it constituted protected activity. Sec. Fin. Dec. and Ord. at 13. *See Passaic Valley Sewerage Commissioners v. United States Dep't of Labor,* 992 F.2d 474, 478-80 (3d Cir. 1993). Applying a mixed motive [*79] analysis, and affirming the ALJ's November 29, 1988 recommended decision, the Secretary's June 1, 1994 Remand Order held that Dunker was motivated to fire Willy both because of the Belcher Report (an illegal basis) and what Dunker regarded as Willy's lie in denying the phone call to TDWR (a legitimate, non-discriminatory reason). Sec. Fin. Dec. & Ord., June 1, 1994, slip op. at 17.

However, the effect of our ruling is to exclude evidence of all privileged material, the Belcher Report (including critical notations and other markings) and the facts surrounding their consideration. *E.g.,* R. D. & O. at 22-23, 26; Sec. Fin. Dec. and Ord. at 3-4, 7-8, 16-17, 19, 21; Willy's testimony at T. 147-52 (Willy's preparation Belcher draft and Fawcett's critical views thereof); T. 155-58 (Willy's negative opinion of Belcher's compliance posture vis-a-vis environmental laws and his objections to Brundrett regarding Fawcett's suggested editorial modifications); T. 161 (Willy's refusal to make Fawcett's changes); T. 164 (Willy's allegation of Belcher's noncompliance); T. 165 (Brundrett's disagreement with Willy's version of report); T. 168-71 (Willy's allegations regarding the seriousness of Belcher's [*80] environmental law noncompliance); T. 194-96 (Willy's allegation of Coastal's inadequate environmental policy towards Belcher); T. 296 (Brundrett's inaction on Willy's version of Belcher Report).

Without otherwise privileged evidence, the record is left with Coastal's evidence that Willy was terminated for a legitimate, non-discriminatory reason. n25 Accordingly, his action must be dismissed.

n25 Although Willy's telephone call to the TDWR might have constituted protected activity and the basis for a claim of discrimination, Willy failed to prove that it was related to an environmental complaint, and in fact denied that he made a call. Nov. 27, 1988 R. D. & O., slip op. at 22.

### CONCLUSION

In sum, we have made the following rulings:

2004 DOL Ad. Rev. Bd. LEXIS 19, *80
2001 N.Y. App. Div. LEXIS 3885, ***4; 10 I.E.R. Cas. (BNA) 1507

1. The law of the case doctrine does not prevent the Board from reconsidering prior rulings in this case, including the Secretary's Final Decision and Order of June 1, 1994.

2. The final judgment in Willy's Texas wrongful discharge claim preventing use of client confidences does not have [*81] preclusive effect on the question of Willy's use of materials protected under the attorney-client privilege in his federal whistleblower claim.

3. Coastal did not waive the attorney-client privilege and it protected its position in the course of these proceedings.

4. Neither the federal common law of attorney-client privilege nor its exceptions permit introduction of the Belcher report and related testimony to prove an affirmative environmental whistleblower against Coastal.

5. Exclusion of evidence protected by the attorney-client privilege results in the failure of Willy's case.

Accordingly, all orders for remedial relief are VACATED and Willy's environmental whistleblower complaint is DENIED.

SO ORDERED.

Legal Topics:

For related research and practice materials, see the following legal topics:
Administrative LawAgency AdjudicationDecisionsGeneral OverviewAdministrative LawAgency AdjudicationHearingsEvidenceAdmissibilityPrivilege