LEXSEE

**BASIL FITZPATRICK, SOLE PROPRIETOR, d/b/a ARTEMIS RECORDS, Plaintiff, - against - SONY-BMG MUSIC ENTERTAINMENT, INC., RED DISTRIBUTION, INC., SHERIDAN SQUARE ENTERTAINMENT, INC. d/b/a ARTEMIS RECORDS, and DANNY GOLDBERG, SHERIDAN SQUARE ENTERTAINMENT, LLC d/b/a ARTEMIS RECORDS, Defendants.**

**07 Civ. 2933 (SAS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2007 U.S. Dist. LEXIS 60238**

**August 14, 2007, Decided
August 15, 2007, Filed**

**COUNSEL:** [*1] Basil Fitzpatrick, Plaintiff, Pro se, Flushing, New York.

For Defendants: Marc S. Reiner, Esq., Dorsey & Whitney LLP, New York, New York.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**OPINION AND ORDER**

SHIRA A. SCHEINDLIN, U.S.D.J.:

**I. INTRODUCTION**

Basil Fitzpatrick, sole proprietor of Artemis Records, proceeding pro se, brings suit under section 1125 of Title 15 of the United States Code ("Lanham Act"), against SONY BMG Music Entertainment and Red Distribution, LLC (collectively, the "Red Defendants"), [1] and Sheridan Square Entertainment, Inc., Danny Goldberg, and Sheridan Square Entertainment, LLC. Fitzpatrick alleges that the Red Defendants infringed on his common law intellectual property rights in the trademark, "ARTEMIS RECORDS," by, *inter alia,* "creating a false designation of origin, intensifying reverse confusion, expanding the unauthorized use of the mark, and proliferating a false

market perception on a national and international scale." [2] He seeks an award of twenty million dollars against the Red Defendants, as well as compensation for current, past and future use of the mark.

> 1   SONY BMG Music Entertainment and Red Distribution, LLC, are sued incorrectly herein as "Sony-BMG [*2] Music Entertainment, Inc." and "Red Distribution, Inc."
> 2   Complaint ("Compl.") at 10-11, PP 3, 6.

The Red Defendants now move to dismiss all claims against them based on the doctrine of laches. For the reasons stated below, the Red Defendants' motion is granted, and the claims against them are dismissed.

**II. FACTS** [3]

> 3   The following factual allegations, taken from the Complaint, are accepted as true for purposes of this motion.

Basil Fitzpatrick is the sole proprietor of a music business which engages in "[the soliciting of] bands and artists, product development, performing, producing, recording, distributing promotional materials [and] advertising[,]" [4] and which operated under the name "ARTEMIS RECORDS." [5] Since 1996, Fitzpatrick has operated a web page for this business entitled "The Artemis Records Homepage." [6] In June of 1999, Fitzpatrick became aware that Goldberg, then CEO of

2007 U.S. Dist. LEXIS 60238, *2
27 Employee Benefits Cas. (BNA) 2833

Sheridan Square Entertainment, LLC, was using the name "ARTEMIS RECORDS" for his "new independent label which was in the very early stage of development[,]" and that Goldberg had applied for a trademark on the name ARTEMIS RECORDS in February of 1999. [7] Fitzpatrick and Goldberg disputed which party held the rights [*3] to the ARTEMIS RECORDS mark, and the dispute led to litigation, which culminated in a trial before Judge Harold Baer, Jr. of this Court, on June 26, 2000. [8] The parties reached a settlement the day of trial. [9]

4   Id. at 2, P 1.
5   See id. at 2, P 5.
6   See id. at 2, P 1.
7   Id. at 2, P 2.
8   See id. at 3-4, PP 3-6.
9   See id. at 4, P 7.

Under the terms of the settlement, Fitzpatrick would discontinue his use of the ARTEMIS RECORDS name and allow Goldberg to use the mark. [10] In exchange, Fitzpatrick would receive compensation of $ 125,000 within ten days. [11] Fitzpatrick complied with the settlement agreement and stopped using the ARTEMIS RECORDS name, but he never received the agreed-upon compensation. [12] As a result, Fitzpatrick resumed using the ARTEMIS RECORDS name on September 15, 2000. [13] Since 1999, Fitzpatrick's endeavors in the music industry have been severely hampered by the "magnified existence of reverse confusion" stemming from Goldberg's continued use of the ARTEMIS RECORDS name for his independent label. [14]

10   See id.
11   See id.
12   See id. at 5-6, PP 10-11.
13   See id. at 6, PP 11-12.
14   Id. at 6-7, PP 12-14.

Between 1999 and 2006, the Red Defendants distributed Goldberg's ARTEMIS RECORDS products [*4] pursuant to a "joint venture[,]" which was entered into before the Red Defendants had verified "the authenticity of ownership of Goldberg's new independent label . . . ." [15] Fitzpatrick claims that this distribution arrangement resulted in further infringement of Fitzpatrick's common law intellectual property rights, intensified reverse confusion, and "further [expansion of] the unauthorized use of the [ARTEMIS RECORDS] mark . . . ." [16] Fitzpatrick bases his trademark

infringement claims against the Red Defendants on these distribution activities, [17] of which he first became aware over six years ago, at the trial before Judge Baer, on June 26, 1999. [18] The instant suit was filed on April 12, 2007.

15   Id. at 10-11, PP 1-6.
16   Id. at 10-11, PP 3, 6.
17   See id. at 10-11, PP 1-6.
18   See id. at 10, P 1.

### III. LEGAL STANDARDS

#### A. Rule 12(b)(6) - Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" [19] When deciding a defendant's motion to dismiss under Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint" [20] and "draw all reasonable inferences [*5] in plaintiff's favor." [21]

19   Erickson v. Pardus, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).
20   Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007).
21   Ofori-Tenkorang v. American Int'l Group, Inc., 460 F.3d 296, 298 (2d Cir. 2006).

Nevertheless, to survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility." [22] Although the complaint need not provide "detailed factual allegations," [23] it must "amplify a claim with some factual allegations . . . to render the claim plausible" [24] The test is no longer whether there is "no set of facts" that plaintiff could prove "which would entitle him to relief." [25] Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" [26]

22   See Bell Atlantic, 127 S. Ct. at 1970.
23   Id. at 1964. See also ATSI Commc'ns v. Shaar Fund, Ltd., -- F.3d --, No. 05-5132, 2007 U.S. App. LEXIS 16382 at *17, 2007 WL 1989336, at *5 n.2 (2d Cir. July 11, 2007) (applying the standard of plausibility outside Twombly's anti-trust context).
24   Iqbal v. Hasty, 490 F.3d 143, No. 05-5732,

2007 U.S. Dist. LEXIS 13911 at *12, 2007 WL 1717803, at *11 (2d Cir. June 14, 2007) [*6] (emphasis in original) (holding that the plaintiff's complaint adequately alleged the personal involvement of the Attorney General because it was plausible that officials of the Department of Justice would be aware of policies concerning individuals arrested after 9/11).

25    Bell Atlantic, 127 S. Ct., at 1969 (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)) ("[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard").

26    ATSI Commc'ns, 2007 U.S. Dist. LEXIS 16382 at *17, 2007 WL 1989336, at *5 (quoting Bell Atlantic, 127 S. Ct. at 1965).

Although the court must take the plaintiff's allegations as true, "the claim may still fail as a matter of law . . . if the claim is not legally feasible." [27] In addition, "bald assertions and conclusions of law will not suffice." [28] However, a pro se plaintiff is entitled to have his pleadings held to "less stringent standards than formal pleadings drafted by lawyers." [29] Accordingly, a pro se plaintiff's papers should be interpreted "to raise the strongest arguments that they suggest." [30]

27    In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 457 F. Supp. 2d 455, 459 (S.D.N.Y. 2006) (citing Allaire Corp. v. Okumus, 433 F.3d 248, 250 (2d Cir. 2006)).

28    Law Offices of Curtis V. Trinko, L.L.P. v. Bell Atlantic Corp., 309 F.3d 71, 74 (2d Cir. 2002) [*7] (quotation omitted).

29    Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972).

30    McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quotation marks and citation omitted).

## B. The Doctrine of Laches

The doctrine of laches is based on the maxim, "vigilantibus non dormientibus aequitas subvenit," meaning "equity aids the vigilant, not those who sleep on their rights." [31] It is an equitable defense that "bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." [32] "A party asserting the defense of laches must establish that: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay." [33]

31    Ivani Contracting Corp. v. City of New York, 103 F.3d 257, 259 (2d Cir. 1997).

32    Ikelionwu v. United States, 150 F.3d 233, 237 (2d Cir. 1998) (quotation omitted).

33    Id.

"'It is well established that the equitable defense of laches may be applied to cases brought under the Lanham Act.'" [34] "Although laches is an equitable defense, employed instead of a statutory time-bar, analogous statutes of limitation remain an important determinant [*8] in the application of a laches defense." [35] In evaluating whether the plaintiff's delay in taking action was sufficiently long to invoke laches in a Lanham Act suit, the Second Circuit has held that the six-year statute of limitations applicable to state-law fraud claims in New York is the appropriate measure. [36] The six-year period begins to run once the plaintiff is aware of the facts underlying its cause of action. [37] If the plaintiff fails to bring suit within the six-year statute of limitations, a presumption of laches will apply, and "'the burden [will be] on the complainant to aver and prove the circumstances making it inequitable to apply laches to his case.'" [38]

34    United States v. Milstein, 401 F.3d 53, 63 (2d Cir. 2005) (quoting Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 193 (2d Cir. 1996)).

