LEXSEE

IN RE: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS
LIABILITY LITIGATION; This document relates to: Escambia County Utilities
Authority v. Amerada Hess Corp., et al., No. 04 Civ. 1722 (SAS); Town of
Campbellsburg v. Amerada Hess Corp., et al., No. 04 Civ. 4990 (SAS); City of
Mishawaka v. Amerada Hess Corp., et al., No. 04 Civ. 2055 (SAS); City of Rockport
v. Amerada Hess Corp., et al., No. 04 Civ. 1724 (SAS); City of South Bend v.
Amerada Hess Corp., et al., No. 04 Civ. 2056 (SAS); North Newton School Corp. v.
Amerada Hess Corp., et al., No. 04 Civ. 2057 (SAS); City of Sioux City, et al. v.
Amerada Hess Corp., et al., No. 04 Civ. 1723 (SAS); Chisholm Creek Utility
Authority v. Alon USA Energy, Inc., et al., No. 04 Civ. 2061 (SAS); City of Bel Aire
v. Alon USA Energy, Inc., et al., No. 04 Civ. 2062 (SAS); City of Dodge City v. Alon
USA Energy, Inc., et al., No. 04 Civ. 2060 (SAS); City of Park City v. Alon USA
Energy, Inc., et al., 04 Civ. 2059 (SAS); Craftsbury Fire District # 2 v. Amerada Hess
Corp., et al., No. 04 Civ. 3419 (SAS); Town of Duxbury, et al. v. Amerada Hess
Corp., et al., No. 04 Civ. 1725 (SAS); Town of Hartland v. Amerada Hess Corp., et
al., No. 04 Civ. 2072 (SAS); Town of Matoaka v. Amerada Hess Corp., et al., No. 04
Civ. 3420 (SAS)

Master File No. 1:00-1898, MDL 1358 (SAS), M21-88

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2005 U.S. Dist. LEXIS 753; CCH Prod. Liab. Rep. P17,292

January 18, 2005, Decided
January 18, 2005, Filed

**SUBSEQUENT HISTORY:** Claim dismissed by, Motion denied by In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 2005 U.S. Dist. LEXIS 6686 (S.D.N.Y., Apr. 20, 2005)

**PRIOR HISTORY:** Orange County Water Dist. v. Unocal Corp. (In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.), 2005 U.S. Dist. LEXIS 225 (S.D.N.Y., Jan. 6, 2005)

**DISPOSITION:** [*1] Motions by defendant Lyondale Chemical Company to dismiss Florida, Indiana, Iowa, Kansas, Massachusetts, Vermont, and West Virginia complaints denied.

**COUNSEL:** For Plaintiffs: Robert Gordon, Esq., C. Sanders McNew, Esq., Stanley N. Alpert, Esq., Weitz & Luxenberg, P.C., New York, NY.

For Defendants: Peter John Sacripanti, Esq., James A. Pardo, Esq., Stephen J. Riccardulli, Esq., McDermott, Will & Emery, New York, NY.

For Defendant Lyondell Chemical Company: Alan J. Hoffman, Esq., Laurence S. Shtasel, Esq., Blank Rome LLP, Philadelphia, PA.

**JUDGES:** Shira A. Scheindlin, U.S.D.J.

**OPINION BY:** Shira A. Scheindlin

**OPINION**

**OPINION AND ORDER**

SHIRA A. SCHEINDLIN, U.S.D.J.:

2005 U.S. Dist. LEXIS 753, *1; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

In 2003, dozens of cities, municipalities and related entities across the country ("plaintiffs") began filing actions against hundreds of companies in the petroleum industry. [1] Plaintiffs allege, in essence, that these companies caused the contamination, or threatened contamination, of groundwater with the gasoline additive methyl tertiary butyl ether ("MTBE"). [2] One of the defendants, Lyondell Chemical Corporation ("Lyondell"), generates billions of dollars in sales annually as a major manufacturer and marketer [*2] of chemicals worldwide. 3 Lyondell is also the world's largest producer of MTBE, according to plaintiffs. [4]

1  *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 342 F. Supp. 2d 147, 148 (S.D.N.Y. 2004) ("MTBE I")*.

2  The factual allegations recited in this Opinion, which do *not* constitute findings of fact by the court, are primarily based on three sources: (1) plaintiffs' complaints, (2) supporting materials attached to plaintiffs' briefs in opposition to Lyondell's motions to dismiss and (3) supporting materials attached to Lyondell's briefs in support of their motions to dismiss. Because the facts alleged in the various complaints are close to identical, and any differences do not affect the jurisdictional analysis, for purposes of this opinion I will rely on the allegations set forth in the complaint in *City of Mishawaka v. Amerada Hess Corp. et al.*, No. 04 Civ. 2055, paragraphs of which are referred to as "Compl. P___." The supporting materials for plaintiffs' briefs are identical and attached as Exhibits A through E to plaintiffs' briefs and are referred to as "Pl. Ex. ___." The relevant supporting material for each of the defendant's briefs is an affidavit by Karen M. Bowling, a Business Manager for Lyondell. This affidavit is referred to as "Bowling Aff."

[*3]

3  *See* Pl. Ex. A (2003 Lyondell Annual Report).

4  *See* Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss Florida Complaint ("Pl. Fla. Mem.") at 1 (citing Pl. Ex. E (1987 statement of ARCO, predecessor to Lyondell)); Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Indiana Complaints ("Pl. Ind. Mem.") at 1 (same); Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss Iowa Complaints ("Pl. Iowa Mem.") at 1 (same); Plaintiffs'

Memorandum of Law in Opposition to Defendant's Motion to Dismiss Kansas Complaints ("Pl. Kan. Mem.") at 1 (same); Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss Massachusetts Complaint ("Pl. Mass. Mem.") at 1 (same); Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss Vermont Complaints ("Pl. Vt. Mem.") at 1 (same); Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss West Virginia Complaint ("Pl. W. Va. Mem.") at 1 (same).

Lyondell now moves to dismiss seven complaints against it, pursuant to Federal Rule of Civil Procedure 12(b)(2) [*4] , on the ground that plaintiffs have failed to make a prima facie showing that this Court may exercise personal jurisdiction over it. [5] The complaints that Lyondell seeks to have dismissed were originally filed in seven states: Florida, Indiana, Iowa, Kansas, Massachusetts, Vermont, and West Virginia. The cases were then removed to federal court and subsequently transferred to this Court pursuant to section 1407 of Title 28 of the United States Code and Rule 7.4 of the Rules of the Judicial Panel on Multidistrict Litigation. [6]

5  *See* Lyondell's Memorandum of Law in Support of Motion to Dismiss Florida Complaint ("Lyondell Fla. Mem."); Lyondell's Memorandum of Law in Support of Motion to Dismiss Indiana Complaints ("Lyondell Ind. Mem."); Lyondell's Memorandum of Law in Support of Motion to Dismiss Iowa Complaints ("Lyondell Iowa Mem."); Lyondell's Memorandum of Law in Support of Motion to Dismiss Kansas Complaints ("Lyondell Kan. Mem."); Lyondell's Memorandum of Law in Support of Motion to Dismiss Massachusetts Complaint ("Lyondell Mass. Mem."); Lyondell's Memorandum of Law in Support of Motion to Dismiss Vermont Complaints ("Lyondell Vt. Mem."); Lyondell's Memorandum of Law in Support of Motion to Dismiss West Virginia Complaint ("Lyondell W. Va. Mem."). Lyondell has also filed a reply brief for each of its motions, which will be referred to with similar abbreviations (*e.g.*, "Lyondell Fla. Reply").

[*5]

6  *See MTBE I*, 342 F. Supp. 2d at 149.

2005 U.S. Dist. LEXIS 753, *5; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

## I. BACKGROUND ON LYONDELL AND MTBE

"Lyondell is a leading global manufacturer and marketer of intermediate chemicals and performance chemical products used in a broad range of consumer goods." [7] In 2003, Lyondell reported a revenue that exceeded $ 3.8 billion. [8] Among the many chemicals produced by Lyondell is MTBE, the chemical compound that results from the reaction of methanol and isobutylene, a by-product of the gasoline refining process. [9]

> 7   Pl. Ex. B (Lyondell's Form 10-K for the Year Ended December 31, 2001).
> 8   See Pl. Ex. A.
> 9   See Compl. P75.

According to the Environmental Protection Agency, "MTBE is produced in very large quantities (over 200,000 barrels per day in the U.S. in 1999) and is almost exclusively used as a fuel additive in motor gasoline." [10] Petroleum companies purportedly add this compound to their gasoline [*6] because MTBE helps raise the oxygen content of the gasoline, which then burns in a more efficient and cleaner fashion. [11] At room temperature, MTBE is a volatile liquid that has a chemical attraction to water molecules and is therefore highly soluble in water. [12]

> 10   U.S. Environmental Protection Agency, "Methyl Tertiary Butyl Ether (MTBE): Overview," *available at* http://www.epa.gov/mtbe/faq.htm.
> 11   Plaintiffs allege that "Defendants' motivation for including MTBE in gasoline, however, was to boost octane cheaply and increase their own profits, and their use of MTBE as a gasoline additive predated the environmental concerns they invoke to justify their use of MTBE." Compl. P79.
> 12   See id. PP1, 73.

Indeed, "MTBE is more than an order of magnitude more soluble in water than other gasoline constituents and therefore has a stronger affinity for and dissolves more easily in any available water." [13] "Whenever gasoline with MTBE leaks, spills, or is otherwise released into the environment, [*7] the MTBE races through underground water reservoirs, spreading faster and farther than other chemical components contained in gasoline, reaching the water table, and soon contaminating wells that draw from the affected underground aquifers." [14] Moreover, "MTBE is slow to break down after it is released into the environment, particularly in the subsurface of the ground." [15] "Because of its recalcitrance, plumes of MTBE can persist in underground aquifers for many decades, far longer than other components of gasoline." [16]

> 13   Id. P84.
> 14   Id. P85.
> 15   Id. P86.
> 16   Id.

