LEXSEE

Gary LaBarbera, Lawrence Kudla, Thomas Gesualdi, Paul Gattus, Theodore King, Chester Broman, Frank Finkel, and Joseph Ferrara, Plaintiffs, - against - Dasgowd, Inc., Irondequoit Corp., Norelli & Oliver Construction Co., Inc., Satisfied Trucking, and Vidago Construction Corp., Defendants.

CV-03-1762 (CPS)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

2007 U.S. Dist. LEXIS 37349

May 22, 2007, Decided
May 22, 2007, Filed

COUNSEL: [*1] For Gary La Barbera, Lawrence Kudla, Thomas Gesualdi, Paul Gattus, Theodore King, Chester Broman, Frank Finkel, Joseph Ferrara as Trustees and Fiduciaries of the Local 282 Welfare, Pension, Annuity, Job Training, Vacation and Sick Leave Trust Funds, Plaintiffs: Abigail R. Levy, LEAD ATTORNEY, Jae W. Chun, Friedman & Wolf, New York, NY.

JUDGES: Charles P. Sifton, United States District Judge.

OPINION BY: Charles P. Sifton

OPINION

MEMORANDUM OPINION AND ORDER

SIFTON, Senior Judge.

On April 8, 2003, plaintiffs, the Trustees and Fiduciaries of the Local 282 Welfare, Pension, Annuity, Job Training and Vacation and Sick Leave Trust Funds (the "Funds") commenced this action against Dasgowd Inc., Irondequoit Corp., Norelli & Oliver Construction Co., Inc., Vidago Construction Corp., and Satisfied Trucking to recover payments for unpaid pension contributions pursuant to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 et. seq.[1] Plaintiffs sought to enforce the terms of a Trust Agreement entered into between plaintiffs and each defendant pursuant to § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3) [*2] and Sections 209(a) and 515 of ERISA, 29 U.S.C. §§ 1059(a) and 1145, and collect payments alleged to be owed to the Funds under the terms of various collective bargaining agreements between defendants and the Teamsters Local 282 of the International Brotherhood of Teamsters.

1   The action against defendant Dasgowd, Inc. was dismissed without prejudice on September 12, 2003.

On November 20, 2004, plaintiffs entered into a settlement agreement with defendant Satisfied Trucking, requiring Satisfied Trucking to pay $ 150,000 over the course of thirty months. The same day, plaintiffs also entered into an agreement with Daryl Soltau, President of Satisfied Trucking, who personally guaranteed to pay the settlement amount in the event that Satisfied Trucking defaulted on the settlement; Soltau has never been named as a defendant in this action. Now before this Court is plaintiffs' motion to enforce Soltau's personal guarantee. For the reasons set forth [*3] below, plaintiffs' motion is denied for lack of subject matter jurisdiction.

Background

The following facts are drawn from plaintiffs' Complaint and submissions in connection with this motion. Neither Satisfied Trucking or Soltau has filed an papers in opposition.

On December 1, 2003, The Clerk of the Court noted

Case 1:07-cv-06214-BSJ-DCF    Document 15-16    Filed 09/19/2007    Page 2 of 19

2007 U.S. Dist. LEXIS 37349, *3
2007 U.S. LEXIS 5901, ***90; 75 U.S.L.W. 4337

the default of Irondequoit, Norelli and Vidago, who failed to appear or otherwise defend in this action. On August 25, 2004, default was noted as to Satisfied Trucking. This Court then consolidating plaintiffs' motion for default judgment against defendants Irondequoit, Norelli and Vidago with the motion filed against Satisfied Trucking and referred the matter to Magistrate Judge Go for determination of the amount of damages.

Before that inquest for damages was concluded, the settlement agreement between plaintiffs and Satisfied Trucking was signed. In late 2004, Satisfied Trucking remitted an initial payment of $ 10,000 but has failed to remit further payment as required under the settlement agreement. Plaintiffs apparently last contacted Satisfied Trucking in January 2005, alerting it to the default and requesting payment. According to plaintiffs, Satisfied Trucking's [*4] assets appear to have disappeared and, accordingly, they must now look to Soltau's personal guarantee for payment.

This Court issued an Order to Show Cause on March 19 which was mailed by the Clerk's office to Soltau and also served on Satisfied Trucking that same day. No responses have been received.

Discussion

For a question to properly be before a federal court, that court must have both subject matter and personal jurisdiction. Even when the parties have not themselves raised the issue, jurisdiction is a threshold issue which the court must address. *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 107 (2d Cir. 1997).

Subject matter jurisdiction requires the existence of a 'federal question' or diversity of citizenship. 28 U.S.C. §§ 1331, 1332. In the present motion to enforce a personal guarantee attached to a settlement agreement, nothing in the papers submitted to this Court allows me to find that subject matter jurisdiction has been properly established. Actions to enforce settlement agreements are, in essence, contract actions which are governed by state law and which do not [*5] themselves raise a federal question unless the court which approved the settlement retained jurisdiction. *See Fidelity Mut. Life Ins. Co. v. American Nat'l Bank & Trust Co.*, 1994 U.S. Dist. LEXIS 457, 1994 WL 14635, *2 (N.D.Ill. 1994) ("Before a court will enforce a settlement agreement, the traditional elements of a contract must be met."). As the Supreme Court has stated, "federal jurisdiction to enforce a private contractual settlement will often be lacking unless the terms of the agreement are incorporated into the order of dismissal." *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 604 n.7, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001) (citing *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)); *see also McKay v. United States*, 207 Fed. Appx. 892, 2006 WL 3291757, *1 (10th Cir. 2006) ("Once a lawsuit is settled and dismissed, the district court does not generally have ancillary jurisdiction to enforce the parties' settlement agreement. A district court can, however, retain jurisdiction over a settlement agreement if the order of dismissal shows an intent to retain jurisdiction or incorporates the settlement agreement.") (internal [*6] citations and quotations omitted). In this case, the parties signed a settlement agreement which they never presented to the Court, and this Court never ordered dismissal or retained any sort of jurisdiction over the settlement agreement. Nor has plaintiff presented anything indicating that diversity jurisdiction would apply either. Accordingly, this contract claim must be dismissed for lack of subject matter jurisdiction.[2]

[2] Plaintiffs cite no cases enforcing a settlement agreement against a non-party where an action was not first commenced independently against that non-party, giving him or her a full opportunity to litigate the claim. Plaintiff may, however, initiate a new action against a guarantor to enforce a guarantee. *See Chase Manhattan Bank v. Rood*, 698 F.2d 435 (11th Cir. 1983) (action to recover on a personal guaranty of a loan); *Ampex Credit Corp. v. Bateman*, 554 F.2d 750 (5th Cir. 1977) (action to recover on guarantee on equipment sales contract); *Design & Development, Inc. v. Vibromatic Mfg., Inc.*, 58 F.R.D. 71 (E.D.Pa. 1973) (action to recover against guarantors to settlement agreement).

