LEXSEE

Gale K. Nordling, Appellant, v. Northern States Power Company, et al.,
Respondents (C7-90-1499), Jack F. Sjoholm, et al., Respondents (CX-90-1500)

Nos. C7-90-1499, CX-90-1500

Court of Appeals of Minnesota

465 N.W.2d 81; 1991 Minn. App. LEXIS 33; 59 U.S.L.W. 2449; 6 I.E.R. Cas. (BNA)
140; 119 Lab. Cas. (CCH) P56,710

January 8, 1991, Decided
January 15, 1991, Filed

PRIOR HISTORY:    [**1]  Appeal from District
Court, Hennepin County; Hon. William S. Posten, Judge.

DISPOSITION:  Affirmed.

COUNSEL: James H. Kaster, Nichols, Kaster &
Anderson, Minneapolis, Minnesota, for Appellant.

Robert R. Reinhart, Melissa Raphan, Oppenheimer,
Wolff & Donnelly, Minneapolis, Minnesota, for
Respondents.

JUDGES: Thomas J. Kalitowski, Presiding Judge, Fred
C. Norton, Judge, and Fleming, Judge. *

    *   Retired judge of the district court, acting as
    judge of the Court of Appeals by appointment
    pursuant to Minn. Const. art. VI, § 2.

OPINION BY: NORTON

OPINION

    [*82] OPINION

    Appellant, Gale K. Nordling, initiated this action
against respondents Northern States Power Company and
David McGannon, alleging, *inter alia,* breach of
employment contract, retaliatory discharge in violation of
Minn. Stat. § 181.932, and tortious interference with
contract arising out of [**2] his discharge as corporate
counsel for Northern States Power Company. Appellant
initiated a second action, also arising out of his discharge,

against Northern States Power Company and respondent
Jack F. Sjoholm, alleging, *inter alia,* tortious interference
with contract. The district court granted summary
judgment in respondents' favor on the breach of contract
and tortious interference with contract claims, finding
these claims precluded under the general rule that a client
has an absolute right to discharge an attorney without
liability for breach of contract. The district court also
granted summary judgment in respondents' favor on the
retaliatory discharge claim on the grounds that appellant
produced insufficient evidence to support a cause of
action under Minn. Stat. § 181.932. This court
consolidated the appeals in both actions.

FACTS

    On appeal from the district court's grant of summary
judgment, we view the facts in the light most favorable to
appellant. Appellant, Gale K. Nordling, was hired by
respondent Northern States Power Company (NSP) as an
engineer in 1971 and was employed in this capacity while
he attended law school. NSP contributed part of
Nordling's law school [**3] tuition in exchange for his
promise to work for NSP as an attorney following his
graduation. Nordling joined the NSP Law Department in
the position of corporate attorney after he was admitted to
the bar in 1975.

    As corporate attorney, Nordling worked primarily
with NSP's engineering departments. His responsibilities
included contract drafting and negotiation related to the
utility business, including construction of NSP's utility
plants.

465 N.W.2d 81, *82; 1991 Minn. App. LEXIS 33, **3;
59 U.S.L.W. 2449; 6 I.E.R. Cas. (BNA) 140

Nordling worked successfully as corporate counsel. During his tenure with NSP, he consistently received above average performance ratings. In 1987, he was rated as a "commendable" employee, "commendable" being defined in NSP's rating system as

an employee who *consistently* meets all his objectives and contributes to departmental or team productivity *above* that [*83] which would normally be expected of a fully competent employee.

Nordling made numerous contributions to the company beyond his employment responsibilities. While employed by NSP's Engineering Systems Department, Nordling, with significant expenditure of his own time, developed and provided to NSP for no additional compensation a valuable computer program. As corporate counsel, Nordling [**4] worked many extra hours at no additional compensation to develop NSP teaching materials. Nordling also worked on behalf of NSP as an arbitrator for the Minnesota Better Business Bureau without separate compensation. He served on various NSP boards and committees and spoke at public forums and industry-related seminars without separate compensation.

In early 1987, the NSP Law Department was involved in preparations for proceedings before the Public Utility Commission (PUC) to seek approval of electricity rate increases. A major component of the rate increase request was the $ 1 billion cost of construction of "SherCo III," a new electrical power generation facility located in Sherburne County. In preparation for PUC review of NSP's rate increase request, the Law Department set up a task force for the purpose of anticipating and preparing appropriate responses to potential PUC questions about expenditures for construction of SherCo III. As part of its work, the task force consulted with an attorney in private practice to determine what internal reviews or investigatory steps NSP might take to satisfy the PUC that no significant construction funds had been wasted or misappropriated.

[**5] In March 1987, David McGannon, then NSP's Vice President of Law, informed Nordling that the private attorney was orchestrating a personal lifestyle investigation of NSP employees working at the SherCo III power plant. It was Nordling's understanding, from his conversation with McGannon, that the private attorney's plan would involve surveillance of employees on the job site and at their homes. Nordling believed such surveillance was not justified and would constitute an invasion of the employees' privacy. He therefore voiced his objections to McGannon and to Gary Johnson, then NSP's Director of Law.

