LEXSEE

DEVORAH SHABTAI, Plaintiff-Appellant, -v.- ERIC LEVANDE, ESTHER LEVANDE, PAUL LEVANDE, CHESTER HARHUT, Judge, Defendants, COMMUNITY MEDICAL CENTER, SCRANTON POLICE DEPARTMENT, Defendants-Appellees.

No. 01-7555

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

38 Fed. Appx. 684; 2002 U.S. App. LEXIS 12710

June 26, 2002, Decided

**NOTICE:** [**1] RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of New York (Frederic Block, Judge).
Shabtai v. Levande, 2001 U.S. Dist. LEXIS 617 (E.D.N.Y. Jan. 23, 2001)

**DISPOSITION:** Affirmed.

**COUNSEL:** Appellant DEVORAH SHABTAI, Pro se, Brooklyn, NY.

For Appellee: PAUL A. BARRETT, O'Malley & Harris, P.C., Scranton, PA, for Community Medical Center.

**JUDGES:** PRESENT: HONORABLE THOMAS J. MESKILL, HONORABLE ROBERT D. SACK, HONORABLE MYRON H. BRIGHT, * Circuit Judges.

   * Of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

**OPINION**

[*685] SUMMARY ORDER

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of said district court, dated April 19, 2001, be, and it hereby is, AFFIRMED.

Devorah Shabtai, *pro se* and *in forma pauperis*, 28 U.S.C. § 1915(a), appeals from a judgment of the United States District Court for the Eastern District of New York (Frederic Block, *Judge*) granting the defendants' motion to dismiss her complaint for failure to provide a clear and concise statement of [**2] her claims, *see* Fed. R. Civ. P. 8, and dismissing her complaint with prejudice. *Shabtai v. Levande*, 2001 U.S. Dist. LEXIS 617, No. 99-CV-8466, 2001 WL 77064 (E.D.N.Y. Jan. 23, 2001).

In December 1999, Shabtai filed a complaint against Eric Levande, her ex-husband; Paul and Esther Levande, her ex-husband's parents; Judge Chester Harhut, a Pennsylvania Family Court Judge; the Community Medical Center; and the Scranton Police Department. The complaint totals 140 single-spaced pages, with more than 900 paragraphs, not including several unenumerated subsections. The document consists principally of a first-person narrative describing in detail Shabtai's marriage to Levande and her experiences with his parents and the community of Scranton, Pennsylvania. It also describes Shabtai's interactions with Judge Harhut, who presided over her divorce from Levande and awarded him custody of their child. Judge Harhut further ordered Shabtai to undergo ten days' counseling at the Community Medical Center. The complaint discusses, *inter alia*, the Scranton Police Department's role in enforcing that order.

Shabtai's complaint enumerates at the outset claims

Page 1

38 Fed. Appx. 684, *685; 2002 U.S. App. LEXIS 12710, **2
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

for fraudulent inducement, [**3] intentional infliction of emotional distress, unjust enrichment, defamation, breach of contract, and negligence, but it does not make clear the factual predicate for these claims. The complaint alleges that the district court may exercise diversity jurisdiction over the action, see 28 U.S.C. § 1332(a)(1), but it provides no basis for the court's personal jurisdiction over the defendants. Shabtai, 2001 U.S. Dist. LEXIS 617, at *1, 2001 WL 77064, at *1. Shabtai's complaint seeks $ 30 million in compensatory and punitive damages.

Community Medical Center moved to dismiss the complaint pursuant to Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure. It argued that the district court lacked personal jurisdiction over the defendants, and that the complaint failed to provide a clear and concise statement of Shabtai's cause or causes of action. Levande moved to dismiss on similar grounds. Both parties urged that, in the alternative, the matter should be transferred to the United States District Court for the Middle District of Pennsylvania.

In September 2000, Shabtai filed a "partial answer" to the defendants' motions in [**4] which she restated the facts surrounding her marriage to Levande and the alleged conspiracy among him and the other defendants. Shabtai argued that the matter should not be transferred to Pennsylvania because (1) Pennsylvania's judges had a conflict of interest based on the complaint's allegations of judicial misconduct; and (2) most of the events at issue took place in New York. Shabtai did not file any further documents in opposition to the defendants' motions.

[*686] On January 24, 2001, the district court granted the motions and dismissed Shabtai's complaint for failure to comply with Fed. R. Civ. P. 8. Shabtai, 2001 U.S. Dist. LEXIS 617, at *1, 2001 WL 77064, at *1. The district court granted Shabtai leave to file an amended complaint within sixty days, provided that her amended complaint "set forth the legal basis and factual allegations to support each alleged wrongful act of each defendant, and the relief she is seeking with respect thereto." Id. The court also advised Shabtai that a complaint must state the factual basis for the court's exercise of personal jurisdiction over each defendant. Id.; see Fed. R. Civ. P. 8(a)(1).

On March 12, 2001, Shabtai [**5] informed the court that she had retained an attorney to assist her in bringing her complaint in compliance with Fed. R. Civ. P. 8, and that the attorney would require additional time properly to prepare the complaint. The court granted Shabtai an extension until April 23, 2001, to enable her newly retained counsel to file an amended complaint.

By letter dated April 17, 2001, Shabtai informed the court that her attorney had not prepared an amended complaint incorporating her claims. Instead, he had refunded half of her $ 2000 fee and provided her with a "memorandum" describing the appropriate form for a civil complaint. Shabtai requested an additional thirty-day extension to seek substitute counsel or to prepare the amended complaint *pro se*. The court declined, and by order dated April 19, 2001, dismissed Shabtai's complaint with prejudice. This appeal followed.

We review dismissals for failure to comply with Rule 8 for abuse of discretion. *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000). Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The statement [**6] must be concise "because unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (internal quotation marks omitted).

Dismissal of a complaint for failure to comply with Rule 8 is generally reserved for those cases in which the complaint is "so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* Rule 8 does not require a plaintiff to prove her case at the pleading stage. The complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *Id.* at 43 (internal quotation marks omitted). This lax standard should be applied especially liberally when reviewing a *pro se* complaint. *See Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995) (citing *Haines v. Kerner*, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972) (per curiam)).

Here, however, we conclude that [**7] the district court did not abuse its discretion in granting the motion to dismiss pursuant to Rule 8. As written, the complaint effectively requires the defendants and the court to plead Shabtai's case and determine the potential bases for relief on her behalf. Imposition of this burden on the defendants would be inappropriate and unjust. *See Salahuddin*, 861 F.2d at 42.