35    Conopco, Inc., 95 F.3d at 191.

36    See id. at 191-92.

37    See Deere & Co. v. MTD Holdings Inc., No. 00 Civ. 5936, 2004 U.S. Dist. LEXIS 2550 at *56, 2004 WL 324890, at *18 (S.D.N.Y. Feb. 19, 2004).

38    Conopco, Inc., 95 F.3d at 191 (quoting Leonick v. Jones & Laughlin Steel Corp., 258 F.2d 48, 50 (2d Cir. 1958)).

In general, the defense of laches is not raised in a motion to dismiss. However, "in certain circumstances, when [*9] the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the insuperable bar, a court may consider the defense on a motion to dismiss." [39]

39    Lennon v. Seaman, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999), aff'd mem., 48 Fed. Appx. 15 (2d Cir. 2002).

2007 U.S. Dist. LEXIS 60238, *9
27 Employee Benefits Cas. (BNA) 2833

## IV. DISCUSSION

The Red Defendants assert the doctrine of laches as an affirmative defense to Fitzpatrick's claims against them. [40] According to the Complaint, Fitzpatrick first learned of the Red Defendants' involvement with Goldberg's ARTEMIS RECORDS label on June 26, 2000, when Goldberg testified in court that the Red Defendants were his distributors. [41] Nearly seven years passed between that day and the filing of the Complaint. The Red Defendants claim that this delay has prejudiced them, primarily through their investment of resources to distribute music under Goldberg's ARTEMIS RECORDS trademark. [42] They argue that because the six-year statute of limitations elapsed before Fitzpatrick filed suit, a presumption of laches is appropriate. [43]

> 40  See Red Defendants' Memorandum of Law in Support of Motion to Dismiss ("Red Mem.") at 1.
> 41  See Compl. at 10, P 1. The Complaint [*10] mistakenly lists the date of the trial as June 26, 1999. See id. Other sections of the Complaint, as well as the Affirmation of Plaintiff in Opposition to the Motion to Dismiss ("Pl. Opp."), state the correct date. See, e.g., Compl. at 4, P 7.
> 42  See Red Mem. at 6.
> 43  See id. at 5.

The Red Defendants' analysis, however, miscalculates the date on which the six-year period began to run. In addition to first learning of the Red Defendants' distribution activities on June 26, 2000, Fitzpatrick also reached a settlement with Goldberg that day. [44] Pursuant to the settlement, Fitzpatrick granted Goldberg the rights to the ARTEMIS RECORDS name. [45] Therefore, there was no trademark infringement by the Red Defendants - such that the six-year period would begin running - until Goldberg failed to abide by the terms of the agreement, thereby voiding the settlement. The earliest date on which Fitzpatrick could have known of the Red Defendants' infringement was July 6, 2000 - the deadline for Fitzpatrick to receive the $ 125,000 compensation that Goldberg never paid. [46] The latest the realization could have occurred is September 15, 2000, the date Fitzpatrick resumed using the ARTEMIS RECORDS name. [47] [*11] Under either set of facts, however, more than six years passed between the date Fitzpatrick knew, or should have known, of the infringement and the filing of his Complaint on April 12, 2007. Accordingly, despite the Red Defendants' miscalculation of the trigger date for the

six-year period, Fitzpatrick has failed to file this action in a timely manner. Thus, a presumption of laches is appropriate.

> 44  See Compl. at 4, P 7.
> 45  See id.
> 46  See id.
> 47  See id. at 6, P 12.

In order to survive the motion to dismiss, Fitzpatrick must demonstrate why it would be inequitable for the Court to apply laches to bar his claim. Fitzpatrick, however, has offered no excuse or justification for why he did not bring this action against the Red Defendants more promptly. The only justification offered by Fitzpatrick is that in 2004 and 2005, he petitioned the Trademark Trial and Appeal Board ("TTAB") to cancel registration of the ARTEMIS RECORDS mark which had been granted to Goldberg earlier in 2004. [48] The TTAB proceedings were finalized on March 1, 2007 - after the six-year period had run - and the instant litigation was filed approximately six weeks later. [49] Fitzpatrick argues that he was justified in delaying [*12] the filing of the instant action, as a "'trademark owner is not bound to take on more than one infringer at a time[,]'" [50] and that because he filed the instant action promptly upon the conclusion of the earlier litigation, laches should not bar his current claim. [51]

> 48  See August 2, 2007 Letter from Fitzpatrick to the Court ("Pl. Surreply") at 2
> 49  See id. at 4.
> 50  Id. at 3 (quoting 6 McCarthy on Trademarks and Unfair Competition § 31:16).
> 51  See id. at 4.

Fitzpatrick's mere involvement in other trademark litigation, however, cannot justify his delay in bringing suit against the Red Defendants. Courts have long recognized that other litigation excuses a plaintiff's delay in bringing suit only when the new defendant is put on notice that the plaintiff intends to sue him when the earlier action terminates. [52] Indeed, the very treatise Fitzpatrick cites in support of his "other litigation" justification states that "in the absence of notice to the alleged infringer that the patentee was delaying enforcement [of his rights] until the conclusion of the other litigation, that other litigation is no excuse." [53] Fitzpatrick does not allege that he put the Red Defendants on notice of his intention [*13] to bring suit against them at the close of his litigation against Goldberg.

2007 U.S. Dist. LEXIS 60238, *13
27 Employee Benefits Cas. (BNA) 2833

Accordingly, his earlier litigation cannot excuse the nearly seven-year delay in the filing of this action.

52   See Jones v. Ceramco, Inc., 387 F. Supp. 940, 941 (E.D.N.Y. 1975) (citation omitted), aff'd, 526 F.2d 585 (2d Cir. 1975).

53   6 McCarthy on Trademarks and Unfair Competition § 31:16. Tellingly, Exhibit A to Pl. Surreply, which is a photocopy from the McCarthy treatise, omits the portion of section 31:16 which describes this limitation on the "other litigation" justification.

Fitzpatrick has not disproved - or even disputed - the date on which he first discovered the Red Defendants' involvement in the alleged trademark claim. He has also failed to dispute the alleged prejudice against the Red Defendants caused by his delay in bringing suit. Finally, Fitzpatrick has offered no reasonable excuse or justification for his failure to bring this suit more promptly. Because Fitzpatrick bears the burden of disproving the presumption of laches, and because he has not satisfied this burden, the claims against the Red Defendants must be dismissed pursuant to the doctrine of laches. 54

54   See supra note 38.

## V. CONCLUSION

For [*14] the reasons stated above, the Red Defendants' motion to dismiss is granted and the Complaint is dismissed against the Red Defendants. The Clerk of the Court is directed to close this motion [Docket # 2]. A conference with the remaining defendants is scheduled for August 21, 2007 at 4:00 p.m.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

August 14, 2007

LEXSEE

**BASIL FITZPATRICK, SOLE PROPRIETOR, d/b/a ARTEMIS RECORDS, Plaintiff, - against - SONY-BMG MUSIC ENTERTAINMENT, INC., RED DISTRIBUTION, INC., SHERIDAN SQUARE ENTERTAINMENT, INC. d/b/a ARTEMIS RECORDS, and DANNY GOLDBERG, SHERIDAN SQUARE ENTERTAINMENT, LLC d/b/a ARTEMIS RECORDS, Defendants.**

07 Civ. 2933 (SAS)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2007 U.S. Dist. LEXIS 60238**

**August 14, 2007, Decided
August 15, 2007, Filed**

**COUNSEL:** [*1] Basil Fitzpatrick, Plaintiff, Pro se, Flushing, New York.

For Defendants: Marc S. Reiner, Esq., Dorsey & Whitney LLP, New York, New York.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**OPINION AND ORDER**

SHIRA A. SCHEINDLIN, U.S.D.J.:

**I. INTRODUCTION**

Basil Fitzpatrick, sole proprietor of Artemis Records, proceeding pro se, brings suit under section 1125 of Title 15 of the United States Code ("Lanham Act"), against SONY BMG Music Entertainment and Red Distribution, LLC (collectively, the "Red Defendants"), [1] and Sheridan Square Entertainment, Inc., Danny Goldberg, and Sheridan Square Entertainment, LLC. Fitzpatrick alleges that the Red Defendants infringed on his common law intellectual property rights in the trademark, "ARTEMIS RECORDS," by, *inter alia,* "creating a false designation of origin, intensifying reverse confusion, expanding the unauthorized use of the mark, and proliferating a false

market perception on a national and international scale." [2] He seeks an award of twenty million dollars against the Red Defendants, as well as compensation for current, past and future use of the mark.