"Even in very small quantities, MTBE gives water a foul taste and odor that renders the water unusable and unfit for human consumption." [17] "MTBE's taste and odor alone are enough to render previously potable water unfit for consumption." [18] MTBE is a "known animal carcinogen that is linked to many potential human health problems." [19] MTBE is also a possible human carcinogen. [20]

> 17   Id. P87.
> [*8]
> 18   Id.
> 19   Id. P89. See also id. P1.
> 20   See id. P89.

"MTBE accounted for approximately 26% of Lyondell's total revenues in 2003, 35% in 2002 and 28% in 2001." [21] Moreover, "Lyondell's North American MTBE sales represented approximately 17% of its total 2003 revenues." [22] Based on these reported percentages of Lyondell's sales, Plaintiffs have calculated that Lyondell sold more than $ 640 million worth of MTBE in North America in 2003 alone. [23] As plaintiffs have noted in their briefs, Lyondell sells its MTBE to refiners and distributors, such as ExxonMobil Corporation, the world's largest integrated energy company and a company that has a broad distribution range for its gasoline. [24]

> 21   Pl. Ex. B.
> 22   Id.
> 23   See, e.g., Pl. Fla. Mem. at 2.
> 24   See id. at 3 n.6 ("In its discovery responses, ExxonMobil Corporation, the world's largest integrated energy company, listed Lyondell as a supplier of MTBE used in its reformulated gasoline (RFG) as recently as last year.").

2005 U.S. Dist. LEXIS 753, *8; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

[*9] Plaintiffs in seven states filed complaints against Lyondell and the other defendants alleging, *inter alia,* seven claims based on the law of those states: (1) strict liability for design defect and/or defective product, (2) strict liability for failure to warn, (3) negligence, (4) public nuisance, (5) private nuisance, (6) trespass, and (7) civil conspiracy. [25] Lyondell now moves to dismiss these complaints based on lack of personal jurisdiction. For the reasons that follow, Lyondell's motions are denied.

25  *See* Compl. PP189-245.

## II. INTERPRETATION OF FEDERAL LAW IN MULTI-DISTRICT LITIGATION

As an initial matter, I address which opinions the Court considers controlling when resolving questions of federal law in this multi-district litigation. While initially transferee courts applied the law of the transferor circuit, it is now well accepted that the transferee court applies the law of its circuit when interpreting questions of federal law. Yet, on these motions to dismiss for lack of personal [*10] jurisdiction, the parties have cited the opinions of seven federal circuits (*i.e.,* the transferor circuits) on the issue of the limits imposed by the U.S. Constitution in the exercise of personal jurisdiction.

Which circuit's opinions control this issue is particularly critical here because the circuits disagree on the limits imposed by the Due Process Clause. For example, as discussed in depth below, the First, Fourth, and Eleventh Circuits have interpreted the U.S. Constitution to impose stricter limitations on the exercise of personal jurisdiction than the Eighth Circuit (as well as the Fifth and Sixth Circuits). [26] Complaints were originally filed in all of these circuits. In the former circuits, however, defendants have a stronger argument for dismissal; in the Eighth Circuit, plaintiffs have the better argument. And, finally, in other circuits, including the Second Circuit, the limits imposed by the U.S. Constitution have yet to be definitively resolved at the circuit court level, which leaves the issue open for this Court to resolve. Determining what circuit law applies to this prong of the jurisdictional analysis merits some discussion.

26  *See infra* note 80.

[*11] **A. Why Courts Have Applied the Law of the Transferee Court in Multi-District Litigation and the Problem Posed by *Lexecon***

Prior to 1987, some courts followed the opinions of the transferor courts in multi-district litigation rather than the law of the transferee court when interpreting a federal statute or the U.S. Constitution. Many of these courts considered the opinions of the transferor court to be binding primarily because of an inapplicable Supreme Court opinion involving state choice-of-law problems. [27]

27  In *Van Dusen v. Barrack,* 376 U.S. 612, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964), the Supreme Court answered the following question: "When a defendant in a diversity action moves for a venue transfer under 28 U.S.C. § 1404(a), which state's law applies post-transfer?" In that case, the defendants in a diversity case sought to transfer the case from the Eastern District of Pennsylvania to the District of Massachusetts. The substantive state law applied to the case was critical to the case because Massachusetts, but not Pennsylvania, limited the damages that plaintiffs could recover. The Supreme Court held that Pennsylvania law would govern substantive state law questions even though all further proceedings would take place in the Massachusetts district court. In deciding which state law should apply -- Pennsylvania (the transferor) or Massachusetts (the transferee), the Court reasoned that because the "twin aims" of the *Erie v. Tompkins,* 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (1938) rule are "discouragement of forum-shopping and avoidance of inequitable administration of the laws," *Hanna v. Plumer,* 380 U.S. 460, 468, 14 L. Ed. 2d 8, 85 S. Ct. 1136 (1965), it would make no sense for the *substantive* state law to change because the case had been transferred from one federal court to another.

The rationales underlying *Erie* and its progeny do not have any force when a federal court interprets and applies *federal* statutory or constitutional law in a multi-district litigation pursuant to 28 U.S.C. § 1407. The parties are not able to "forum shop" and there is no "inequitable administration of the laws" because the same federal law will always apply regardless of the transfer. Of course, how federal statutory or constitutional law is *interpreted* may (or may not) differ depending on which circuit court's interpretation controls the issue and whether that issue has been decided. While the difference

2005 U.S. Dist. LEXIS 753, *11; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

between the law that applies and its interpretation may occasionally be a murky one, it is nonetheless a distinction that courts not only commonly draw but, in fact, strive to maintain.

It should be noted that in *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 408 n.7 (2d Cir. 1975), the Second Circuit applied the law of the transferor court to a group of cases based on federal securities law and transferred under section 1407, relying on *Van Dusen*. *See id.* ("Since this case was brought in a district court in the Fifth Circuit, the substantive law of that circuit is the law we must consider here."). *See also In re Gas Reclamation, Inc. Sec. Litig.,* 659 F. Supp. 493, 510 (S.D.N.Y. 1987) ("We agree with defendants that the law of the transferor forum applies.") (citing *Berry Petroleum*).

[*12] In 1987, however, the question was resolved in favor of applying the law of the transferee court when construing a federal statute or the U.S. Constitution. In *In re Korean Air Lines Disaster,* [28] authored by then-Judge Ruth Bader Ginsburg, the court cited three reasons for its conclusion that a district court should not be bound by the opinions of each transferor circuit. *First,* "applying divergent interpretations of the governing federal law to plaintiffs, depending solely upon where they initially filed suit, would surely reduce the efficiencies achievable through consolidated preparatory proceedings." [29] *Second,* "because there is ultimately a single proper interpretation of federal law, the attempt to ascertain and apply diverse circuit interpretations simultaneously is inherently self-contradictory." [30] *Third,* the parties could always seek review by the Supreme Court if the lower courts had different interpretations of the same law, which could then provide a single interpretation. [31]

28   265 U.S. App. D.C. 39, 829 F.2d 1171 (D.C. Cir. 1987).

29   *Id.* at 1175.

[*13]

30   *Id.*

31   *See id.* at 1176.

In his concurrence, Judge Douglas Ginsburg wrote "separately to emphasize the practical problems inherent in any resolution of this problem under the statute as written." [32] Judge Ginsburg first found it salient that "Congress could have directed transferee courts to apply the case law of the transferor court" but found "no such

language in section 1407(a)." [33] In addition, "Congress contemplated that transferred cases might never return to the transferor courts, but instead might be settled or resolved by summary judgment in the transferee court, or else transferred under section 1404(a) to that same transferee court for joint trial." [34] "In practice, the vast majority of transferred cases are so resolved, and do not return to the transferor courts." [35] "Finally, during the period of the 1407(a) transfer, any appeals -- interlocutory or after summary judgment -- go to the court of appeals for the transferee court, not to the courts of appeals for the transferor circuits." [36]

32   *Id.* (Douglas Ginsburg, J., concurring).

[*14]

33   *Id.* at 1178.

34   *Id.* In fact, prior to the Supreme Court's decision in 1998 holding that cases were required to be remanded back to the transferor court for trial, less than four percent of cases transferred under section 1407 were sent back for trial in the district where the complaint was filed. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach (In re American Continental Corporation/Lincoln S&L Secs. Litig.)* 102 F.3d 1524, 1540 (9th Cir. 1996) (Kozinski, J., dissenting).

35   *In re Korean Air Lines Disaster,* 829 F.2d 1171 at 1178, 265 U.S. App. D.C. 39.

36   *Id.*

Following this decision, the circuit and district courts have uniformly applied the law of the transferee circuit to issues of federal law. [37] In 1998, however, the landscape changed again. In *Lexecon v. Milberg Weiss Bershad Hynes & Lerach,* [38] the Supreme Court overturned three decades of uniform case law that allowed transferee courts to retain cases for trials through the practice of a "self-transfer" under section 1404, [39] the federal statute allowing a change of venue. *Lexecon* held that section 1407 prohibits this practice because [*15] this statute requires transferee courts to remand all cases to the transferor courts once the pretrial proceedings have concluded.

37   For circuit court opinions, see *Knouse v. Gen. Am. Life Ins. Co. (In re Gen. Am. Life Ins. Co. Sales Practices Litig.),* 391 F.3d 907, 911 (8th Cir. 2004) (citing *Temporomandibular Joint (TMJ) Implant Recipients v. E.I. Du Pont de*

2005 U.S. Dist. LEXIS 753, *15; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

*Nemours & Co.,* 97 F.3d 1050, 1055 (8th Cir. 1996), which relies on *In re Korean Air Lines* for its holding; *Murphy v. F.D.I.C.,* 208 F.3d 959, 964-65 (11th Cir. 2000) (discussing at length Korean Air Lines);*In re Newton v. Thomason,* 22 F.3d 1455, 1460 (9th Cir. 1994) ("We are persuaded by the approach taken by the D.C. Circuit in *In re Korean Air Lines Disaster.*"); *Bradley v. United States,* 161 F.3d 777, 782 n.4 (4th Cir. 1998) ("We, of course, apply the law of the Fourth Circuit, not the Fifth Circuit.") (citing *In re Korean Air Lines*); *Menowitz v. Brown,* 991 F.2d 36, 40-41 (2d Cir. 1993). "The Seventh Circuit has also agreed, in dicta, in the factually dissimilar case of *Eckstein v. Balcor Film Investors,* 8 F.3d 1121 (7th Cir. 1993), with the reasoning of the D.C. Circuit." *Murphy,* 208 F.3d at 965 n.4.