[*7] Conclusion

For the reasons set forth above, plaintiffs' motion is denied for lack of subject matter jurisdiction. The Clerk is directed to furnish a copy of the within to the parties and to the Magistrate Judge.

SO ORDERED.

Dated: Brooklyn, New York

2007 U.S. Dist. LEXIS 37349, *7
2007 U.S. LEXIS 5901, ***90; 75 U.S.L.W. 4337

May 22, 2007                               United States District Judge

By: /s/ Charles P. Sifton (electronically signed)

LEXSEE

In re Matter of: WAYDE S. LERBS, Complainant, v. BUCA DI BEPPO, INC., Respondent.

CASE NO: 2004-SOX-8

U.S. Department of Labor
Office of Administrative Law Judges

2004 DOLSOX LEXIS 65

June 15, 2004

[*1]

By STEPHEN L. PURCELL, Administrative Law Judge

OPINION:

RECOMMENDED DECISION AND ORDER GRANTING RESPONDENT'S MOTION FOR SUMMARY DECISION

This case arises out of a complaint of discrimination filed by Wayde S. Lerbs ("Complainant" or "Lerbs") against Buca di Beppo ("Respondent" or "Buca") pursuant to the employee protection provisions of Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("Sarbanes-Oxley") enacted on July 30, 2002.

On March 23, 2004, Buca filed a motion for summary decision. The motion was originally denied because Complainant had not yet received discovery in this case and Buca opposed any extension of time to allow Lerbs to receive and review the discovery responses prior to responding to Buca's motion for summary decision. On April 6, 2004, Buca filed a motion seeking reconsideration of the order denying summary decision on the grounds that it had by that time produced responses to Lerbs' discovery requests. Buca expressly asked that Complainant be allowed to supplement his opposition to the motion for summary decision in light of the discovery [*2] materials he has now received. During a telephone conference conducted April 13, 2004, Lerbs confirmed that he had received from Buca all documents to which he was entitled. Accordingly, on April 15, 2004, I granted Respondent's motion for reconsideration of the order denying summary decision. On April 30, 2004, Complainant filed his opposition to Respondent's motion for summary decision, along with supporting documents and affidavits. The decision herein is based on a review of the documents submitted, the arguments of the parties, applicable statutory provisions, regulations, and pertinent precedent.

Summary Decision

Applicable regulations provide that an Administrative Law Judge "may enter summary judgment for either party if the pleadings, affidavits, material obtained by discovery or otherwise, or matters officially noticed show that there is no genuine issue as to any material fact and that a party is entitled to summary decision." 29 C.F.R. § 18.40(d). The opposing party "may not rest upon the mere allegations or denials of such pleading. . . . [but] must set forth specific facts showing that there is a genuine issue of fact for the hearing." 29 C.F.R. § 18.40(c).

Section [*3] 18.40 is modeled on Rule 56 of the Federal Rules of Civil Procedure, pursuant to which "the judge does not weigh the evidence or determine the truth of the matter asserted, but only determines whether there is a genuine issue for trial" by viewing "all the evidence and factual inferences in the light most favorable to the non-moving

Page 1

2004 DOLSOX LEXIS 65, *3
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

party." *Stauffer v. Wal-Mart Stores, Inc.*, USDOL/OALJ Reporter (HTML), ARB No. 99-107, ALJ No. 99-STA-21 at 6 (ARB Nov. 30, 1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1985)). The party moving for a summary decision has the initial burden of showing that there is no genuine issue of material fact. This burden may be discharged by simply stating that there is an absence of evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Moreover, there is no requirement that the moving party support its motion with affidavits or other similar material negating the opponent's claim. *See Celotex*, 477 U.S. at 324; Fed. R. Civ. Pro. 56(b). However, if a motion is properly supported, then the nonmoving [*4] party must go beyond the pleadings to overcome the summary judgment motion. He may not rest upon mere allegations, but must set forth specific facts showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 248.

Based on the evidence of record, I find the facts listed below to be both undisputed and material to this litigation:

1. Complainant was employed by Respondent as Cash Manager from October 6, 1998 until October 10, 2002 (Comp. Aff. at 1). In this capacity, Complainant reported to Dan Skrypek, Vice President and Controller for Buca n1 (Skrypek Stat. at 1). n2

2. On at least one occasion, Complainant asked Skrypek about certain entries on the general ledger which reclassified a negative cash account balance to accounts payable (Comp. Dep. at 197-98; Skrypek Stat. at 1; Skrypek Aff. 5). Specifically, Lerbs asked "what a particular entry was doing" n3 (Skrypek Stat. at 1; Comp. Mot. at 2). After Skrypek explained these entries, Complainant asked him how to list these entries on a bank reconciliation, and was told to list them as an adjusting entry (Comp. Dep. at 196-97). Complainant also brought up this concern with John Motschenbacher, [*5] Chief Information Officer, in early 2002, after Scott Krusemark, Assistant Controller, had asked Complainant about this type of entry. *Id.* at 197. Complainant indicated to Motschenbacher that he "did not think it was right and that it was misleading," but was told not to worry about it. *Id.* at 199. Complainant believed that these entries misrepresented Buca's true financial position to its bankers and investors (Comp. Aff. at 1). Specifically, he believed that these entries were contrary to generally accepted accounting principles because "when the change was initially made[, it was] not disclosed" (Comp. Dep. at 200). He subsequently learned that these entries were consistent with generally accepted accounting procedures (Comp. Dep. at 200).