When McGannon did not indicate that he would stop or impede the plan, Nordling reported to John Noer, General Manager of Plant Engineering and Construction, his conversation with McGannon. Noer, in turn, reported the plan to NSP Vice President Roland Jensen and to James Kettner, SherCo III Project Manager.

Kettner voiced his strenuous objection to the plan to Johnson and accused him of being involved. Although Kettner refused to disclose the source of his information, Johnson assumed it was Nordling. Johnson reported to McGannon his conversation with Kettner and told McGannon that he [**6] suspected Nordling as Kettner's source of information.

In response to Noer's information, Jensen reported the matter to his superior, Dennis Gilberts, Senior Vice President of NSP. Gilberts reported the matter to NSP's Chief Executive Officer, James Howard. A meeting took place between Jensen, Gilberts and Howard, and Howard made the decision to stop whatever investigatory work the private attorney was planning.

In April 1987, McGannon began monitoring Nordling's phone messages and personally returning Nordling's incoming calls allegedly because McGannon felt that Nordling was working on nonwork matters during the day. McGannon monitored the calls to determine whether they were from NSP personnel or from others. McGannon also maintained that Nordling was spending an inordinate amount of time out of the office without indicating on the Law Department's call/message board where he was going.

McGannon sent Nordling a memorandum, dated April 9, 1987, informing him that the messages he left on the call/message board were "insufficient." McGannon included a detailed list of Nordling's alleged "deficiencies" in complying with a February 19, 1987 memorandum that instructed Law Department personnel [**7] on use of the call/message board. McGannon's [*84] memorandum to Nordling also instructed him to adhere to certain conditions in order to correct his deficiencies and threatened to place him on "Positive Discipline" if he failed to do so. (See discussion below regarding "Positive Discipline.")

465 N.W.2d 81, *84; 1991 Minn. App. LEXIS 33, **7;
59 U.S.L.W. 2449; 6 I.E.R. Cas. (BNA) 140

Nordling met with McGannon shortly after receiving the memorandum. Nordling was perplexed and somewhat angered by the memorandum, as he perceived the criticism as unwarranted. At the end of the meeting, McGannon retracted the memorandum and indicated that he would destroy it.

On November 30, 1987, David McGannon discharged Nordling from his position without notice or warning. McGannon's stated reasons for terminating Nordling included his belief that Nordling was "unhappy" and his "unhappiness" affected his relationships with others in the Law Department, including McGannon. McGannon alleged that Nordling did not say "good morning, good night, how are you" and impeded lunch meetings between Law Department personnel.

McGannon also claimed to have relied on specific statements made by Jack F. Sjoholm in reaching his decision to terminate Nordling. Both Sjoholm and Johnson reported to McGannon that [**8] Steve Larsen, an NSP employee, had related to them a conversation he had had with Nordling. Larsen allegedly came to see Johnson in his office about a legal matter. Johnson's door was closed because he was in a meeting. Nordling allegedly told Larsen that he should "barge right in" because Johnson was not working anyway, so Larsen would not "interfere with a thing." Larsen testified that incident in question never took place.

Sjoholm also related to McGannon, at an October 1987 meeting, that he had overheard Nordling telling Nordling's secretary, Barbara Tiemann that McGannon and Johnson could not be trusted. Tiemann testified that Nordling never made such a statement.

As a NSP employee, Nordling received a copy of the NSP Employee Handbook and was subject to a policy called "Positive Discipline." The handbook describes "Positive Discipline" as:

a company-wide, uniform policy which covers job performance and commitment for all NSP employees. * * * It provides a system to recognize and communicate good performance and gain commitment to change inappropriate behavior.

* * *

The three formal steps of the Positive Discipline system are:

1. Oral Reminder

2. Written Reminder

[**9] 3. Decision Making Leave - (day off with pay for you to decide your commitment to the job).

Should * * * informal coaching and counseling and the three formal steps of Positive Discipline fail to bring about appropriate behavior, an employee may be terminated.

*Policies and Practices* at 10, NSP Employee Handbook (1984). The handbook also provided eight specific examples of types of conduct that could result in disciplinary action and discharge from the company. None of the "Positive Discipline" steps were applied to Nordling prior to his discharge.

ISSUES

1. Did the district court err by ruling as a matter of law that Nordling's status as in-house counsel precludes wrongful discharge claims against NSP?

2. Did the district court err in granting summary judgment in respondents' favor on Nordling's tortious interference with contract claims?

ANALYSIS

A district court may grant summary judgment if the pleadings and other documents before the court "show that there is no genuine issue as to any material fact and that either party is entitled to judgment as a matter of law." Minn. R. Civ. P. 56.03. On appeal from a summary judgment, it is the function of this court to determine whether [**10] there are any genuine [*85] issues of material fact and whether the trial court erred in its application of the law. *Betlach v. Wayzata Condominium,* 281 N.W.2d 328, 330 (Minn. 1979).

Before addressing the merits of this case, we note the role of the Minnesota Court of Appeals within the state's judicial system:

The Court of Appeals is an intermediate appellate court. It is primarily decisional and error correcting rather than a legislative or doctrinal court. Its primary function is the correction of error by application of legal principles. Its task is to find the law, to state it and to apply it to the facts. Only when there are no statutory or

465 N.W.2d 81, *85; 1991 Minn. App. LEXIS 33, **10;
59 U.S.L.W. 2449; 6 I.E.R. Cas. (BNA) 140

judicial precedents to follow will the Court of Appeals make new law.