38 Fed. Appx. 684, *686; 2002 U.S. App. LEXIS 12710, **7
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

Moreover, Fed. R. Civ. P. 41(b) authorizes a district court to "dismiss a complaint for failure to comply with a court order, treating the noncompliance as a failure to prosecute." *Simmons*, 49 F.3d at 87 (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633, 8 L. Ed. 2d 734, 82 S. Ct. 1386 (1962)). We review dismissals pursuant to Rule [*687] 41(b) for abuse of discretion. *LeSane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001).

"This court has repeatedly detailed factors . . . to be considered before dismissal for failure to comply with a court order"; and here, too, where a litigant acts *pro se*, district courts should conduct this analysis with leniency. *Lucas v. Miles*, 84 F.3d 532, 534-35 (2d Cir. 1996). A district court [**8] contemplating dismissal of a plaintiff's claim for failure to prosecute pursuant to Fed. R. Civ. P. 41(b) must consider:

> (1) the duration of the plaintiff's failures, (2) whether plaintiff had received notice that further delays would result in dismissal, (3) whether the defendant is likely to be prejudiced by further delay, (4) whether the district court judge has taken care to strike the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard, and (5) whether the judge has adequately assessed the efficacy of lesser sanctions.

*Nita v. Connecticut Dep't of Env. Protection*, 16 F.3d 482, 485 (2d Cir. 1994) (internal quotation marks and citations omitted). Applying these factors to the circumstances of the instant case, we conclude that the district court did not abuse its discretion under Fed. R. Civ. P. 41(b).

We note that our disposition does not foreclose Shabtai from pursuing, should she choose, potential claims against her former counsel, whose services apparently consisted of providing her with a boilerplate document at the eleventh hour. We further note that the *res judicata* [**9] and collateral estoppel effects of our disposition is necessarily limited by (1) the posture of a Rule 8 dismissal, which can make it difficult to discern which claims, if any, may properly be deemed precluded in a subsequent federal action; and (2) any viable state-law causes of action Shabtai may have in light of applicable principles of state preclusion law.

Finally, Shabtai requested that another case pending before this Circuit be consolidated with this case. *Shabtai v. City of New York*, No. 01-CV-502(FB), 2001 U.S. Dist. LEXIS 21277, 2001 WL 1646520 (E.D.N.Y. Dec. 17, 2001). Because that matter is before another panel and involves unrelated issues, consolidation would be inappropriate. *Cf. General Motors Co. v. City of New York*, 501 F.2d 639, 648 (2d Cir. 1974).

For the foregoing reasons, the judgment of the district court is AFFIRMED.

Case 1:07-cv-06214-BSJ-DCF    Document 15-20    Filed 09/19/2007    Page 4 of 20

LEXSEE

ESTHER SMITH, Individually And On Behalf Of All Others Similarly Situated, Plaintiff-Appellee, -against- LOCAL 819 I.B.T. PENSION PLAN; THE BOARD OF TRUSTEES OF THE LOCAL 819 I.B.T. PENSION PLAN, Defendants-Third-Party Plaintiffs-Appellants. THE BOARD OF TRUSTEES OF TEAMSTERS LOCAL 819 PENSION FUND, Individually And On Behalf Of The Teamsters Local 819 Pension Fund, Third-Party Plaintiff-Appellant, -against- CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Third-Party Defendant-Appellee.

Docket No. 01-7583

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

291 F.3d 236; 2002 U.S. App. LEXIS 9547; 27 Employee Benefits Cas. (BNA) 2833

February 28, 2002, Argued
May 20, 2002, Decided

**PRIOR HISTORY:** [**1] Third-party plaintiffs administer a pension plan and are (in that capacity) defendants in a class action suit alleging noncompliance with federal and state law. They appeal from the judgment of the United States District Court for the Southern District of New York (McKenna, J.), which dismissed their third-party action seeking indemnification and/or contribution from an insurance company that participated in formulation, reformation, and administration of the pension plan during part of the alleged period of noncompliance.
Smith v. Local 819 I.B.T. Pension Plan, 2001 U.S. Dist. LEXIS 422 (S.D.N.Y. 2001) Smith v. Local 819 I.B.T. Pension Plan, 2001 U.S. Dist. LEXIS 12505 (S.D.N.Y. Aug. 16, 2001)

**DISPOSITION:** District Court's dismissal of third-party complaint reversed and remanded. District Court's certification of interlocutory ruling as final judgment affirmed.

**COUNSEL:** CHARLES PERGUE, New York, NY (LARRY CARY, Vladeck, Waldman, Elias & Engelhard, P.C., on the brief), for Defendants-Third-Party-Plaintiffs-Appellants and Third-Party Plaintiff-Appellant.

THOMAS A. MARTIN, New York, NY (STEVEN R. SHAPIRO, Putney, Twombly, Hall & Hirson, LLP, on the brief), for Third-Party Defendant-Appellee.

**JUDGES:** Before: KEARSE, JACOBS, KEITH, Circuit Judges. *

* The Honorable Damon J. Keith, Senior Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

**OPINION BY:** DENNIS JACOBS

**OPINION**

[*238] DENNIS JACOBS, *Circuit Judge*:

Local 819 I.B.T. Pension [**2] Plan and its Board of Trustees (the "Trustees") are defendants in a putative class action brought by plan participant Esther Smith, alleging that the plan has been non-compliant with the Employee Retirement Income Security Act of 1974 ("ERISA") since 1976 (and non-compliant with state law as well), and that these deficiencies were uncorrected or insufficiently cured by a 1997 revision made by the Plan and its Trustees in response to earlier litigation. The Plan and its Trustees appeal from the judgment of the United States District Court for the Southern District of New York (McKenna, J.), dismissing their third-party complaint for indemnification and/or contribution against Connecticut General Life Insurance ("Connecticut General"). It is alleged (or conceded) that Connecticut General designed the plan in 1966, administered it until 1995 (exercising sole discretion over its assets), reformed it on October 1, 1976 to bring it into compliance with

Page 1

291 F.3d 236, *238; 2002 U.S. App. LEXIS 9547, **2;
27 Employee Benefits Cas. (BNA) 2833

ERISA, reformed it again in 1986, and represented to the Trustees that it complied with all applicable laws and regulations, including ERISA.

The district court dismissed the third-party complaint for failure to state a claim, pursuant [**3] to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the ground that the class action complaint cited the 1997 reformation (in which Connecticut General played no part) and alleged that it fails to remedy the plan's deficiencies.