[1]  SONY BMG Music Entertainment and Red Distribution, LLC, are sued incorrectly herein as "Sony-BMG [*2] Music Entertainment, Inc." and "Red Distribution, Inc."

[2]  Complaint ("Compl.") at 10-11, PP 3, 6.

The Red Defendants now move to dismiss all claims against them based on the doctrine of laches. For the reasons stated below, the Red Defendants' motion is granted, and the claims against them are dismissed.

**II. FACTS** [3]

[3]  The following factual allegations, taken from the Complaint, are accepted as true for purposes of this motion.

Basil Fitzpatrick is the sole proprietor of a music business which engages in "[the soliciting of] bands and artists, product development, performing, producing, recording, distributing promotional materials [and] advertising[,]" [4] and which operated under the name "ARTEMIS RECORDS." [5] Since 1996, Fitzpatrick has operated a web page for this business entitled "The Artemis Records Homepage." [6] In June of 1999, Fitzpatrick became aware that Goldberg, then CEO of

2007 U.S. Dist. LEXIS 60238, *2
27 Employee Benefits Cas. (BNA) 2833

Sheridan Square Entertainment, LLC, was using the name "ARTEMIS RECORDS" for his "new independent label which was in the very early stage of development[,]" and that Goldberg had applied for a trademark on the name ARTEMIS RECORDS in February of 1999. [7] Fitzpatrick and Goldberg disputed which party held the rights [*3] to the ARTEMIS RECORDS mark, and the dispute led to litigation, which culminated in a trial before Judge Harold Baer, Jr. of this Court, on June 26, 2000. [8] The parties reached a settlement the day of trial. [9]

    4  *Id.* at 2, P 1.
    5  *See id.* at 2, P 5.
    6  *See id.* at 2, P 1.
    7  *Id.* at 2, P 2.
    8  *See id.* at 3-4, PP 3-6.
    9  *See id.* at 4, P 7.

Under the terms of the settlement, Fitzpatrick would discontinue his use of the ARTEMIS RECORDS name and allow Goldberg to use the mark. [10] In exchange, Fitzpatrick would receive compensation of $ 125,000 within ten days. [11] Fitzpatrick complied with the settlement agreement and stopped using the ARTEMIS RECORDS name, but he never received the agreed-upon compensation. [12] As a result, Fitzpatrick resumed using the ARTEMIS RECORDS name on September 15, 2000. [13] Since 1999, Fitzpatrick's endeavors in the music industry have been severely hampered by the "magnified existence of reverse confusion" stemming from Goldberg's continued use of the ARTEMIS RECORDS name for his independent label. [14]

    10  *See id.*
    11  *See id.*
    12  *See id.* at 5-6, PP 10-11.
    13  *See id.* at 6, PP 11-12.
    14  *Id.* at 6-7, PP 12-14.

Between 1999 and 2006, the Red Defendants distributed Goldberg's ARTEMIS RECORDS products [*4] pursuant to a "joint venture[,]" which was entered into before the Red Defendants had verified "the authenticity of ownership of Goldberg's new independent label . . . ." [15] Fitzpatrick claims that this distribution arrangement resulted in further infringement of Fitzpatrick's common law intellectual property rights, intensified reverse confusion, and "further [expansion of] the unauthorized use of the [ARTEMIS RECORDS] mark . . . ." [16] Fitzpatrick bases his trademark

infringement claims against the Red Defendants on these distribution activities, [17] of which he first became aware over six years ago, at the trial before Judge Baer, on June 26, 1999. [18] The instant suit was filed on April 12, 2007.

    15  *Id.* at 10-11, PP 1-6.
    16  *Id.* at 10-11, PP 3, 6.
    17  *See id.* at 10-11, PP 1-6.
    18  *See id.* at 10, P 1.

## III. LEGAL STANDARDS

### A. Rule 12(b)(6) - Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" [19] When deciding a defendant's motion to dismiss under Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint" [20] and "draw all reasonable inferences [*5] in plaintiff's favor." [21]

    19  *Erickson v. Pardus,* 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).
    20  *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007).
    21  *Ofori-Tenkorang v. American Int'l Group, Inc.,* 460 F.3d 296, 298 (2d Cir. 2006).

Nevertheless, to survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility." [22] Although the complaint need not provide "detailed factual allegations," [23] it must "amplify a claim with some factual allegations . . . to render the claim *plausible*" [24] The test is no longer whether there is "no set of facts" that plaintiff could prove "which would entitle him to relief." [25] Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" [26]

    22  *See Bell Atlantic,* 127 S. Ct. at 1970.
    23  *Id.* at 1964. *See also ATSI Comme'ns v. Shaar Fund, Ltd.,* -- F.3d --, No. 05-5132, 2007 U.S. App. LEXIS 16382 at *17, 2007 WL 1989336, at *5 n.2 (2d Cir. July 11, 2007) (applying the standard of plausibility outside *Twombly's* anti-trust context).
    24  *Iqbal v. Hasty,* 490 F.3d 143, No. 05-5732,

2007 U.S. Dist. LEXIS 13911 at *12, 2007 WL 1717803, at *11 (2d Cir. June 14, 2007) [*6] (emphasis in original) (holding that the plaintiff's complaint adequately alleged the personal involvement of the Attorney General because it was plausible that officials of the Department of Justice would be aware of policies concerning individuals arrested after 9/11).

25 *Bell Atlantic*, 127 S. Ct. at 1969 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)) ("[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard").

26 *ATSI Comme'ns*, 2007 U.S. Dist. LEXIS 16382 at *17, 2007 WL 1989336, at *5 (quoting *Bell Atlantic*, 127 S. Ct. at 1965).

Although the court must take the plaintiff's allegations as true, "the claim may still fail as a matter of law . . . if the claim is not legally feasible." 27 In addition, "bald assertions and conclusions of law will not suffice." 28 However, a pro se plaintiff is entitled to have his pleadings held to "less stringent standards than formal pleadings drafted by lawyers." 29 Accordingly, a pro se plaintiff's papers should be interpreted "to raise the strongest arguments that they suggest." 30

27 *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 457 F. Supp. 2d 455, 459 (S.D.N.Y. 2006) (citing *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006)).

28 *Law Offices of Curtis V. Trinko, L.L.P. v. Bell Atlantic Corp.*, 309 F.3d 71, 74 (2d Cir. 2002) [*7] (quotation omitted).

29 *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972).

30 *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quotation marks and citation omitted).

**B. The Doctrine of Laches**

The doctrine of laches is based on the maxim, "*vigilantibus non dormientibus aequitas subvenit*," meaning "equity aids the vigilant, not those who sleep on their rights." 31 It is an equitable defense that "bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." 32 "A party asserting the defense of laches must establish that: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff

inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay." 33

31 *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997).

32 *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998) (quotation omitted).

33 *Id.*

"'It is well established that the equitable defense of laches may be applied to cases brought under the Lanham Act.'" 34 "Although laches is an equitable defense, employed instead of a statutory time-bar, analogous statutes of limitation remain an important determinant [*8] in the application of a laches defense." 35 In evaluating whether the plaintiff's delay in taking action was sufficiently long to invoke laches in a Lanham Act suit, the Second Circuit has held that the six-year statute of limitations applicable to state-law fraud claims in New York is the appropriate measure. 36 The six-year period begins to run once the plaintiff is aware of the facts underlying its cause of action. 37 If the plaintiff fails to bring suit within the six-year statute of limitations, a presumption of laches will apply, and "'the burden [will be] on the complainant to aver and prove the circumstances making it inequitable to apply laches to his case.'" 38

34 *United States v. Milstein*, 401 F.3d 53, 63 (2d Cir. 2005) (quoting *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 193 (2d Cir. 1996)).

35 *Conopco, Inc.*, 95 F.3d at 191.

36 *See id.* at 191-92.

37 *See Deere & Co. v. MTD Holdings Inc.*, No. 00 Civ. 5936, 2004 U.S. Dist. LEXIS 2550 at *56, 2004 WL 324890, at *18 (S.D.N.Y. Feb. 19, 2004).

38 *Conopco, Inc.*, 95 F.3d at 191 (quoting *Leonick v. Jones & Laughlin Steel Corp.*, 258 F.2d 48, 50 (2d Cir. 1958)).

In general, the defense of laches is not raised in a motion to dismiss. However, "in certain circumstances, when [*9] the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the insuperable bar, a court may consider the defense on a motion to dismiss." 39

39 *Lennon v. Seamen*, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999), *aff'd mem.*, 48 Fed. Appx. 15 (2d Cir. 2002).