For examples of recent district court opinions, see *Rubin v. MasterCard Int'l, LLC,* 342 F. Supp. 2d 217, 218 n.1 (S.D.N.Y. 2004) (holding, in a case transferred from Florida, "Second Circuit law is controlling") (citing *Menowitz,* 991 F.2d at 40); *Kendall v. Metro. Life Ins. Co. (In re New Eng. Mut. Life Ins. Co. Sales Practices Litig.),* 324 F. Supp. 2d 288, 297 (D. Mass. 2004) ("In the ordinary course, questions of federal law in MDL-transferred cases are governed by the law of the transferee circuit."); *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.,* 323 F. Supp. 2d 861, 876 (S.D. Ohio 2004) ("Thus, the rule in multidistrict litigation is that the transferee court, in interpreting federal law, should apply the law of its own circuit rather than the law of the transferor court's circuit.") (relying on *In re Korean Air Lines*).

[*16]

38  523 U.S. 26, 140 L. Ed. 2d 62, 118 S. Ct. 956 (1998).

39  28 U.S.C. § 1404

The reasoning of *Lexecon* undercuts *In re Korean Air Lines* and its progeny in two ways. In *Lexecon,* the Court emphasized that courts must begin their analysis by looking at the language of a statute. [40] Courts must do their "job of reading the statute whole . . . even if doing that will reverse the longstanding practice under the statute and the rule." [41] Moreover, when Congress's intent in passing the statute is clear from the text of a statute or

its legislative history, courts must ignore policy arguments about how to apply the statute because "the proper venue for resolving that [policy] issue remains the floor of Congress." [42]

40  *See Lexecon,* 523 U.S. at 33-39 (reviewing the language of the statute).
41  *Id.* (citations omitted).
42  *Id.* at 40.

The second way that [*17] *Lexecon* substantially undermines*In re Korean Air Lines* is by changing the practical realities of multi-district litigation. Prior to *Lexecon,* the "vast majority of cases" were "settled or resolved by summary judgment in the transferee court, or else transferred under section 1404(a) to that same transferee court for joint trial." [43] Such self-transfers are no longer permitted. In other words, as a result of *Lexecon,* several thousands of actions, as opposed to a hundred or so, are remanded on a yearly basis for trial [44] -- a fact that significantly undermines the rationale offered by the concurrence in *In re Korean Air Lines* (and followed by the Second Circuit in *Menowitz v. Brown*) for why courts should not consider themselves bound by the opinions of the transferor circuits.

43  *Id.* at 46 (emphasis added).
44  *See* William J. Martin, Reducing Delays in Hatch-Waxman Multidistrict Litigation, 71 U. Chi. L. Rev. 1173, 1180 (2004) ("In the first twenty-nine years of multidistrict litigation, the Panel remanded only 3,781 actions to their transferor districts. In 1998 (the year Lexecon was decided) alone, the Panel remanded 1,171 actions. The following year, the Panel remanded another 4,363 actions.").

[*18] It is well established that lower courts are bound not only by the specific holding of a Supreme Court opinion but also its reasoning. Thus, as the Second Circuit and other circuits have recognized, when there is an "intervening Supreme Court decision that casts doubt on [this Circuit's] controlling precedent" [45] that precedent may no longer be binding. Because the approach and result of *Lexecon* substantially undercut the reasoning offered to support the holding of *In re Korean Air Lines* and those opinions that rely upon it, including those of the Second Circuit, it is necessary to re-evaluate whether this Court should follow the law of the Second Circuit or the law of the transferor circuits when interpreting federal law.

2005 U.S. Dist. LEXIS 753, *18; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

45    *Union of Needletrades, Indus. & Textile Employees v. INS*, 336 F.3d 200, 210 (2d Cir. 2003). *Accord Boothe v. Hammock*, 605 F.2d 661, 663 (2d Cir. 1979).

**B. This Court Will Continue to Follow the Opinions of the Second Circuit When Interpreting [*19] and Applying Federal Law**

Even after *Lexecon*, district courts should apply the law of the transferee circuit. [46] The text of section 1407 reads, in pertinent part:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions. [47]

The plain language of the statute does not explicitly resolve the issue of which circuit's law is binding, but it is important that section 1407 only allows cases to be transferred on the condition that such coordination "will promote the *just and efficient conduct* of such actions." [48] In this instance, the phrase "just and efficient" has a distinct meaning.

> The legislative history, including the reports of the Congressional Committees and of the Judicial Conference, and by testimony before Congress of [*20] its authors, makes it clear that [section 1407's] remedial aim is to eliminate the potential for conflicting contemporaneous pretrial rulings by coordinate district and appellate courts in multidistrict related civil actions. [49]

In other words, the phrase "just and efficient" as used in section 1407 has a distinct meaning in that it encompasses the statute's goal of eliminating "delay, confusion, conflict, inordinate expense and inefficiency" [50] during the pretrial period.

46    According to the Manual for Complex Litigation:

> In diversity cases, the law of the transferor district follows the case to the transferee district. Where the claim or defense arises under federal law, however, the transferee judge should consider whether to apply the law of the transferee circuit or that of the transferor court's circuit, keeping in mind that statutes of limitations may present unique problems.

Manual for Complex Litigation § 20.132 (4th ed. 2004) (citations omitted).

47    28 U.S.C. § 1407(a).

48    *Id.* (emphasis added).

49    *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 491-92 (J.P.M.L. 1968) (extensively citing legislative history of statute).

[*21]

50    *Id.* at 495.

This purpose would be thwarted if this Court were to follow the opinions offered by the many circuits from which the cases were transferred. [51] Moreover, without limiting the sources of binding precedent, each motion in multi-district litigation could easily turn into a review of the interpretations of all or most of the circuits, a result at odds with the fundamental purpose of section 1407. This would have a debilitating effect on the court's ability to resolve motions in a timely and efficient manner.

51    *See id.* at 490 n.1 ("'The objective of the legislation is to provide centralized management under court supervision of pretrial proceedings of multidistrict litigation to assure the *'just and efficient conduct'* of such actions. The committee believes that the possibility for conflict and duplication in discovery and other pretrial procedures in related cases can be avoided or minimized by such centralized management. To accomplish this objective the bill provides for the transfer of venue of an action for the limited purpose of conducting coordinated pretrial proceedings.'") (quoting H.R. Rep. No. 90-1130, at 1899-1900 (1968)) (emphasis added).

2005 U.S. Dist. LEXIS 753, *21; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

[*22] In sum, Second Circuit precedent controls this Court's interpretation of federal law in this multi-district litigation. Thus, when interpreting and applying the federal Constitution, any federal statute, or the Federal Rules of Civil Procedure with respect to these motions, I am bound only by the opinions of the Supreme Court and Second Circuit.

## III. OVERVIEW OF ISSUES PERTAINING TO PERSONAL JURISDICTION

In order to render a valid decision, a federal court must have both subject matter jurisdiction over the action and personal jurisdiction over the parties. In earlier decisions, this Court held that it had subject matter jurisdiction based on both federal agent jurisdiction and bankruptcy law. [52] In order for a federal court to exercise personal jurisdiction over a party there must be (1) a statutory source of jurisdiction that (2) does not surpass the limitations imposed by the U.S. Constitution.

> 52  See MTBE I, 342 F. Supp. 2d at 148 (federal agent jurisdiction); City of Park City v. Alon USA Energy, Inc. (In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.), 341 F. Supp. 2d 386, 387 (S.D.N.Y. 2004) ("MTBE II") (bankruptcy jurisdiction).

[*23] In multi-district litigation, section 1407 serves as this Court's statutory source of power for personal jurisdiction. As the Second Circuit has explained, this Court "has all the jurisdiction and powers over pretrial proceedings in the actions transferred to [it] that the transferor judge would have had in the absence of transfer." [53] In all federal courts, including those federal courts from which these cases were transferred, personal jurisdiction is determined by the Federal Rules of Civil Procedure, as well as constitutional limitations based on a party's right to due process.

> 53  In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 145, 163 (2d Cir. 1987) (quoting In re FMC Corp. Patent Litig., 422 F. Supp. 1163, 1165 (J.P.M.L. 1976)).

In particular, each transferor court would have determined whether it had personal jurisdiction under Rule 4(k) of the Federal Rules of Civil Procedure, which states, in pertinent part:

> (1) Service [*24] of a summons or filing

a waiver of service is effective to establish jurisdiction over the person of a defendant

> > (A) who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located . . . . [54]

As a result, this Court must look to the state laws of Florida, Indiana, Iowa, Kansas, Massachusetts, Vermont and West Virginia to determine whether a court in that state could have exercised personal jurisdiction over Lyondell when the complaint was filed.

> 54  Fed. R. Civ. P. 4(k).

Thus, this Court must answer the following two questions: First, would the exercise of personal jurisdiction by a state court in these states surpass the limits imposed by the U.S. Constitution? Second, does state law permit the exercise of personal jurisdiction over these defendants?

## IV. APPLICABLE LAW

### A. Legal Standard

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure [*25] , a defendant may move for dismissal of a complaint for lack of personal jurisdiction. [55] On a "motion to dismiss for lack of personal jurisdiction, plaintiff bears the burden of showing that the court has jurisdiction over the defendant." [56] However, "the nature of the plaintiff's obligation varies depending on the procedural posture of the litigation." [57]

> 55  See Fed. R. Civ. P. 12(b)(2) (allowing defendant to move for dismissal based on "lack of jurisdiction over the person").
> 56  In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003) (citing Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996)).
> 57  Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990).