3. Complainant repeatedly complained that it was not proper for Respondent to hire accountants that were formerly employed by Respondent's auditor, Deloitte and Touche, because, according to Complainant, this practice compromised Respondent's controls by "opening the door for fraudulent activities to be covered up." *Id.* at 75, 174-75. Complainant testified that "although [the practice was] not illegal at the time, I felt it compromised [*6] the validity of the annual audit, which shareholders rely on to make investment decisions." *Id.*

4. Complainant first complained about Buca hiring former Deloitte and Touche employees to Jennifer Percival, who at all relevant times was Vice President of Human Resources. n4 He made this complaint shortly after Respondent hired John Montgomery as Assistant Controller in early 2000, approximately two years prior to Complainant's termination (Comp. Aff. at 1; Comp. Dep. at 80, 175-76). Approximately six months prior to his termination, he also made this complaint to John Motschenbacher. *Id.* at 79.

5. With reference to Respondent's decision to hire Montgomery, Complainant also indicated to Percival (in the presence of Mary Schrader) that he was interested in being promoted at Buca (Comp. Dep. at 52), but that there seemed to be an exclusionary club of CPAs at Buca, which prevented individuals such as Complainant who were not CPAs from being promoted. *Id.* at 73, 77.

6. Shortly after Montgomery was hired as Assistant Controller, Skrypek learned that Complainant had

2004 DOLSOX LEXIS 65, *6
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

expressed to Jennifer Percival his displeasure about not being promoted to this position (Skrypek Stat. at [*7] 6). Skrypek asked Complainant to inform him of any such concerns in the future. *Id.* Skrypek also heard from others that Lerbs had commented that one had to be a CPA or from Deloitte and Touche to be promoted at Buca (Skrypek Stat. at 2). During Complainant's June 7, 2002 performance review, Skrypek stated that "while it is important to question decisions, I feel it is inappropriate to discuss those questions with other members of the department without first discussing them with me" (CX 8 at 4).

7. Complainant again complained about the practice of hiring former Deloitte and Touche employees when Candi Olson and Scott Krusemark were hired around December of 2001. *Id.* at 75, 175.

8. Prior to April of 2001, Buca had been purchasing lunches for corporate employees every workday from various restaurants (Skrypek Stat. at 1). Starting around April 2001, Buca began paying its St. Paul restaurant $ 1,000 per day to provide lunches to Respondent's corporate office (Skrypek Aff. at 5). Around May 2002, Respondent decided that this price was too low, because Buca restaurants are not normally open for lunch and, in order to provide lunches for corporate employees, the employees in [*8] the St. Paul restaurant had to begin preparing food earlier in the day than they otherwise would have (Skrypek Stat. at 1; Skrypek Aff. at 5; Comp. Dep. at 194). n5 The average cost of a meal at Buca restaurants is approximately $ 20.00 per person, and there were usually approximately 75 to 100 n6 people at Buca's corporate office (Skrypek Stat. at 1; Skrypek Aff. at 5; Comp. Aff. at 1-2).

9. Complainant complained to Joe Kohaut, Vice President of Food and Beverage and Purchasing, about the increase in the price paid for lunches from $ 1,000 to $ 2,000 per day (Comp. Aff. at 2). He also made this complaint to Jennifer Percival in the presence of Mary Schrader (Comp. Dep. at 77-78, 189). Specifically, he complained that this practice inappropriately inflated the "same store sales" indicator for Buca's St. Paul restaurant because the food was not worth this much. *Id.* at 190. These sales were recorded as sales by the restaurant and as an expense to the corporate office, resulting in no change to Buca's net income (Skrypek Stat. at 1; Skrypek Aff. at 5; Comp. Dep. at 190). Nevertheless, Complainant believed that the figures were inflated, because "when they report same store sales [*9] which are not generally reported to the SEC they are reported to the public, to the investors, they don't report expenses, they only report sales." *Id.* at 191-91. The information regarding the "same store sales" at Buca's St. Paul restaurant, including the sales to Respondent, was, in fact, released to the shareholders (CX 12 at 4-5).

10. Complainant was not a high performer at Buca. Dan Skrypek rated his performance as satisfactory (or average) n7 in most categories in his 2000 and 2001 performance reviews (Skrypek Aff. at 1; CX 8; Comp. Dep. at 110). Along with positive comments, Complainant's 2000 review contained the following critical comments:

- "I encourage him to develop a cash model which will estimate cash needs over future period(s)."
- "I encourage Wayde to look for more automated ways to complete tasks."
- "Develop opportunity to organize and schedule department priorities."
- "I encourage him to work on his conflict management."

(CX 8). Skrypek also listed the following "developmental needs:" "conflict resolution, organizational skills, communication with stores." *Id.* At the same time, he noted the following "targeted strengths:" "knowledge of accounting, [*10] accuracy and attention to detail, loyalty to organization." *Id.* Based on this review, Skrypek recommended that Complainant's salary be increased by $ 5,000 (to $ 42,000 per year). *Id.*

11. Complainant's 2001 performance review also contained both positive and negative feedback. *Id.* In

2004 DOLSOX LEXIS 65, *10
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

particular, Skrypek provided the following deficiencies:

. "Work on resolving issues with regionals and make process more efficient."
. "I encourage him to develop ways in which to better manage cash flow and create a report which projects cash inflows/outflows."
. "I encourage Wayde to look for efficiencies and more effective ways to accomplish tasks."
. "I encourage Wayde to work on organizational skills and setting up more specific, easy to understand policies and procedures."
. "Be careful regarding being critical of others."
. "Work on delegating tasks and making sure priorities are consistent and important."

*Id.* The 2001 review listed the following "developmental needs:" "organizational skills, delegate duties, develop policies and procedures, communication with regionals and operations, and time management." *Id.* It also identified the following "targeted strengths:" [*11] "team player and 'pro-Buca,' prepares accurate reports/entries, committed to ultimately completing task, very knowledgeable." *Id.* Based on this evaluation, Complainant was awarded a raise of 5 percent (to $ 44,100). *Id.*

12. In the course of Complainant's tenure, Respondent experienced massive growth. During the period of Complainant's employment, Respondent's operations grew from thirteen restaurants to over 90 restaurants, and its finance department expanded from five or six employees to 15-20 employees (Comp. Dep. at 49-50; Gadel Aff. at 1).

13. Complainant testified that, as a result of Respondent's expansion, his position "grew because of the volume, there was a lot more of the same things to do. With the growth I needed to consolidate bank accounts and come up with better systems and procedures to get the work done" (Comp. Dep. at 42-43). As a result, his work became more challenging, as there was "a lot more money being moved around, there was a lot more to keep track of." *Id.* at 49-50.