Minn. Ct. App. Internal R. 1.

I.

It is well settled in Minnesota and in all other jurisdictions that a client may discharge an attorney with or without cause. *See, e.g., Lawler v. Dunn,* 145 Minn. 281, 284, 176 N.W. 989, 989 (1920) (citations omitted); *see also* Minn. R. Prof. Conduct 1.16 & comment (incorporating the general rule). Upon discharge, the client is liable, under the theory of quantum meruit, for payment of [**11] services rendered. *Trenti, Saxhaug, Berger, Roche, Stephenson, Richards & Aluni, Ltd. v. Nartnik,* 439 N.W.2d 418, 420 (Minn. App. 1989) (citing *Lawler,* 145 Minn. at 284-85, 176 N.W. at 990), *pet. for rev. denied* (Minn. July 12, 1989). The client does not, however, incur liability for breach of contract. *Meagher v. Kavli,* 251 Minn. 477, 492, 88 N.W.2d 871, 882 (1958).

The discharge of the attorney by [a] client does not constitute a breach of the contract [between the attorney and client], because it is a term of such contract, implied from the peculiar relationship which the contract calls into existence, that the client may terminate the contract at any time with or without cause. * * * It follows from this rule, by necessary implication, that if the client has the right to terminate the contract, [the client] cannot be made liable in damages for doing that which under the contract [the client] has a right to do.

*Lawler,* 145 Minn. 281, 284, 176 N.W. 989, 990 (1920) (citing *Martin v. Camp,* 219 N.Y. 170, 174, 176, 114 N.E. 46, 48 (1916)). [**12] The client's unfettered right to discharge an attorney is deemed necessary because of the confidential nature of the relationship between attorney and client and the evil that would be engendered by friction or distrust. *State v. Smith,* 260 Minn. 405, 416, 110 N.W.2d 159, 167 (1961) (citing *In re Lachmund's Estate,* 179 Or. 420, 170 P.2d 748 (1946)).

Nordling argues that the rule stated in *Lawler* and its progeny has no application to an in-house attorney as the in-house attorney's only client, the corporation, defines his or her entire professional life, controlling the hours worked, the nature of the work performed, the compensation paid, and the focus and development of the attorney's practice. We disagree.

The Minnesota appellate courts have not yet had occasion to decide applicability of the general rule to in-house counsel. We find a decision by the Appellate Court of Illinois instructive. In *Herbster v. North Am. Co. for Life & Health Ins.,* 150 Ill. App. 3d 21, 103 Ill.Dec. 322, 501 N.E.2d 343 (1986), *appeal denied* 114 Ill.2d 545, 108 Ill.Dec. 417, 508 N.E.2d 728 (1987), *cert. denied* [**13] 484 U.S. 850, 108 S. Ct. 150, 98 L. Ed. 2d 105 (1987), the plaintiff, Robert W. Herbster, brought a retaliatory discharge suit against his employer, North American Company for Life and Health Insurance. The suit was premised on Herbster's refusal to destroy documents subject to discovery in a lawsuit pending against North American. Herbster was employed under an oral agreement, terminable at will, in the position of North American's chief legal counsel and vice president in charge of the legal department.

The trial court granted summary judgment in favor of North American, finding no cause of action for retaliatory discharge by an attorney who is terminated by a client. The Appellate Court of Illinois declined to extend the tort of retaliatory discharge to in-house counsel and affirmed [*86] the trial court's grant of summary judgment against Herbster.

Herbster argued that the general rule allowing a client an unfettered right to terminate an attorney with or without cause did not apply because he was "only an employee" of North American. *Id.* at 26, 501 N.E.2d at 346. Herbster argued that his relationship with the corporation "was of a permanent [**14] nature unlike the usual attorney-client relationship" because he was a salaried employee; he was employed only by the corporation; he owed duties to the corporation's directors, shareholders and officers; and his work was subject to review by his supervisors. *Id.,* 501 N.E.2d at 346. Further, Herbster looked to North American for career development and job security as well as for compensation. *Id.,* 501 N.E.2d at 346.

The court was unable to separate Herbster's role as an employee of North American from his profession.

Unlike the average employee, plaintiff was a registered attorney subject not only to North American's review but also, like other attorneys, subject to disciplinary review and the Code of Professional Responsibility. * * * Plaintiff's duties were legal in nature and his relationship with his profession as an attorney was and will continue

465 N.W.2d 81, *86; 1991 Minn. App. LEXIS 33, **14;
59 U.S.L.W. 2449; 6 I.E.R. Cas. (BNA) 140

to be pervasive.

*Id.* at 26-27, 501 N.E.2d at 346. The court also emphasized the unique position that attorneys occupy vis-'a-vis their clients. The confidential nature of the relationship makes trust between attorney and client essential. [**15] Thus, the client must have absolute authority to fire the attorney, especially when a breakdown of trust occurs. *Id.* at 28, 501 N.E.2d at 347.

We find the reasoning of *Herbster* persuasive and agree with the Appellate Court of Illinois that the general rule allowing a client to discharge an attorney without liability for breach of contract applies to in-house counsel.