On appeal, the Trustees argue that the district court misconstrued the class action as limited to the insufficiency of the 1997 reformation undertaken by the Trustees, and therefore as unconnected to Connecticut General's drafting, redrafting, and administration of the plan in prior years. The Trustees attribute the error to the district court's failure to consider that [i] the noncompliance existed since 1976, and [ii] Smith seeks relief retroactive to that year. Connecticut General challenges the district court's certification of its interlocutory ruling as a final judgment, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

Preliminarily, we hold that the district court did not abuse its discretion by certifying its ruling as a final judgment. [1] As to the merits, we conclude that the Trustees sufficiently state ERISA and state claims for indemnity and contribution because: [1] Smith seeks relief retroactive to the time when [**4] Connecticut General administered the plan; and [2] notwithstanding the 1997 reformation, which is not as a matter of law a superseding event, deficiencies in the plan attributable to Connecticut General may have proximately caused (under a negligence theory) or "enabled" (under an ERISA theory, 29 U.S.C. § 1105) any deficiencies in the reformation.

> 1 On appeal, Connecticut General briefs a number of defenses that were not presented to the district court or that the district court did not address: statute of limitations, ERISA preemption of state claims, etc. Because the district court did not rule on these questions, we decline to reach them.

I

In 1990, plan participant Jennie DeVito initiated suit against the Trustees alleging that the plan was "back-loaded," that is, designed in violation of ERISA to provide excessively low rates of accrual in an employee's early years of employment. *DeVito v. Pension Plan of Local 819 I.B.T.* [*239] *Pension Fund*, 975 F. Supp. 258, 269-70 (S.D.N.Y. 1997); [**5] *see also* 29 U.S.C. § 1054. The Trustees served a third-party complaint seeking indemnification and contribution from Connecticut General as the entity that developed and administered the plan.

In 1995, while the *DeVito* action was pending, the Trustees altered their contractual relationship with Connecticut General. For $ 4.6 million in consideration paid by the Plan, Connecticut General agreed to the termination of its contract, except to the extent that Connecticut General remained liable under the plan "for providing an annuity to participants receiving a benefit as of June 7, 1995." *Smith v. Local 819 I.B.T. Pension Plan*, 2001 U.S. Dist. LEXIS 422, 2001 WL 55733, at *1 (S.D.N.Y. Jan. 23, 2001) (internal quotation marks omitted).

DeVito prevailed in 1997, and the Trustees were ordered "to reform the Plan consistent with the requirements of ERISA retroactive to October 1, 1976." *DeVito*, 975 F. Supp. at 270. The Trustees reformed the plan in 1997, settled their suit with DeVito in 1999, and settled their third-party action against Connecticut General in 2000 (Connecticut General having made no admission of third-party liability).

In 2000, plan [**6] participant Esther Smith commenced the present class action on behalf of herself and similarly situated plan participants. Her complaint sought injunctive and equitable relief "to reform the plan in accordance with ERISA's minimum standards *retroactive* to October 1, 1976," alleging, specifically, that the plan remains "back-loaded" (and thereby noncompliant with ERISA), because the 1997 reformation did "nothing to change the rate of accrual of the normal retirement benefit." Joint App. at 9, 12-13 ("J.A.") (emphasis added). In short, Smith maintained that the Trustees' 1997 reformation of the benefit formula failed to correct the formula's previously-adjudicated noncompliance with ERISA.

The Trustees then filed their third-party complaint against Connecticut General, alleging that: [1] under ERISA, Connecticut General owes indemnification or contribution because Connecticut General was a fiduciary of the Plan, *see* 29 U.S.C. §§ 1002(21)(A), 1104, 1105;

Page 2

Case 1:07-cv-06214-BSJ-DCF   Document 15-20   Filed 09/19/2007   Page 7 of 20

and [2] even if it was not a fiduciary, Connecticut General owes indemnification or contribution under state law for breach of contract, or of other express and implied duties. Specifically, the third-party [**7] complaint seeks indemnification for the plan's noncompliance with ERISA resulting from Connecticut General's administration of the plan between 1976 and 1995, and contribution to the extent Connecticut General's breach caused any subsequent noncompliance by the Trustees.

The district court granted Connecticut General's motion to dismiss the third-party complaint for failure to state a claim, on the ground that

> it was the Trustees who modified the benefit formula in May of 1997, not [Connecticut General]. Without any facts linking [Connecticut General] to the May Reformation, considering the May Reformation is the basis of Smith's complaint, the Court cannot find any basis for sustaining the third-party action against [Connecticut General].

Smith, 2001 U.S. Dist. LEXIS 422, 2001 WL 55733, at *2.

The Trustees moved for an order, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, certifying the interlocutory ruling as a final judgment from which the Trustees could appeal. The district court granted the Rule 54(b) motion, citing "an increased risk" otherwise that there would be "a duplicative action between third-party plaintiffs and third-party defendant [*240] in [**8] the future." Smith v. Local 819 I.B.T. Pension Plan, 2001 U.S. Dist. LEXIS 12505, No. 00 Civ. 0781 (Aug. 16, 2001).

## II

We review for abuse of discretion a district court's decision to certify an order as a final judgment (under Fed. R. Civ. P. 54(b)). See Maurizio v. Goldsmith, 230 F.3d 518, 520 (2d Cir. 2000). Notwithstanding the "historic federal policy against piecemeal appeals," judicial efficiency may require certification in the "infrequent harsh case [where] there exists some danger of hardship or injustice through delay which would be alleviated by immediate appeal." Hogan v. Consolidated Rail Corp., 961 F.2d 1021, 1025 (2d Cir. 1992) (internal citations and quotation marks omitted). Accordingly, Rule 54(b) "authorizes certification of an interlocutory appeal where there is no just cause for delay." Maurizio, 230 F.3d at 520.

The district court's discretionary certification was appropriate. Certification in this case avoids [i] potentially duplicative litigation, and [ii] an insufficiency of Plan funds to support a possible judgment.