2007 U.S. Dist. LEXIS 60238, *9
27 Employee Benefits Cas. (BNA) 2833

## IV. DISCUSSION

The Red Defendants assert the doctrine of laches as an affirmative defense to Fitzpatrick's claims against them. [40] According to the Complaint, Fitzpatrick first learned of the Red Defendants' involvement with Goldberg's ARTEMIS RECORDS label on June 26, 2000, when Goldberg testified in court that the Red Defendants were his distributors. [41] Nearly seven years passed between that day and the filing of the Complaint. The Red Defendants claim that this delay has prejudiced them, primarily through their investment of resources to distribute music under Goldberg's ARTEMIS RECORDS trademark. [42] They argue that because the six-year statute of limitations elapsed before Fitzpatrick filed suit, a presumption of laches is appropriate. [43]

> 40  See Red Defendants' Memorandum of Law in Support of Motion to Dismiss ("Red Mem.") at 1.
> 41  See Compl. at 10, P 1. The Complaint [*10] mistakenly lists the date of the trial as June 26, 1999. See id. Other sections of the Complaint, as well as the Affirmation of Plaintiff in Opposition to the Motion to Dismiss ("Pl. Opp."), state the correct date. See, e.g., Compl. at 4, P 7.
> 42  See Red Mem. at 6.
> 43  See id. at 5.

The Red Defendants' analysis, however, miscalculates the date on which the six-year period began to run. In addition to first learning of the Red Defendants' distribution activities on June 26, 2000, Fitzpatrick also reached a settlement with Goldberg that day. [44] Pursuant to the settlement, Fitzpatrick granted Goldberg the rights to the ARTEMIS RECORDS name. [45] Therefore, there was no trademark infringement by the Red Defendants - such that the six-year period would begin running - until Goldberg failed to abide by the terms of the agreement, thereby voiding the settlement. The earliest date on which Fitzpatrick could have known of the Red Defendants' infringement was July 6, 2000 - the deadline for Fitzpatrick to receive the $ 125,000 compensation that Goldberg never paid. [46] The latest the realization could have occurred is September 15, 2000, the date Fitzpatrick resumed using the ARTEMIS RECORDS name. [47] [*11] Under either set of facts, however, more than six years passed between the date Fitzpatrick knew, or should have known, of the infringement and the filing of his Complaint on April 12, 2007. Accordingly, despite the Red Defendants' miscalculation of the trigger date for the

six-year period, Fitzpatrick has failed to file this action in a timely manner. Thus, a presumption of laches is appropriate.

> 44  See Compl. at 4, P 7.
> 45  See id.
> 46  See id.
> 47  See id. at 6, P 12.

In order to survive the motion to dismiss, Fitzpatrick must demonstrate why it would be inequitable for the Court to apply laches to bar his claim. Fitzpatrick, however, has offered no excuse or justification for why he did not bring this action against the Red Defendants more promptly. The only justification offered by Fitzpatrick is that in 2004 and 2005, he petitioned the Trademark Trial and Appeal Board ("TTAB") to cancel registration of the ARTEMIS RECORDS mark which had been granted to Goldberg earlier in 2004. [48] The TTAB proceedings were finalized on March 1, 2007 - after the six-year period had run - and the instant litigation was filed approximately six weeks later. [49] Fitzpatrick argues that he was justified in delaying [*12] the filing of the instant action, as a "'trademark owner is not bound to take on more than one infringer at a time[,]'" [50] and that because he filed the instant action promptly upon the conclusion of the earlier litigation, laches should not bar his current claim. [51]

> 48  See August 2, 2007 Letter from Fitzpatrick to the Court ("Pl. Surreply") at 2
> 49  See id. at 4.
> 50  Id. at 3 (quoting 6 McCarthy on Trademarks and Unfair Competition § 31:16).
> 51  See id. at 4.

Fitzpatrick's mere involvement in other trademark litigation, however, cannot justify his delay in bringing suit against the Red Defendants. Courts have long recognized that other litigation excuses a plaintiff's delay in bringing suit only when the new defendant is put on notice that the plaintiff intends to sue him when the earlier action terminates. [52] Indeed, the very treatise Fitzpatrick cites in support of his "other litigation" justification states that "in the absence of notice to the alleged infringer that the patentee was delaying enforcement [of his rights] until the conclusion of the other litigation, that other litigation is no excuse." [53] Fitzpatrick does not allege that he put the Red Defendants on notice of his intention [*13] to bring suit against them at the close of his litigation against Goldberg.

Page 4

2007 U.S. Dist. LEXIS 60238, *13
27 Employee Benefits Cas. (BNA) 2833

Accordingly, his earlier litigation cannot excuse the nearly seven-year delay in the filing of this action.

> 52  *See Jones v. Ceramco, Inc.*, 387 F. Supp. 940, 941 (E.D.N.Y. 1975) (citation omitted), *aff'd*, 526 F.2d 585 (2d Cir. 1975).
>
> 53  6 McCarthy on Trademarks and Unfair Competition § 31:16. Tellingly, Exhibit A to P1. Surreply, which is a photocopy from the McCarthy treatise, omits the portion of section 31:16 which describes this limitation on the "other litigation" justification.

Fitzpatrick has not disproved - or even disputed - the date on which he first discovered the Red Defendants' involvement in the alleged trademark claim. He has also failed to dispute the alleged prejudice against the Red Defendants caused by his delay in bringing suit. Finally, Fitzpatrick has offered no reasonable excuse or justification for his failure to bring this suit more promptly. Because Fitzpatrick bears the burden of disproving the presumption of laches, and because he has not satisfied this burden, the claims against the Red Defendants must be dismissed pursuant to the doctrine of laches. [54]

> 54  *See supra* note 38.

## V. CONCLUSION

For [*14] the reasons stated above, the Red Defendants' motion to dismiss is granted and the Complaint is dismissed against the Red Defendants. The Clerk of the Court is directed to close this motion [Docket # 2]. A conference with the remaining defendants is scheduled for August 21, 2007 at 4:00 p.m.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

August 14, 2007

LEXSEE

**GREGORY A. FRASER, Plaintiff, - against - FIDUCIARY TRUST COMPANY INTERNATIONAL, FRANKLIN RESOURCES INC., MICHAEL MATERASSO, JEREMY H. BIGGS, WILLIAM Y. YUN, CHARLES B. JOHNSON, ANNE M. TATLOCK, GREGORY E. JOHNSON AND MARTIN L. FLANAGAN, Defendants.**

04 Civ. 6958 (PAC)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

417 F. Supp. 2d 310; 2006 U.S. Dist. LEXIS 6467; 87 Empl. Prac. Dec. (CCH) P42,268; 37 Employee Benefits Cas. (BNA) 1195; 24 I.E.R. Cas. (BNA) 246; Fed. Sec. L. Rep. (CCH) P93,708

February 15, 2006, Decided
February 15, 2006, Filed

COUNSEL: [**1] For Gregory A. Fraser, Plaintiff: Bruce A. Hubbard, Bruce A. Hubbard, P.C., New York, NY.

For Fiduciary Trust Company International, Franklin Resources Inc., Michael Materasso, Jeremy H. Biggs, William Y. Yun, Charles B. Johnson, Anne M. Tatlock, Gregory E. Johnson, Martin L. Flanagan, Defendants: Christina L. Feege, Littler Mendelson, P.C., New York, NY.

JUDGES: PAUL A. CROTTY, United States District Judge.

OPINION BY: PAUL A. CROTTY

OPINION

[*314] DECISION AND ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Gregory A. Fraser ("Fraser") filed a Second Amended Complaint ("Compl.") on August 12, 2005 against Fiduciary Trust Company International ("Fiduciary"), Franklin Resources Inc. ("Franklin"),

Michael Materasso ("Materasso"), Jeremy H. Biggs ("Biggs"), William Y. Yun ("Yun"), Charles B. Johnson, Anne M. Tatlock, Gregory E. Johnson, and Michael L. Flanagan (collectively, "Defendants"). [1] Before the Court is Defendants' motion to dismiss numerous claims in the Second Amended Complaint ("Compl."). Fraser amended the Amended Complaint following Judge Berman's June 23, 2005 decision, which granted in part and denied in part Defendants' first motion to dismiss. [2]

> 1   The individual defendants are referred to as the "Individual Defendants."

[**2]

> 2   This action was reassigned to this Court on August 5, 2005.

In the June 23, 2005 Decision, Judge Berman denied Defendants' motion to dismiss with regard to the following claims: a whistleblower claim under § 806 of the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A (based on the Third Instance (out of four) alleged by Fraser); a discriminatory discharge claim under § 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140; and, race discrimination claims asserted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq., and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq.,

417 F. Supp. 2d 310, *314; 2006 U.S. Dist. LEXIS 6467, **2;
87 Empl. Prac. Dec. (CCH) P42,268; 37 Employee Benefits Cas. (BNA) 1195

arising out of Defendants' alleged discriminatory treatment of Fraser on the basis of his race.

Judge Berman dismissed without prejudice the following claims: securities law claims pursuant to §§ 10(b) and 20(a) of the Securities [**3] Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t, Rule 10b-5, 17 C.F.R. § 240-10b-5, and California Corporations Code § 25402; SOX § 806 whistleblower claims based on Fraser's alleged First, Second, and Fourth Instances and all SOX § 806 claims against Individual Defendants; an ERISA § 510 whistleblower claim; an ERISA § 404 breach of fiduciary duty claim; and a common law breach of contract claim. Judge Berman dismissed with prejudice claims brought under § 15 of the Exchange Act and §§ 1102 and 1107 of SOX.