"Prior to discovery, a plaintiff challenged by a

2005 U.S. Dist. LEXIS 753, *25; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

jurisdiction testing motion may defeat the motion by pleading in good faith, *see* Fed. R. Civ. P. 11 [*26] , legally sufficient allegations of jurisdiction." [58] In addition, a plaintiff may also rely upon its "affidavits and supporting materials, containing an averment of facts that, if credited . . . would suffice to establish jurisdiction over the defendant." [59] "In the absence of an evidentiary hearing on the jurisdictional allegations, or a trial on the merits, all pleadings and affidavits are construed in the light most favorable to plaintiff, and where doubts exist, they are resolved in the plaintiff's favor." [60]

> [58]   *Id.* *Accord In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d at 206. A party fails to make an allegation in good faith "either when it has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *W.K. Webster & Co. v. American President Lines, Ltd.,* 32 F.3d 665, 670 (2d Cir. 1994) (quotation marks and citation omitted).

[*27]

> [59]   *Whitaker v. American Telecasting Inc.,* 261 F.3d 196, 208 (2d Cir. 2001) (quotation marks and citations omitted).
> [60]   *Id.*

## B. Constitutional Due Process

The Fourteenth Amendment to the United States Constitution states: "No state shall . . . deprive any person of life, liberty, or property, without due process of law." [61] "Due process centrally concerns the fundamental fairness of governmental activity. Thus, at the most general level, the due process nexus analysis requires that we ask whether an individual's connections with a State are substantial enough to legitimate the State's exercise of power over him." [62]

> [61]   U.S. Const. amend. XIV, § 1.
> [62]   *Quill Corp. v. North Dakota,* 504 U.S. 298, 312-13, 119 L. Ed. 2d 91, 112 S. Ct. 1904 (1992).

"The due process requirement for personal jurisdiction, enunciated by the Supreme Court in the seminal case of *International Shoe Co. v. Washington,* protects [*28] a person without meaningful ties to the forum state from being subjected to binding judgments within its jurisdiction." [63] In *International Shoe,* the Supreme Court rejected the view that, under the Due Process Clause of the Fourteenth Amendment, a defendant must be present within a state's territory in order for that state to assert personal jurisdiction. [64] Rather, due process requires that "to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" [65] As the Second Circuit has repeatedly held, this involves "an analysis consisting of two components: the 'minimum contacts' test and the 'reasonableness' inquiry." [66]

> [63]   *Metropolitan Life,* 84 F.3d at 567 (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945)). The rationale underlying this constitutional requirement is that defendants should not be forced to defend themselves in a "jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985) (various citations omitted).

[*29]

> [64]   *See International Shoe,* 326 U.S. at 316; *see also Mayes v. Leipziger,* 674 F.2d 178, 183 (2d Cir. 1982).
> [65]   *International Shoe,* 326 U.S. at 316 (citing *Milliken v. Meyer,* 311 U.S. 457, 463, 85 L. Ed. 278, 61 S. Ct. 339 (1940)). *Accord Pennoyer v. Neff,* 95 U.S. 714, 733, 24 L. Ed. 565 (1877) (holding that "since the adoption of the Fourteenth Amendment . . . judgments against parties over whom that court has no jurisdiction do not constitute due process of law").
> [66]   *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 305 F.3d 120, 127 (2d Cir. 2002) (quoting *Metropolitan Life,* 84 F.3d at 567).

## 1. Minimum Contacts Test: General and Specific Jurisdiction

Because the "central concern of the inquiry into personal jurisdiction" is "the relationship among the defendant, the forum, and the litigation," [67] courts distinguish between two types of situations. When a state

2005 U.S. Dist. LEXIS 753, *29; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

exercises personal jurisdiction over a defendant in a suit "arising out of or related to" the defendant's contacts with the forum, the [*30] state is exercising "specific jurisdiction." [68] In contrast, when a state exercises personal jurisdiction over a defendant in an action that does not arise out of or relate to the defendant's contacts with the forum, the state is said to be exercising "general jurisdiction" over the defendant. The distinction between "specific jurisdiction" and "general jurisdiction" determines how courts decide whether there are sufficient "minimum contacts" in a given case.

> 67  *Shaffer v. Heitner*, 433 U.S. 186, 204, 53 L. Ed. 2d 683, 97 S. Ct. 2569). *Accord Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775, 79 L. Ed. 2d 790, 104 S. Ct. 1473 (1984) (quoting *Shaffer*).
> 68  *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414, 80 L. Ed. 2d 404, 104 S. Ct. 1868). *Accord Burger King*, 471 U.S. at 473 n.15.

### a. Specific Jurisdiction

"Where the claim arises out of, or relates to, the defendant's contacts with the forum -- *i.e.*, specific jurisdiction -- minimum contacts exist where the defendant *purposefully availed* itself [*31] of the privilege of doing business in the forum and could foresee being haled into court there." [69] Likewise, if "a commercial actor's efforts are *'purposefully directed'* toward residents of another State," [70] a state may assert personal jurisdiction over a claim involving the harm that allegedly comes about from those efforts. [71] For example, the Supreme Court has held that a state may assert specific jurisdiction "over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State and those products subsequently injure forum consumers." [72]

> 69  *Bank Brussels Lambert*, 305 F.3d at 127 (quotation marks and citation omitted) (emphasis added). A defendant's contacts with the forum state need not have "directly given rise to the plaintiff's cause of action," in order to "relate to" the claim. *Id.* at 128.
> 70  *Burger King*, 471 U.S. at 476 (emphasis added).
> 71  While the phrases "purposefully availed" and "purposefully directed" are sometimes used

interchangeably, the former analysis typically applies to actions sounding in contract, while the latter analysis usually applies to actions involving tort claims. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (Fletcher, J.); *cf. LiButti v. United States*, 178 F.3d 114, 123 (2d Cir. 1999) ("In addition to the concept of a defendant purposefully availing itself of the protections of the law of the forum State, the Supreme Court has also found minimum contacts to exist when the defendant 'purposefully directed' the harmful effects of his activities at the forum State.").

[*32]

> 72  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298, 1980, 62 L. Ed. 2d 490, 100 S. Ct. 559). *Accord Burger King*, 471 U.S. at 473 (quoting *World-Wide Volkswagen*, 444 U.S. at 297-98).

As the Second Circuit explained in *Kernan v. Kurz-Hastings, Inc.*, [73] there are two views of the "stream of commerce" standard, which are represented by the Supreme Court's plurality and concurring opinions in *Asahi Metal Industry Co. v. Superior Court.* [74] The plurality and concurring opinions are not controlling, however, because each failed to garner a majority. In brief, the plurality held that "the placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." [75] The concurrence rejected the plurality's view that "an unwavering line can be drawn between 'mere awareness' that a component will find its way into the forum State and 'purposeful availment' of the forum's market." [76] The concurrence held that whether or not the defendant's conduct, which was arguably more than the placement of a product [*33] into the stream of commerce, rises to the level of purposeful availment "requires a constitutional determination that is affected by the volume, the value, and the hazardous character of the components." [77] It "concluded that in most cases a regular course of delivering over 100,000 units annually would constitute 'purposeful availment.'" [78] Moreover, *Kernan* itself is not a controlling precedent as the Second Circuit avoided choosing which rule should govern since the plaintiff could satisfy both standards. [79]

> 73  175 F.3d 236, 243-44 (2d Cir. 1999).
> 74  480 U.S. 102, 94 L. Ed. 2d 92, 107 S. Ct. 1026 (1987).

2005 U.S. Dist. LEXIS 753, *33; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

75  *Id.* at 117.

76  *Id.* at 122.

77  *Id.*

78  *Id.*

79  *See* 175 F.3d at 243-44.

Because neither *Asahi* nor *Kernan* constitute binding decisions, the holding and reasoning of *World-Wide Volkswagen Corp. v. Woodson* remain controlling in this case. [80]

80  *See generally* Kristin R. Baker, Product Liability Suits and the Stream of Commerce After *Asahi: World-Wide Volkswagen* Is Still the Answer, 35 *Tulsa L.J.* 705, 706 (2000). The circuit courts are split on this issue. *See Bridgeport Music, Inc. v. Still N The Water Publ'g,* 327 F.3d 472, 479 (6th Cir. 2003) (collecting citations comparing the split between Fifth and Eighth Circuits, which have adopted standard of the *Asahi* concurrence, and First and Eleventh Circuits, which adopted the stricter stream of commerce 'plus' theory followed by the Sixth Circuit in *Bridgeport Music*). *See also Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939 (4th Cir. 1994) (applying the stream of commerce plus theory).

[*34] **b. General Jurisdiction**

When general jurisdiction is based on a defendant's activities, [81] a court may assert personal jurisdiction only if the defendant's forum contacts are "continuous and systematic." [82] While "the appropriate period for evaluating a defendant's contacts will vary in individual cases," the Second Circuit has explained that courts typically examine a period of more than several years prior to the filing of the action. [83] "For example, in *Helicopteros Nacionales de Colombia v. Hall,* the Supreme Court examined the defendant's contacts with the forum state over a seven-year period to determine whether it met the 'continuous and systematic' minimum contacts test." [84] Finally, in determining whether the contacts rise to a sufficient level to exercise personal jurisdiction, the Second Circuit has cautioned that even if "certain categories of contacts alleged . . . might be insufficient to establish minimum contacts when taken individually," courts must always consider them in their totality. [85]

81  General jurisdiction may be based on grounds

other than a defendant's activities. For example, a court may have general jurisdiction because of an individual defendant's domicile in the forum state, or on a corporate defendant's principal place of business or place of incorporation. *See generally* Lea Brilmayer, *et al.,* A General Look at General Jurisdiction, 66 Tex. L. Rev. 723, 728-35 (1988). Likewise, general jurisdiction may be based only on service of process on the defendant while that defendant is physically present within the forum state. *See Burnham v. Superior Court,* 495 U.S. 604, 628, 109 L. Ed. 2d 631, 110 S. Ct. 2105 (1990).

[*35]

82  *Helicopteros,* 466 U.S. at 416. *Accord Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 438, 96 L. Ed. 485, 72 S. Ct. 413, 63 Ohio Law Abs. 146 (1952) (holding that general jurisdiction attaches if a foreign corporation carries on continuous and systematic general business within the forum); *Bank Brussels Lambert,* 305 F.3d at 127 ("A state may assert 'general jurisdiction' -- *i.e.,* jurisdiction irrespective of whether the claim arises from or relates to the defendant's forum contacts -- only where these contacts are 'continuous and systematic.'") (citations omitted).