14. On some occasions, Complainant failed to reconcile Respondent's books on a monthly basis. *Id.* at 50. He attempted to do so and was successful most of the time. *Id.* [*12] According to Complainant, "with the volume and the demands of the job there's certain times where you can't get through all of the work in a month." *Id.* On occasion, he carried over to the next month negative amounts of money that he was unable to explain. *Id.* at 51. Sometimes he carried such amounts forward more than one month and, possibly, more than two months. *Id.*

15. Due to a heavy work load, Complainant did not complete the payroll bank reconciliations prior to the December 2001 audit, as he was supposed to. *Id.* at 127. In preparation for the December 2001 audit, Skrypek discovered that Complainant was several months behind on bank reconciliations (Skrypek Stat. at 2). As a result, Skrypek worked with Scott Krusemark to prepare the payroll accounts for this audit. *Id.* In connection with this problem, Skrypek informed Complainant that he should not be more than one month behind on accounts. *Id.* at 3.

16. Complainant recorded an amount of $ 12,512 as "deposits in transit" on bank reconciliations for Buca's Maple Grove location for April and May of 2002 (Comp. Dep. at 135-36). In June of 2002, Complainant made an adjustment to the over and short account [*13] for this amount, because it was a "missing deposit that had been missing way too long." *Id.* at 137. Similarly, the May bank balance reflected a $ 1,000 deposit in transit, which was later charged to the over and short account. *Id.*

17. In response to Complainant's request for a salary and performance review, Dan Skrypek reviewed his

2004 DOLSOX LEXIS 65, *13
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

performance on June 7, 2002 and found it to be lacking in many respects (CX 8; Skrypek Aff. at 3). Respondent acknowledged that this review set forth goals that were not found in his previous reviews, because "the circumstances of Mr. Lerbs' job had changed" due to Buca's growth (Skrypek Stat. at 4).

18. According to the June review, Complainant was charged with "develop[ing] a risk analysis that identifies areas of poor cash management" (CX 8). Complainant indicated that he worked on this task, but did not complete it (Comp. Dep. at 151). The review further stated that by the end of the third quarter of the fiscal year 2002, Complainant was expected to develop a set of written policies and procedures regarding all forms of cash and treasury management, and present ideas for improvement. Id. Complainant stated that he began preparing such [*14] a list of policies, but did not complete it. Id. at 149-50; Comp. Aff. at 2. He did, however, produce a Word document setting forth some of the policies, which he distributed to other employees. Id. The June review also required Complainant to enhance Respondent's cash flow analysis tool and to discuss this issue with all relevant departments (CX 8). Complainant acknowledged that he had discussions with some of the departments he considered relevant, but not all of them (Comp. Dep. at 155-56). The review further stated that Complainant was expected to work with the accounts payable and payroll department to ensure that all checks and deposits were currently watched and recorded, and to maintain a check number summary (CX 8). Complainant indicated that "it was something that was in development that I had instructed my assistants to deal with. I don't think it was completed" (Comp. Dep. at 156).

19. Complainant's June 7, 2002 performance review also contained sections entitled "Wayde's strengths" and "Wayde's development opportunities" (CX 8). In the former section, Skrypek listed the following qualities: loyalty to Buca ("you [have] been loyal to our organization and committed, [*15] when focused, to do a good job and get the correct answer"); intelligence ("I feel that if I were to give you a specific problem or task, you would have the ability to investigate the situation and come up with the proper answer"); and honesty ("I feel that you are honest and committed to doing the right thing"). Id.

20. In the "development opportunities" section Skrypek listed concerns that he has "noted over the past several years." Id. One of the "development opportunities" cited by Skrypek was Complainant's excessive use of the Internet. Id. He stated: "The practice of spending personal time on the Internet needs to stop immediately. . . . I will review the time spent on the Internet with you on a monthly basis. If usage continues to exceed the agreed upon limit, n8 then access to the Internet will be relinquished and could serve as means of termination." Id.; Comp. Dep. at 107. Prior to this review, Complainant used the Internet on average one hour per day, accessing both work-related and non-work-related sites (Comp. Dep. at 105). Complainant repeatedly visited web sites of a sexual nature while at work during the after hours, even though he acknowledged that [*16] this was not appropriate. Id. at 105. After his June review, Complainant continued to visit non-work-related web sites on the Internet, but limited his Internet use to "less than an hour a day." Id. at 108. In the months that followed Complainant's June performance review, Dan Skrypek was aware that Complainant continued to use the Internet for non-work-related purposes (Skrypek Aff. at 3).

21. Respondent did not obtain any documentation regarding Complainant's use of the Internet until after his termination (Skrypek Stat. at 3). After his termination, Respondent obtained a sample of Complainant's Internet use, which showed the amount of time he spent on Internet use and the nature of the web sites he visited. n9 Id.; Gadel Aff. (attachment).

22. Complainant's June review also noted that his "personal behavior" needed to be improved (CX 8). Specifically, Skrypek noted that several home office employees have complained about Complainant's inappropriate comments, and that he personally witnessed Complainant make comments that he felt were inappropriate and could be interpreted as offensive. Id. Skrypek added that "any pattern of behavior

2004 DOLSOX LEXIS 65, *16
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

cannot be tolerated regarding [*17] comments on personal appearance, sex, clothing attire, etc. I would refer to the Buca, Inc. sexual harassment policy for further guidance." *Id.*

23. Complainant made a number of comments in the presence of his co-workers that Respondent considered inappropriate. For example, Complainant had stated at a meeting that while looking for a great employee, he was not looking for one who is great in size (Comp. Dep. at 124). When Skrypek told Complainant that this comment was inappropriate, Complainant promised that he would not repeat such behavior and apologized to all the attendees. *Id.*

24. Complainant acknowledged that on another occasion he had the following exchange with his female subordinate: "[she] said I'm working my ass off and I said no, you're not, look behind you." *Id.* at 125. When this co-worker told Complainant that she was offended by this comment, Complainant apologized. *Id.* On May 30, 2002, Respondent's employee Candi Olson sent a memorandum to Dan Skrypek, apparently describing the same episode (CX 13). She stated, in part:

> Per your request, I am writing this memo to provide details of some behavior I witnessed that I feel was unprofessional and [*18] unacceptable in the workplace.
>
> . . .
>
> On one particular day a couple months ago, there were about 5-7 people left in the [lunch] room still eating when a conversation started about something I can't clearly remember . . . gambling or something in which you'd talk about losing. Michelle McManigle made a comment about "losing her ass" and Wayde's response was something to the effect of "No you haven't, look behind you." It was clearly a reference to Michelle's weight. . . . Not only was Wayde's comment rude and tactless, but he is Michelle's direct supervisor and showed a total lack of respect for her in front of others. Michelle was clearly upset by Wayde's remark.