Nordling's relationship with NSP was different from the usual attorney-client relationship in that NSP was Nordling's only client. Nevertheless, Nordling's duties with NSP were legal in nature and Nordling's role as an attorney, subject to ethical rules of his profession, was pervasive. The relationship was one of confidence, requiring an atmosphere of continued mutual trust. When a breakdown of that trust occurred, it was NSP's right, as Nordling's client, to discharge him without liability for breach of contract. We therefore hold that the district court did not err in ruling as a matter of law that Nordling's status as in-house counsel precluded a breach of contract action against NSP. [1]

> [1] We find the general rule allowing a client an unfettered right to discharge its attorney applicable to preclude Nordling's retaliatory discharge claim as well. We therefore do not reach the question of whether Nordling produced sufficient evidence to support a cause of action under Minn. Stat. § 181.932.

[**16] II.

Nordling pled two tortious interference with contract claims. The first, against Nordling's now-deceased supervisor, David McGannon, alleges that McGannon's act of discharging Nordling constituted tortious interference with contract. The second, against Nordling's co-employee, Jack F. Sjoholm, alleges that Sjoholm committed tortious interference with contract by relating to McGannon Nordling's alleged remark that McGannon could not be trusted. Both claims must fail.

The Minnesota Supreme Court has held, as a matter

of law, that a party cannot interfere with its own contract. *Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 901 (Minn. 1982); *Wild v. Rarig*, 302 Minn. 419, 442 n.16, 234 N.W.2d 775, 790 n.16 (1975). The "interferor" must be a third party; no liability for this tort exists against a party to the contract. *Houser v. City of Redmond*, 91 Wash.2d 36, 39, 586 P.2d 482, 484 (1978). The acts of a corporate officer within the scope of his or her duties constitute the acts of the [*87] corporation, and the officer is thus shielded from personal liability for tortious interference with contract. [**17] *See Bouten*, 321 N.W.2d at 900-01; *Furley Sales and Assoc. v. North Am. Automotive Warehouse*, 325 N.W.2d 20, 26 (Minn. 1982).

McGannon had no personal capacity to discharge Nordling. In terminating Nordling's employment, McGannon acted within the scope of his duties as NSP's Vice President of Law. We therefore hold that the district court did not err in dismissing the tortious interference with contract claim against McGannon.

As to Nordling's claim against Sjoholm, Minnesota courts have never recognized a cause of action against a co-employee for tortious interference with an employment contract. We decline, on the facts of this case, to take the unprecedented step of recognizing such a cause of action.

Respondent raises the issues of whether NSP's Employment Handbook and "Positive Discipline" policies constitute a contract offer and whether Minnesota recognizes an independent cause of action for breach of an implied-in-fact covenant of good faith and fair dealing. We do not address these issues. They are not properly before this court, as respondent failed to file a notice of review.

DECISION

The district court did not err in granting summary [**18] judgment in NSP's favor on Nordling's wrongful discharge claims.

The district court properly granted summary judgment in favor of McGannon and Sjoholm on Nordling's tortious interference with contract claims.

Affirmed.

CONCUR BY: KALITOWSKI (In Part)

465 N.W.2d 81, *87; 1991 Minn. App. LEXIS 33, **18;
59 U.S.L.W. 2449; 6 I.E.R. Cas. (BNA) 140

**DISSENT BY: KALITOWSKI (In Part)**

**DISSENT**

THOMAS J. KALITOWSKI, Judge (concurring in part, dissenting in part).

I agree with the trial court's dismissal of appellant's claims involving tortious interference with contract. However, I do not believe that appellant's claim of wrongful discharge should have been dismissed as a matter of law. The general rule allowing a client to discharge its attorney without liability for breach of contract developed in the context of lawsuits between attorneys in private practice and their clients. *See, e.g., Martin v. Camp,* 219 N.Y. 170, 114 N.E. 46 (1916); *Lawler v. Dunn,* 145 Minn. 281, 176 N.W. 989 (1920); *Meagher v. Kavli,* 251 Minn. 477, 492-93, 88 N.W.2d 871, 882 (1958). I question applicability of the general rule to in-house counsel, especially on the present facts.

First, the situation of in-house counsel is simply not analogous to [**19] that of a private attorney. A private attorney works much like an independent contractor, generally having a diverse client base. A private attorney controls the hours he or she works, and the compensation and benefits he or she receives. Most importantly, a private attorney controls the focus and nature of his or her practice, and may decline to represent certain clients or to take particular types of cases. In-house counsel, on the other hand, is subject to control by his or her only "client," the corporation. The corporation controls the hours in-house counsel works, the salary and benefits he or she receives and the focus and nature of in-house counsel's practice. Further, in-house counsel may be subject to the corporation's own disciplinary measures in addition to those of the Lawyers Professional Responsibility Board. Unlike a private attorney, in-house counsel, if discharged by the corporation, may be unable

readily to secure new clients. The focus of in-house counsel's work is much narrower than that of a private attorney. In-house counsel thus changes his or her marketability in reliance on continued employment with the corporation. The relationship of in-house counsel and [**20] corporation is dual in nature: the relationship is one of attorney-client as well as of employer-employee. Unlike the *Herbster* court, *see Herbster v. North Am. Co. for Life & Health Ins.,* 150 Ill. App. 3d 21, 103 Ill.Dec. 322, 501 N.E.2d 343 (1986), *cert. denied,* 114 Ill. 2d 545, 108 Ill.Dec. 417, 508 N.E.2d 728 (1987); *cert. denied,* 484 U.S. 850, 108 S. Ct. 150, 98 L. Ed. 2d 105 (1987), I do not believe the attorney-client relationship negates the enforceability of an employment contract.