## III

We review de novo the district court's dismissal of the third-party complaint for failure [**9] to state a claim. See Castellano v. City of New York, 142 F.3d 58, 66 (2d Cir. 1998). [2]

> 2 At oral argument, Connecticut General urged us to review the Trustees' appeal under an abuse of discretion standard, arguing that the district court's ruling was akin to a denial of a motion to implead a third-party defendant under Rule 14(a) of the Federal Rules of Civil Procedure. The law of impleader does not bear upon this dismissal for failure to state a claim. See Bank of India v. Trendi Sportswear, Inc., 239 F.3d 428, 437-38 (2d Cir. 2000) (holding that a motion to implead presents a procedural question "distinct" from the issue of whether a third-party complaint alleges a substantive claim). In any event, the Trustees filed their third-party complaint within ten days of serving their answer, and were therefore entitled to do so without leave. See Fed. R. Civ. P. 14(a) ("The third-party plaintiff need not obtain leave to make the service if the third-party plaintiff files the third-party complaint not later than 10 days after serving the original answer.").

[**10] Dismissal for failure to state a claim is proper where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999) (internal citation and quotation marks omitted). All factual allegations in the complaint are therefore presumed to be true. See Zinermon v. Burch, 494 U.S. 113, 118, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990); Charles W. v. Maul, 214 F.3d 350, 356 (2d Cir. 2000). And all reasonable inferences are drawn in favor of the plaintiff. See Fed. R. Civ. P. 12(b)(6); EEOC v. Staten Island Sav. Bank, 207 F.3d 144, 148 (2d Cir. 2000). However, "conclusory allegations or

291 F.3d 236, *240; 2002 U.S. App. LEXIS 9547, **10;
27 Employee Benefits Cas. (BNA) 2833

legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Gebhardt v. Allspect, Inc.*, 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000) (internal citation and quotation marks omitted).

A. *ERISA Claims*

Congress created no explicit cause of action for contribution or indemnity. *Cf.*, 29 U.S.C. § 1105 (providing only for liability [**11] for breach of co-fiduciary). However, our reading of ERISA is informed by Congress's intent "to develop a federal common law of rights and obligations . . . guided by principles of trust law." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110-11, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989) (internal quotation marks omitted). "Rather than explicitly enumerating *all* [*241] of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility." *Varity Corp. v. Howe*, 516 U.S. 489, 496, 134 L. Ed. 2d 130, 116 S. Ct. 1065 (1996) (internal citations and quotation marks omitted) (emphasis in original); *see also Chemung Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 16 (2d Cir. 1991) (citing *Firestone*, 489 U.S. at 110).

Courts applying trust law principles have implied federal common law rights between defaulting fiduciaries. *See, e.g., Chemung*, 939 F.2d at 16 (holding that under ERISA a breaching fiduciary is entitled to contribution protection traditionally granted fiduciaries under equitable provisions [**12] of trust law); *Free v. Briody*, 732 F.2d 1331, 1337 (7th Cir. 1984) (holding that breaching fiduciary is entitled to indemnification under trust law principles).

The first disputed question is whether the third-party complaint sufficiently alleges that Connecticut General was a fiduciary. ERISA Section 3(21)(A) provides that a party is a fiduciary with respect to a plan only to the extent that

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

The Trustees' complaint alleges that Connecticut General breached its fiduciary duty to the Plan and to the Trustees because

> Connecticut General exercised discretionary authority and control with respect to the [**13] administration of the Fund and the management and disposition of the Fund's assets. . . . Third-party plaintiffs relied on Connecticut General's representations, either expressed or implied, that all versions of the Plan drafted by Connecticut General were in full compliance with all applicable laws and regulations, including ERISA, that the Plan was required to satisfy.

J.A. at 53-54. Although Connecticut General denies that it possessed discretionary authority over the plan, we accept the Trustees' allegation as true for the purposes of a motion to dismiss, as did the district court. *Smith*, 2001 U.S. Dist. LEXIS 422, 2001 WL 55733, at *1 ("[Until 1995, Connecticut General] exercised exclusive discretion with respect to the management and investment of the Plan's assets.").

The next disputed question is whether the pleadings sufficiently allege that Connecticut General violated this fiduciary duty. ERISA Section 404 provides that a fiduciary owes a duty of reasonable care:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances [**14] then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Page 4

291 F.3d 236, *241; 2002 U.S. App. LEXIS 9547, **14;
27 Employee Benefits Cas. (BNA) 2833

29 U.S.C. § 1104(a)(1)(B). And ERISA Section 505 provides in relevant part that a fiduciary is liable if the fiduciary's failure to exercise reasonable care leads to a co-fiduciary's breach:

> [*242] [A] fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach.

29 U.S.C. § 1105(a)(2).

Smith's complaint seeks damages retroactive to 1976 on the theory that the plan is back-loaded in violation of ERISA. [3] And it is alleged in the Trustees' third-party complaint (or conceded by Connecticut General) that: [1] in 1976 Connecticut General designed the formula that is alleged by Smith to have caused the illegal back-loading; [2] between 1976 [**15] and 1995, Connecticut General maintained, redesigned and exercised discretionary control over the formula; and [3] the Trustees relied on warranties of ERISA compliance made by Connecticut General while it was a fiduciary. These allegations are enough to state a claim for indemnification for the period between 1976 and 1995.

> 3 Smith's claim for retroactive relief is supported under ERISA Section 204, which provides that "the accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." ERISA section 204, 29 U.S.C. § 1054(g)(1). Therefore, no argument can be made that the 1997 reformation completely undid everything that came before. See Amato v. Western Union Int'l, Inc., 773 F.2d 1402, 1407-14 (2d Cir. 1985).

The allegations also state a claim for contribution, though that is a closer question. The Trustees allege that "Connecticut General has breached its fiduciary duty to the Plan," citing §§ 1104 and 1105. Among the inferences [**16] that fairly could be drawn from these allegations and citations is that Connecticut General's non-compliant design of the plan did not lend itself to retroactive correction; specifically, that Connecticut General's fiduciary breach of its duty of reasonable care "enabled" the Trustees' subsequent failure to correct the preexisting default. See 29 U.S.C. §§ 1104(a)(1)(B), 1105(a)(2). Therefore, it was error for the district court to focus on the 1997 reformation in isolation, especially since Smith's underlying complaint charges the Trustees with failing to correct the very same noncompliant rate of accrual initially developed by Connecticut General.

B. *State-Law Claims*

No fiduciary duty need be alleged in order to state a claim for indemnification under state law. A state-law claim for indemnity may rest upon (*inter alia*) breach of a quasi-contractual relationship or warranty. See *McDermott v. City of New York*, 50 N.Y.2d 211, 216, 428 N.Y.S.2d 643, 406 N.E.2d 460 (1980). And a state-law claim for contribution may arise where the defendant and a third party both caused the same injury--albeit nonconcurrently or under alternative [**17] theories of causation. See *Board of Educ. of the Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21, 27, 523 N.Y.S.2d 475, 517 N.E.2d 1360 (1987); see also N.Y. C.P.L.R. § 1401 (McKinney 2001) (codifying *Dole v. Dow Chem. Co.*, 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972)).