Fraser's Second Amended Complaint deleted the claims Judge Berman dismissed with prejudice and repleaded the securities law, ERISA, SOX, and breach of contract claims. Despite Judge Berman's direction that the Second Amended Complaint be more "streamlined and better organized" than the 110-page Amended Complaint (June 23, 2005 Decision, at 26) (and the command of Rule 8, calling for a "short and plain statement of the claim," Fed. R. Civ. P. 8,) the Second Amended Complaint is 91 pages long and suffers many of the infirmities of the prior complaint.

The prolix, wandering [**4] style of the allegations of the Second Amended Complaint do not cure the deficiencies that Judge Berman found with the securities claims, §§ 10(b) and 20(a), Rule 10b-5, and California Corporate Codes §§ 25402 and 25502; with the §§ 510 and 404 ERISA claims; and with § 806 SOX claims based on the First and Fourth Instances. The Court dismisses those claims with prejudice. The Second Amended Complaint cures the deficiencies with regard to the SOX § 806 whistleblower claim based on [*315] the Second Instance as well as the common law breach of contract claim.

## INTRODUCTION

Judge Berman's June 23, 2005 Decision and Order provided a detailed accounting of the factual background to this case (June 23, 2005 Decision and Order, at 2-6). The Court, thus, will not recount detailed facts, which specifically relate to the claims that Judge Berman sustained in Defendants' first motion to dismiss (i.e., race discrimination claims, the § 510 ERISA discriminatory

discharge claim, and the § 806 SOX whistleblower claim (Third Instance)).

## I. Facts

### A. The Parties

Plaintiff was a Vice President at Fiduciary Trust Company International ("Fiduciary"). Compl. P94. Fraser began [**5] employment with Fiduciary on October 2, 2000, id., and was terminated on March 7, 2003. Id. P70.

Defendant Fiduciary is an investment management company and chartered bank under New York laws with its principal offices located in New York. Id. P15. Fiduciary was acquired by defendant Franklin Resources Inc. ("Franklin") on April 10, 2001 and is now a wholly-owned subsidiary of Franklin. Id. Franklin is a Delaware corporation with principal offices located in California. Id. P16. Franklin is a global investment management and advisory services company. Id.

Defendant Michael Materasso was Head of Domestic Fixed Income Asset Management at Fiduciary. Id. P17. Materasso was Fraser's direct supervisor starting in October, 2000. Id. On November, 2001, Materasso became Head of Domestic and Global Fixed Income. Id. Materasso received the claimed whistleblowing notices and complaints. Id. Materasso also engaged in claimed racially discriminatory conduct and fabricated retaliatory allegations to terminate Fraser. Id.

Defendant Jeremy H. Biggs is the current Vice Chairman of Fiduciary and former Chief Investment Officer. Id. P18. Defendant William [**6] Y. Yun ("Yun") is the current President of Fiduciary and of Franklin Templeton Institutional. Id. P19. Defendant Charles B. Johnson is the former Chief Executive Officer of Franklin and served in that capacity from 1957 until 2004. Id. P20. Johnson also serves as the Chairman of the Board of Directors of Franklin. Id. Defendant Anne M. Tatlock is the Chief Executive Officer and Chair of the Board of Directors of Fiduciary. Id. P21. Defendant Gregory E. Johnson is a Co-Chief Executive Officer and Co-President of Franklin and member of the Board of Fiduciary. Id. P22. Finally, Defendant Martin L. Flanagan was also Co-Chief Executive Officer and Co-President of Franklin. Id. P23. Flanagan left the company on July 31, 2005. Id.

### B. Claimed Corporate Wrongdoing

417 F. Supp. 2d 310, *315; 2006 U.S. Dist. LEXIS 6467, **6;
87 Empl. Prac. Dec. (CCH) P42,268; 37 Employee Benefits Cas. (BNA) 1195

Fraser claims illegal conduct related to Franklin's acquisition of Fiduciary. Id. P33. Fraser claims that filings in connection with the acquisition contained "insufficient, not meaningful, materially false and misleading" statements. Id. Chief among these allegations is the improper inclusion of U.N. Pension Fund Account assets in Fiduciary's and Franklin's assets under management ("AUM") [**7] and improper low fees. Id. (cataloguing alleged wrongdoing). According to Fraser, this spawns a raft of further allegations of violations of GAAP standards, breach of Securities and Exchange Commission ("SEC") accounting and reporting requirements, and overvaluation of Fiduciary at the time of Franklin's acquisition. Id. PP34-61.

### [*316] C. Claimed Whistleblowing Activities

Fraser alleges that he sent Materasso an e-mail on March 19, 2001, which put Materasso on notice that Fraser "suspected . . . accounting misconduct at Fiduciary and stressed that he was obligated to comply with the [Chartered Financial Analyst ("CFA")] Institute's Code and Standards." Id. lines 1990-91. [3] After this e-mail, Fraser contends that Materasso "embarked on a campaign of retaliation, denial of promotion and advancement opportunities and adverse employment actions toward [him] culminating in [his] March 7, 2003 unlawful and retaliatory discharge at Materasso's direction." Id. lines 1992-95.

> [3]  The Second Amended Complaint contains both paragraphs and line numbers. Where the cited material is easily identified by paragraph, the Court so notes; when necessary, the Court cites to line numbers.

### [**8] 1. First Claimed Instance

Fraser sent e-mails to Fiduciary's Chief Investment Officer, Biggs, in December, 2001, which claimed that a portfolio manager named Michael Rohwetter ("Rohwetter") was responsible for poor performance across ERISA and trust accounts (managed by Fraser's Department, Institutional Fixed Income) because Rohwetter had not followed Fraser's investment strategy advice. Id. P67. Fraser also alleged that Rohwetter wanted Fraser to conceal and falsify 2001 year-end performance results. Id. After these e-mails, Fraser alleges that "Rohwetter commenced retaliatory actions against him with a pattern of negative behavior (i.e., reduced his responsibilities, less opportunities for career advancement, unnecessary criticism of Plaintiff's work, less recognition and exposure to senior management, less sociable and less friendly)." Id. According to Fraser, Rohwetter engaged in conduct that violated a whole host of provisions under ERISA, the Investment Advisors Act of 1940 ("IAA"), the Uniform Prudent Investor Act of 1994, and the New York State Estates, Powers & Trusts Laws. Id.

### 2. Second Claimed Instance

In May, 2002, Plaintiff sent a notice [**9] to Fiduciary President Yun that the New York office's decision to sell WorldCom bonds from New York-based ERISA and trust management accounts was not equally disseminated to all accounts firm-wide. Id. P68. In February, 2002, Rohwetter wanted to communicate firm-wide that the Head Office had decided to sell its WorldCom holdings. Rohwetter instructed him not to do so. Id. As a result, Fraser claims that the Los Angeles office continued to hold WorldCom bonds "because they were unaware that [the New York office] was exiting its WorldCom positions." Id. This decision, Fraser states, resulted eventually in "substantial losses in [Los Angeles]-ERISA and trust accounts holding WorldCom bonds." Id. Fraser characterized this conduct as a breach of fiduciary conduct and evidence of a conflict of interest. Id. Fraser states that after his report to Yun, Materasso and Rohwetter "commenced retaliatory actions against him" -- again with a pattern of negative behavior culminating in "less sociable" and "less friendly". Id. The conduct related to the WorldCom bonds, Fraser charges, constituted "clear violations" of a host of federal laws, including ERISA and the IAA, and [**10] was a fraud on investors. Id.

Fraser claims that in the Fall of 2002, "an anonymous e-mail was sent . . . to Franklin senior management, Franklin's legal department and the SEC informing them that an accounting fraud involving improperly classified U.N. Pension Fund [*317] Accounts was taking place at Fiduciary." Id. P69.

### 3. Third Claimed Instance

Fraser claims that approximately one to two weeks before his wrongful termination on March 7, 2003, he became aware of a scheme on the part of Fiduciary senior officers to manipulate and falsify managed assets and defraud clients. Id. P70. This scheme was related to the reported AUM and the fact that Fiduciary only received a

417 F. Supp. 2d 310, *317; 2006 U.S. Dist. LEXIS 6467, **10;
87 Empl. Prac. Dec. (CCH) P42,268; 37 Employee Benefits Cas. (BNA) 1195

nominal consulting fee in connection with its activities with the U.N. Pension Fund. Id. Fraser confronted Materasso about his allegations and Materasso simply "brushed [him] off." Id. Judge Berman previously allowed this instance as a basis for Fraser's SOX § 806 claim (June 23, 2005 Decision and Order, at 26).

### 4. Fourth Claimed Instance

On March 6, 2003, one day prior to his discharge, Fraser sent an e-mail to Materasso, Yun and others "to inform senior management that investment performance [**11] had suffered because the New York office failed to implement a recommendation he proposed on November 1, 2002 to establish a long/short high-yield investment fund for Fiduciary clients." Id. P71. Fraser states that later that day, Fiduciary retaliated against him "with a discriminatory act by falsely charging him of violating company policy and asking him to submit his resignation or accept a discharge from the company." Id.