83  *Metropolitan Life,* 84 F.3d at 569.

84  *Id.* (citing *Helicopteros,* 466 U.S. at 409-11). As a result, in *Metropolitan Life,* the Second Circuit held that "the district court reasonably provided for discovery for a six-year period" prior to the filing of the action. *Id.*

85  *Id.* at 570.

**2. Reasonableness Inquiry**

Where "minimum contacts" have been established because of either specific or general jurisdiction, the court must also determine whether the [*36] exercise of personal jurisdiction over the non-resident comports with "fair play and substantial justice" -- *i.e.,* whether it is reasonable to exercise jurisdiction under the circumstances of the particular case. [86] However, once minimum contacts are established, it is defendant's burden to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." [87] As a result, "dismissals resulting from the application of the reasonableness test should be few and far between." [88]

2005 U.S. Dist. LEXIS 753, *36; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

86    *See Burger King*, 471 U.S. at 476 ("Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'"); *see also Bank Brussels Lambert*, 305 F.3d at 128-30.

87    *Burger King*, 471 U.S. at 477.

88    *Metropolitan Life*, 84 F.3d at 575 (citing *Burger King*, 471 U.S. at 477).

[*37] The Second Circuit requires courts to consider five factors when determining the reasonableness of exercising jurisdiction:

> (1) the burden that the exercise of jurisdiction will impose on the defendant;

> (2) the interests of the forum state in adjudicating the case;

> (3) the plaintiff's interest in obtaining convenient and effective relief;

> (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and

> (5) the shared interest of the states in furthering substantive social policies. [89]

Finally, "the import of the reasonableness inquiry varies inversely with the strength of the minimum contacts showing -- a strong (or weak) showing by the plaintiff on minimum contacts reduces (or increases) the weight given to reasonableness." [90]

89    *See Bank Brussels Lambert*, 305 F.3d at 129.

90    *Id.* (quotation marks and citations omitted).

## V. DISCUSSION

The touchstone of determining whether a state court [*38] may exercise personal jurisdiction over a party is "whether the defendant purposefully established 'minimum contacts' in the forum State." [91] In *World-Wide Volkswagen*, the Supreme Court explained that introducing a product into the stream of commerce may serve as the basis for personal jurisdiction if the sale of that product "is not simply an isolated occurrence, but

arises from the efforts of the manufacturer . . . to serve, directly *or indirectly*, the market for its product." [92]

91    *Burger King Corp.*, 471 U.S. at 474.

92    444 U.S. at 297 (emphasis added).

As Justice Brennan aptly explained in *Asahi*, the "stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale." [93] If a corporation "in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." [94] Common sense dictates [*39] that there are times when a corporation purposefully establishes minimum contacts with every state in the nation by introducing its products into the stream of commerce in vast amounts.

93    *Asahi*, 480 U.S. at 117 (Brennan, J., concurring).

94    *Id.*

This case proves the point: Lyondell's revenue exceeds $ 3.8 billion a year, and it is one of the world's largest producers of chemicals used in a wide variety of products throughout this country. Moreover, because twenty-six percent of Lyondell's revenue was derived from selling MTBE in 2003, it is easy to conclude that the company sold almost a *billion* dollars worth of the chemical in that year alone. [95] It should not come as a surprise to Lyondell that, after having made significant revenue on sales throughout the United States, it is subject to suit throughout the United States. Indeed, Lyondell has done more than introduce a few of its products into the stream of commerce -- it primed and then pumped its product into the stream.

95    Pl. Ex. B.

[*40] A. Exercise of Personal Jurisdiction by the Forum States over Lyondell Comports with Due Process

1. Plaintiffs Have Established Minimum Contacts for the Exercise of Specific Jurisdiction in All of the States

Two facts relied upon by plaintiffs are significant for establishing minimum contacts in each of the forum states and supporting the exercise of specific jurisdiction: (1) Lyondell has been the world's largest producer of

2005 U.S. Dist. LEXIS 753, *40; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

MTBE since 1987, [96] and (2) the company sold more than $ 640 million worth of MTBE in North America in 2003. [97] As plaintiffs note in their briefs, Lyondell created a national market for MTBE and over the last two decades sold MTBE to oil refiners, traders, and gasoline blenders across the country who incorporated MTBE into their gasoline. [98] For example, one of Lyondell's customers is ExxonMobil Corporation, a company that has stores and gas stations across the country. [99] Likewise, by 1987, sixteen of the top twenty oil companies were blending MTBE into their gasoline, much of which was supplied by Lyondell. [100] Drawing all inferences in the plaintiffs' favor, as this Court must, the facts are sufficient for plaintiffs to establish minimum [*41] contacts in all of the forum states to support the exercise of specific jurisdiction because plaintiffs' claims arise out of Lyondell's sales of MTBE. [101] In addition, in six of the seven forum states, Lyondell concedes that it sold MTBE directly to customers in those states. [102]

96  See Pl. Ex. E.

97  See, e.g., Pl. Fla. Mem. at 2. See also Pl. Ex. B (Lyondell's Form 10-K for the Year Ended December 31, 2001). In their briefs, plaintiffs also rely upon Lyondell's nationwide toll-free number and Lyondell's interactive website to establish specific jurisdiction. However, the fact that Lyondell currently has a website or telephone number is not an activity that arises out of, or relates to plaintiffs' claims and thus cannot be considered for purposes of establishing specific jurisdiction.

98  See Pl. Fla. Mem. at 2. In fact, Lyondell's sales of "MTBE accounted for approximately 26% of Lyondell's total revenues in 2003, 35% in 2002 and 28% in 2001." Pl. Ex. B.

99  See Pl. Fla. Mem. at 3 n.6.

100  See Pl. Ex. E.

101  While these facts, by themselves, would not be sufficient to prove or establish that any of the states have sufficient contacts with Lyondell to assert specific jurisdiction related to the claims, that is not the burden that plaintiffs must satisfy prior to discovery or an evidentiary hearing. Rather, at this early stage of the proceedings, plaintiffs must merely point to facts that are sufficient to support a good faith allegation that the forum states may assert personal jurisdiction over Lyondell, and these facts are sufficient. See Ball, 902 F.2d at 197 (holding that prior to

discovery a plaintiff may defeat a motion to dismiss by pleading in good faith allegations of jurisdiction).

As explained below, however, these facts in combination with the ones conceded by Lyondell in their affidavit about the company's direct sales to customers in the forum states are, in fact, sufficient to establish minimum contacts with six of the seven states.

[*42]

102  See Bowling Aff. at 3 (direct sales in all states except Vermont).

The Supreme Court's decision in World-Wide Volkswagen dictates the conclusion that these forum states may exercise personal jurisdiction over Lyondell throughout this litigation. [103] In that case, a couple purchased a new automobile from a local dealer in New York, began driving to Arizona and had an accident in Oklahoma. The couple brought suit in Oklahoma against the New York dealer and the New York distributor, claiming that design defects in the automobile contributed to their injuries. Plaintiffs argued that Oklahoma's exercise of jurisdiction over the New York corporations was appropriate because of the mobile nature of the automobile and the foreseeability that some cars these corporations sold would find their way into Oklahoma.

103  444 U.S. at 286.

The Supreme Court held that Oklahoma could not exercise jurisdiction [*43] over a local car dealer in New York because to do so would violate due process. [104] The Court, however, drew a distinction between local dealerships and nationwide manufacturers and distributors. As the Court explained,

> if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. [105]

2005 U.S. Dist. LEXIS 753, *43; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

104   *See id.* at 296.

105   *Id.* at 297. The Court's primary concern in *World-Wide Volkswagen* was protecting *local* dealers from being haled into state courts across the country. *See id.* at 296 (explaining that if personal jurisdiction could be exercised over the local New York car dealer then "a local California tire retailer could be forced to defend in Pennsylvania when a blowout occurs there; a Wisconsin seller of a defective automobile jack could be haled before a distant court for damage caused in New Jersey; or a Florida soft-drink concessionaire could be summoned to Alaska to account for injuries happening there.") (citations omitted). Such concerns do not relate to a company such as Lyondell.

[*44] Lyondell is obviously far more similar, if not identical, to a worldwide manufacturer such as Audi or Volkswagen than to a local car dealership in New York. Over the last two decades, Lyondell has sold hundreds of millions of dollars worth of MTBE to customers across the country and has conceded that it directly sold to customers in six of the forum states during the time period at issue in these actions. Under such circumstances, the forum states have sufficient "minimum contacts" with Lyondell on the basis of specific jurisdiction. 106

106   I also note that it is reasonable to infer prior to discovery that Lyondell has had "continuous and systematic" contact with each of the forum states sufficient to establish general jurisdiction. As plaintiffs' supporting material makes clear, Lyondell has made *tens of billions* of dollars by selling a variety of chemicals nationwide over the last two decades. For example, plaintiffs' supporting material shows that the chemicals that Lyondell has sold "are used to produce unsaturated polyester resins for bathroom fixtures and boat hulls; lower toxicity antifreeze, coolants and aircraft deicers, and cosmetic[s] and cleaners." Pl. Ex. B. Lyondell sold billions of pounds of a variety of chemicals in 2003 alone. *See id.* These products, used to produce plastics such as foam cups and containers, are precisely the type of end products that are sold in every state in the nation including, of course, the forum states.

## [*45] 2. The Exercise of Personal Jurisdiction by the Forum States Is Reasonable

The exercise of personal jurisdiction over Lyondell by each of the forum states must also be reasonable. 107 Because plaintiffs have shown "minimum contacts," Lyondell now must show that the exercise of jurisdiction would be unreasonable. With respect to the five factors governing reasonableness, none weigh significantly in Lyondell's favor.

107   *See Bank Brussels Lambert,* 305 F.3d at 127.