*Id.* On yet another occasion, Complainant made a comment to Maia Lind, Greg Gadel's assistant, which he described as "something about would you be wearing underwear with that." *Id.* at 125-26. Dan Skrypek, who was present during this conversation, indicated to Complainant that he found his comment offensive, and Complainant apologized. *Id.*

25. Complainant's June performance review also noted deficiencies with respect to Lerbs' organizational skills. It stated: "currently your cube is extremely disorganized [*19] and includes an excessive amount of personal items, specifically sport cards. This disorganization makes it extremely difficult for other members of the finance and cash department to find necessary banking information. . . . I believe it will also make you more productive" (CX 8).

26. Skrypek further noted in the June review that Complainant's performance was deficient with respect to planning and use of time:

> Besides the use of Internet time, I believe that you spend more time than necessary discussing non-work related issues with fellow home office members. While home office camaraderie is important, I believe that this is taking away from your time and others ability to work. This causes inefficiency and should be managed more appropriately.

*Id.*

2004 DOLSOX LEXIS 65, *19
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

27. The final problem area listed in Complainant's June performance review concerned his attitude. Skrypek stated:

> Generally you have a good attitude. However, there are certain times in which you have displayed a negative attitude regarding completion of a project and resolving questions of fellow team members. I encourage you to be more receptive to others' ideas and less critical. Also, I believe you have been critical [*20] of certain decisions, especially regarding personnel issues, made by myself or other finance department members. While I believe it is important to question decisions, I feel it is inappropriate to discuss those questions with other members of the department without first discussing them with me.

(CX 8).

28. Skrypek concluded Complainant's June performance review by stating that:

> Based upon the above information, I recommend . . . a retroactive 5% annual pay increase, as we discussed in our previous review meeting in March 2002. However, I also believe that we need to revisit the items within this review by September 30, 2002 to ensure that all the development opportunities are being completed to our mutually agreed upon satisfaction. If any items are not being met to our mutually agreed upon satisfaction, then we need to take corrective steps which could include change of position or termination.

(CX 8).

29. On June 7, 2002, Skrypek discussed the results of the June review with Complainant and informed him that the issues raised in this review would be revisited in ninety days (Skrypek Aff. at 3).

30. After his review on June 7, 2002, Complainant made an effort [*21] to improve his performance (Comp. Aff. at 2; CX 8). He removed many of the personal items that he had kept in his cube. Id. He automated the process for recording journal entries, so that the descriptions were more meaningful, and entered cash entries within three days of the end of the month. Id. He completed all bank reconciliations, with the exception of accounts that were missing statements, before the following month ended. Id. He consolidated as many of Buca's bank accounts as he could into its largest banks and explored other banking relationships. He also began developing written policies and procedures regarding cash handling, banking, armored car services, and treasury management. Id.

31. In the months leading up to the termination of Complainant's employment, Dan Skrypek discussed deficiencies in his performance with Greg Gadel and Scott Krusemark (Skrypek Stat. at 4). In particular, he expressed concern that Complainant was behind on reconciling accounts. Id.

32. On October 10, 2002, Complainant was terminated by Dan Skrypek (Comp. Aff. at 1; Skrypek Stat. at 6).

---

n1 Skrypek had worked for Buca since February of 1999 (Skrypek Stat. at 1).

n2 According to Skrypek, this statement contains his answers to the questions posed by the Department of Labor. Id. at 1.

[*22]

2004 DOLSOX LEXIS 65, *22
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

n3 Complainant stated that after he first saw this kind of entry made by Skrypek, he "went and asked him what it was about." (Comp. Dep. at 196).

n4 Comp. Letter dated April 3, 2004.

n5 The cost to Buca's restaurant of providing lunches included the cost of supplies, as well as compensation paid to its employees for preparing the food and, occasionally, delivering lunches (Comp. Dep. at 194).

n6 In his unsworn statement dated May 22, 2002, Skrypek stated that the number of employees present at the corporate office ranged from 75 to 125 (Skrypek Stat. at 1). However, in his sworn affidavit dated March 16, 2004, he stated that there were between 75 and 100 people present at the corporate office on a daily basis (Skrypek Aff. at 5).

n7 Performance was rated on a scale from "1" to "5," and Complainant received a grade of "3" in most categories.

n8 The document specified how much time Complainant spent on Internet use and prescribed an acceptable maximum number of hours per week. However, both numbers are redacted in the copy of the document submitted by Complainant as part of CX 8, and the parties submitted no other evidence regarding these two numbers.

n9 I note that Respondent did not submit into evidence any documentation showing the amount of time that Complainant spent accessing the Internet.

[*23]

## DISCUSSION

Retroactive Application of Sarbanes-Oxley.

In its motion for summary decision, Respondent argues, in part, that Complainant's claim must fail because Sarbanes-Oxley was not in effect when Complainant engaged in the activity which he now alleges was protected (R. Mot. at 1, 16). n10 In his opposition to Respondent's motion, Complainant acknowledged that all of his alleged reporting activities took place no later than March or May of 2002, prior to July 30, 2002 when Sarbanes-Oxley took effect (Comp. Mot. at 3). He argues, however, that the rule against retroactive application of the Act does not bar his claim because he was terminated on October 10, 2002 and "in recent SOX cases, protected activities that occurred previous to enactment of [Sarbanes-Oxley] with adverse action occurring after enactment have resulted in hearings" (Comp. Mot. at 1-2).

n10 Hereinafter, the following abbreviations will be used: "Comp. Mot." for Complainant's motion in opposition to Respondent's motion for summary decision and supporting memorandum; "Comp. Opposition dated 4/2/04" for Complainant's original opposition to Respondent's motion for summary decision, dated April 2,2002; "R. Mot." for Respondent's motion for summary decision and supporting memorandum; "Comp. Dep." for Complainant's deposition; "Comp. Aff." for Complainant's affidavit; "Skrypek Stat." for the statement of Dan Skrypek, "Skrypek Aff." for the affidavit of Dan Skrypek, "Gadel Aff." and "Gadel Aff. (attachment)" for the affidavit of Greg Gadel.