[*88] Second, I do not believe, as the *Herbster* court did, that the confidential nature of the relationship between in-house counsel and its client-employer would necessarily be jeopardized by limitations on the corporation's right to discharge in-house counsel. *See Herbster,* 150 Ill. App. at 27, 501 N.E.2d at 346-47. In the present case, a personal dispute between Nordling and his supervisor in the Law Department, rather than matters involving Nordling's legal representation of NSP, appears to have led to his discharge. I question whether evidence produced at a trial in this action would be any more damaging to NSP than highly sensitive [**21] nonprivileged information introduced in a wrongful discharge suit by a high-level employee who is not an attorney.

I believe Nordling has produced sufficient evidence that he was not an at-will employee to preclude summary judgment. *See Pine River State Bank v. Mettille,* 333 N.W.2d 622, 627 (Minn. 1983) (employee handbook or disciplinary procedures may cause contractual modification of at-will employment). Therefore, I would reverse and remand this issue for trial.

LEXSEE

In the Matter of: RANDALL PITTMAN, Complainant, vs. SIEMENS AG, SIEMENS
MEDICAL SOLUTIONS, DIAGNOSTIC PRODUCTS CORPORATION, SEYFARTH
SHAW, LLP, DAVID J. ROWLAND, and ERICH R. REINHARDT, Respondents.

CASE NO. 2007-SOX-0015

U.S. Department Of Labor
Office of Administrative Law Judges

2007 DOLSOX LEXIS 56

July 26, 2007

[*1]

DECISION AND ORDER DISMISSING COMPLAINT AND DENYING REQUEST FOR ATTORNEY'S FEES

ANNE BEYTIN TORKINGTON, Administrative Law Judge

OPINION:

This proceeding arises under the employee protection provisions of the Sarbanes-Oxley Corporate and Criminal
Accountability Act of 2002 ("the Act" or "SOX"), 18 U.S.C. § 1514A.

PROCEDURAL BACKGROUND

It is undisputed that Complainant was terminated from his employment with Siemens Medical Solutions
Diagnostics ("SMSD"), formerly Diagnostic Products Corporation ("DPC"), on January 12, 2005. RM at 2; CR at 2.

On October 4, 2005, Complainant filed a complaint ("SOX I") against Respondent DPC under SOX with the
Secretary of Labor. On November 3, 2005, the Occupational Safety and Health Administration ("OSHA") investigated
and dismissed the complaint for untimeliness. Complainant initially requested a hearing before the Office of
Administrative Judges ("OALJ"), but later withdrew his complaint on January 19, 2006.

On December 4, 2005, Complainant filed a second SOX complaint ("SOX II") against DPC, Michael Ziering, Ira
Ziering, Sid Aroesty, Chris Goss, and Seyfarth Shaw LLP. Complainant alleged that DPC took certain adverse [*2]
employment actions against him after his termination. OSHA dismissed Complainant's claim as untimely, and
Complainant requested a hearing with the OALJ. On March 6, 2006, Administrative Law Judge Alexander Karst
dismissed the complaint as untimely. Complainant appealed to the Administrative Review Board ("ARB"), where the
case is currently pending.

On April 26, 2006, Complainant filed a 29-count complaint in California state court against DPC, Sid Aroesty,
Fritz Backus, Anna Bermea, Chris Goss, Ava Sedgwick, Ira Ziering, and Does 1-10. RX F. The 29 claims alleged were
related to wrongful termination, employment discrimination, and harassment. RX F. One such claim was that
Complainant was defamed by a memorandum written by DPC's general counsel at the time, Fritz W. Backus ("Backus
Memo") that was sent to some of DPC's employees. RM at 4. On August 14, 2006, DPC and Fritz Backus filed an
anti-SLAPP motion n1 against the defamation claim and all claims related to the Backus Memo. RM at 4. On
September 11, 2006, the court granted the anti-SLAPP motion, struck the defamation claim and related claims from the

complaint, and awarded the defendants, attorney's fees in the amount of $ 1,600.  [*3]  RX 1.

n1 An anti-SLAPP motion is a special motion to strike a strategic lawsuit against public participation. Cal. Civ. Proc. Code § 425.16 (Deering 2007). Such lawsuits are brought primarily to chill the valid exercise of a "person's right of petition or free speech under the United States or California Constitution in connection with a public issue." § 425.16.

On August 7, 2006, Complainant filed the current SOX complaint ("SOX III" or "CC") with OSHA. On December 18, 2006, OSHA dismissed the complaint because one claim was untimely and the remaining claims did not allege actions that were materially adverse. On December 26, 2006, Complainant requested a hearing before the OALJ.