The Trustees' third-party complaint alleges that Connecticut General is liable under state law for "breach of duty, [and] breach of contract or implied obligation to third-party plaintiffs." J.A. at 57. Under these theories, the Trustees could shift their liability to Connecticut General: [1] under indemnity, because (during a portion of the period for which Smith seeks damages) Connecticut General may have breached its contractual obligations to the Plan by developing [*243] and applying a back-loaded formula, while misrepresenting that the formula was compliant; or [2] under contribution, because the formula was negligently developed and administered in a way that impaired the Plan's ability to effect a full correction in 1997.

As indicated earlier, the indemnity theory may be more plausible, but the contribution theory may be viable as [**18] well; even if the alleged failure of the 1997 reformation to correct the illegal back-loading reflects negligence on the part of the Trustees, their "actions will not break the necessary chain of causation where those [actions] are 'a normal or foreseeable consequence of the situation created by [Connecticut General's] negligence.'" *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 473 (2d Cir.

291 F.3d 236, *243; 2002 U.S. App. LEXIS 9547, **18;
27 Employee Benefits Cas. (BNA) 2833

1995) (quoting *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 414 N.E.2d 666 (1980)).

CONCLUSION

The judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with this decision.

LEXSEE

TRANSATLANTIC MARINE CLAIMS AGENCY, INC., a/s/o Daewoo Automotive
Components, Ltd., Plaintiff-Appellee; M/V HYUNDAI EMPEROR, etc., her
engines, boilers, etc., Defendant, HYUNDAI MERCHANT MARINE, Defendant,
BURLINGTON NORTHERN RAILROAD, Defendant, CONRAIL, Defendant - v. -
ACE SHIPPING CORP., division of Ace Young Inc., Defendant-Appellant

Docket No. 96-7583

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

109 F.3d 105; 1997 U.S. App. LEXIS 4632; 37 Fed. R. Serv. 3d (Callaghan) 531; 1997
AMC 1772

January 8, 1996, Argued
March 13, 1997, Decided

**PRIOR HISTORY:** [**1] The District Court (S.D.N.Y., Cedarbaum, J.) entered a default judgment against defendant-appellant on a contract claim. Defendant moved to vacate the default judgment, under Federal Rule of Civil Procedure 60 (b)(4), arguing that the case is not one in admiralty (the only ground upon which plaintiff invoked federal jurisdiction). Because further fact-finding is necessary to determine its admiralty status, we remand to the District Court.

**DISPOSITION:** REVERSED and REMANDED.

**COUNSEL:** James F. Campise, Marcigliano & Campise, New York, New York, for Plaintiff-Appellee.

Stephen A. Frank, Badiak Will & Maloof, New York, New York, for Defendant-Appellant.

**JUDGES:** Before: NEWMAN, Chief Judge, McLAUGHLIN, Circuit Judge; and SAND, District Judge *

    * Hon. Leonard B. Sand of the United States District Court for the Southern District of New York, sitting by designation.

**OPINION BY:** McLAUGHLIN

**OPINION**

[*106] McLAUGHLIN, *Circuit Judge*:

Background

In March 1994, Daewoo Automotive Components, Ltd. ("Daewoo") hired defendant-appellant Ace Shipping Corp. ("Ace") to transport automobile parts from New York to Pusan, Korea. Daewoo and Ace executed six bills of lading (which are simply contracts [**2] of carriage) calling for transportation of the parts from New York, through Seattle, to Pusan.

Ace is a non-vessel-owning common carrier ("NVOCC"), which means that it arranges for the shipment of cargo, but does not itself own a ship. Ace accepted Daewoo's relatively small cargo, consolidated it with cargo from other customers, and placed the whole load in a "container"--a boxcar-sized storage unit that can be carried by trucks, trains or ships. Ace delivered the container to Hyundai Intermodal, Inc. ("Hyundai"), which, in turn, conveyed it to Burlington Northern [*107] Railroad Co. ("Burlington Northern") for transport by rail from New York to Seattle. The train carrying the cargo derailed in Montana. Most of Daewoo's automobile parts were damaged; some were totally destroyed.

The loss was covered by insurance and the cargo underwriter paid Daewoo. On March 21, 1995, plaintiff-appellee Transatlantic Marine Claims Agency ("Transatlantic"), an agent for the cargo underwriter, brought this action as a subrogee of Daewoo, naming Ace, Hyundai, Burlington Northern, and Conrail as defendants. On April 10, 1995, Ace signed a waiver of

109 F.3d 105, *107; 1997 U.S. App. LEXIS 4632, **2;
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

service, acknowledging that it had received a copy of Transatlantic's [**3] complaint, and that it recognized its obligation to file an answer or a motion. Ace, however, failed to file an answer or a motion, failed to attend an initial pre-trial conference on July 21, 1995, and ignored a letter (apparently sent as a professional courtesy) from Transatlantic warning Ace that it would be subject to a default judgment if it did not appear in the action.

On August 18, 1995, Transatlantic filed a motion--on notice to Ace--to enter a default judgment against Ace. Ace again failed to respond, and on October 25, 1995, the District Court entered a default judgment for $ 51,753.86 (the amount Transatlantic sought in its complaint--$ 45,976.83--plus interest and costs). Transatlantic entered into a stipulation with the remaining defendants, discontinuing its case against them.

On March 7, 1996, Ace finally reacted by filing a motion to vacate the default judgment. Ace argued that because its principals are Korean, unfamiliar with our legal system, its failure to appear should be deemed "excusable neglect" under Federal Rule of Civil Procedure 60(b)(1). The District Court denied Ace's motion and Ace filed a timely notice of appeal.

On appeal, Ace now abandons its [**4] claim of "excusable neglect," and asks us, instead, to vacate the default judgment for lack of subject matter jurisdiction. See Fed. R. Civ. P. 60(b)(4) and 12(h)(3). Transatlantic vigorously disputes this contention.