### II. Legal Standard

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957). On a motion to dismiss based on Rule 12(b)(6), "all factual allegations in the complaint must be taken as true and construed favorably to the plaintiff." LaBounty v. Adler, 933 F.2d 121, 123 (2d Cir. 1991) (citations omitted). "The issue is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims'." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995) [**12] (citations omitted).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the Complaint as exhibits or incorporated in it by reference. Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993). Because Fraser refers to multiple documents crucial to his claims, these documents may properly be considered for the purposes of this motion. Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

### III. Analysis

### A. Securities Claims

### 1. § 10(b) and Rule 10b-5 Claims

Fraser asserts claims under § 10(b) of the Securities and Exchange Act ("SEA"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10(b), in the First Cause of Action of the Second Amended Complaint. The critical issue here is whether any of Fraser's allegations demonstrate that claimed misconduct occurred.

#### a. No "In Connection with a Purchase or Sale" Shown

Under the Supreme Court's decision in Blue Chip Stamps v. Manor Drug Stores, only an actual purchaser or seller of securities has standing to assert claims under § 10(b) and Rule 10b-5. 421 U.S. 723, 749-55, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975). [**13] Fraser pleads a number of facts [*318] relating to his status as purported purchaser and seller of Franklin securities. Compl. lines 1630-90. The plain fact is that Fraser never purchased the Franklin securities. Id. lines 1630-31. He earned them as a part of his compensation and thus was not a purchaser. As to the other shares he acquired, they also suffer from fatal infirmities.

This Court adopts the analysis set out in Judge Berman's decision with regard to the grant of Franklin stock to Fraser through the Company's Restricted Stock Award Program en toto (see, June 23, 2005 Decision and Order, 7-10 (citing In re Cendant Corp. Sec. Litig., 81 F. Supp. 2d 550, 556 (D. N.J. 2000) ("When an employee does not give anything of value for stock other than the continuation of employment nor independently bargains for . . . stock, there is no 'purchase or sale' of securities." (citation omitted)))), and finds that Fraser does not satisfy the purchaser / seller requirement with regard to these shares.

With regard to the securities, which Fraser alleges he acquired under Incentive Plans by being induced to stay following the offer of employment from a competitor, Compl. [**14] lines 1643-90, this allegation is plagued by a number of fatal pleading deficiencies. First, Fraser fails to allege the number of Franklin stock that he acquired as part these Incentive Plans. Id. Second, while Fraser denominates these shares as ones acquired under the Incentive Plans (which are identified as the Fiduciary / Franklin Cash and Bonus Compensation Retention Plan and the Franklin Universal Stock Incentive Plan in the Second Amended Complaint, Compl. lines 1970-72), these shares were not identified as such in the "schedule"

of stock purchased (Pl.'s Ex. E). Instead, the "schedule" includes information regarding the "acquisition" of Trio Plan Stock Fund, Bond Fund, and Special Equity Fund and specifies as the acquisition date "[January 1, 2002 to March 31, 2002]." Id. Further, Fraser fails to identify any number of shares "acquired" through any of the Incentive Plans in both the schedule and the Second Amended Complaint. As Judge Berman noted, in order to satisfy the pleading requirement of Rule 9(b), Fraser must allege the dates on which he acquired stock and the number of shares acquired (June 23, 2005 Decision and Order, at 8 (citing cases)). Because the Second [**15] Amended Complaint fails to cure these (and other) defects related to the retention plans, the securities claims can not stand. [4]

> [4] Further, the Court doubts whether the second set of shares, in fact, even constitute bargained-for consideration as Fraser contends. Fraser relies on a company memorandum dated October 25, 2000 to show that Fraser was induced to stay at Franklin and forewent alternate, more lucrative compensation in exchange for the shares he received under the Incentive Plans (Pl. Ex. L). However, as Defendants point out, the memorandum in fact states that the company "had arranged for retention bonuses to be paid to all active salaried employees who have *accepted positions with us* through October 25, 2000." Id. (emphasis added). Elsewhere, Fraser alleges that he first received an offer of employment from Fiduciary in September, 2000, Compl. lines 1643, and that he started work at Fiduciary in October 2000. Id. lines 1646-47; see also id. lines 1997-99 (stating that Materasso included Fraser in the October 2000 Retention Plan although Fraser had been with the company for less than a month).

### [**16] b. § 10(b) Claim is Untimely

"Section 10(b) of the Securities Exchange Act of 1934 provides that 'no action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." [*319] Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 167 (2d Cir. 2005) (citing 15 U.S.C. § 78i(e)) (internal quotation marks and other citations omitted); see also Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003). Fraser's Second Amended

Complaint tries to avoid the statute of limitations by walking a fine line between what he "suspected" and what he "knew". Fraser attempts to avoid the statute of limitations by claiming that he based the March 19, 2001 actions on "suspicions" and that he did not have direct knowledge or evidence of wrongdoing until "one or two weeks" prior to his termination on March 7, 2003. Id. lines 793-97. Fraser can't have it both ways -- he cannot plead for purposes of his whistleblower claims that he "suspected" -- i.e., discovered -- wrongdoing in [**17] connection with the U.N. Pension Fund on March 19, 2001 but plead for purposes of his securities claims that he "knew" -- i.e., discovered -- that wrongdoing in early March, 2003. Compare Compl. lines 2002-03 ("After Plaintiff's March 19, 2001 e-mail, Materasso was motivated to deny Plaintiff promotion and portfolio management opportunities."), with id. lines 1994-96 ("Plaintiff's March 19, 2001 e-mail put Materasso on notice that Plaintiff was aware of unlawful activity at Fiduciary although at that time Plaintiff had no direct evidence to support his suspicions.").

Where an employee asserts securities fraud claims against an employer, the "discovery" analysis for purposes of the statute of limitations differs somewhat from the typical investor case. The Second Circuit has stated that "where 'the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint,' we can readily resolve the issue on a motion to dismiss, and have done so in 'a vast number of cases'." Lentell, 396 F.3d at 168 (citation omitted). [**18]

Fraser pled facts in which he claimed to have conducted an investigation relating to his "suspicions" about Defendants' improper AUM -- i.e., that he had conversations with several Fiduciary employees about the subject, that he reviewed Fiduciary's public financial reports, that he reviewed Fiduciary client presentation material, and, that he noted the fact that Fiduciary had a far smaller number of fixed income employees dedicated to managing its purported $ 20 billion in fixed income assets compared to other firms that disclosed a similar level of fixed income. Compl. lines 659-66, 670-76. This investigation and the knowledge he gained through it caused Fraser to communicate with higher-ups -- albeit in general terms -- regarding his suspicions. See id. lines 1994-96 ("Essentially, Plaintiff's March 19, 2001 e-mail put Materasso on notice that Plaintiff was aware of

unlawful activity at Fiduciary although at that time Plaintiff had no direct evidence to support his suspicions."). Having plead that he engaged in an investigation sufficient to raise "suspicions," which induced Fraser to act, Fraser has asserted on the face of the complaint that he had discovered the claimed [**19] wrongdoing as early as March, 2001 and, thus, is time-barred from asserting the § 10(b) claim. Accordingly, an alternate ground for dismissal of the § 10(b) claim is that it is time-barred.

### 2. California Securities Claims

Fraser asserts securities claims under California Corporate Code §§ 25402 and 25502. Section 25506 of the California Corporate Code provides that "for proceedings commencing before January 1, 2005, no action shall be maintained to enforce any liability created under Section . . . 25502 . . . . unless brought before the [*320] expiration of four years after the act or transaction constituting the violation or the expiration of one year after the discovery by the plaintiff of the facts constituting the violation, whichever shall first expire." Cal. Corp. Code § 25506. Section 25502 provides for damages for violations of § 25402. Cal. Corp. Code § 25502. Thus, Fraser's California securities claims are time-barred for the reasons stated above in relation to the federal securities claims (i.e., Fraser pled facts showing discovery of the circumstances giving rise to the AUM-related fraud [**20] in March, 2001). [5]

> [5] Plaintiff's counsel conceded at Oral Argument that if the Court were to dismiss the federal securities claims, the California securities violations would also have to be dismissed.

### 3. Controlling Person Liability

Because the Court is dismissing Fraser's § 10(b) and Rule 10b-5 claim, the Court also dismisses Fraser's Second Cause of Action for controlling person liability under § 20(a) of the Exchange Act. 15 U.S.C. § 78t; see also June 23, 2005 Decision and Order, at 10 (citing Salinger v. Projectavision, Inc., 972 F. Supp. 222, 235 (S.D.N.Y. 1997)).

### B. ERISA Claims

In Fraser's Amended Complaint he asserted three claims under ERISA: a § 510 claim for discriminatory discharge; a § 510 whistleblower claim; and a § 404

breach of fiduciary duty claim. Judge Berman sustained the § 510 discriminatory discharge claim (June 23, 2005 Decision and Order, at 26) and dismissed the other two claims without prejudice. The Court next considers [**21] Defendants' motion to dismiss each of the two remaining ERISA claims.