Lyondell has not shown that it would bear any unique burden litigating in these states given that Lyondell is a national corporation. In addition, "the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." 108 The interests of the forum states and plaintiffs also favor the exercise of jurisdiction over Lyondell. As plaintiffs allege in their complaints, this litigation implicates each of the states' "most precious natural resource -- water," 109 giving each [*46] of the states "an unquestionable interest in adjudicating the claim[s]." 110 The forum states also have significant interests in the litigation because plaintiffs are cities, municipalities or related entities that provide water to residents of those states. 111 The location of witnesses and evidence also favor the exercise of jurisdiction by the forum states. In this litigation, evidence concerning spills or leaks of gasoline and subsequent contamination of underground water reservoirs with MTBE will be located in the forum states. Finally, no party has argued that substantive social policies would be furthered or hindered by permitting this case to be heard in the forum states. This factor is therefore neutral. 112 Taken together, these factors all favor the exercise of jurisdiction by the forum states.

108   *Metropolitan Life,* 84 F.3d at 574. *See also Burger King,* 471 U.S. at 483 (noting that inconvenience must be "substantial [] to achieve *constitutional* magnitude") (emphasis in original).

109   Compl. P1.

110   *Bank Brussels Lambert,* 305 F.3d at 130.

[*47]

111   *See, e.g., McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 2 L. Ed. 2d 223, 78 S. Ct. 199 (1957) (stating that forum states frequently will have a "manifest interest in providing

2005 U.S. Dist. LEXIS 753, *47; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

effective means of redress for its residents"); *Asahi*, 480 U.S. at 114-15; *Metropolitan Life*, 84 F.3d at 574.

112 *See Bank Brussels Lambert*, 305 F.3d at 130 ("Defendant did not address the fifth factor, but holding defendant subject to jurisdiction in New York does not appear likely to erode any shared social policies.").

### B. Exercise of Personal Jurisdiction by the Forum States over Lyondell Comports with Each State's Long-Arm Statute

Having determined that the exercise of personal jurisdiction over Lyondell complies with the Due Process Clause of the Constitution, the next question is whether the exercise of personal jurisdiction by a state court complies with the law of each forum state. Most states have enacted long-arm statutes that set forth specific grounds upon which state courts may exercise personal jurisdiction over a nonresident defendant.

To [*48] summarize my findings below, plaintiffs have satisfied the requirements of the various long-arm statutes for essentially two reasons. *First*, Lyondell has conceded that it directly shipped MTBE to customers in each of the forum states, with the exception of Vermont, at some point over the time period at issue in this litigation. Lyondell undoubtedly received revenue from those sales, and such sales constitute the transaction of business in those states.

*Second*, Lyondell is the world's largest producer of MTBE and has indirectly benefitted, and continues to benefit, from the sale of MTBE to refiners, traders, and gasoline blenders who are part of an institutionalized system of gasoline distribution in every state in the nation. For example, Lyondell continues to sell MTBE to intermediaries, such as ExxonMobil, which distribute the product nationwide. [113] The amount of MTBE sold to such companies is quite significant as "MTBE accounted for approximately 26% of Lyondell's total revenues in 2003, 35% in 2002 and 28% in 2001." [114] Thus, Lyondell's MTBE has, according to plaintiffs' allegations, contaminated the states' waters, thereby giving rise to the various tort claims that [*49] have been brought against it.

113 *See supra* Part V(A)(1)-(2).
114 Pl. Ex. B.

Finally, it is worth noting that according to plaintiffs' calculations based on Lyondell's admissions in its affidavit and its annual sales as reported to the SEC, Lyondell has made millions of dollars in non-MTBE sales to four of the forum states in recent years. In particular, in the last two years, Lyondell has earned $ 12 million from sales to Florida, [115] more than $ 13 million from sales to Indiana, [116] more than $ 11 million from its sales to Iowa, [117] and $ 325,000 from its sales to West Virginia. [118] Such sales constitute significant contact with each of these states. [119]

115 *See* Pl. Fla. Mem. at 2. *See also* Bowling Aff. at 3 (stating that in 2002 and 2003, direct sales to Florida constituted 0.14% and 0.21% of Lyondell's gross revenue respectively).
116 *See* Pl. Ind. Mem. at 2. *See also* Bowling Aff. at 3 (stating that in 2002 and 2003, direct sales to Indiana constituted 0.19% of Lyondell's gross revenue for each year).

[*50]

117 *See* Pl. Iowa Mem. at 2. *See also* Bowling Aff. at 3 (stating that in 2003, direct sales to Iowa constituted 0.30% of Lyondell's gross revenue).
118 *See* Pl. W. Va. Mem. at 2. *See also* Bowling Aff. at 3 (stating that in 2002, direct sales to West Virginia constituted 0.01% of Lyondell's gross revenue).
119 Although such significant contact over the course of many years may well be sufficient to satisfy the "general jurisdiction" provisions of the state's long-arm statutes, I do not make any findings because each of the states may exercise jurisdiction on the basis of specific jurisdiction.

As explained below, the fact that Lyondell directly shipped MTBE to customers in six of these seven states and always benefitted from selling vast amounts of MTBE to intermediaries who then delivered the MTBE to the forum states, demonstrates that Lyondell purposefully availed itself or benefitted from its contact with each state.

### 1. Florida

The long-arm statute that allows Florida courts to exercise personal jurisdiction contains two relevant provisions. [120] Subsection [*51] (1) relates to specific jurisdiction as it pertains to "any cause of action *arising from* the doing of the following [specified] acts." [121] Subsection (2) relates to general jurisdiction as it pertains

2005 U.S. Dist. LEXIS 753, *51; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

to any "defendant who is engaged in substantial and not isolated activity within this state . . . *whether or not* the claim arises from that activity." [122] I address only the provision relating to specific jurisdiction, however, because it resolves whether Florida may exercise jurisdiction over Lyondell in this case.

> 120   *See* Fla. Stat. § 48.193.
> 121   *Id.* § 48.193(1) (emphasis added).
> 122   *Id.* § 48.193(2) (emphasis added).

Subsection (1) allows, *inter alia*, a Florida court to exercise personal jurisdiction if the cause of action arises from a defendant's conduct that:

> caus[es] injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury . . . [*52] products, materials, or things, processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use. [123]

As one Florida court has explained, even when a defendant "conducts no business, has no salesmen or distributors, and has no other ties in Florida or the United States," personal jurisdiction may be exercised "under [Florida's] long-arm statute, where the [defendant's] products have been placed into the stream of commerce and there is a reasonable expectation that large numbers will be purchased here." [124]

> 123   Fla. Stat. § 48.193(1)(f)(2).
> 124   *McHugh v. Kenyon*, 547 So.2d 318, 318 (Fla. Ct. App. 1989) (citing Fla. Stat. § 48.193).

In this case, Escambia County Utilities Authority ("Escambia") alleges that defendants manufactured and supplied MTBE and/or gasoline containing MTBE to Florida, and that MTBE has contaminated and continues to [*53] contaminate its water wells. [125] Escambia asserts that the contamination occurs through discharges of MTBE gasoline from spills, leaks, and other losses during its distribution, sale and use, and defendants knew that combining MTBE with gasoline would result in massive groundwater contamination. [126] In this case, Lyondell admits that it has sold and continues to sell MTBE to at least one customer in Florida. [127] Plaintiff's allegations and defendant's admissions are sufficient to

bring Lyondell within section 48.193(1)(f)(2) of Florida's long-arm statute. [128]

> 125   *See* Escambia County Utilities Authority Fifth Amended Complaint PP3-4.
> 126   *See id.* PP89-90.
> 127   *See* Bowling Aff. at 3.
> 128   *See Ford Motor Co. v. Atwood Vacuum Mach. Co.*, 392 So.2d 1305, 1308 (Fla. 1981) (Florida court could exercise personal jurisdiction over Illinois manufacturer of door hinges used in automobiles shipped to Florida because "the defendant manufactured products outside the state that were used within the state 'in the ordinary course of commerce'") (citing Fla. Stat. § 48.193(1)(f)(2)); *Mason v. McCrory Corp.*, 549 So.2d 1159, 1160 (Fla. Ct. App. 1989) ("The allegations that the product causing an injury in this state was manufactured by the defendant and shipped to this state in the ordinary course of commerce, were sufficient to withstand a motion to dismiss on grounds that the court was without jurisdiction over the defendant corporation.") (citing Fla. Stat. § 48.193(1)(f)(2)); *Gaines Motor Lines, Inc. v. Scott*, 545 So.2d 508, 509 (Fla. Ct. App. 1989) (court could exercise jurisdiction over North Carolina manufacturer of wheel assembly that had broken off a passing truck and injured plaintiff in Florida) (citing Fla. Stat. § 48.193(1)(f)(2)).

[*54] Thus, this Court has personal jurisdiction over Lyondell in the Florida case.

## 2. Indiana

Under Indiana's long-arm statute, a defendant "submits to the jurisdiction of the courts of this state as to any action arising from the following [eight specified] acts." [129] "*In addition*," according to an amendment added by the state legislature in 2001 which took effect on January 1, 2003, "a court of this state may exercise jurisdiction on *any basis* not inconsistent with the Constitutions of this state or the United States." [130] As the Indiana Court of Appeals explained soon after the statute's enactment, but before it took effect, "Indiana long-arm jurisdiction has been expanded to the full extent of the law." [131] Indeed, Lyondell seemingly concedes that the plain language of the statute allows a court to exercise jurisdiction to the full extent of the Constitution. [132] Nonetheless, after the briefing on this motion concluded,

2005 U.S. Dist. LEXIS 753, *54; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

Indiana's intermediate appellate court rejected the plain language of the statute and held in *Pozzo Truck Center, Inc. v. Crown Beds, Inc.* that

> if Indiana's long-arm statute was intended to be coextensive with the limits of personal [*55] jurisdiction under the Due Process Clause, the enumerated acts listed in Rule 4.4(A) could have been deleted and the Rule could have been rewritten with general language, like the "any constitutional basis" statutes used in several other states. [133]

129   Ind. Trial R. 4.4(A).
130   *Id.* (emphasis added).
131   *Richards & O'Neil, LLP v. Cook,* 774 N.E.2d 540, 550 n.6 (Ind. Ct. App. 2002).
132   Lyondell Ind. Mem. at 4 ("The 2003 amendment now directs Indiana courts to skip the first step and go directly to the due process inquiry.") (citing *Laibe Corp. v. R. Cushman & Assocs.,* 2003 U.S. Dist. LEXIS 24218, No. 1:03-CV-1144-DFH, 2003 WL 23220053, at *2 (S.D. Ind. Dec. 31, 2003)).
133   816 N.E.2d 966, 970 n.2 (Ind. Ct. App. 2004) (citing *Anthem Ins. Co. v. Tenet Healthcare Corp.,* 730 N.E.2d 1227, 1232 (Ind. 2000) (rejecting one-step due process analysis)).