[*24]

Although there are no Board decisions regarding whether Sarbanes-Oxley has retroactive application, certain Administrative Law Judge decisions have concluded that it does not. For example, in *Gilmore v. Parametric Tech.*

*Corp.*, 2003-SOX-1 (ALJ Feb. 6, 2003), Associate Chief Administrative Law Judge Thomas Burke concluded that Sarbanes-Oxley has no retroactive application in light of the framework prescribed by the Supreme Court in *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994). n11 Since *Gilmore*, other Administrative Law Judges have agreed with Judge Burke's analysis, concluding that Congress did not manifest an intent to apply Section 806 of Sarbanes-Oxley retroactively. *See, e.g., Kunkler v. Global Futures & Forex, Ltd.*, 2003-SOX-6 (ALJ Apr. 24, 2003); *McIntyre v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 2003-SOX 23 (Jan. 16, 2004).

> n11 *The Landgraf* Court held that because there is a strong presumption against retroactive application of laws, courts should apply them prospectively unless it is determined that retroactive application was clearly intended by Congress. Landgraf, 511 U.S. at 263).

[*25]

There are, however, other recent ALJ decisions which have found application of Sarbanes-Oxkley appropriate under facts similar to those presented here, *i.e.*, when alleged protected activity predated the Act's implementation but the employer's discriminatory actions post-dated the Act's effective date. *See Getman v. Southwest Secs., Inc.*, 2003-SOX-8 (Feb. 2, 2004) (complainant's refusal to change stock rating in November 2001 constituted protected activity and employer's termination of employee on July 31, 2002 was adverse personnel action); *Halloum v. Intel Corp.*, 2003-SOX-7 (Mar. 4, 2004) (complainant's March 14, 2002 report to SEC of suspected wrongdoing constituted protected activity and employer's modification of previously imposed Corrective Action Plan ("CAP") on August 19, 2002 was adverse personnel action). Although not expressly discussed, both decisions implicitly acknowledge that it is the date of the adverse personnel action to which adjudicators must look in determining whether the Act applies. The language of the statute itself supports such a conclusion inasmuch as 18 U.S.C. § 1514A is clearly intended to punish the [*26] conduct of employers, *i.e.*, "no company . . . may discharge, demote, suspend, threaten, harass, or in any other manner discriminate . . . ." 18 U.S.C. § 1514A(a). The statute became effective July 30, 2002, and employer conduct described in the statute thus became prohibited as of that date. No issue of retroactive application of the Act is thus implicated in this case. I therefore reject Respondent's argument and find that it is the date upon which an employer is alleged to have engaged in retaliation which determines whether the Act applies, not the date upon which the alleged protected activity occurred.

The Elements of a Whistleblower Claim under Sarbanes-Oxley.

The whistleblower provision of Sarbanes-Oxley, set forth at 18 U.S.C. § 1514A, states, in part:

> No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)), or any officer, employee, contractor, [*27] subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee--
>
> (1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by--
>
> (A) a Federal regulatory or law enforcement agency;
>
> (B) any Member of Congress or any committee of Congress; or

2004 DOLSOX LEXIS 65, *27
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

> (C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct) . . . .

18 U.S.C. § 1514A (a); *see also* 29 C.F.R. § 1980.102 (a), (b)(1).

The whistleblower provision of Sarbanes-Oxley is similar to whistleblower provisions found [*28] in many other federal statutes. Since the Sarbanes-Oxley Act is relatively new, reference to case authority interpreting other whistleblower statutes is appropriate. The elements of a claim of discrimination under other federal "whistleblower" provisions are: (1) Complainant engaged in protected activity as defined by the Act; (2) his employer was aware of the protected activity; (3) he suffered an adverse employment action, such as discharge; and (4) circumstances exist which are sufficient to raise an inference that the protected activity was likely a contributing factor in the unfavorable action. n12 *See Macktal v. U.S. Dep't of Labor,* 171 F.3d 323, 327 (5th Cir. 1999); *Zinn v. Univ. of* Missouri, Case No. 1993-ERA-34 (Sec'y Jan. 18, 1996); *Overall v. Tennessee Valley Auth.,* Case No. 1997-ERA-53 at 12 (ARB Apr. 30, 2001). With respect to the nexus requirement, proximity in time is sufficient to raise an inference of causation. *Id.*

> n12 *In Marano v. Dept't of Justice,* 2 F.3d 1137 (Fed. Cir. 1993), interpreting the Whistleblower Protection Act, 5 U.S.C. § 1221(e)(1), the Court observed:
>
> > The words "a contributing factor" . . . mean any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision. This test is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a "significant," "motivating," "substantial," or "predominant" factor in a personnel action in order to overturn that action.
>
> *Marano,* 2 F.3d at 1140 (citations omitted).

[*29]

In order to prevail on its motion for a summary decision, Respondent has the initial burden of showing that undisputed facts establish that one or more of the aforementioned elements is not established. If Respondent succeeds, Complainant may rebut this showing by setting forth specific facts establishing that there is a genuine issue for trial. *See Anderson,* 477 U.S. at 248. In its motion for summary decision, Respondent asserts that "based on the records filed and Mr. Lerbs' deposition testimony, no disputes of material fact exist in this case, and those same facts show that Mr. Lerbs' claim fails as a matter of law." (R. Mot. at 8). n13 Complainant, in turn, argues that there are several genuine issues of fact that can only be resolved at a hearing (Comp. Mot. at 2).