On February 26, 2007, Complainant filed a motion to stay proceedings pending the ARB's ruling on his SOX II complaint. On February 28, 2007, I ordered Respondents to show cause why Complainant's motion to stay proceedings should not be granted. On March 6, 2007, Respondents filed an opposition to Complainant's motion to stay proceedings.

Also [*4]  on March 6, 2007, Respondents filed a motion for summary judgment ("Respondents' motion" or "RM") with attached exhibits ("RX").

On March 7, 2007, Complainant filed a motion to withdraw his objections to the Secretary's findings on his current complaint. On March 9, 2007, I issued a notice taking the case off calendar, and an order requiring Complainant to show cause why the case should not be dismissed with prejudice based on his motion to withdraw his objections. On March 19, 2007, Complainant filed an objection to Respondents' motion for summary judgment and reasserted his objections to the Secretary's findings. Complainant also repeated his request that this matter be stayed and requested that he be given an opportunity to respond to Respondents' motion for summary judgment.

On March 26, 2007, I issued an order denying Complainant's motion to stay proceedings as inappropriate and inefficient. I also issued an order requiring Complainant to show cause why Respondents' motion for summary judgment should not be granted. On April 6, 2007, Complainant filed an opposition to Respondents' motion for summary judgment ("Complainant's response" or "CR") with attached exhibits ("CX"). On [*5]  April 20, 2007, Respondents filed their reply ("Respondents' reply" or "RR").

## SUMMARY OF DECISION

I find that Complainant's complaint must be dismissed with prejudice for a number of reasons. First, Complainant does not demonstrate that any of the Respondents are subject to the Act. Second, Complainant's claims of wrongful termination, blacklisting, failure to mediate wage-and-hour disputes, slander, and hostile work environment are all barred by the 90-day statute of limitations set forth in SOX at 18 U.S.C. § 1541A(b). Third, Complainant's second claim of slander and his anti-SLAPP claim are not covered by the Act. Therefore, the complaint must be dismissed with prejudice.

I also find that Respondents' request for attorney's fees must be denied. Complainant's claims do not rise to the level of frivolousness necessary to justify an award of attorney's fees.

## ANALYSIS

## COVERAGE

The whistleblower protection provisions of section 806 state that covered employers and individuals may not retaliate against employees who provide information and assist in investigations related to violations of listed laws and Securities and Exchange Commission [*6]  (SEC) rules and regulations. Covered entities under the provisions include

Page 2

2007 DOLSOX LEXIS 56, *6
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

any

"company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)), or any officer, employee, contractor, subcontractor, or agent of such company." (codified at 18 U.S.C. § 1514A(a)).

Complainant brings his SOX III complaint against: 1) Siemens AG; 2) Erich Reinhardt; 3) Siemens Medical Solutions Diagnostics ("SMSD"); 4) Diagnostics Products Corporation ("DPC"); 5) Seyfarth Shaw LLP ("Seyfarth"); and 6) David Rowland. Complainant alleges that all Respondents had knowledge of his protected activity and participated in adverse acts against him. CR at 14. Complainant also contends that DPC was controlled by Siemens AG's Board of Directors from July 2006 until January of 2007. CR at 13-14.

Respondent Siemens AG qualifies as a publicly traded German corporation under SOX. RM at 5. However, Siemens AG is not covered under the Act [*7] because it did not employ Complainant, and Complainant has not shown sufficient commonality of management and purpose between Siemens AG and DPC to justify piercing the corporate veil. *See Bothwell v. American Income Life,* 2005-SOX-57 at 8 (ALJ) (Sept. 19, 2005); *Dawkins v. Shell Chemical, LP,* 2005-SOX-41 (ALJ)(May 16, 2005); *Gonzales v. Colonial Bank & The Colonial Bancgroup, Inc.,* 2004-SOX-39 (ALJ)(Aug. 20, 2004).

Respondent Erich Reinhardt is a board member of Siemens AG and the chairman of Siemens Medical Solutions USA Inc.'s ("SMSU") board of directors. Dr. Reinhardt does not qualify as an officer, employee, contractor, subcontractor, or agent of a covered entity, because neither Siemens AG nor SMSU is covered by the Act.

Respondent SMSD is a non-public subsidiary of SMSU. RM at 5. Respondent DPC changed its name to SMSD on November 14, 2006, and will hereafter be referred to as DPC/SMSD. RM at 1. Respondent DPC/SMSD is not subject to the Act because it is not a publicly traded company.

Respondent Seyfarth is a law firm that represents all Respondents. Seyfarth is not subject to the Act because it did not employ Complainant and because it is not a publicly traded [*8] company.

Respondent David Rowland is a managing partner of Seyfarth's Chicago office. RM at 6. Respondent David Rowland is not subject to the Act because he is not an officer, employee, contractor, subcontractor, or agent of a covered entity.

I find that none of the named Respondents are covered under SOX. However, assuming *arguendo* that they were, I find that Complainant's allegations are all either untimely, not covered under the Act, or both.

ALLEGED ADVERSE ACTIONS

Complainant alleges Respondents retaliated against him for engaging in protected activity under the Act. Complainant alleges several adverse employment actions. In my analysis below, I find that these actions are either untimely filed, not legally "adverse," or both.