In its complaint, Transatlantic invoked only admiralty jurisdiction (probably because the $ 50,000 amount in controversy requirement for diversity jurisdiction was not satisfied). Transatlantic attached to its complaint a document entitled "Schedule B" (purportedly based on the bills of lading themselves) which imparted the following information about the transport of Daewoo's automobile parts:

Vessel: HYUNDAI EMPEROR

Place to Delivery to First Carrier: NEW YORK

Intended Port of Shipment: Seattle

Intended Port of Discharge: Busan, ** Korea

   **    This appears to be a peculiarly British spelling of Pusan, a place of unhappy memory to many Americans of a certain age.

On appeal, the parties have submitted copies of the actual bills of lading, listing the following information:

Pier: NEW [**5] YORK

Ocean Vessel: HD EMPEROR V. 14

Port of Loading: SEATTLE

Port of Discharge: BUSAN, KOREA

For Transhipment to: [BLANK]

Onward Inland Routing: [BLANK]

Place of Delivery: CFS BUSAN

While it is clear that Daewoo and Ace agreed that the parts would journey from New York to Seattle to Pusan, nothing in the record addresses whether the first leg of the trip, from New York to Seattle, would be by train or by ship. Again, the derailment occurred in Montana, and this appeal requires us to determine whether there is admiralty jurisdiction in this somewhat peculiar situation.

Discussion

A. Papers and Evidence to be Considered.

It is undisputed that the issue of subject matter jurisdiction was never raised before the District Court. This, however, poses no obstacle because "the failure of the parties to contest the district court's authority to hear a case 'does not act to confer [federal] jurisdiction . . . since a challenge to subject matter jurisdiction cannot be waived and may be raised [either by motion or] *sua sponte*'" at any time. *United Food Local 919 v. Centermark* [*108] *Properties*, 30 F.3d 298, 301 (2d Cir. 1994) (quoting *Alliance* [**6] *of Am. Insurers v. Cuomo*, 854 F.2d 591, 605 (2d Cir. 1988)); Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."); *see generally* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350.

Ace argues that in deciding whether there is subject matter jurisdiction, we must examine only Transatlantic's complaint. Hence, runs the argument, we cannot consider the bills of lading because they were not included in the

109 F.3d 105, *108; 1997 U.S. App. LEXIS 4632, **6;
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

record before the District Court, and are introduced for the first time on appeal. Ace advances two arguments to support this contention.

First, Ace suggests that its challenge to jurisdiction is a "facial challenge," viz., that the "jurisdictional allegations of the complaint are insufficient on their face to demonstrate the existence of subject-matter jurisdiction." Therefore, Ace concludes, our review is confined to the allegations of the complaint.

Ace relies on an Eighth Circuit case, *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990), which does indeed make a distinction between a "facial attack" [**7] on jurisdiction--which challenges only whether jurisdiction is sufficiently pled--and a "factual attack"--which looks beyond the pleadings and challenges the factual basis of jurisdiction. *Osborn*, however, does not compel us to make a choice between the two approaches.

Even if Ace challenges only the sufficiency of Transatlantic's complaint, we are entitled at any time *sua sponte* to delve into the issue of whether there is a factual basis to support the District Court's exercise of subject matter jurisdiction. *See Maryland Cas. Co. v. W.R. Grace and Co.*, 23 F.3d 617, 621 (2d Cir. 1993); *United States v. Burmah Oil Co., Ltd.*, 558 F.2d 43, 46 (2d Cir. 1977); *Bernstein v. Universal Pictures, Inc.*, 517 F.2d 976, 979 (2d Cir. 1975). In so doing, the case law does not limit our right to refer to any material in the record. *See Land v. Dollar*, 330 U.S. 731, 735 & n.4, 91 L. Ed. 1209, 67 S. Ct. 1009 (1947); *United Food Local 919 v. Centermark Properties*, 30 F.3d 298, 303, 305 (2d Cir. 1994); *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir. 1991) ("on a motion . . . challenging jurisdiction the court may resolve disputed jurisdictional fact issues by reference [**8] to evidence outside the pleadings") *vacated on other grounds*, 505 U.S. 1215, 112 S. Ct. 3020, 120 L. Ed. 2d 892 (1992); *see generally* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350.

Second, at argument, Ace maintained that we particularly cannot examine the bills of lading because "in default, the plaintiff is limited to its pleadings." It is, of course, ancient learning that a default judgment deems all the well-pleaded allegations in the pleadings to be admitted. *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 69-70 (2d Cir.), *rev'd on other grounds*, 409 U.S. 363, 34 L. Ed. 2d 577, 93 S. Ct. 647 (1971). This principle, however, has no bearing on an inquiry into whether the default judgment itself is void for lack of subject matter jurisdiction.

*B. Admiralty Jurisdiction.*

Turning to the fundamental question whether this case falls within admiralty jurisdiction, we start by noting that the injury to Transatlantic (as Daewoo's subrogee) occurred on land--in Montana--where the train carrying the parts derailed. Conceivably, this injury could still fall within admiralty jurisdiction as: (1) [**9] an admiralty tort (negligence); or (2) a breach of an admiralty contract.

1. *Tort.*

We conclude that this case does not fall within admiralty tort jurisdiction. The Supreme Court, in *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 673-74, 73 L. Ed. 2d 300, 102 S. Ct. 2654 (1982), and again in *Sisson v. Ruby*, 497 U.S. 358, 364, 111 L. Ed. 2d 292, 110 S. Ct. 2892 (1990), [*109] has emphasized that all admiralty torts must have "a substantial relationship to traditional maritime activity." An important--although not necessarily determinative--consideration in ascertaining whether such a "relationship" exists is whether the tort occurred on navigable waters. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 115 S. Ct. 1043, 1048, 130 L. Ed. 2d 1024 (1995).

Under these standards, it is clear that since the incident at issue in the instant case occurred solely on land--as the result of a train derailment having no relationship whatsoever to admiralty activity--admiralty tort jurisdiction does not lie. *See Jerome B. Grubart, Inc.*, U.S. at , 115 S. Ct. at 1048 ("a court must determine whether the general character of the activity giving rise to the incident shows a substantial relationship to traditional maritime activity") [**10] (citations omitted) (internal quotations omitted); *J. Lauritzen A/S v. Dashwood Shipping, Ltd.*, 65 F.3d 139, 142 (9th Cir. 1995).