### 1. ERISA § 510 Whistleblower Claim

In the Second Amended Complaint (Third Cause of Action), Fraser asserts a claim under § 510 of ERISA. Compl. line 1794. ERISA § 510 provides that "it shall be unlawful for any person to discharge . . . or discriminate against any person because he has given information or has testified or is about to testify in any *inquiry or proceeding* relating to this chapter . . . ." 29 U.S.C. § 1140 (emphasis added). As Judge Berman noted in his Decision and Order, in order for a plaintiff to assert a claim under this provision, he must allege "that he gave information in connection with an 'inquiry'" (June 23, 2005 Decision and Order, at 19 (citing Nicolaou v. Horizon Media, Inc., 402 F.3d 325, 328-29 (2d Cir. 2005)). The Second Amended Complaint did not cure Fraser's prior failure to plead facts that he provided information concerning ERISA violations in response to an "inquiry." Thus, this claim is dismissed with prejudice.

### 2. ERISA § 404 Breach of Fiduciary Duty Claims

In the Second Amended Complaint (Third Cause of Action), [**22] Fraser also asserts a claim under § 404 of ERISA against the Individual Defendants. Compl. lines 1788-92, 1877-80. This provision imposes a "prudent man standard of care" on fiduciaries under the Act. 29 U.S.C. § 1104(a). More specifically, this duty requires ERISA fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries," § 1104(a)(1), "for the exclusive purpose of providing benefits to participants and their beneficiaries," § 1104(a)(1)(A)(I), and "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." § 1104(a)(1)(C). ERISA defines a [*321] person to be "a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any

Page 6

417 F. Supp. 2d 310, *321; 2006 U.S. Dist. LEXIS 6467, **22;
87 Empl. Prac. Dec. (CCH) P42,268; 37 Employee Benefits Cas. (BNA) 1195

authority or responsibility to do so, or (iii) [**23] he has any discretionary authority or discretionary responsibility in the administration of such plan." § 1002(21)(A).

Defendants contend that this claim should be dismissed because "the Second Amended Complaint lacks sufficient allegations to establish that any of the Individual Defendants are fiduciaries" (Defs.' Br. 13).

In the Second Amended Complaint, Fraser's allegations regarding the Individual Defendants identifies their role in the defendant companies (see Compl. lines 188-212). None of these allegations, however, contain facts regarding the Individual Defendants and their role as fiduciaries vis-a-vis the "Trio Plan," which is the basis of this ERISA claim. Id. The allegations with respect to the Individual Defendants and the ERISA § 404 breach of fiduciary claim is limited to the following:

. "the Individual Defendants owed and owe Fiduciary, Franklin and their respective Client Participants and Beneficiaries fiduciary obligations and duties," Compl. lines 1788-89;

. "the Inidividual Defendants, and each of them, respectively, violated their respective fiduciary obligations and breached their fiduciary duties as set forth in Sections 510 and 1104, respectively [**24] of [ERISA][;] they made no reasonable inquiry[;] they exercised no standard of due care; and they provided no oversight, supervision nor response to notices of wrongdoing." Id. lines 1793-97.

"Given that a defendant's role as an executive of an employing company is, standing alone, insufficient to confer fiduciary status, these allegations are inadequate."In re AOL Time Warner, Inc. Sec. and ERISA Litig., 02 Civ. 8853, 2005 U.S. Dist. LEXIS 3715, at *14 (S.D.N.Y. Mar. 10, 2005) (citing to regulations). The pleading requirements for an ERISA claim are not stringent: "an ERISA complaint need 'do little more than track the statutory definition' to establish a defendant's fiduciary status in compliance with Rule 8." In re Polaroid ERISA Litig., 362 F. Supp. 2d 461, 470 (S.D.N.Y. 2005) (citations omitted). A complaint "satisfies that standard by separately alleging that each Defendant was a Plan fiduciary who exercised discretionary authority regarding the Plan." Id. Because Fraser has failed to satisfy even this very liberal requirement, the ERISA § 404 breach of fiduciary claim is dismissed with prejudice.

## C. SOX Claims

Fraser [**25] asserts SOX § 806 claims based on four purported instances of whistleblowing. As noted previously, Judge Berman sustained one claim based on the Third Instance and dismissed without prejudice other claims based on the First, Second, and Fourth Instances alleged in the Amended Complaint (June 23, 2005 Decision and Order, at 26).

Section 806 provides that "no company with a class of securities registered under section 12 of the [Exchange Act], or that is required to file reports under section 15(d) of the [Exchange Act], or any officer, employee, contractor, subcontractor, or agent of such company, may discharge . . . or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee to provide information [*322] . . . regarding any conduct which the employee reasonably believes constitutes a violation of . . . any rule or regulation of the [SEC], or any provision of Federal law relating to fraud against shareholders, when the information . . . is provided to . . . a person with supervisory authority over the employee." 18 U.S.C. § 1514A.

To assert a whistleblower claim under SOX, [**26] Fraser "must show by a preponderance of the evidence that (1) [he] engaged in protected activity; (2) the employer knew of the protected activity; (3) [he] suffered an unfavorable personnel action; and (4) circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action." Collins v. Beazer Homes USA, Inc., 334 F. Supp. 2d 1365, 1375 (N.D. Ga. 2004) (citations omitted). SOX protects employees who provide information, which the employee "reasonably believes constitutes a violation'" of any SEC rule or regulation or "'Federal law relating to fraud against shareholders'." Id. (citing 18 U.S.C. § 1514A(a)(1)). While a plaintiff need not show an actual violation of law, id, or cite a code section he believes was violated (June 23, 2005 Decision and Order, at 16), "'general inquiries . . . do not constitute protected activity'." Id. (citing cases); see also Lerbs v. Buca Di Beppo, Inc., 2004-SOX-8, 2004 DOLSOX LEXIS 65, at **33-34 (Dep't Labor June 15, 2004) ("In order for the whistleblower to be protected by [SOX], the reported information must have a certain degree of specificity [**27] [and] must state particular concerns which, at the very least, reasonably identify a respondent's conduct that

417 F. Supp. 2d 310, *322; 2006 U.S. Dist. LEXIS 6467, **27;
87 Empl. Prac. Dec. (CCH) P42,268; 37 Employee Benefits Cas. (BNA) 1195

the complainant believes to be illegal." (citation omitted). Thus, "protected activity must implicate the substantive law protected in Sarbanes-Oxley 'definitively and specifically'" (June 23, 2005 Decision and Order, at 16 (citation omitted)).

### 1. First and Fourth Instances

Neither the First Instance nor the Fourth Instance constitute protected activity under SOX. With regard to the First Instance, Fraser contends that a confidential memo he prepared and sent to Fiduciary's Human Resources Department along with other e-mails to company official Biggs, the current Vice Chairman of Fiduciary and former Chief Investment Officer, contained whistleblowing information regarding illegal conduct. Compl. P67. Fraser alleges that the e-mails to Biggs "suggested the large losses sustained across accounts could have been avoided if Rohwetter had heeded [Fraser's] advice for investment strategy and not taken a cavalier attitude towards [Fraser's] credit research." Id. (lines 697-99) Further, the confidential memo "spoke of how Rohwetter wanted [Fraser] to conceal and [**28] falsify the actual 2001 year end performance results and characteristics for the high yield component of client portfolios in communication reports to clients." Id. (lines 707-10).

The Court has conducted a searching review of Fraser's original OSHA complaint and of the confidential memo (Pl.'s Ex. M). Fraser has failed to cure the pleading deficiency with regard to the First Instance, which Judge Berman previously found (June 23, 2005 Decision and Order, at 17). Fraser's documents complain that his advice was not followed, but they are barren of any allegations of conduct that would alert Defendants that Fraser believed the company was violating any federal rule or law related to fraud on shareholders. As such, any claim based on the First Instance is dismissed with prejudice.

With regard to the Fourth Instance, Fraser alleges that on March 6, 2003, one day before his termination, he sent an e-mail [*323] to Materasso, Fiduciary President Yun, and General Counsel Edward Eisert "to inform senior management that investment performance had suffered because the New York office failed to implement a recommendation he proposed on November 1, 2002 to establish a long/short high-yield investment [**29] fund for Fiduciary clients." Compl. P71 (lines 837-42). Fraser further alleges that "the high-yield sector

was experiencing strong market appreciation shortly after his November 1st proposal and Fiduciary clients were missing out." Id. (lines 842-43). Fraser contends that "the far too conservative investment posture" violated the clients' investment policy statement guidelines and the Third Restatement of Trusts. Id. (lines 857-58). The Fourth Instance suffers from the same deficiency as the First Instance. Fraser's March 6, 2003 e-mail is more a complaint that his advice was not being followed but contains no communication from Fraser to any of the Defendants indicating that Fraser believed the company to be violating any provision related to fraud on shareholders. Accordingly, the claim based on the Fourth Instance is dismissed with prejudice. [6]

6 Because there is no way to construe the First or Fourth Instances as protected activity, the Court does not reach the issue of whether ERISA violations fall under SOX.