It is well established that when interpreting state law "the job of the federal courts is carefully [*56] to predict how the highest court of the forum state would resolve the uncertainty or ambiguity." [134] Such decisions must give fullest weight to the decisions of a state's highest court, and [courts] must give proper regard to the decisions of a state's lower courts." [135] Thus, a federal court "may not be bound even by an intermediate state appellate court ruling" if it believes that the intermediate state court has incorrectly predicted how the state's highest court would interpret that statute. [136]

134   *State Farm Mut. Auto. Ins. Co. v. Mallela,* 372 F.3d 500, 505 (2d Cir. 2004) (citation omitted).
135   *Phansalkar v. Andersen Weinroth & Co., L.P.,* 344 F.3d 184, 199 (2d Cir. 2003) (quotation

marks and citations omitted).
136   *Commissioner v. Bosch,* 387 U.S. 456, 465, 18 L. Ed. 2d 886, 87 S. Ct. 1776). *Accord Hicks ex rel. Feiock v. Feiock,* 485 U.S. 624, 630 n.3, 99 L. Ed. 2d 721, 108 S. Ct. 1423 (1988).

I find it likely that the Supreme Court of Indiana would follow the plain language [*57] of the new amendment to Trial Rule 4.4, and thus would overturn the recent opinion by the Indiana Court of Appeals. The reason for my conclusion is that the holding of *Pozzo Truck Center* rests on a misinterpretation of *Anthem Insurance Co. v. Tenet Healthcare Corp.,* [137] a case decided in 2000 by the Supreme Court of Indiana.

137   730 N.E.2d 1227.

In *Anthem,* the court held that when a statute specifies certain acts, it must be presumed that the legislature intended that only those acts would give rise to personal jurisdiction. "If the Indiana long-arm statute were intended to be coextensive with the limits of personal jurisdiction under the Due Process Clause, it could be written with general language, *such as* the 'any constitutional basis' statutes used in several other states." [138] The key phrase is "such as" -- a statute that broadened jurisdiction merely needed to adopt a phrase similar to "any constitutional basis." [139]

138   *Id.* at 1232 (emphasis added).
[*58]
139   *Id.*

In fact, the 2001 amendment to Trial Rule 4.4 does exactly that by stating: "In addition, a court of this state may exercise jurisdiction on *any basis* not inconsistent with the Constitutions of this state or the United States." [140] Such language *unambiguously* indicates the intention to broaden the reach of Indiana's long-arm statute to the full extent permitted by the Due Process Clause.

140   Ind. Trial R. 4.4(A) (emphasis added).

Moreover, the *Pozzo* court erroneously held that it would not follow the plain language of the new amendment to Rule 4.4(A) because the specified acts "could have been deleted." [141] While the specified acts could have been excised, there is no requirement of statutory interpretation that the legislature draft its laws in a prescribed manner, and this rationale does not provide a basis for ignoring the plain meaning of the amendment.

2005 U.S. Dist. LEXIS 753, *58; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

Indeed, it is not unusual for a legislature [*59] to expand the reach of its long-arm statute to the full extent of the Due Process Clause without deleting other sections. In recent years, Alabama, Alaska, Nebraska, Oregon, and Tennessee have amended their statutes in this manner without deleting the enumerated sections of the acts. [142]

> 141    Pozzo, 816 N.E.2d at 970 n.2 (citing Anthem, 730 N.E.2d at 1232).
> 142    See Douglas D. McFarland, Dictum Run Wild: How Long-Arm Statutes Extended to the Limits of Due Process, 84 B.U. L. Rev. 491, 529-30 (2004) ("The six states that chose to retain their recitation of enumerated acts and add a catch all, no-limits clause are Alabama, Alaska, Indiana, Nebraska, Oregon, and Tennessee.").

In light of the plain language of the amended statute, I conclude that the Supreme Court of Indiana would hold that the Indiana Court of Appeals erred in its interpretation of the long-arm statute, which now extends to the limits of the Constitution. In this case, plaintiffs' allegations [*60] and Lyondell's admissions serve as the "basis" for the exercise of jurisdiction which, as I explained earlier, is "not inconsistent with the Constitutions of [Indiana] or the United States." [143] Lyondell manufactured MTBE and sold it directly to customers in Indiana until 1990. [144] This MTBE allegedly contaminated the water wells in the state, causing property damage to the Indiana plaintiffs. [145]

> 143    Ind. Trial R. 4.4(A).
> 144    See Bowling Aff. at 3.
> 145    See, e.g., Town of Campbellsburg Second Amended Complaint ("Campbellsburg Compl.") PP197-199, 207-208, 214-215, 220-225, 234-235, 240-241, 246-247.

Therefore, this Court may exercise personal jurisdiction over Lyondell in the Indiana cases. [146]

> 146    Out of an abundance of caution, and to avoid an unnecessary remand if the Supreme Court of Indiana should eventually decide the question contrary to this Court's prediction, I also find that the same allegations satisfy specific provisions of the statute that also give rise to jurisdiction. In particular, the causes of action arise out of defendants "doing . . . business in [Indiana]," Ind. Trial R. 4.4(A)(1), as well as "causing personal injury or property damage in

this state by an occurrence, act or omission done outside this state [from which it]. . . derived substantial revenue or benefit from goods, materials, or services used, consumed, or rendered in this state." Ind. Trial R. 4.4(A)(3). See, e.g., Campbellsburg Compl. PP197-199, 207-208, 214-215, 220-225, 234-235, 240-241, 246-247.

[*61] 3. Iowa

Iowa's long-arm statute, section 617.3 of the Iowa Code, and Iowa Rule of Civil Procedure 56.2, are the relevant authority for determining whether the state may exercise personal jurisdiction over a party. [147] Among other things, Iowa's long-arm statute allows for personal jurisdiction to be exercised over "a nonresident person . . . if such person commits a tort in whole or in part in Iowa against a resident of Iowa." [148] In addition, Iowa Rule 56.2 "provides for the broadest expanse of personal jurisdiction consistent with due process." [149] It states:

> Every corporation . . . that shall have the necessary minimum contact with the state of Iowa shall be subject to the jurisdiction of the courts of this state, and the courts of the state shall hold such corporation . . . amenable to suit in Iowa in every case not contrary to the provisions of the Constitution of the United States. [150]

> 147    Before exercising personal jurisdiction over a defendant, Iowa courts must determine whether a statute or rule authorizes the exercise of jurisdiction. See Aquadrill, Inc. v. Environmental Compliance Consulting Servs., 558 N.W.2d 391, 392 (Iowa 1997).

[*62]

> 148    Iowa Code § 617.3.
> 149    State ex rel. Miller v. Moneda Corp., 571 N.W.2d 1, 3 (Iowa 1997). Accord Hogan v. Val-Hi, Inc., 484 N.W.2d 173, 176 (Iowa 1992) (under Rule 56.2, "personal jurisdiction extends to the boundaries established by the due process clause of the United States Constitution").
> 150    Iowa R. Civ. P. 56.2.

Lyondell is subject to the exercise of personal jurisdiction under these provisions as the Iowa plaintiffs have alleged that Lyondell committed tortious acts in

2005 U.S. Dist. LEXIS 753, *62; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

Iowa in whole or in part. [151] To give one example, the Iowa plaintiffs have alleged that the defendants, including Lyondell, "had a duty to issue warnings to Plaintiff, the public, public officials and Downstream Handlers of the risk posed by MTBE," [152] which they failed to provide, thereby giving rise to a tort claim for failure to warn. [153]

> 151   See City of Galva, City of Ida Grove, and City of Sioux City Fifth Amended Complaint ("Galva Compl.") PP187-235, 246-252. The Iowa plaintiffs have also asserted causes of action for breach of warranty and civil conspiracy. See id. PP236-245. In Iowa, civil conspiracy is a derivative claim of an underlying tort. See Wright v. Brooke Group Ltd., 652 N.W.2d 159, 172 (Iowa 2002).

[*63]

> 152   Galva Compl. P202.
> 153   See id. PP201-208.

"Under the rule that [courts] accept the allegations of the petition as true," the Iowa plaintiffs have "carried [their] burden of showing that the exercise of jurisdiction over [Lyondell] is authorized by the long-arm statute." [154] Moreover, Rule 56.2 allows personal jurisdiction over Lyondell because, as determined earlier, Lyondell has the necessary minimum contacts with Iowa, and the exercise of jurisdiction would not offend principles of due process.

> 154   State ex rel. Miller v. Internal Energy Mgmt. Corp., 324 N.W.2d 707, 710 (Iowa 1982).

Thus, this Court may exercise personal jurisdiction over Lyondell in the Iowa cases.

### 4. Kansas

The Kansas long-arm statute specifies eleven grounds that serve as a basis for the exercise of personal jurisdiction under the statute. [155] Among other things, courts may assert personal [*64] jurisdiction over any corporation "whether or not a citizen or resident" of the state "as to any cause of action arising from the":

> (1) Transaction of any business within this state;
>
> (2) Commission of a tortious act within this state;

> . . . .

> (7) Causation to persons or property within this state any injury arising out of an act or omission outside of this state by the defendant if, at the time of the injury [] products, materials or things processed, serviced or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of trade or use. [156]

Personal jurisdiction over Lyondell is proper under each of these subsections.

> 155   See Kan. Stat. § 60-308(b).
> 156   Id.