> n13 In his initial opposition to Respondent's motion for summary decision, Complainant stated that "additional reasons that I object to this motion include the inclusion of a redacted deposition of me taken by respondent's attorney." Comp. Opposition, dated 4/2/04 at 1. This objection is without merit since Complainant had ample opportunity since then to submit the unredacted version of his deposition transcript in response to the motion for summary judgment, but apparently chose not to do so. Complainant also stated that the "testimony at my deposition also shows that at the time of my deposition, I was under the influence of medications, taken as the result of an automobile accident I was involved in on December 17, 2003, which could tend to affect my ability to testify (medication descriptions as provided by my pharmacist attached, marked as Claimant 5, Claimant 6, and Claimant 7). *Id.* at 2. However, Complainant never specified which parts of the deposition, if any, were inaccurate due to the purported influence of the medication. Furthermore, Complainant was free to submit a sworn affidavit in support of his opposition to summary decision setting forth any additional facts relevant to his deposition testimony which might establish that there was a genuine dispute about a material fact. However, he has not done so.

[*30]

2004 DOLSOX LEXIS 65, *30
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

### A. Whether Complainant Engaged in Activities Protected by Sarbanes-Oxley?

"Protected activity," as defined under the Act and relevant regulations, includes, *inter alia*, providing (or causing to be provided) to an employer or to the Federal Government information regarding any conduct which the employee reasonably believes constitutes a violation of various fraud provision of Title 18 of the U.S. Code (§§ 1341, 1343, 1344, or 1348), any rule or regulation of the SEC, or any provision of Federal law relating to fraud against shareholders. 18 U.S.C. § 1514A (a)(1); *see also* 29 C.F.R. § 1980.102 (a), (b)(1). This statutory language makes it clear that the employee is not required to show the reported conduct actually constituted a violation of the law.

The complainant must, however, show that he reasonably believed the respondent violated one of the laws and regulations enumerated in the Act. *Melendez v. Exxon Chemicals Americas*, ARB No. 96-051, ALJ No. 193-ERA-6 (ARB July 14, 2000) (citing *Oliver v. Hydro-Vac Servs., Inc.* Case No. 91-SWD-1, Sec'y Dec., Nov. 1, 1995, slip op. at 9-13). Thus, complainant's belief "must be scrutinized [*31] under both subjective and objective standards, *i.e.*, he must have actually believed that the employer was in violation of [the relevant laws or regulations] and that belief must be reasonable." *Id.* at 20. The reasonableness of a complainant's belief regarding illegality of a respondent's conduct is to be determined on the basis of "the knowledge available to a reasonable [person] in the circumstances with the employee's training and experience." *Melendez*, ARB No. 96-051 (quoting *Minard v. Nerco Delamar Co.*, 92-SWD-1 (Sec'y Jan. 25, 1995), slip op. at 7, n.5).

Complainant specifically alleges that he engaged in protected activity by reporting to Respondent's management his concerns regarding the following three practices: (1) reclassifying outstanding cash balances to accounts payable; (2) hiring former employees of Respondent's auditor, Deloitte and Touche; and (3) purchasing employee meals from one of Respondent's restaurants for $ 2,000 per day. Each one of these alleged protected activities is considered below.

1. Reclassification of Cash Balances.

On at least one occasion, Complainant asked Dan Skrypek, Vice President and Controller for Buca, about certain [*32] entries on the general ledger which reclassified a negative cash account balance to accounts payable (Comp. Dep. at 197-98; Skrypek Stat. at 1; Skrypek Aff. 5). Specifically, Complainant stated that, after he first saw this kind of entry made by Skrypek, he "went and asked him what it was about," whether it was appropriate, and what was the proper way to list it on a bank reconciliation (Comp. Dep. at 196-98). n14 Complainant alleges that in early 2002, he also indicated to John Motschenbacher, Chief Information Officer, that he "did not think it was right and that it was misleading." *Id.* at 197, 199.

> n14 Skrypek, in turn, indicated that Complainant asked him "what a particular entry was doing" (Skrypek Stat. at 1; Skrypek Aff. 5).

As stated above, Complainant must show that he actually and reasonably believed Respondent violated one of the laws and regulations enumerated in the Act. *Melendez*, ARB No. 96-051. Although Complainant states that he initially believed that the practice of reclassifying cash balances as accounts payable misrepresented Buca's true financial position to its bankers and investors, he candidly admitted that he later learned that it was a generally [*33] accepted accounting practice (Comp. Aff. at 1; Comp. Dep. at 200). When asked specifically during his deposition whether he had any reason to believe that reclassifying cash balances in this manner was contrary to generally accepted accounting principles, he replied:

> Only when the change was initially made and not disclosed, I believe generally accepted accounting principles states (sic) that transactions of this type deserve a footnote on the financial statements.

(Comp. Dep. at 200). n15 Thereafter, Complainant went on to testify that he never specifically mentioned to Skrypek, or to anyone else, his concern about the need to report the change in the recording of the negative cash accounts to the

Page 11

SEC. *Id.* at 201.

> n15 Complainant explained that he had reviewed the financial statements posted by Respondent in 1999 with the SEC and noted that when Respondent began using this practice in 1999, it failed to disclose this change in its financial statements. *Id.*

The pertinent case law makes it clear that, in order for the whistleblower to be protected by the Act, the reported information must have a certain degree of specificity. *See generally Bechtel Constr. Co. v. Sec'y of Labor, 50 F.3d 926, 931 (11th Cir. 1995).* [*34] Thus, general inquiries do not constitute protected activity. *See id.* Instead, in order to be protected, a whistleblower must state *particular concerns* which, at the very least, reasonably identify a respondent's conduct that the complainant believes to be illegal. *See id.* In the present case, Complainant's questions to Skrypek and Motschenbacher concerning the reclassification of the negative cash account balance to accounts payable were simply "general inquiries" and do not constitute protected activity since Complainant never identified particular concerns about Respondent's conduct (failure to disclose a change in accounting practices) that he may have believed was illegal.

2. Hiring Former Employees of Deloitte and Touche.

On three occasions, Complainant complained that it was not proper for Respondent to hire accountants that were formerly employed by Respondent's auditor, Deloitte and Touche (Comp. Dep. at 75, 174-75). Complainant made this complaint to Jennifer Percival (who at all relevant times was Vice President of Human Resources) shortly after Respondent hired John Montgomery as Assistant Controller in early 2000, approximately two years prior to Complainant's [*35] termination (Comp. Aff. at 1; Comp. Dep. at 80, 175-76). He again complained about this practice when Candi Olson and Scott Krusemark were hired around December of 2001. *Id.* at 75, 175. Finally, approximately six months prior to his termination, he made the same complaint to John Motschenbacher. *Id.* at 79. Although, Complainant could not state more specifically when he made the latter complaint, he indicated that he did not make any complaints that could constitute protected activity after March or May of 2002 (Comp. Mot. at 3).