Under section 806 of SOX, a covered employer may not "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee." 18 U.S.C. 1541A(a). In *Harvey v. Home Depot, Inc.,* the ALJ stated that with the exception of blacklisting and interfering with a complainant's subsequent employment, [*9] SOX merely protects an employee from retaliation for his protected activities while the complainant is an employee of the respondent. 2004-SOX-36, at 4 (ALJ)(May 28, 2004). I agree with this standard, as it reflects the language of the statute.

Additionally, a SOX complaint must be filed with the Secretary of Labor (OSHA) within 90-days of the alleged

Page 3

violation. 18 U.S.C. § 1514A(b). The regulations clarify that the alleged violation occurs "when the discriminatory decision has been both made and communicated to the Complainant." 29 C.F.R. § 1980.103.

Equitable tolling and equitable estoppel may be invoked in a whistleblower case to relax the statute of limitations and excuse untimely filing of a complaint. *Rzepiennik v. Archstone Smith, Inc.,* 2004-SOX-26, at 20 (ALJ)(Feb. 23, 2007). However, Complainant bears the burden of justifying the application of these doctrines, and he has raised neither arguments nor facts in support. I therefore find that neither of these doctrines applies in this case.

1) *Hostile Work Environment*

Complainant alleges that Respondents first subjected him to a hostile work environment in September 2004 and that [*10] this environment continues today because he still seeks reinstatement. CR at 13.

The latest date that Complainant could have been subjected to a hostile work environment was on the last day of his employment, January 12, 2005. Since this claim was filed over a year and half after January 12, 2005, it is untimely.

2) *Wrongful Termination*

Complainant alleges that Respondent DPC/SMSD wrongfully terminated him on January 12, 2005. CR at 2. Complainant concedes that he was made aware of this alleged adverse action on January 12, 2005. CR at 2. However, Complainant's complaint was not filed until August 7, 2006, which is well past the 90-day statute of limitations. Thus, Complainant's claim is untimely.

3) *Blacklisting*

To prove blacklisting, a complainant must show evidence that a specific act of blacklisting occurred. *Pickett v. Tennessee Valley Auth.,* ARB Case Nos. 00-56, 00-59, slip op. at 9 (Nov. 28, 2003). "Subjective feelings on the part of a complainant toward an employer's action are insufficient to establish that any actual blacklisting took place." *Id.*

a. Negative Write-up

Complainant alleges that Respondents placed a negative write-up in his file in September [*11] 2004 after he complained about discrimination and overtime violations. CR at 10. He claims that he has not been rehired due to this write-up and that each day it remains in his file triggers a new statute of limitations. CR at 11.

First, Complainant does not provide any support for his assertion that a negative write-up was placed in his personnel file. Second, even if I were to assume that DPC/SMSD placed a negative write-up in Complainant's personnel file and that that act amounted to an adverse action, this claim is still untimely. Complainant alleges that the write-up was placed in his file in September 2004. Complainant did not file his complaint until August 2006, almost 2 years after the alleged adverse action.

In addition, Complainant failed to provide any evidence of any specific acts of blacklisting or refusal to rehire resulting from this alleged write-up.

b. Eastridge Group

Complainant alleges that he was denied employment with a potential employer, the Eastridge Group, after they reviewed a memo written by DPC/SMSD's general counsel ("Backus Memo"). CC at 9. The Backus Memo was sent to DPC/SMSD employees by DPC/SMSD's general counsel on September 23, 2005. RM at 4. Complainant [*12] interviewed with the Eastridge Group on April 4, 2006, and admits that he sent them a copy of the memo on April 11, 2006 in order to "diffuse the bad reference that SMSD was disseminating." CR at 8-9. Complainant claims he never heard back from the Eastridge Group and that he missed out on a number of job opportunities with the Eastridge Group

2007 DOLSOX LEXIS 56, *12
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

after May 8, 2006 because of the memo. CR at 9.

Except for a vague mention of a negative reference DPC/SMSD was disseminating, Complainant has failed to allege any specific acts of blacklisting by Respondents that caused the Eastridge Group to not hire him. Respondents cannot be held liable for Complainant's own distribution of the memo to the Eastridge Group on April 11, 2006. Thus, the only action that Complainant alleges Respondents took in connection with the memo was its original circulation to DPC/SMSD employees on September 23, 2005. Since Complainant did not file his complaint until August 7, 2006, this claim is untimely.

c. Termination by Manatt

Complainant alleges that his employment at the law firm of Manatt, Phelps & Phillips ("Manatt") was terminated due in part to a bad reference from Respondent Siemens. CR at 10. Complainant was [*13] hired by Manatt on June 19, 2006, and was later fired by Manatt on October 16, 2006. CR at 10.

First, Complainant provides no evidence that Respondents contacted Manatt and supplied them with a negative reference during his employment. Second, Complainant first raised this claim in his opposition to Respondents' motion for summary judgment on April 6, 2007. Even if Complainant was terminated due to a bad reference from Respondents, he was terminated on October 16, 2006 and any alleged adverse action by Respondents would have taken place before that date. Since April 6, 2007 is well beyond the 90-day statute of limitations, this claim is untimely.

4) *Anti-SLAPP Motion*

Fourth, Complainant alleges that Respondents filed their anti-SLAPP claim against him on August 14, 2006 in an effort to threaten, harass, and intimidate him for filing this SOX claim with OSHA on August 7, 2006. CR at 11.