2. *Contract.*

When assessing admiralty contract jurisdiction, "the 'nature and subject matter' of the contract at issue [is] the crucial consideration." *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 611, 114 L. Ed. 2d 649, 111 S. Ct. 2071 (1991). The general rule is that admiralty

Page 3

109 F.3d 105, *109; 1997 U.S. App. LEXIS 4632, **10;
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

jurisdiction arises only when the subject-matter of the contract is "purely" or "wholly" maritime in nature. *See Rea v. The Eclipse*, 135 U.S. 599, 608, 10 S. Ct. 873, 34 L. Ed. 269 (1890); *Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l, Inc.*, 968 F.2d 196, 199 (2d Cir. 1992); *The Ada*, 250 F. 194, 196 (2d Cir. 1918). A "mixed" contract, i.e., a contract that contains both admiralty and non-admiralty obligations is, therefore, usually not within admiralty jurisdiction. *Atlantic Mutual*, 968 F.2d at 199; *Compagnie Francaise v. Bonnasse*, 19 F.2d 777, 779 (2d Cir. 1927); *Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874, 880 (3d Cir. 1992) [hereinafter *Berkshire*].

We must determine therefore, whether Daewoo and Ace, at the time they executed the bills of lading, contemplated [**11] that the automobile parts would travel from New York to Seattle by rail, or by ship. If the former, then the contract is "mixed," and not within admiralty jurisdiction. If the latter, then the contract is wholly maritime, and within admiralty jurisdiction. We stress that the question is not how the goods were *actually* transported (or, more accurately, attempted to be transported) from New York to Seattle but what the parties *intended* or at least expected when they executed the bills of lading. *Berkshire*, 954 F.2d at 881.

We are aware that there are two exceptions to the general rule that "mixed" contracts fall outside admiralty jurisdiction. Assuming, *arguendo*, that the bills of lading are "mixed" contracts, those exceptions clearly do not pertain to this case. They apply only when the non-maritime portion of a "mixed" contract is either (1) severable from the maritime obligations or (2) "merely incidental" to the maritime obligations. *See Sirius Ins. Co. v. Collins*, 16 F.3d 34, 36 (2d Cir. 1994); *Atlantic Mutual*, 968 F.2d at 199 ("The extensive cross-United States transport of the goods would not be an 'incidental' aspect of the contract."); *Berkshire*, [**12] 954 F.2d at 881; *New York Marine & Gen'l Ins. Co. v. S/S Ming Prosperity*, 920 F. Supp. 416, 420 (S.D.N.Y. 1996) (transportation from coast to coast across the United States may not be considered incidental).

The question whether the contract between Daewoo and Ace (assuming that it is a mixed contract) is severable is irrelevant in this case because the loss undoubtedly occurred during non-maritime activity, and we could not exercise admiralty jurisdiction over that portion of a "mixed" contract. *See New York Marine*, 920 F. Supp. at 420 ("severability of the non-maritime portion [is] impossible where 'the loss occurred during the non-maritime leg of the journey'").

The mode of transportation from New York to Seattle that was contemplated by the parties remains the core of this case. In determining whether the parties contemplated a train trip, which would defeat admiralty jurisdiction, we turn first to the face of the bills of lading:

[*110] Pier: NEW YORK

Ocean Vessel: HD EMPEROR V. 14

Port of Loading: SEATTLE

Port of Discharge: BUSAN, KOREA

For Transhipment to: [BLANK]

Onward Inland Routing: [BLANK]

Place of Delivery: CFS BUSAN

The bills, as we noted above, [**13] are unenlightening as to how the goods would travel from New York to Seattle. On the one hand, the fact that New York is designated as the "pier," and that the designation "onward inland routing" is left blank, would seem to indicate that the parties intended the goods to go by ship from New York to Seattle. On the other hand, the fact that Seattle--not New York--is designated the "port of loading," and that the *shortest* sea route from New York to Seattle is a circuitous course through the Panama Canal, would suggest that the parties anticipated that the goods would be transported by rail from New York to Seattle.

In *Berkshire*, the Third Circuit faced a strikingly similar dilemma. A Taiwanese corporation contracted (via a bill of lading) to have a freight forwarder transport several hundred cartons of umbrellas from Taiwan to New York. "The Bill of Lading . . . described in general terms how the goods would travel from Taiwan to New York, but not specifically. While the Bill stated that the goods would be loaded onto the ship M.V. Hakusan II at Keelung, Taiwan . . . and that the place of delivery was New York, it did not specify the means of transporting the containers between [**14] these two ports. The Bill neither provided that the Hakusan II would transport the umbrellas all the way to New York, nor did it specifically mention land transport." *Berkshire*, 954 F.2d at 878.

109 F.3d 105, \*110; 1997 U.S. App. LEXIS 4632, \*\*14;
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

Finding that the bill of lading was ambiguous, the *Berkshire* court remanded the case to the District Court. The Third Circuit directed the District Court to take evidence on whether the course of dealing between the parties, and customary practice in the industry, involved shipping goods from Taiwan to Los Angeles, and then completing the trip cross-country via rail to New York. Only from such evidence, the Third Circuit concluded, could it be determined "whether, in executing the initial Bill of Lading, the parties entertained a reasonable expectation of only maritime transport of the umbrellas." *Berkshire*, 954 F.2d at 885.

Much the same can be said of the instant case. Additional fact-finding in this case may reveal, for example, that the designation of New York as a "pier," does not actually imply that the goods will be put on a ship in New York. It may be that the practice in the industry is to use large industrial areas such as piers to load and maneuver the large containers [\*\*15] that are used both in rail and ocean transportation. It is possible that the goods were delivered to the pier but were to be placed in a container at the pier and the container then put on a train.

It is also possible that designating Seattle as the "port of loading" does not mean that the goods could not have traveled to Seattle "loaded" on a different ship. The term may refer only to "loading" on the ship that will take the goods to their ultimate destination, or on which the goods will travel the greatest distance.

It may also be that, despite the length of the route, it made economic sense for Ace to arrange for the parts to be shipped through the Panama Canal. Fact-finding may reveal that Ace had other customers who needed to ship goods through the Panama Canal, and that by consolidating Daewoo's cargo with these other customers, Ace could obtain a discount rate for the journey.

We must, therefore, remand this case to the District Court for a determination as to whether the parties contemplated a mixed contract or a purely maritime route. If the District Court finds that the parties contemplated a mixed contract, and that, therefore, admiralty jurisdiction is not present, [\*\*16] it must, of course, dismiss the case. In a letter to this court, Ace represents that, if there is such a dismissal, it will waive the statute of limitations defense to any subsequent action brought by Transatlantic in state court within six months from the date of the dismissal order. We express no opinion as to whether the other defendants could successfully invoke the statute of limitations, or any other defense for that matter, to any future action by Transatlantic on this claim.