### [**30] 2. Second Instance

Fraser's claim based on the Second Instance -- although a close call -- fairs better. As noted previously, this communication concerned WorldCom bonds. On February 6, 2002, Fraser prepared an e-mail stating that the company's Fixed Income Group was "recommending a SELL on WorldCom bonds due to deteriorating industry conditions, continued pricing pressures and heightened competition" (Pl.'s Ex. M). The e-mail continued that "although the debt is rated A3/Stable/BBB+/Stable, its credit ratios continue to worsen on a sequential quarterly basis." Id. The e-mail attached another e-mail prepared on December 21, 2001, which contained an analysis and recommendation to reduce holdings of WorldCom bonds among other investments. Id. On May 16, 2002, Fraser forwarded to company President Yun the February 6, 2002 and December 21, 2001 e-mails stating "I prepared this e-mail to distribute firmwide, but was told by one of the NY-based PMs not send [sic] this e-mail out (for whatever reason, I do not know)." Id.

While Fraser does not expressly state in this e-mail that Defendants are engaged in illegal conduct related to fraud on shareholders, given the context [**31] of the e-mail and the circumstances giving rise to the communication -- i.e., clients of the New York office benefitted from a prudent decision to timely sell WorldCom bonds, whereas the Los Angeles clients suffered losses related to this holdings, which losses they

417 F. Supp. 2d 310, *323; 2006 U.S. Dist. LEXIS 6467, **31;
87 Empl. Prac. Dec. (CCH) P42,268; 37 Employee Benefits Cas. (BNA) 1195

might have avoided had the New York office communicated the decision to sell -- the e-mail is sufficient to satisfy the pleading requirement for a SOX whistleblowing claim.

With regard to this claimed Instance, "the Court finds that Defendants cannot establish as a matter of law that Plaintiff did not engage in protected activity under Sarbanes-Oxley." Collins, 334 F. Supp. 2d at 1377. Thus,

> though this is a close case, . . . the Court finds that there is a genuine issue of material fact whether Plaintiff engaged in protected activity. It is evidence that Plaintiff's complaints do not rise to the level of complaints that were raised by Sherron Watkins at Enron. However, the mere fact that the severity [*324] or specificity of her complaints does not rise to the level of action that would spur Congress to draft legislation does not mean that the legislation it did draft was not meant to protect [him]. [**32] In short, if Congress had intended to limit the protection of Sarbanes Oxley . . . or to have required complainants to specifically identify the code section that they believe was being violated, it could have done so. It did not. Congress instead protected "employees" and adopted the "reasonable belief" standard for those who "blow the whistle on fraud and protect investors."

Id. at 1377 (citations omitted). [7]

> 7    For purposes of SOX applicability, at a minimum, Fraser contends that the Second Instance relates to violations of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80-b et seq., which prohibits fraudulent conduct by investment advisers against shareholders. Compl. lines 757-58, 761-62; see also 15 U.S.C. § 80-b(6)(2) (Investment Advisers Act of 1940, proscribing conduct "which operates as a fraud or deceit upon any client or prospective client").

Judge Berman's June 23, 2005 Decision and Order previously found that Fraser [**33] satisfied the other prongs necessary to assert SOX whistleblower claims -- that is, employer awareness of protected activity;

unfavorable personnel action; and contributing factor (June 23, 2005 Decision and Order, at 17-18). [8]

> 8    Judge Berman suggested that the fact that the Second Instance occurred almost ten months prior to Fraser's termination did not provide sufficient temporal proximity to satisfy the "contributing factor" prong (June 23, 2005 Decision and Order, at 18). Nevertheless, the Court finds that Plaintiff has plead sufficient facts suggesting retaliation, such as for instance Materasso's moving Fraser's desk next to him. Compl. lines 762-63.

### D. Race Discrimination Claims

Judge Berman denied Defendants' motion to dismiss Fraser's race discrimination claims. Accordingly, these claims survived and remain in the action.

### E. Breach of Contract Claim

Generally the law in New York is that at-will employees, like Fraser, can be fired at any time, without reason. Horn v. New York Times, 100 N.Y.2d 85, 90-91, 790 N.E.2d 753, 760 N.Y.S.2d 378(2003). [**34] There are certain well-defined and limited exceptions to this rule. Id. at 92. Where an employer has a well-established, written practice that specifies procedures and grounds for termination, the "at-will" doctrine may be modified. Weiner v. McGraw-Hill, 57 N.Y.2d 458, 465-66, 443 N.E.2d 441, 457 N.Y.S.2d 193 (1982). "To establish that such policies are a part of the employment contract, an employee alleging a breach of implied contract must prove that (1) an express written policy limiting the employer's right of discharge exists, (2) the employer (or one of its authorized representatives) made the employee aware of this policy, and (3) the employee detrimentally relied on the policy in accepting or continuing employment." Baron v. Port Auth. of N.Y. and N.J., 271 F.3d 81, 85 (2d Cir. 2001) (citation omitted).

Fraser satisfied the pleading requirement with regard to "express limitations." Id. Fraser cites passages from the manual, which states as follows: "employees are responsible for reporting to a Department Head if they have any knowledge of any illegal conduct by any employee, if that conduct relates to Company business . . . [;] no reprisals shall [**35] be made against the reporting employee." Compl. P157 (lines 2143-49). In addition, the manual states that "an employee who has disclosed in good faith [those personal circumstances that

417 F. Supp. 310, *324; 2006 U.S. Dist. LEXIS 6467, **35;
87 Empl. Prac. Dec. (CCH) P42,268; 37 Employee Benefits Cas. (BNA) 1195

the Policy Manual addresses [*325] [are] grounds for immediate dismissal and possible legal action] will be afforded a reasonable time to resolve conflicts or the appearance of conflict without prejudice." Id. P161 (lines 2192-99). "Defendants' . . . Manual advises employees to report misconduct and assures protection from any retaliation[;] under New York law, such language appears sufficient to create a limitation on the at-will nature of [Plaintiff's] employment." Brady v. Calyon Securities (USA), 05 Civ. 3470, 406 F. Supp. 2d 307, 2005 U.S. Dist. LEXIS 27130, at *19 (S.D.N.Y., Nov. 8, 2005). Fraser also satisfies the second prong of the pleading requirement -- i.e. employer notification of employee -- as he contends that he signed statements indicating his receipt of the Fiduciary Company Policy Manual in 2000, 2001, 2002, and 2003. Compl. P156 (lines 2129-30).

Judge Berman dismissed the breach of contract claim in his June 23, 2005 Decision and Order, in part, because Fraser [**36] failed to plead reliance. Fraser's Second Amended Complaint alleges reliance and thus cures the prior pleading deficiency. See id. PP156, 157, 162. The Court denies Defendants' motion to dismiss the breach of contract claim.

F. Jury Trial

"There is no right to a jury trial under ERISA. . . ." Muller v. First Unum Life Ins. Co., 341 F.3d 119, 124 (2d Cir. 2003) (citing Sullivan v. LTV Aerospace and Def. Co., 82 F.3d 1251, 1257-59 (2d Cir. 1996)). Accordingly, Defendants' motion to strike Plaintiff's Demand for Jury Trial on the ERISA claims is granted.

"The SOX Act is silent as to whether a plaintiff may demand a jury trial. . . ." Hanna v. WCI Communities, Inc., 348 F. Supp. 2d 1332, 1334 (S.D. Fla. 2004). This Court could find only one published decision, which considered whether a litigant may demand a jury trial for SOX claims. Murray v. TXU Corp., 03 Civ. 0888, 2005 U.S. Dist. LEXIS 10945 (N.D. Tex. June 7, 2005). In that

case, the court struck plaintiff's demand for a jury trial. Id. at *16.

At this time, the Court denies Defendants' motion to strike a jury trial on the SOX claims without prejudice [**37] to bring this motion again prior to trial. At that later juncture, the Court might have the benefit of guidance from additional courts that have considered the issue. Hanna, 348 F. Supp. 2d at 1334.

CONCLUSION

Judge Berman previously allowed the following claims: SOX § 806 based on the Third Instances; the discriminatory discharge § 510 ERISA claim; and all race discrimination complaints (June 23, 2005 Decision, at 26). Pursuant to this Order and Decision, the following claims are added: SOX § 806 claim based on the Second Instances and the common law breach of contract claim. In considering the contract claim, Fraser may assert the allegations arising out of the Second and Third Instances. The First and Fourth Instances do not rise to the level of whistleblowing and are more reflective of Fraser's complaints that Defendants did not follow his investment advice. They cannot be read as allegations of wrong-doing, the sine qua non of whistleblowing. Defendants should answer the surviving claims and discovery should proceed on the surviving claims.

Accordingly, the Court grants in part and denies in part Defendants' motion to dismiss.

SO ORDERED

[**38] PAUL A. CROTTY

United States District Judge

Dated: New York, New York

February 15, 2006