Lyondell transacted business within the state by selling MTBE directly to customers in Kansas until 1996, [157] which the Kansas plaintiffs allege caused property damage and gave rise to their causes of action. [158] Lyondell's sales of MTBE must [*65] have provided the company with a direct financial benefit, warranting the exercise of personal jurisdiction under subsection (b)(1).

> 157   See Bowling Aff. at 3.
> 158   See, e.g., Chisholm Creek Utility Authority Fourth Amended Complaint PP188-244.

In addition, the Kansas plaintiffs allege numerous tortious acts by defendants, such as the failure to curtail or reduce MTBE's manufacture and distribution. These allegations satisfy subsection (b)(2). It is not significant that the acts may have occurred outside of the jurisdiction because the Kansas Supreme Court has said that it is "possible to bring suit in Kansas to recover for damages for injuries occurring in this state which resulted from negligent conduct outside the state." [159]

> 159   Ling v. Jan's Liquors, 237 Kan. 629, 703 P.2d 731, 734 (Kan. 1985) (finding section 60-308(b)(2) applicable where the sale of liquor took place in Missouri but the injury to plaintiff occurred in Kansas).

[*66] Finally, the Kansas Supreme Court has recognized that subsection (b)(7) applies to products liability cases, such as this one, and that the intent of the legislature "was to grant in personam jurisdiction to the courts of this state over those who engage in the

manufacture, sale, or servicing of products if they receive or can anticipate some direct or indirect financial benefit from the sale, trade, use or servicing of their products within [Kansas]." [160] The Kansas plaintiffs' claims fall squarely within this subsection as Lyondell could have reasonably anticipated financial benefit from its direct and indirect sales of MTBE into Kansas. Moreover, this provision of the statute should be "construed to assert jurisdiction over nonresident defendants to the full extent permitted by the due process clause." [161]

> 160  *Id.* at 733.
> 161  *Id.* at 734.

Therefore, this Court may exercise personal jurisdiction over Lyondell in the Kansas cases.

### 5. Massachusetts

The Massachusetts [*67] long-arm statute "sets out a list of specific instances in which a Massachusetts court may acquire personal jurisdiction over a nonresident defendant." [162] I address only one provision of this statute, however, because it resolves whether a Massachusetts court could exercise jurisdiction over Lyondell in this case. In particular, the long-arm statute provides that a court of the commonwealth may exercise jurisdiction when the defendant "transact[s] any business in the commonwealth," and plaintiff's causes of action "arise from" that business. [163]

> 162  *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 625 N.E.2d 549, 551 (Mass. 1994).
> 163  Mass. Gen. Laws ch. 223A § 3(a).

Like the Kansas complaints, the causes of action asserted by the Massachusetts plaintiffs arise from Lyondell's transaction of business in the commonwealth. In particular, the company directly sold MTBE to customers in Massachusetts until 1996. [164] Lyondell undoubtedly received financial revenue from those sales, [*68] and such sales constitute the transaction of business. The sale of this MTBE allegedly caused, at least in part, the contamination of plaintiffs' water supply. [165] Given that the commonwealth's highest court, the Supreme Judicial Court of Massachusetts, interprets the provision of the statute relating to the transaction of business broadly, [166] there is no doubt that a Massachusetts court could exercise personal jurisdiction over Lyondell. [167]

164  *See* Bowling Aff. at 3.
165  *See, e.g.,* Town of Duxbury, et al. Fifth Amended Complaint PP1, 3-64, 143-161.
166  *See Tatro,* 625 N.E.2d at 551 ("The transacting any business clause [in § 3] has been construed broadly.") (quotation marks and citation omitted). *Accord Droukas v. Divers Training Acad., Inc.,* 375 Mass. 149, 153, 376 N.E.2d 548 (1978) ("We view[] the function of the long arm statute as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States.") (quotation marks and citation omitted).
167  *See Tatro,* 625 N.E.2d at 554 (holding that court had personal jurisdiction under section 3(a) where Massachusetts resident brought personal injury action against California hotel to recover for personal injuries suffered in that hotel because of defendant's agreement to provide accommodations to plaintiff); *Salmon v. Lefrancois,* 1997 Mass. Super. LEXIS 334, No. 94-2675-C, 1997 WL 346177, at *4 (Mass. Super. May 5, 1997) (railroad's acknowledgments that it owned the boxcars involved in the accident, that it derived revenue or value from the use of those boxcars, and that it derived revenue or value generally from the nationwide interchange system furnished sufficient proof of "transacting business" under subsections (a) of long-arm statute); *Parmenter v. Hyundai Motor Co.,* 1995 Mass. Super. LEXIS 554, No. 931591, 1995 WL 809544, at *2 (Mass. Super. June 19, 1995) (holding that the state had jurisdiction over Hyundai Motor Co. pursuant to section 3(a) when it sought, according to its handbook, to "support a sales service network spread out across the U.S." as well as maintain "a network throughout the U.S.") (emphasis removed).

[*69] Thus, this Court may exercise personal jurisdiction over Lyondell in the Massachusetts cases.

### 6. Vermont

In Vermont, personal jurisdiction may be exercised over a corporation if it is served with the complaint, [168] and "it appears that the contact with the state . . . is sufficient to support a personal judgment against [it]." [169] Vermont's long-arm statute does not enumerate categories of personal jurisdiction, but rather, "confers

2005 U.S. Dist. LEXIS 753, *69; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause." [170] Because I have already determined that jurisdiction may be exercised over Lyondell in Vermont without offending principles of due process, there is no need for further analysis.

> 168   *See* Vt. Stat. tit. 12, § 855 ("any process against [the defendant] which is so served upon the secretary of state shall be of the same legal force and effect as if served on the foreign corporation at its principal place of business in the state or country where it is incorporated . . . ."). Lyondell does not contest that it was properly served.
>
> 169   *Id.* § 913(B); *see also id.* § 855.

[*70]

> 170   *Dall v. Kaylor,* 163 Vt. 274, 658 A.2d 78, 79 (Vt. 1995). *Accord Northern Aircraft, Inc. v. Reed,* 154 Vt. 36, 572 A.2d 1382, 1383 (Vt. 1990) (Vermont long-arm statute "reflects a clear policy to assert jurisdiction over individual defendants to the full extent permitted by the Due Process Clause."). *See also* Reporter's Notes, Vermont Rule of Civil Procedure 4(e) (statute allowing personal service outside state reaches to "outer limits permitted by the due process clause").

Thus, this Court may exercise personal jurisdiction over Lyondell in the Vermont cases.

### 7. West Virginia

West Virginia's long-arm statute allows a state court to exercise personal jurisdiction over a defendant "for a cause of action arising from or growing out of" seven enumerated acts. [171] Among other things, it permits a court to assert personal jurisdiction if the acts involve "transacting any business in this state." [172] In addition, West Virginia has a statute that elaborates on this "transacting business" provision of the state's long-arm statute and specifically applies to foreign corporations. [*71] [173] The relevant provision, entitled "Authority to transact business and jurisdiction over foreign corporations," states that a "foreign corporation is deemed to be transacting business in this state . . . if such corporation commits a tort, in whole or in part" in West Virginia. [174]

> 171   W. Va. Code § 56-3-33(a)(1)-(7).
> 172   *Id.* § 56-3-33(a)(1).
> 173   *See* W. Va. Code § 31D-15-1501.

> 174   *Id.* ch. 31D-15-1501(d)(2).

Personal jurisdiction may be exercised under the plain language of both statutes. Lyondell concedes that it directly sold MTBE to customers in West Virginia until 1988. [175] Lyondell received substantial revenue from these sales. The West Virginia plaintiff, the Town of Matoaka, has alleged that the MTBE sold directly and indirectly to West Virginia contaminated or threatens to contaminate the town's water supplies. [176] Lyondell's sales of MTBE are thus related to Matoaka's cause of action and qualify as the "transaction [*72] of any business" in West Virginia. [177]

> 175   *See* Bowling Aff. at 3.
> 176   *See* Town of Matoaka Second Amended Complaint ("Matoaka Compl.") PP3, 86-93.
> 177   *See Hill by Hill v. Showa Denko, K.K.,* 188 W. Va. 654, 425 S.E.2d 609, 615 (W. Va. 1992) (defendant's conduct fell within long-arm statute because defendants had control over sale of product in the state and derived substantial revenue from the product purchased and used in West Virginia).

In addition, just as I found with the Iowa complaint, Matoaka has alleged that Lyondell committed a number of torts "in whole or in part" in West Virginia. [178] Matoaka alleges that defendants, including Lyondell, do business in West Virginia, [179] and that defendants engaged in a pattern of conduct that proximately caused plaintiff's injuries -- to wit, contamination or potential contamination of plaintiff's groundwater and production wells. Defendants' conduct included failing to reduce the manufacture and distribution of MTBE, marketing MTBE gasoline [*73] without disclosing its hazards, and failing to instruct downstream handlers and the public about the safe handling of such products. [180] The fact that Lyondell stopped directly selling MTBE in the jurisdiction in 1998 is not relevant if its acts or omissions caused the present injury to the Town of Matoaka and thus committed a tort "in whole or in part" in West Virginia.

> 178   *See* Matoaka Compl. PP191-251 (alleging the torts of (1) strict liability for design defect and/or defective product, (2) strict liability for failure to warn, (3) negligence, (4) public nuisance, (5) private nuisance, (6) trespass, and (7) civil conspiracy).
> 179   *See id.* PP4-72.

2005 U.S. Dist. LEXIS 753, *73; CCH Prod. Liab. Rep. P17,292
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

180 *See id.* PP3, 86-93.

Accordingly, this Court has personal jurisdiction over Lyondell in the West Virginia case.

## VII. CONCLUSION

For the foregoing reasons, plaintiffs have shown that Lyondell has sufficient contacts with each of the forum states to support the exercise of personal jurisdiction. Accordingly, Lyondell's motions [*74] to dismiss the Florida, Indiana, Iowa, Kansas, Massachusetts, Vermont, and West Virginia Complaints pursuant to Rule 12(b)(2) are denied.

The Clerk of the Court is directed to close these motions. A conference is scheduled for February 24, 2005 at 10:00 a.m.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

January 18, 2005