As stated above, "protected activity" is defined under the Act as reporting an employer's conduct which an employee reasonably believes constitutes a violation of the laws and regulations related to fraud against shareholders. In his affidavit, Complainant stated that he complained about Respondent's practice of hiring former Deloitte and Touche employees because, "although not illegal at the time, I felt it compromised the validity of the annual audit, which shareholders rely on to make investment decisions." *Id.* Thus, Complainant himself acknowledged that he did not believe at the time that this practice was illegal. As a result, Complainant's [*36] alleged complaints regarding this activity fail to satisfy the definition of "protected activity" set forth in the Act. 18 U.S.C. § 1514A (a)(1); *see also* 29 C.F.R. § 1980.102 (a), (b)(1); *see also Melendez,* ARB No. 96-051.

3. Purchasing Food from Buca's St. Paul Restaurant for $ 2,000 per Day.

As previously noted, Complainant also asserts that he viewed Respondent's decision to raise the price of lunches provided by Buca's St. Paul restaurant to Respondent's corporate office employees from $ 1,000 per day to $ 2,000 per day as an inappropriate attempt to increase "same store sales" n16 figures for the St. Paul location. *Id.* Complainant states that he complained about this practice to Joe Kohaut, Vice President of Food and Beverage and Purchasing, and to Jennifer Percival (Comp. Dep. at 77-78, 189; Comp. Aff. at 2). Specifically, he complained that this practice inappropriately inflated the "same store sales" indicator because the food was not worth this much. *Id.* at 190.

> n16 Complainant explained the term "same store sales" as follows:
>
> > One of the measures of performances in retail that stock purchasers, investors look at is improvements in same store sales which compare stores open a certain number of months sales this year compared with sales last year over the same time frame and they're always looking for

2004 DOLSOX LEXIS 65, *36
24 I.E.R. Cas. (BNA) 1561; 37 Employee Benefits Cas. (BNA) 1195

them to go up. It's an indication of strength of sales.

*Id.* at 189-90.
[*37]

Based on the evidence of record, I find that Complainant failed to show that it was reasonable for him to believe Respondent's decision to increase the price of lunches purchased by Buca from its St. Paul restaurant constituted illegal conduct. In his affidavit, Complainant states that "the increase [from $ 1000] to $ 2000 per day represents a per person charge of approximately $ 25.00," while "Buca restaurants average guest check runs between $ 20 and $ 22 per person for dinner," including alcoholic beverages (Comp. Aff. at 1-2). Assuming that Complainant accurately estimated the number of employees for whom Buca was purchasing lunches (Skrypek estimated the number of employees as ranging from 75-100), he failed to show that the price increase could reasonably be viewed by anyone as unlawful or fraudulent. Between April of 2001 and May of 2002, Respondent was paying its St. Paul restaurant $ 1,000 per day for meals, which translates into a charge of $ 12.50 per person for eighty employees. This price is significantly lower than the average price of a meal at Buca's restaurants, and there is simply nothing unlawful or improper about a decision by Buca to adjust upward the amount it [*38] paid for employees' meals to bring the cost into line with the cost of meals for non-employee consumers. Furthermore, it is undisputed that Respondent's restaurants are not normally open for lunch and the St. Paul restaurant had to open early to start preparing food for lunches for the corporate office (Skrypek Stat. at 1; Skrypek Aff. at 5; Comp. Dep. at 194). Complainant himself acknowledged that the cost to Buca of providing lunches included the cost of supplies as well as compensation paid to its employees for preparing the food and, sometimes, delivering lunches (Comp. Dec. at 194).

Complainant also argues that the figures associated with Buca's purchase of food for its corporate employees were somehow "inflated" because "same store sales" are not generally reported to the SEC but are reported to the public (Comp. Dec. at 191). Respondent acknowledges, however, that the purchase of employees' lunches were accurately recorded as sales to its St. Paul restaurant and as an expense to the corporate office, resulting in no change in Buca's overall net income (Skrypek Stat. at 1; Skrypek Aff. at 5; Comp. Dep. at 190). I thus find Complainant's assertion that Buca's purchase of lunches [*39] from its St. Paul restaurant somehow either could or did mislead potential investors is both speculative and unsubstantiated. Claimant has thus failed to establish that he reasonably believed Buca was engaged in wrongdoing, and any conduct associated with reporting this practice would therefore not be protected.

CONCLUSION

Based on the foregoing discussion, construing all facts in the light most favorable to Complainant, it is clear that Complainant did not engage in activities protected under Sarbanes-Oxley. Respondent is thus entitled to summary decision as a matter of law.

RECOMMENDED ORDER

It is RECOMMENDED that Respondent's motion for summary decision be GRANTED.

Washington, D.C.

NOTICE OF APPEAL RIGHTS: This decision shall become the final order of the Secretary of Labor pursuant to 29 C.F.R. § 1980.110, unless a petition for review is timely filed with the Administrative Review Board ("Board"), U.S. Department of Labor, Room S-4309, 200 Constitution Avenue, NW, Washington DC 20210, and within 30 days of the filing of the petition, the ARB issues an order notifying the parties that the case has been accepted for review. The petition for review must specifically [*40] identify the findings, conclusions or orders to which exception is taken. Any exception not specifically urged ordinarily shall be deemed to have been waived by the parties. To be effective, a petition must be filed within ten business days of the date of the decision of the administrative law judge. The date of the postmark, facsimile transmittal, or e-mail communication will be considered to be the date of filing; if the petition is

filed in person, by hand-delivery or other means, the petition is considered filed upon receipt. The petition must be served on all parties and on the Chief Administrative Law Judge at the time it is filed with the Board. Copies of the petition for review and all briefs must be served on the Assistant Secretary, Occupational Safety and Health Administration, and on the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor, Washington, DC 20210. *See* 29 C.F.R. §§ 1980.109(c) and 1980.110(a) and (b), as found in OSHA, Procedures for the Handling of Discrimination Complaints Under Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002, Title VIII of the Sarbanes-Oxley Act of 2002; Interim Rule, 68 Fed. Reg. 31860 [*41] (May 29, 2003).