With the exception of blacklisting and interfering with a complainant's subsequent employment, SOX only protects an employee from retaliation for his protected activities while the complainant is an employee of respondent. *Harvey v. The Home Depot, Inc.,* 2004-SOX-36, at 4 (ALJ)(May 28, 2004). [*14] Respondents filed their anti-SLAPP motion against Complainant a year and a half after he had ceased to be an employee at DPC/SMSD. Since Complainant was not an employee at the time of the alleged adverse act and this does not constitute blacklisting or interference with employment, this claim is not covered by the Act.

Additionally, Respondents prevailed on their anti-SLAPP claim in state court. This provides support that the filing of the anti-SLAPP claim was justified. I conclude that this claim does not qualify as an adverse employment action under SOX.

5) *Wage-and-Hour Claims*

Fifth, Complainant alleges that Respondents continued a harassment and intimidation campaign against him on August 2, 2006 when they refused to mediate his state wage-and-hour claims unless he dropped his SOX claims. CC at 5. Respondents counter that DPC/SMSD sent an e-mail to Complainant in which it first refused to mediate with him on August 16, 2005. RX N at 1.

Respondents first refused to mediate with Complainant on August 16, 2005, but then attempted to mediate with Complainant again after that date. RX N at 1. Nonetheless, the statute of limitations began when Respondents first refused to mediate [*15] his wage-and-hour claims. SOX regulations state that an alleged violation occurs "when the discriminatory decision has been both made and communicated to the Complainant." 29 C.F.R. § 1980.103. Even assuming that Respondents' refusal to mediate was retaliatory in nature, their decision was first communicated to Complainant almost one year before he filed this claim. Thus, this claim is untimely.

6) *Slander*

a. Backus Memo

Complainant first alleges that Respondents slandered him when they sent the Backus Memo to employees on September 23, 2005. CC at 7. Respondents contend that this claim was untimely filed because the Backus Memo was sent to DPC/SMSD's employees on September 23, 2005 and thus, the statute of limitations expired in December 2005. RM at 10.

Complainant's complaint was filed on August 7, 2006, which is well past the 90-day statute of limitations. Thus, Complainant's first claim of slander is untimely.

b. Work-Place Rumors

Complainant claims that on July 15, 2006 a former co-worker who was still working for DPC/SMSD contacted and informed Complainant that DPC/SMSD officers were spreading rumors that he had threatened their lives. CC at 7. He also asserts that two [*16] other employees contacted him regarding these alleged rumors. CR at 12.

First, Complainant does not present any evidence to support his claim. Complainant does not provide affidavits from the three employees who allegedly contacted him, nor does he mention them by name or provide any specifics about the phone calls. Second, Complainant also alleges that the slanderous statements began months before he was made aware of them. CC at 8. Thus, it is likely that this alleged adverse action should be dismissed on statute of limitation grounds, but I cannot be certain without more specific information about when these statements were made.

Third, even if this claim was timely filed, it is not covered under the Act. With the exception of blacklisting and interfering with a complainant's subsequent employment, SOX only protects an employee from retaliation for his protected activities while the complainant is an employee of respondent. *Harvey v. The Home Depot, Inc.,* 2004-SOX-36, at 4 (ALJ)(May 28, 2004). The alleged slanderous statements were spread in 2006, two years after Complainant's employment had been terminated with DPC/SMSD. Since Complainant was not an employee at the time of [*17] the alleged adverse action, this claim is not covered under SOX.

ATTORNEY'S FEES

An ALJ may award a respondent attorney's fees not exceeding $ 1,000 when a complaint is "frivolous or brought in bad faith." 29 C.F.R. § 1980.109(b). Respondents request attorney's fees because they allege Complainant's complaint is frivolous, duplicative, and brought in bad faith. RM at 16. Although I find that Complainant brought an unmeritorious case against Respondents, I do not believe that it was completely frivolous. Complainant is pro se, and although he did not present a strong case, that "does not mean he did not have a sincere belief a legitimate claim could be brought." *Grant v. Dominion East Ohio Gas,* 2004-SOX-63 at 51 (ALJ) (Mar. 10, 2005). On the contrary, Complainant demonstrated a deep belief in his claims. Therefore, I deny Respondents' request for attorney's fees.

CONCLUSION

Complainant's complaint must be dismissed with prejudice for a number of reasons. First, Complainant does not demonstrate that any of the Respondents are subject to the act. Second, Complainant's claims of wrongful termination, blacklisting, failure to mediate wage and hour disputes, slander, and hostile [*18] work environment all are barred by the 90-day statute of limitations set forth in SOX at 18 U.S.C. § 1541A(b). Third, Complainant's second claim of slander and his anti-SLAPP claim are not covered by the Act. Therefore, the complaint must be dismissed with prejudice.

I also find that Respondents' request for attorney's fees must be denied. Complainant's claims do not rise to the level of frivolousness necessary to justify an award of attorney's fees.

ORDER

2007 DOLSOX LEXIS 56, *18
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

For the reasons stated above, Complainant's complaint is hereby DISMISSED with prejudice.

**IT IS SO ORDERED.**