[\*111] C. Damages

The default judgment entered by the District Court was in the amount of $ 51,753.86. To arrive at this number, the District Court simply accepted at face value Transatlantic's statement in its complaint that it "has sustained damages as nearly as can now be estimated in the amount of $ 45,976.83," and then added interest and costs to arrive at the $ 51,753.86 figure.

Rule 55(b)(2) of the Federal Rules of Civil Procedure provides that, in order to determine the amount of damages in the context of a default judgment, "the court may conduct . . . a hearing." We have held that, under Rule 55(b)(2), "it [is] not necessary for the District Court to hold a hearing, as long as it ensured [\*\*17] that there was a basis for the damages specified in the default judgment." *Fustok v. ContiCommodity Services, Inc.*, 873 F.2d 38, 40 (2d Cir. 1989); see *Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir. 1993) ("not necessary for the district court to hold a hearing to fix damages after a default judgment had been entered where the court had 'relied upon detailed affidavits and documentary evidence supplemented by the District Judge's personal knowledge of the record gained during four years involvement with the litigation. . .'"); *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1991) (where district judge was "inundated with affidavits, evidence, and oral presentations" a full evidentiary hearing was not necessary).

While the District Court may not have been obligated to hold an evidentiary hearing, it could not just accept Transatlantic's statement of the damages. This did not satisfy the court's obligation to ensure that the damages were appropriate. If the District Court concludes that this case does fall within admiralty jurisdiction, it should take the necessary steps to establish damages with reasonable certainty. Any action by the District [\*\*18] Court in this regard would, of course, in no way undermine the validity of the default judgment on the issue of liability.

Conclusion

While we in no way condone Ace's cavalier disregard of the earlier proceedings in this case, and we

109 F.3d 105, *111; 1997 U.S. App. LEXIS 4632, **18;
37 Fed. R. Serv. 3d (Callaghan) 531; 1997 AMC 1772

deny costs on appeal to empahsize the point, *see* F. R. App. P. 39, we are nonetheless obligated to ensure that the limited jurisdiction of the federal courts is exercised properly. This case is remanded to the District Court for further fact-finding on the issue of whether the case falls within the admiralty jurisdiction. If the District Court finds that admiralty jurisdiction is proper, the default judgment as to liability will stand, but the District Court must then determine the damages based on appropriate evidence. If the District Court concludes that this case does not fall within the admiralty jurisdiction of a federal court, it must, of course, dismiss the case.

LEXSEE

David M. Wise, Respondent-Appellant, v. Consolidated Edison Company of New York, Inc., Appellant-Respondent.

3883

SUPREME COURT OF NEW YORK, APPELLATE DIVISION, FIRST DEPARTMENT

282 A.D.2d 335; 723 N.Y.S.2d 462; 2001 N.Y. App. Div. LEXIS 3885

April 19, 2001, Decided
April 19, 2001, Entered

COUNSEL: [***1] For Plaintiff-Respondent-Appellant: Kenneth McCallion.

For Defendant-Appellant-Respondent: Jeanmarie Schieler.

JUDGES: Concur--Williams, J.P., Wallach, Lerner, Rubin, Friedman, JJ.

OPINION

[*335] [**462] Order, Supreme Court, New York County (Richard Lowe, III, J.), entered on or about August 7, 2000, which, upon renewal, granted defendant's motion to dismiss the [**463] complaint pursuant to CPLR 3211 to the extent of dismissing plaintiff's cause of action for abuse of process, but otherwise denied the motion, denied defendant's motion to permanently seal the record, and denied plaintiff's request to permit him to use confidential information in discovery and at trial, unanimously modified, on the law, the facts and in the exercise of discretion, to grant the motions of defendant in their entirety, and otherwise affirmed, without costs. The Clerk is directed to enter judgment in defendant's favor dismissing the complaint.

Renewal, sought by defendant in accordance with the motion court's instructions, was properly granted. Upon renewal, however, defendant's motion to dismiss the complaint should have been granted in its entirety, since permitting [***2] the action to go forward would entail the improper disclosure by plaintiff, an attorney who was in-house counsel to defendant prior to his termination, of client confidences, including specific corporate tax strategies (see, Code of Professional Responsibility DR 4-101 [22 NYCRR 1200.19]; State v State of New York, 268 AD2d 857, 859). The ethical obligation to maintain the "confidences" and "secrets" of clients and former clients is broader than the attorney-client privilege, and exists " 'without regard to the nature or source of information or the fact that others share the knowledge' " (Brennan's, Inc. v Brennan's Rest., 590 F2d 168, 172, quoting ABA Code of Professional Responsibility EC 4-4 [1970]; accord, Thompson U. S. v Gosnell, 181 AD2d 558, lv dismissed 80 NY2d 893). The fact that defendant mailed to plaintiff, after his termination, certain documents [*336] on which he had worked as an attorney, did not constitute a knowing waiver of confidentiality (see, Code of Professional Responsibility DR 4-101 [c] [***3] [1] [22 NYCRR 1200.19 (c) (1)]), particularly since defendant had previously warned plaintiff that the commencement of a legal action would violate his ethical duty to preserve those confidences. Plaintiff's affirmative claims against defendant for damages, grounded in the theory of wrongful discharge, do not fall within the exception permitting an attorney to disclose confidences or secrets necessary to defend "against an accusation of wrongful conduct" (see, Code of Professional Responsibility DR 4-101 [c] [4] [22 NYCRR 1200.19 (c) (4)]; Eckhaus v Alfa-Laval, Inc., 764 F Supp 34, 37-38), and plaintiff cannot circumvent the rule prohibiting such claims by reframing his claims as other related torts (see, Perrucci v CIGNA Ins, Co., 256 AD2d 87, lv denied 93 NY2d 803; see also, Fowler v Parks, 248 AD2d 210, lv denied 92 NY2d 802). Since this action involves client confidences, defendant's

motion permanently [***4] to seal the record should have been granted.

Plaintiff's claim for abuse of process, denominated "abuse of power," for procuring two confidentiality stipulations was properly dismissed, since voluntary agreements do not constitute "process" within the meaning of the tort, and plaintiff failed to allege any specific, quantifiable damages (see, *Walentas v Johnes*, 257 AD2d 352, 354, *lv dismissed* 93 NY2d 958).

Concur--Williams, J. P., Wallach, Lerner, Rubin and Friedman, JJ.

Case 1:07-cv-06214-BSJ-DCF     Document 15-20     Filed 09/19/2007     Page 20 of 20